FILED
2016 Apr-04  PM 03:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ADTRAV CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| | ) | NO:  2-14-CV-0056-TMP-S |
| | ) | |
| V. | ) | |
| | ) | |
| DULUTH TRAVEL, INC., | ) | |
| | ) | |
| Defendant and Plaintiff in Counterclaim. | ) | |

_____

**DULUTH TRAVEL INC.'S MOTION FOR CONTEMPT, SANCTIONS, AND ADDITIONAL RELIEF PURSUANT TO THIS COURT'S ORDER OF NOVEMBER 30, 2015**

_____

COMES NOW Duluth Travel, Inc. (hereafter "Duluth"), and files this its motion for contempt, sanctions, and additional appropriate relief pursuant to the order entered by this Court on November 30, 2015.

## Introduction

As the Court is well aware, the counterclaim asserted by Duluth in this action is premised upon evidence that Plaintiff ADTRAV Corporation (hereafter "ADTRAV") misappropriated revenue earned by the Parties under Duluth's contract with the Veterans Administration for the provision of travel services (the "VA

1

Contract").[1] Duluth contends that ADTRAV perpetuated this scheme in at least two ways. First, ADTRAV utilized manipulative accounting practices in order to retain greater amounts of revenue than it was entitled to receive with regard to the revenue that ADTRAV actually reported to Duluth as having been collected pursuant to the VA Contract. Second, ADTRAV collected revenue under the VA contract which it never disclosed to nor shared with Duluth. This latter contention has now been proven as a result of data obtained from third-party payors as set forth in the supplemental expert witness report of Howard Zandman attached hereto as Exhibit "A" ("Zandman Supplement"). While the findings of Mr. Zandman are, in Duluth's view, fatal both to the Plaintiff's complaint and to the Plaintiff's defense of the counterclaim brought by Duluth, those findings are equally important for another reason. They illustrate and confirm that ADTRAV has withheld critical evidence from Duluth and from the Court, even now under compulsory process. For all of the reasons set forth herein, Duluth prays that its Motion be granted and that appropriate remedies be entered by this Court.

<u>Factual Background</u>

Since the inception of this litigation and indeed, for years before that date, Duluth has sought the third-party payor data from which the Plaintiff was supposed

---

[1] Duluth, a service disabled veteran owned small business (SDVOSB) was awarded the prime contract for the provision of travel services to the Veterans Administration in 2006. Each of the two contracts at issue in this matter are subcontracts entered into between Duluth as the prime contractor and ADTRAV as its subcontractor.

to perform the accounting functions pursuant to its subcontract with Duluth. Each week and each month and at other times over the course of the administration of that subcontract, ADTRAV produced reports purporting to reflect 100% of the revenue collected by ADTRAV arising from the provision of VA travel services under Duluth's prime contract with the VA. Duluth sought that third-party payor information in an effort to verify that the revenue ADTRAV was reporting was accurate. ADTRAV refused to provide the data both prior to the inception of this lawsuit, during the course of discovery, and even now after the entry of an order mandating its production. Given what Duluth has now discovered, it is readily apparent why ADTRAV has refused to turn over this critical information.

ADTRAV has maintained throughout the course of this litigation that approximately $705,180 was collected in the form of hotel commissions while it was tasked with performing the accounting for the Parties from 2008 through the end of 2013. This amount was reported by ADTRAV in its monthly commission reports to Duluth. As set forth in the Zandman Supplement, an additional approximately $260,000.00 (representing a 37% difference between what ADTRAV reported and what Duluth has found thus far) has been identified in the form of hotel commissions using third party data. Further, an additional $160,000.00 in transaction fees paid to ADTRAV under the VA contract were never disclosed to Duluth either prior to this lawsuit, during discovery, nor even now after an order was entered concerning in

part, the adequacy of ADTRAV's responses to Duluth's discovery efforts. Duluth points out to the Court that this unreported $420,000 was identified from a review of only a limited percentage of the overall third-party data that would have reflected the total commissions and transaction fees that were actually paid during the six years in which ADTRAV controlled the accounting for the Parties. As discussed further herein and below, Duluth believes that the missing $420,000.00 identified thus far, represents the proverbial tip of the iceberg.

In its initial Motion to Compel Duluth sought permission to have a third-party forensic electronic discovery expert examine ADTRAV's electronic records. In light of the foregoing and the discussion which follows, Duluth again requests that this Court order the Plaintiff to make its electronic records available to be reviewed by such a third-party forensic expert. Further, and in light of the Plaintiff's conduct in this matter, Duluth requests as an appropriate remedy that the subject search be at the Plaintiff's expense.

Duluth will not belabor the history of the Plaintiff's refusal to respond to discovery herein. However, a brief reiteration of the wholesale failure of the Plaintiff to produce the third-party records that would reveal the true revenue actually paid to the Plaintiff under the VA Contract, is important. From approximately page 103 through page 108 of Roger Hale's deposition, Mr. Hale testifies concerning the huge volume of third-party payment records which ADTRAV has contended have been

4

lost or destroyed. Those include: all ARC weekly net remit reports from 2007 through November 2009 (pg. 103); ARC weekly summaries in 2010 for April 11, 18 and 25 as well as May 2 and August 1 (pg. 104); 2011 August 7, November 13, 20, and 27; 2012 May 13, July 1, and November 18 (pg. 105); all Pegasus, TACS, and NPC data files for 2007 through 2009 inclusive (pg. 105); all bank statements from Red Mountain Bank from April 1, 2008 through closing of the account (pg. 105); and all of the Aliant Bank Statements for the Parties' joint account (pg. 106). This despite the fact that ADTRAV's former chief financial officer testified that ADTRAV had a five-year document retention policy and despite the fact that the applicable Federal Acquisition Regulations ("FAR") mandate record retention for three years after final payment. In this case that would mean until September of 2017. (*See* FAR 4.703, a copy of which is attached hereto as Exhibit "B.").

In the Order of November 30, 2015, the Court included the following directive:

> IV.    INDIVIDUALLY-HELD    OPERATING
> ACCOUNTS Both parties are directed to produce, within
> 20 days, a list of all individually held bank accounts into
> which any revenue derived from the VA contract at issue
> was deposited.  The parties shall provide: (1) the date of
> any such deposit, (2) the amount of the deposit, (3) the
> payor, (4) the account number, and (5) the bank name. No
> subpoenas shall be issued to any bank or in connection
> with any such account without first seeking and receiving
> court approval.

In response to this directive, ADTRAV provided a list of VA and Non-VA deposits to individually held bank accounts. It is impossible for Duluth to reconcile which deposits pertain to VA revenue from the information provided. ADTRAV contends that it too is unable to separate VA commission deposits from commission deposits from other sources. One might wonder how then, ADTRAV was ever able to determine the volume of VA revenue that was to be divided between the Parties. Of interest though is the fact that the deposits identified by ADTRAV comprise approximately two million dollars in commission revenue. Duluth believes that in light of the unreported commission revenue already identified, an independent search of the bank records (and of all sources of ESI) is absolutely essential. The exact number of all of those deposits listed was $2,195,871.08. Attached hereto as Exhibit "C" is the Dec. 22, 2015 transmittal letter from ADTRAV's counsel which states, "Please note that the amount of the deposit includes, in many cases, revenue that is not associated with the VA account."

In addition to the forgoing, in its order of November 30, 2015, the Court mandated that Duluth provide a list of search terms to the Plaintiff such that the Plaintiff could conduct an ESI search that might reveal what happened to the huge amount of critically important third-party financial data. In its December 2, 2015 production, ADTRAV produced a list of places that data is stored, attached hereto as Exhibit "D." Thereafter, on December 7, 2015, Duluth provided search terms and

specific instructions for searching the databases identified on Exhibit "C" and requested a search report indicating metrics from the search terms used against the specific sources of information, attached hereto as Exhibit "E." The instructions for reporting metrics were completely disregarded by ADTRAV. As a result, Duluth and the Court remain completely in the dark concerning what ESI was searched or how the search was conducted. Further, Duluth asked in the production instructions that a load file be produced for the data which would indicate various fields of metadata about the documents being produced. Again, these instructions were ignored. Had search report metrics been provided as requested, Duluth would know with certainty what ESI had been searched and how.

Further, had these searches been done in keeping with the intent of the exercise, metadata would have been produced that could have indicated when information had been deleted and when third-party payor financial reports and data had been deleted or destroyed (and whether it is recoverable). Lastly, it is abundantly clear from ADTRAV's production pursuant to this Court's November 30, 2015 Order that ADTRAV did not search all of its sources of ESI. In totality, ADTRAV produced nine (9) individual excel files, one (1) .pdf file, and one (1) large .pst file (containing correspondence). While ADTRAV's search yielded a large amount of previously unproduced correspondence, the remaining 10 files do not nearly reflect the remaining documents in ADTRAV's possession. Obviously, none of the

documents from earlier productions was located by ADTRAV's electronic search (again, search reports would indicate this information). Further, it cannot reasonably be believed that only 10 files, aside from correspondence, exist in ADTRAV's universe of electronically stored information containing the search terms that Duluth provided.

It is important too, that the Court be apprised of how the financial data produced by ADTRAV is compiled. ADTRAV produced its Trams records for 2007 through 2013 on or about December 22, 2015. These records purport to be a complete record of all revenue paid to ADTRAV arising from Duluth's prime contract with the VA for the provision of travel services. However, it is not that simple. The Trams data can be easily manipulated in order to present a completely false picture of revenue received. Transactions entered into Trams can be re classified as non-commissionable or even cancelled reservations when in reality the third-party payor did in fact pay a commission. Duluth has found 2,524 transactions in the Trams data produced by the Plaintiff which were identified as generating no commission when in fact almost $80,000.00 in commissions were paid to Plaintiff for these same transactions according to the data that Duluth received from the relevant third parties. In addition, transactions can be recorded under a different ARC number from the ARC number or numbers dedicated to the VA contract. In that case, those transactions would not appear in the Plaintiff's Trams report for the

VA contract. Duluth has identified 6,506 transaction confirmation numbers totaling $189,381 in commissions from third-party payor data which commissions appear nowhere in the Trams data produced by ADTRAV. (*See* Zandman Supplement, pages 1, 4).

In keeping with this theme, once Duluth took over the accounting for the VA contract in 2014, the volume of reported hotel bookings under the VA contract ***inexplicably immediately doubled***. This despite the fact that overall transactions under the VA Contract remained relatively constant. As demonstrated in the Zandman Supplement (*see* page 7), the total dollar volume of hotel bookings reported by ADTRAV in its Trams for 2011, 2012, and 2013 was essentially eight million dollars in each year. In the very first year in which Duluth finally controlled the accounting (2014), the dollar volume of reported hotel bookings more than doubled to over 16 million dollars as compared to the approximate eight million dollars in annual sales reported by ADTRAV for the prior three years. The same increase in volume occurred during 2015 suggesting strongly that this discrepancy in reporting was no anomaly.

The magnitude of the under-reported revenue identified from only a percentage of the third-party payors, together with the inexplicable increase in hotel bookings immediately upon Duluth taking over the accounting function, makes it clear that the relief sought by Duluth herein is not only appropriate but necessary.

## Argument and Citation of Authorities

In light of the facts as discussed above, the need for an independently administered forensic search of the Plaintiff's ESI as well as its bank accounts is clear. In denying Duluth's request for a third-party forensic analysis of ADTRAV's ESI, the Court noted in its Order that:

> ADTRAV and Duluth have agreed to a search of ADTRAV's Electronically Stored Information ("ESI"), but were unable to reach an agreement about how that search shall be performed. The court finds that Duluth's desire to have an independent third-party conduct the search is unwarranted **_at this time_**. In keeping with the dictate of the Eleventh Circuit Court of Appeals, a party is not due to be given "unrestricted, direct access" to the opponent's database.  *In re Ford Motor Co.*, 345 F.3d at 1316-17 (11th Cir. 2003).

(Emphasis added). The Court specifically noted that, *at the time*, ordering a third-party forensic analysis was unwarranted. However, given the circumstances as discussed herein and above, and Duluth's discovery from third parties of additional revenues that ADTRAV failed to report, Duluth again moves the Court to order that an independent third-party forensic analyst be allowed to conduct a search of ADTRAV's ESI.

The Court in *In re Ford Motor Co.*, 345 F.3d 1315 (11th Cir. 2003), cited by this Court in its Order, recognized that:

> Without constraints, the [district court's] order grants [the plaintiff] access to information that would not—and should not—otherwise be discoverable without [the

> defendant] first having had an opportunity to object. While some kind of direct access might be permissible in certain cases, this case has not been shown to be one of those cases. [The plaintiff] is unentitled to this kind of discovery without—at the outset—a factual finding of some non-compliance with discovery rules by [the defendant].

*Id.* at 317. The *Ford Motor* Court specifically noted that in the face of a party's non-compliance with discovery rules, the opposing party's direct access to the party's computer data/ESI "might be permissible in certain cases…." *Id.* Further, this Court should also note that *In re: Ford Motor Co.* is clearly distinguishable from the present case in that, Duluth, as a party, does not seek direct, unfettered access to ADTRAV's ESI.  Rather, Duluth seeks the use of a neutral, independent third-party expert to access Plaintiff's ESI.  The 11th Circuit Court of Appeals in *In re: Ford Motor Co.* specifically took issue with a *party's* (rather than a neutral's) direct access to ESI.

   In the present matter, this Court is faced with circumstances where a party has failed to comply with not only the discovery rules, but this Court's November 30, 2015 Order. As Duluth has discovered through its own analysis of the limited third-party payor information it has been able to obtain, ADTRAV failed to report *substantial* amounts of revenues earned and collected under Duluth's contract with the VA and lost or destroyed data that would have shown such revenues. *See  Bank of Mongolia v. M & P Global Financial Services, Inc.*, 258 F.R.D. 514 (S.D. Fla. 2003) (where the Court held that, "based on the discrepancies between Defendants'

Response to Plaintiff's Requests for Production and their concession at the hearing that not all documents have yet been produced, and particularly in light of the recovery of apparently responsive documents by the Plaintiffs from third-party sources, the Court determined that an independent expert should be appointed to retrieve any deleted responsive files from Defendants' computers."). "Deleted computer files, … whether e-mails or otherwise, are discoverable." *Id.* at 519.[2]

Duluth is not seeking direct, unfettered access to ADTRAV's ESI and admits and acknowledges that certain information contained within the ESI will not be material or relevant to the issues in this case and may be confidential and/or proprietary. With that acknowledgement, however, the fact that some of the information may not be discoverable or may be protected does not preclude this Court from granting Duluth's motion and, thereafter, imposing appropriate safeguards on any independent third-party forensic analysis.[3] In *Procaps S.A. v. Patheon Inc.*, WL 800468 (S.D. Fla. 2014), a case that is factually similar to this case, the 11th Circuit Court ordered the delinquent party to:

---

[2] Further, when a party reasonably anticipates litigation, it "must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, 2011 WL 1456029, *11 (S.D. Fla. 2011).

[3] *See e.g.*, *John B. v. Goetz*, 531 F.3d 448 (6th Cir. 2008) (the Court noting that, "[a]s a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation or ... should have known that the evidence may be relevant to future litigation.' … It is the responsibility of the parties to ensure that relevant ESI is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions. See Fed.R.Civ.P. 37(b), (e).")

1. engage an expert to conduct a forensic analysis of ESI as a neutral third-party and not as an agent, representative, or expert of either party;

2. allow the expert to interview the head of IT to understand the architecture of the producing party's computer systems and retention/backup procedures;

3. have the expert use a list of search terms, a reasonable procedure to refine those terms, and suitable format for production, including specific metadata fields to be provided;

4. make available to the expert all sources of ESI to make a forensic image of each source of ESI;

5. attempt to recover any user-created files that were deleted after a specific date, providing a written report of any files unable to be recovered, the date the files were deleted, and from what electronic data the files were deleted from;

6. have the expert run the search terms on all ESI collected and produce a report regarding the number of document hits from the search terms (and if necessary run a refined search);

7. after completing the search, run de-duplication of exact copies ("exact copies" refers to those documents that have identical MD5 or SHA1 hash values) on the documents uncovered by the search (Uncovered Documents);

8. produce to the producing party's counsel the Uncovered Documents for review and allow the same to withhold documents considered privileged or subject to work product;

9. produce to the requesting party all non-privileged Uncovered Documents (if any), including any redacted

documents, and a privilege log to the extent one exists of withheld Uncovered Documents;

10. pay all of the expert's fees, costs, and expenses that the expert incurred in connection with the work performed pursuant to the order;

11. adequately staff the project to meet the court's deadlines; and

12. provide the requesting party an opportunity to seek additional fees or sanctions after reviewing the Uncovered Documents.

*See Procaps* 2014 WL 800468 at *3-6. *Procaps* provides guidance to this Court and the parties for a reasonable way that ADTRAV's ESI can be *properly* searched without Duluth becoming privy to confidential and/or proprietary information from ADTRAV that is neither material nor relevant to the issues in this case, but that does provide Duluth with the discovery to which it is entitled.

Based on the foregoing facts and case law, there are more than ample grounds for this Court to grant Duluth's motion and, thereafter, impose appropriate safeguards on any independent third-party forensic analysis and levy the appropriate sanctions against ADTRAV.

## Conclusion

ADTRAV has maintained that it reported all revenue earned under the VA Contract to Duluth as it was required to do. This contention has been proven to be untrue. ADTRAV has maintained that it lost or destroyed huge amounts of third-

party data and records from which the scope of ADTRAV's failure to report revenue could have been ascertained. No information concerning when this data was destroyed or whether it was recoverable was included in ADTRAV's responses to the Court's order. Further, ADTRAV did not comply with the Court's directive concerning identification of deposits into ADTRAV bank accounts that represented revenue earned under the VA Contract. Duluth has been forced to go to extraordinary extremes in an effort to obtain financial information which the Plaintiff was required by law to maintain (but did not) and has been met with an unrelenting refusal on the part of ADTRAV to turn over that critical information.

ADTRAV has pervasively refused to cooperate in the discovery process in an action which it initiated. ADTRAV has failed to comply with this Court's order of November 30, 2015. Duluth has uncovered evidence from third parties that ADTRAV did indeed fail to report significant revenue to Duluth. ADTRAV continues to claim that much of the third-party financial data that could have been used to verify actual revenue paid under the VA Contract has been lost or destroyed. ADTRAV's search of its ESI was wholly inadequate.

In light of all of the forgoing, it would work a manifest injustice on Duluth if a third-party expert in the area of searching and restoring electronically stored information was not allowed to search ADTRAV's records. Further and under the

circumstances, it would be wholly appropriate for this Court to order ADTRAV to pay the costs of that search.[4]

Respectfully submitted,

/s/ D. *Michael Sweetnam*
D. MICHAEL SWEETNAM
KYLE W. BRENT

OF COUNSEL:

Sweetnam & Schwartz, LLC
Suite 190
1200 Ashwood Parkway
Atlanta, GA  30338
Phone: (678) 528-6739

/s/ *Jim H. Wilson*
LYNNE STEPHENS O'NEAL
JIM H. WILSON

Attorneys for
Defendant/Counterclaim Plaintiff
Duluth Travel, Inc.

OF COUNSEL:

LEITMAN, SIEGAL & PAYNE, P.C.
Wells Fargo Tower
420 20th Street North, Suite 2000
Birmingham, AL 35203
Phone: (205) 251-5900

---

[4] Duluth specifically reserves any right it may have to assert spoliation objections and to seek appropriate sanctions for any such spoliation of evidence.

## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed a copy of the foregoing using the Court's CM/ECF electronic filing system which will serve a copy upon the following counsel of record on this the 4th day of April, 2016:

Roger L. Bates, Esq.
Tracy R. Davis, Esq.
Hand Arendall, LLC
2001 Park Place North
Suite 1200
Birmingham, AL 35203

Rod Cate, Esq.
RSA Tower
11 North Water Street
Suite 30200
Mobile, Alabama 36602

/s/ *Jim H. Wilson*
OF COUNSEL