FILED
2016 Apr-18  PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ADTRAV CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| V. | ) | CASE NO:  2:14-cv-0056-TMP-S |
| | ) | |
| DULUTH TRAVEL, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## ADTRAV CORPORATION'S RESPONSE TO DULUTH TRAVEL, INC.'S MOTION FOR CONTEMPT, SANCTIONS, AND ADDITIONAL RELIEF PURSUANT TO THE COURT'S ORDER OF NOVEMBER 30, 2015

COMES NOW ADTRAV Corporation ("ADTRAV"), and in response to Duluth Travel Inc.'s ("Duluth") Motion for Contempt, Sanctions, and Additional Relief (hereafter referred to as "Motion for Contempt"), says as follows:

## I.  Introduction

ADTRAV has appropriately responded to Duluth's discovery request and has complied with the Court's November 30, 2015 discovery order.  ADTRAV has produced thousands upon thousands of pages of financial data and reports that have been provided to Duluth during the more than eight years of the relationship between ADTRAV and Duluth related to their work on the Veterans' Administration government contract.  Duluth has attempted to cast ADTRAV in a negative light by an unsupported argument that ADTRAV has not disclosed or

shared with Duluth certain revenue under the VA Contract.  Specifically, Duluth has filed with the Court a Supplemental Report from its "expert" witness Howard Zandman, CPA, which purportedly supports Duluth's position that ADTRAV withheld, did not disclose and did not share with Duluth approximately $260,000 in hotel commissions.

Duluth argues that Zandman's findings are not only fatal to ADTRAV's complaint and defense to Duluth's counterclaims, these findings "illustrate and confirm that ADTRAV has withheld critical evidence from Duluth and from the Court, even now under compulsory process."  See Duluth Travel, Inc.'s Motion for Contempt. (Doc. 75, p. 2 of 17).  Duluth argues based upon Zandman's findings, it should have access to ADTRAV's electronic data which would show, based upon Zandman's analysis, ADTRAV withheld hotel commissions from Duluth.

Duluth's position and argument has been fabricated based upon the work of Zandman.  Duluth apparently takes the position that the best defense is a good offense and when you don't have a good offense, you make it up.  Zandman's Supplemental Report attached to and relied upon by Duluth to support its Motion for Contempt is so flawed in so many different respects that not only is it unreliable and in no way supports Duluth's Motion for Contempt, but also shows how either inept Zandman is as an accounting expert and/or evidences a conspiracy of deception between Zandman and Duluth.

Zandman's Supplemental Report upon which Duluth relies makes the following findings: (1) 6,506 individual transactions totaling $189,381 of hotel commissions were retained by ADTRAV and not shared with Duluth and not reported to or shared with Duluth and (2) 2,524 individual transactions of hotel commissions totaling $79,601 were disclosed to Duluth by ADTRAV but were "misclassified" on ADTRAV's reports as non-commissionable and therefore not paid to Duluth.  (See Zandman's Supplemental Report, Doc. 75-1, pp. 3-4 and p. 22 of 390).

Zandman arrived at these figures by comparing (1) ADTRAV 80622, which is an Excel spreadsheet of Trams hotel booking data (Trams software is a travel industry specific accounting system) which ADTRAV produced to Duluth which contains data of ADTRAV's hotel booking transactions including travelers name, confirmation numbers, travel dates, commissions, etc. to (2) reports from third party payers, primarily Pegasus and TACS, which contain similar hotel booking data.

The sole method Zandman used to compare this information was  by attempting to match confirmation numbers for each transaction.  Zandman states he used this comparison methodology as instructed by Duluth as the best method to compare the data. (Doc. 75-1, p. 5 of 390).  In arriving at his conclusion that ADTRAV retained $189,380 in hotel commissions that ADTRAV did not report to

Duluth, Zandman concluded if he could not match a confirmation number between Pegasus, TACS and other third party payers and ADTRAV's Trams data, ADTRAV withheld the hotel commissions.  If he could not match confirmation numbers, he did not attempt to reconcile the reports by using any other data such as passenger name but simply concluded if a confirmation number from Pegasus, TACS or other third party sources was not matched on the Trams data, ADTRAV did not disclose the hotel commission and improperly retained the commission. Specifically, Zandman states in his supplement report:

> I imported the Trams data, as well as the detailed third party data, into a database management software and related all of the data to each other within the created database based on confirmation numbers.  I then compared confirmation numbers between the third party data and the Trams data, to see which of those confirmation numbers did not appear on the Trams.  **That would indicate the existence of unreported commissions earned under the contract but not reported and/or paid by ADTRAV to Duluth.**"

(Zandman Supplemental Report, Doc. 75-1, pp. 5-6 of 390) (emphasis added).  So, if Zandman could not match confirmation numbers, he concluded unreported commissions.  The below shows Zandman's analysis is not only incorrect but also how dangerous an "expert" like Zandman is to the judicial process.

## II.    Zandman's Supplemental Report is so flawed as to be completely unreliable.

The following are examples showing the major flaws in Zandman's Supplemental Report, which renders his report useless and incapable of providing

support for Duluth's Motion for Contempt[1]:

- Trailing zeros leading to unmatched confirmation numbers.   On Schedule 4, Zandman concludes from his comparison of unmatched confirmation numbers from ADTRAV's Trams data to the Pegasus ARC 016 Part 1 data, ADTRAV withheld $4,427.22 in hotel commissions from Duluth. (See Doc. 75-1, p. 22 of 390).  The data relied upon by Zandman from the Pegasus ARC 016 Report is listed on Schedule 5 of his supplemental report. (See Doc. 75-1, pp. 24-30 of 390).  As is apparent from the confirmation numbers listed on Schedule 5, many of the confirmation numbers end in a zero. Apparently, unbeknownst to Zandman, the confirmation numbers in this Pegasus data in Schedule 5 contain trailing zeros that are not contained in the Trams data.  (Affidavit of Roger Hale, ¶ 3).[2]  As such, these confirmation numbers will not match.

  ADTRAV's sampling shows several of the travelers listed on Schedule 5 are also listed on the Trams data when the trailing zero is removed from the Pegasus confirmation number.  (Affidavit of Roger Hale, ¶ 3, Exhibit 1).  Zandman's opinion that ADTRAV withheld

---

[1] ADTRAV has not attempted to completely recreate Zandman's analysis but has shown samples of his flawed methodology and incorrect results.

[2] The Affidavit of Roger Hale is attached as Exhibit A.

these commissions is incorrect.  It is important to understand what Zandman has done here.  Zandman did not realize, or realized but ignored, that certain Pegasus data contain trailing zeros would lead to confirmation numbers not matching in Trams simply because of the extra zero.  As a result, he has concluded and represented to the Court through Duluth that ADTRAV withheld hotel commissions when undisputedly ADTRAV did not.  It is hard to imagine that Duluth, being in this travel industry for such a long time, was not aware of the trailing zeros on Pegasus' confirmation numbers and allowed Zandman to go forward with his incorrect analysis.

- <u>Hotels use different confirmation numbers</u>.  Hotel commission payment consolidators (such as Pegasus and TACS) often use different confirmation numbers than the confirmation numbers provided by the hotel at the time of the booking.  (Affidavit of Roger Hale, ¶ 4).  Again, it is inconceivable that Duluth did not have knowledge of this fact.  Yet, Zandman jumped to the conclusion that simply because confirmation numbers between Pegasus and TACS did not match the confirmation numbers on the ADTRAV Trams data, ADTRAV was withholding commissions from Duluth.

Confirmation numbers for Hyatt Hotels, which pays through TACS, most often do not match what is in the Trams data. (*Id*.). The confirmation numbers in Trams for Hyatt Hotel typically begin with HY000 and TACS uses a completely different confirmation number. (*Id*.). Exhibit 2 to the Affidavit of Roger Hale show multiple examples of confirmation numbers for certain Hyatt Hotels' travelers contained on the TACS data used by Zandman with matching entries on ADTRAV's Trams data <u>but with different confirmation numbers</u>.

Wyndham Hotels' confirmation numbers in Trams have a different sequence than what was used in Pegasus. (*Id*., ¶ 4). Attached as Exhibit 3 to Roger Hale's Affidavit are examples of travelers contained in Zandman's schedules in which he purports to <u>not</u> match with Wyndham Hotel travelers in ADTRAV's Trams data. As is apparent, the identical travelers from the Pegasus data used by Zandman with the identical hotel commission amount paid are included on ADTRAV's Trams report. Other examples are Kimpton Hotels and Omni Hotels. Kimpton Hotels also have a different confirmation number sequence than what is used in Pegasus. (*Id*., ¶ 5). Kimpton Hotels is a chain of boutique hotels owned by the same entity. They are booked under the same "brand" but represent a

7

number of different brands such as Hotel Palomar and Hotel Monaco. (*Id*.). The confirmation numbers for Kimpton Hotels' bookings in Trams all begin with a "CI," which is vastly different from the confirmation number sequence Pegasus uses. (*Id*.).

Omni Hotels' confirmation numbers in Trams also have a different sequence than what was used in Pegasus. (*Id*., ¶ 6). Attached as Exhibits 4 and 5 to Roger Hale's Affidavit are examples relating to Kimpton and Omni Hotels showing that Zandman again incorrectly concluded ADTRAV withheld commissions from Duluth simply because Zandman could not properly match the data. As is apparent, Pegasus and TACS frequently use different confirmation numbers than what appears in the hotel booking data in Trams. (*Id*.). ADTRAV's sample analysis clearly shows that multiple travelers staying at a Hyatt Hotel, Wyndham Hotel, Kimpton Hotel and/or Omni Hotel are matched between ADTRAV's Trams data and the data used by Zandman, proving Zandman's analysis of ADTRAV withholding hotel commissions is incorrect. (*Id*.).

- <u>Use of confirmation numbers "Multiple" and "(blank)"</u>. Throughout Zandman's schedules indicating non-matched confirmation numbers and resulting unpaid commissions are line items containing

confirmation numbers and passenger names as "Multiple" as well as confirmation numbers that say "(blank)". (See e.g., Doc. 75-1, pp. 136-137; 149-155). Of course, such items are not going to match any confirmation number on ADTRAV's Trams data. Yet, Zandman concluded hotel commissions for travelers with these "Multiple" and "(blank)" confirmation numbers listed on third party data as being withheld by ADTRAV and not paid to Duluth when he knew such confirmation numbers would not match the Trams data.

- <u>Zandman's inclusion of rental car commissions</u>. On Schedule 9 of Zandman's Supplemental Report, multiple line items contain confirmation numbers that begin with "NTSD". (See e.g., Doc. 75-1, pp. 164, 165, 173, 176-179). These confirmation numbers are for car rental commissions. (Affidavit of Roger Hale, ¶ 7). Such confirmation numbers would, of course, not match with anything on ADTRAV's Trams data as the Trams data contains information solely relating to hotel bookings. Attached as Exhibit 6 to the Affidavit of Roger Hale are samples of the NTSD confirmation numbers in Zandman's schedules.

- <u>Zandman's double counted hotel commissions</u>. Possibly the most incredible part of Zandman's analysis is shown on Schedule 4 to his

report where he duplicates purported "unreported commissions" and "misclassified commissions" related to Hilton ARC 119 and Hilton ARC 119 Supplemental.  Zandman concludes ADTRAV did not pay Duluth hotel commissions listed on Hilton ARC 119 and Hilton ARC 119 Supplemental because he could not find confirmation number matches with ADTRAV's Trams data.  Notwithstanding the fact that Zandman is incorrect that ADTRAV withheld these commissions paid by Hilton, Zandman double-dipped as the confirmation numbers on Hilton ARC 119 and Hilton ARC 119 Supplemental are identical for almost every transaction.

For example, Schedules 13 and 14 to Zandman's Supplemental Report contain data for Hilton Hotels ARC 11970965 including confirmation numbers, commissions and commissions paid.  (Doc. 75-1, pp. 229-237 of 390).  Schedule 14 is apparently Hilton Hotel's ARC 11970965 (Supplemental) (See Doc. 75-1, p. 238-246 of 390).   Although Zandman claims in his report he compared the data to ensure the same confirmation number was not duplicated, he completely failed to do so as the confirmation numbers listed on Schedule 13 are identical to those listed on Schedule 14 other than three additional line items that appear on Schedule 14.   Not only are the confirmation numbers

identical but the amounts of commission paid are identical to the confirmation numbers on each schedule.  This "mistake" is even more glaring when on Schedule 4 of Zandman's report (Doc. 75-1, p. 22 of the identical commission amount to the penny for 2010 is listed for Hilton ARC 119 and Hilton ARC 119 Supplemental ($2,786.65).  In other words, Zandman added $2,786.65 twice in arriving at his total claimed hotel commission dollars withheld by ADTRAV.

Zandman did the same double-dipping for the Hilton ARC 119 and Hilton ARC 119 Supplemental under "Misclassified Commissions in Trams" on Schedule 4.  A comparison of Schedules 18 and 19 show the same confirmation numbers and commission amounts.  (Doc. 75-1, pp. 256-272 of 390).  Moreover, on Schedule 4 to Zandman's Supplemental Report, the commission amounts allegedly retained by ADTRAV and improperly not paid to Duluth in 2010 are again identical to the penny between Hilton ARC 119 and Hilton ARC 119 Supplemental ($3,370.28).  Out of the approximately $260,000 in hotel commissions Zandman improperly claims were not paid to Duluth by ADTRAV, over $28,000 of those dollars were improperly included in the amount by clear duplication by Zandman.  (See Schedule 4).

- <u>Zandman's improper inclusion of 2014 hotel commissions</u>.  Zandman acknowledges in his supplemental report that beginning in 2014 Duluth controlled the accounting for the VA account.  (See Doc. 75-1, p. 5 of 390).  After this point, ADTRAV no longer received Pegasus remittance information from Duluth.  (Affidavit of Roger Hale, ¶ 8).  In addition, TACS deposits were no longer made into the joint account and ADTRAV did not receive remittance information from TACS (except for approximately $1,300).  (*Id*.).  As such, after January 17, 2014, ADTRAV did not reconcile any hotel commission payments as it did not receive any money nor the remittance information. (*Id*.).  <u>How could ADTRAV withhold hotel commissions from Duluth when ADTRAV never received these commissions</u>?  As shown in Schedule 4 of Zandman's report, he includes $27,081 in "unreported commissions" for the year 2014 and $32,579 for "misclassified commissions" for 2014.  <u>There would not be matching confirmation numbers in the Pegasus/TACS or other third party information used by Zandman in his analysis with ADTRAV's Trams for almost all of 2014 as ADTRAV did not receive the payments nor any commission data from Duluth and thus did not reconcile anything after January 17, 2014</u>.  For example, of the $9,860.74 Zandman has

calculated on Schedule 4 as unreported commissions in 2014 related to Hilton ARC 119, all but $128.29 relate to commissions after January 17, 2014.  (See Doc. 75-1, pp. 232-237 of 390).  Zandman knew Duluth handled the accounting in 2014 and ADTRAV was no longer providing reservation services after January 17, 2014.  The fact that Zandman included in his analysis, and Duluth allowed, 2014 hotel commission amounts that both knew would not match with ADTRAV's Trams data shows more than just incompetency.  It shows a deliberate attempt to reach a false conclusion that ADTRAV withheld hotel commissions.

- Duluth controlled all of the Pegasus ARC 119 hotel commission dollars.  This one is the real kicker.  Every hotel commission dollar related to Pegasus ARC 119 was paid into a bank account wholly owned and controlled by Duluth.  (Affidavit of Roger Hale, ¶ 9).  It would have been impossible for ADTRAV to withhold from and not share with Duluth these alleged unreported or misclassified hotel commission dollars when these commissions were sitting in Duluth's bank account to which ADTRAV had no access. (*Id*.).[3]

---

[3] According to Zandman's Supplemental Report, $127,573.92 was related to Pegasus ARC 119 and allegedly withheld by ADTRAV.  This amount is approximately 50% of the total hotel commissions Zandman claims were withheld by ADTRAV and not shared with Duluth.

- Duluth failed to provide ADTRAV with certain Pegasus data.  All remittance information from Pegasus went directly to Duluth. (Affidavit of Roger Hale, ¶ 10).  ADTRAV relied solely on Duluth to report the total amount of Pegasus payments and to provide the detailed backup required to reconcile the account. (*Id.*).  Attached as Exhibit 7 to the Affidavit of Roger Hale is a list of payments that appear in the Pegasus data produced in this case of which ADTRAV has no record. (*Id.*).  As a result, these hotel commission amounts would never have been reconciled in Trams, resulting in Zandman not finding a matching confirmation numbers. (*Id.*).  This $20,910 represents hotel commissions paid by Pegasus into the Duluth account that Duluth never disclosed to ADTRAV. (*Id.*).  Duluth owes ADTRAV its percentage split of these hotel commissions. (*Id.*).

- Inability to match confirmation numbers.  It is not uncommon in using the reconciliation process that hotel commissions cannot be matched

---

Additionally, prior to mid-June 2010, all TACS payments for ARC 11970965 ("TACS ARC 119") were also deposited into Duluth's bank account to which ADTRAV had no access.  After mid-June 2010, the TACS ARC 119 payments were deposited into a joint account owned and controlled by ADTRAV and Duluth.  Duluth had access to information showing all deposits into the joint account and approval of all funds disbursed from the joint account.  Including Hilton ARC 119 which is also paid through TACS, based upon Schedule 4 of Zandman's Supplemental Report, another approximate $108,000 was related to TACS ARC 119 and allegedly withheld by ADTRAV.  Adding this amount to the amount Zandman claims was allegedly withheld by ADTRAV that was deposited into Duluth's account relating to Pegasus ARC 119, almost 90% of the hotel commissions Zandman claims were withheld by ADTRAV from Duluth were deposited into either a Duluth bank account or a joint bank account controlled by Duluth and ADTRAV.

to a specific hotel booking within Trams. (*Id.*, ¶ 12). Electronic remittance of hotel commissions is vouchered on an unreconciled account. (*Id.*). The money was identified and included on the monthly reconciliations and splits between ADTRAV and Duluth. (*Id.*). Duluth had full knowledge of unreconciled hotel commissions as each month ADTRAV sent reports showing non-reconcilable hotel commissions that were split between ADTRAV and Duluth. (*Id.*). Attached as Exhibit 9 to the Affidavit of Roger Hale is a sample of a monthly commission report sent to Duluth. (*Id.*). On page MONTHLY ADTRAV 032153 the lines entitled "Research/NONE" show hotel commissions that could not be reconciled that were in the bank accounts and divided between Duluth and ADTRAV. (*Id.*).

### III.   Zandman's prior similar "Errors."

As shown above, Zandman and Duluth have completely failed in their attempt to prove ADTRAV did not disclose and share certain hotel commissions with Duluth.  As stated earlier, the fact that Duluth allowed Zandman to engage in his analysis by only using confirmation number comparisons when Duluth must have known of the multiple pitfalls with this method calls into question Duluth's and Zandman's intent to search for the truth in this case.  Zandman's "mistakes" as pointed out above are pervasive through his entire report rendering his report

unreliable at best and deceptive at worst.  Zandman's Supplemental Report is not the first occasion in this case where his analysis has led to the improper conclusion that ADTRAV was not reporting and paying revenue to Duluth.

In his initial expert report, Zandman accused ADTRAV of not reporting and sharing with Duluth commissions and other travel revenue based upon Zandman's now admitted "mistake" in his method.  In his initial report, Zandman accused ADTRAV of not reporting VA travel revenue when he compared travelers' names that appeared on an alleged improper ADTRAV ARC number to names listed on Duluth's CBA Reports.  Zandman concluded that the identical matches from ADTRAV's ARC Reports and Duluth's CBA Reports indicated commissions and travel moneys paid to ADTRAV that were not shared with Duluth.

However, when ADTRAV investigated this allegation, it found that the individuals listed on ADTRAV's ARC Reports and Duluth's CBA Reports for whom Zandman contended Duluth was not paid ticket or commission revenue were included on the Net Remit Reports sent to Duluth from ADTRAV, proving ADTRAV did report to and share with Duluth this revenue.  Specifically, in his Supplemental Expert Report, Zandman admits as follows:

> In my initial report, I identified 65 identical name matches between the Duluth CBA reports and the ADTRAV ARC 016 report.  During my deposition on December 18, 2015, I was asked if the identified names and ARC 016 transactions were reported to Duluth on the weekly net remit reports.  I have since reviewed the data, and discovered that all of the names on the

16

> ARC 016 report, ADTRAV's own/not shared number, appear
> on a weekly net remit report at some time.  In fact, some of the
> specific transactions, as pointed out by Mr. Cate in my
> deposition on December 18, 2015, were reported as transactions
> to Duluth and split accordingly.

(Doc. 75-1, p. 11 of 390).

It appears every time Zandman attempts to make a comparison between or among reports, he "misses" important data that renders his analysis false, untrustworthy and worthless.  This is not a situation where an accounting expert has adopted a certain theory of calculating figures and an accountant on the other side of the case arrives at a different calculation based upon a different theory. This is a case where Zandman is just wrong in his own analysis.  He consistently misses data that is right in front of his face.  Worse, Duluth adopts Zandman's incorrect findings and represents to the Court the correctness of the findings. Duluth has relied upon Zandman's incorrect analysis to fabricate a discovery dispute and attempt to collect money from ADTRAV in its counterclaim. Zandman's entire analysis is untrustworthy and cannot be relied upon.

### IV.   Duluth's claim of unreported hotel commissions based upon Duluth's claim of increased hotel bookings is false and unreliable.

In his Supplemental Report, Zandman lists the dollar figure amount of hotel bookings from 2007 through 2013 when ADTRAV was in charge of the accounting.  Zandman then represents since Duluth took over the accounting in 2014 and 2015, the hotel bookings have doubled, suggesting that ADTRAV

underreported hotel bookings and consequently commissions owed to Duluth. Again, Zandman's accounting on this issue is untrustworthy.   Even though ADTRAV terminated reservation services due to Duluth's lack of payment effective January 17, 2014, Duluth did not shut down its interface connection for VA bookings to ADTRAV's Trams database until May 27, 2014.   (Affidavit of Roger Hale, ¶ 11).

After receipt of Zandman's Supplemental Expert Report, ADTRAV ran a report using this data from January to May 2014 which showed the VA had booked approximately $4.5 million of hotel bookings through Duluth during this time period. (*Id.*).   ADTRAV then ran a similar report from January to May for 2011, 2012 and 2013 to compare to the January – May 2014 time period. (*Id.*, ¶ 11 and Exhibit 8).   The hotel bookings made by the VA during the January – May time period for 2011, 2012 and 2013 represented between approximately 42%-45% of the full year hotel bookings for those years.   (*Id*).   This makes sense as January – May 2014 represents 42% of a full year.

Based on this analysis, it would be expected that the January – May 2014 hotel bookings would represent approximately 42% of the total 2014 hotel bookings. (*Id.*, ¶ 8).   Zandman claims a total of approximately $16 million in total hotel bookings for the year 2014.   The actual hotel bookings from January through May 2014 represent 28% of the full year hotel bookings Zandman claims were

made by the VA through Duluth in 2014. (*Id*.).   The $16 million Zandman calculates for total hotel bookings for 2014 is not even in the realm of possibility. (*Id*.). If Zandman is to be believed, 72% of all hotel bookings made by the VA through Duluth in the year 2014 occurred in June through December 2014. (*Id*.).

It appears obvious Zandman has made another one of his "mistakes."  He likely has either double counted hotel bookings or included all of Duluth's customers' hotel bookings, not just VA customers, in this total.   Based upon ADTRAV's analysis and Zandman's history of errors, mistakes and/or misrepresentations, Zandman's calculations regarding 2014 and 2015 VA hotel bookings for Duluth should be disregarded.

## V.   Discovery status.

Prior to April 4, 2016 when Duluth filed its Motion for Contempt, ADTRAV was not made aware by Duluth of any outstanding discovery issues with regard to the Court's November 30, 2015 discovery order.  Obviously, the entire basis for Duluth's Motion for Contempt is Zandman's Supplemental Report, which has been shown to be (1) riddled with mistakes, (2) based upon an analysis method that was known or should have been known to be incorrect, (3) untrustworthy, and (4) potentially the product of intentional deceit.  Zandman's Supplemental Report does not support Duluth's Motion for Contempt, yet is the reason Duluth has at this late stage attempted to revisit the Court's November 30, 2015 discovery Order.

ADTRAV has complied with the Court's November 30, 2015 discovery order. The fact that ADTRAV has conceded from the beginning that it cannot locate certain documents requested is not going to change. ADTRAV has produced thousands and thousands of pages of reports and the fact that ADTRAV could not find certain reports for limited time periods does not indicate any attempt of deception.

Duluth acknowledges that in response to the Court's November 30, 2015 discovery order ADTRAV provided a list of VA and non-VA deposits to individually held bank accounts. Duluth then states in its Motion for Contempt:

> It is impossible for Duluth to reconcile which deposits pertain to VA revenue from the information provided. ADTRAV contends that it too is unable to separate VA commission deposits from commission deposits from other sources. One might wonder how then, ADTRAV was ever able to determine the volume of VA revenue that was to be divided between the parties.

(Doc. 75, p. 16 of 17). The answer as to how ADTRAV was able to determine the volume of VA revenue that was to be divided between the parties is, of course, known to Duluth. The VA revenue that was to be divided between the parties was shown in both weekly and monthly reports sent to Duluth from ADTRAV that broke down every type of revenue received from the VA account with the detailed backup supporting the calculations. This information is included in the thousands

and thousands of pages produced to Duluth by ADTRAV, which Duluth already had in its possession.

The fact that ADTRAV was unable to separate VA commission deposits from other sources when it produced its bank account information in no way means ADTRAV was not able to determine the volume of VA revenue divided between the parties on a weekly and monthly basis. Duluth knows this. But just for the Court's edification, attached to this Response Brief as Exhibit B is a sample of one of the emails sent from ADTRAV to Duluth showing revenue splits and the detailed backup supporting the splits that Duluth reviewed prior to agreeing to the splits.[4]

## VI.   CONCLUSION

Based upon the above, ADTRAV submits Duluth's Motion for Contempt is due to be denied. Additionally, ADTRAV requests the Court to consider the myriad of "mistakes," and/or deceits contained in Zandman's Supplemental Report when the Court rules upon ADTRAV's motion to exclude the testimony of Zandman. (Doc. 64). Zandman's reports are so unreliable and flat out wrong that he should be excluded from giving opinions based upon his reports. His reports are so faulty and based upon incorrect data and methodology that his testimony

---

[4] Only the first page of some of the reports are attached as some reports contain hundreds of pages of backup data supporting the revenue splits.

would be unreliable and certainly not help the trier of fact to understand the evidence or determine any factual issue.

Respectfully submitted,

ROGER L. BATES (ASB-8176-T65R)
TRACY R. DAVIS (ASB-5086-C62D)

OF COUNSEL:
HAND ARENDALL LLC
2001 Park Place North, Suite 1200
Birmingham, AL 35203
(205) 324-4400
rbates@handarendall.com
tdavis@handarendall.com

/s/ Rodney R. Cate
RODNEY R. CATE (ASB-8568-T46R)

OF COUNSEL:
HAND ARENDALL LLC
P. O. Box 123
Mobile, AL 36601
(251) 432-5511
rcate@handarendall.com

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Lynne Stephens O'Neal, Esq. (loneal@lspclaw.com)
Jim H. Wilson, Esq. (jwilson@lspclaw.com)
LEITMAN SIEGAL PAYNE & CAMPBELL, P.C.
420 20th Street North, Suite 2000
Wells Fargo Tower
Birmingham, AL 35203

D. Michael Sweetnam, Esq. (dms@msweetnam.com)
THE SWEETNAM FIRM
P.O. Box 2089
Suwanee, GA 30024

*/s/ Rodney R. Cate*
RODNEY R. CATE (ASB-8568-T46R)

2879122