IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ADTRAV CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION FILE |
| ) | NO: 2-14-CV-0056-TMP-S |
| ) | |
| V. ) | |
| ) | |
| DULUTH TRAVEL, INC., ) | |
| ) | |
| Defendant and Plaintiff in Counterclaim. ) | |

_____

**DULUTH TRAVEL INC.'S REPLY TO ADTRAV'S RESPONSE TO MOTION FOR CONTEMPT, SANCTIONS, AND ADDITIONAL RELIEF**
_____

COMES NOW Duluth Travel, Inc. (hereafter "Duluth"), and submits its reply to Adtrav Corporation's ("Adtrav") response to Duluth's April 4, 2016 Motion for Contempt, Sanctions, and Additional Appropriate Relief ("Motion").

## Introduction

Duluth's Motion for Sanctions seeks relief for Adtrav's failure to comply with this Court's November 30, 2015 Order. Adtrav has admitted in its response that the list of deposits into individually held accounts does not distinguish between VA and non-VA revenue, rendering the information useless to Duluth. Adtrav was required to electronically search all of its ESI, yet it has made no affirmative representation that the search was completed or how it was completed. Adtrav has

1

offered no reason for failing to provide a search report based on the search that was conducted. Further, it has not explained the near complete absence of files expected from the electronic search. The supplemental report from Duluth's expert ("Supplemental Report") highlights Adtrav's manipulation of accounting based on accounting data it produced pursuant to the November 30, 2015 Order. Once that data was finally produced, it could finally be reconciled against third-party data that Duluth was able to obtain via subpoenas. The Supplemental Report simply reinforces the importance of having an independent and thorough search of all of Adtrav's ESI to determine what exists, what was deleted, when Adtrav deleted its files, and whether it is possible to recover any of them.[1]

---

[1] Respectfully, Duluth would ask the Court to take note that, as part of the discovery process in this case, Duluth has been forced to re-create a reconciliation process that was Adtrav's responsibility during the terms of the agreements between Duluth and Adtrav, which Adtrav was paid to do. Adtrav had a duty to preserve (by law, federal regulation, and accounting standards) this information, but admittedly failed to do so. As a result, Duluth had to subpoena 25 separate third parties to obtain the backup information that Adtrav should have retained. In most instances, Duluth had to go back and forth for months with these third parties to obtain the relevant information and still, in most instances, that information is incomplete. Duluth had to retain a forensic accounting expert, Howard Zandman, to try to re-create the reconciliation process with the information available to him. In the meantime, and despite Adtrav having been provided all of the same third-party data, it has made no attempt whatsoever to reconcile this same information. Adtrav also has apparently made no effort whatsoever to discover when it destroyed all of its reconciliation back-up from the third parties, failing to even so much as make any affirmative representation that it has electronically searched all of its electronically stored information. Adtrav has simply pointed to extremely isolated examples of inconsistencies in Duluth's Supplemental Report that when conceded for argument's sake total no more than $100,000 of the $420,000 in revenues that Duluth has claimed were unreported and not paid. Adtrav has made no effort to justify or explain the remaining $320,000 in unreported commissions and transaction fees that should have been paid to Duluth.

## Adtrav's Discovery Failures

Adtrav asserts that "the entire basis for Duluth's Motion for Sanctions is Zandman's Supplemental Report," which Adtrav characterizes as "potentially the product of intentional deceit." (Adtrav's Response to Duluth's Motion for Sanctions ("Response"), p. 19). The profoundly unprofessional tone and content of Adtrav's Response is telling. The Response is designed in large part to distract the Court from the reality that Adtrav fails to respond to, or to explain, the vast majority of the issues raised by Duluth in its Motion. The Supplemental Report evidences accounting manipulation by Adtrav and reinforces the need for the relief Duluth seeks. It is Adtrav's failure to comply with the Court's Order (and its now proven failure to report all revenue earned under the VA contract) that forms the basis for the Motion for Sanctions.[2]

Adtrav did not produce a list of all VA revenue deposited into its bank accounts. Adtrav argues that, even though it claims it cannot separate VA from non-VA deposits, that fact does not mean Adtrav could not determine the volume of VA revenue on a monthly or weekly basis. (Response, p. 21). As illustration of this claim, Adtrav points to Exhibit B to Roger Hale's Affidavit, which is a sample of partial revenue splits and alleged backup. *Id*. Duluth admits it received these types

---

[2] Adtrav has provided no explanation for the $160,000 in transaction fees not reported to Duluth. These fees were reflected in Adtrav's documents as illustrated in Zandman's initial report. (Doc. 54-1, pp. 82-190).

of reports, but a review of Exhibit B demonstrates the hollowness of this claim. Adtrav makes a circular argument which is essentially, "we were able to determine VA revenue because we reported that we had determined VA revenue." In no way does Exhibit B show any reported commission as corresponding to any payment or reconciliation. Even with all of the data Duluth now has, its expert cannot reconcile Exhibit B. Adtrav has also failed to illustrate how a single deposit of VA revenue into one of its six (6) individually held accounts was ever reflected in any of its reports to Duluth, much less Exhibit B.

Further, and pursuant to the Court's Order, Duluth requested that Adtrav produce a search report that would reveal search metrics for each source of ESI. Instead, Adtrav gave no information regarding how it conducted its search or what sources of ESI were searched. Adtrav reported nothing with regard to the metadata contained in its sources of ESI that would indicate when Adtrav deleted the critical third-party financial backup information it was paid to compile and maintain and was required by law to compile and maintain. Adtrav alleges that the fact "that it cannot locate certain documents requested is not going to change." (Response, p. 20). Since its ESI was not properly searched, Adtrav's contention that the destroyed evidence cannot be found is hollow and disingenuous at best. An independent forensic analysis of Adtrav's ESI could identify when evidence was destroyed and possibly even recover that material. While Adtrav has admitted destroying or losing

much of the third-party financial data from which its reports were allegedly compiled, it has provided no information as to when or how this occurred.

Lastly, the correspondence file that Adtrav produced evidences a large amount of files that the electronic search did not recover. Many of Adtrav's emails contain attachments in the form of PDF, Word, and Excel files (among other types of files). The original files where these attachments originated should have been located by an electronic search, yet none of these files was produced. Adtrav has made no attempt to explain this omission.

## **Adtrav's Erroneous Arguments**

Adtrav attempts to provide "examples showing the major flaws in Zandman's Supplemental Report," which Adtrav maintains "render" his report useless and incapable of providing support for Duluth's Motion for Sanctions." Adtrav's "examples," however, do not contradict Duluth's arguments or the evidence.

**I.  Zandman's "prior similar errors" are not errors.**

Adtrav argues that "Zandman's Supplemental Report is not the first occasion in this case where his analysis has led to the improper conclusion that ADTRAV was not reporting and paying revenue to Duluth." (Response, p. 16). Adtrav's argument relates to damages listed in Zandman's initial report §6.4.1 of approximately $160,000 in unreported transaction fees. (Doc. 54-1 pp. 30-32). Adtrav points to Zandman's concession in his Supplemental Report that he was mistaken that the

names of passengers contained in the CBA report were reported to Duluth in weekly net remit reports. (Response, pp. 16-17). However, Adtrav's block quote from Zandman's Supplemental Report omits the next paragraph of that report where Zandman indicates his damages analysis "**remains unchanged**." (Doc. 75-1, pp. 11-12) [emphasis supplied]. The reason Zandman does not change his damages analysis is due to the fact that Adtrav reported only one transaction to Duluth for each of the 65 names. In the 016 ARC report, these names had multiple transactions, the majority of which were not reported to Duluth. *Id*. Adtrav's sum total of the reported transaction fees to Duluth was a credit to Adtrav of $379 which is effectively $0. *Id.* In reality, the 016 ARC report reflected $160,000 in total transaction fees that should have been split accordingly. (Doc. 54-1, pp. 82-190). Hence, Zandman's initial report did not make an error on unreported transactions, and Adtrav has not attempted to address these unreported transaction fees.

## II.  Trailing zeros

Adtrav notes that in his Supplemental Report, Mr. Zandman identifies $4,427.22 in unreported hotel commissions based on unmatched confirmation numbers from Adtrav's TRAMS data compared to the confirmation numbers contained in the Pegasus ARC number 016 data. (Response, p. 5). Adtrav's argument begins with the notion that confirmation numbers in the Pegasus reports will not match confirmation numbers in Adtrav's TRAMS data because of the inclusion of

"trailing zeroes" which are not found in Adtrav's TRAMS. Adtrav provides no explanation as to why the confirmation numbers are different in its TRAMS. Further, some of the "trailing zero" confirmation numbers do not appear at all in Adtrav's TRAMS system, even by traveler name. Some of the confirmation numbers with "trailing zeros" have a completely different number altogether. In addition, a simple comparison of the first and last columns in Exhibit 1 of Adtrav's Response shows not only that the confirmation number changed, but also the ARC number changed. All of the entries on Adtrav's Exhibit 1 in the first column are credited to Adtrav's ARC number (016). However, Adtrav's TRAMS data credits every entry to Duluth's ARC number (119) with the exception of two (2) entries.

While it seems at least plausible a third-party payment consolidator could alter a confirmation number, it is not plausible the third party would also arbitrarily and fortuitously change the ARC number to one that happened to belong to Adtrav. The ARC number is the only way a payment consolidator knows who is owed the commission. As is increasingly clear, Adtrav's Response not only fails to address the majority of the failures and omissions of which Duluth complained, it actually provides additional and further reasons for the Court to order an independent search of Adtrav's ESI.

Lastly, this alleged issue with trailing zeros is unique to the data that Pegasus produced for Adtrav's ARC number (016). Pursuant to third-party subpoenas,

Pegasus produced data segregated by ARC number. Not one of the confirmation numbers contained in the information for Duluth's ARC number (119) contained a mismatched confirmation number due to a missing zero when reconciled with Adtrav's TRAMS data. All of these facts point to the conclusion that Adtrav was manipulating the confirmation numbers and the ARC numbers for these entries on its end.

Adtrav claims, "it is hard to imagine that Duluth, being in this travel industry for such a long time, was not aware of the trailing zero on Pegasus' confirmation numbers and allowed Zandman to go forward with his incorrect analysis." (Response, p. 6). Given that this dilemma appears to have never been an issue for Duluth's ARC number, it is hard to imagine how Duluth could have known about this (alleged) issue.

### III.   Duluth did not control reconciliation of the Pegasus ARC 119 hotel commission dollars.

Adtrav argues that "[e]very hotel commission dollar related to Pegasus ARC 119 was paid into a bank account wholly owned and controlled by Duluth." (Response, p. 13; see also, fn. 3). According to Adtrav, "This one is the real kicker." *Id.* Adtrav's "kicker" argument is misleading at best.

Duluth is not and has not claimed that Adtrav was withholding payments from Pegasus and TACS. Duluth has, however, claimed that Adtrav was able to manipulate the reconciliation of actual commissions versus what commissions were

8

reported to Duluth. Duluth had no way of knowing what was booked on the front end in TRAMS nor whether it closed out on the back end when payments were received. That fact is true for all transactions, not just those under Pegasus and TACS. Thus, when Adtrav provided its monthly reports showing the split and the applicable credits/debits, Duluth had no way to verify these figures other than what Adtrav reported. Duluth's claims are based on unreported commissions in those reports, which skewed the credit/debit split in favor of Adtrav. So while money may have passed into Duluth's bank account, Adtrav dictated how much money it was owed based on what it reported. Accordingly, Adtrav's argument that Duluth "controlled" all of the Pegasus ARC 119 hotel commissions is a consummate red herring. Further, for the first three (3) years of the Parties' contract, Pegasus paid directly to Adtrav and not to Duluth.

### IV. Duluth did not fail to provide Adtrav with Pegasus data.

Adtrav argues that Duluth owes Adtrav a percentage split of hotel commissions received from Pegasus because "all remittance information from Pegasus went directly to Duluth … [and] ADTRAV relied solely on Duluth to report the total amount of Pegasus payments and to provide the detailed backup required to reconcile the account," which Adtrav maintains Duluth did not do. (Response, p. 14). Adtrav's argument is based solely on Exhibit 7 to Mr. Hale's affidavit, which is a list of Pegasus payments that Adtrav "has no record of receiving." However, with

9

a simple electronic search, Duluth was able to locate two (2) of the alleged missing payments listed in Exhibit 7 in Adtrav's recent production of correspondence. Not only is Mr. Hale's affidavit testimony incorrect, it also demonstrates that Adtrav is apparently unable to search its own ESI properly.[3]

**V.   Inability to match confirmation numbers**

Adtrav argues that "[i]t is not uncommon in using the reconciliation process that hotel commissions cannot be matched to a specific hotel booking within TRAMS." (Response, pp. 14-15). Adtrav maintains that "Duluth had full knowledge of unreconciled hotel commissions as each month ADTRAV sent reports showing non-reconcilable hotel commissions that were split between ADTRAV and Duluth." *Id.*, p. 15. Adtrav's argument is perplexing in several ways. First, Adtrav admits that some hotel commissions could not be matched to anything, so Adtrav could have reported any number it desired in phantom commissions. While it makes sense that Duluth would not be able to match confirmation numbers under these circumstances, the question is, "How was Adtrav able to determine that these commissions were VA transactions?" Even if Duluth had access to Adtrav's TRAMS, nothing exists to

---

[3]   Four (4) of the payments listed in Adtrav's Exhibit 7 are from a date after the contract ended in January 2014. Further, the question that begs to be answered by Adtrav's argument is "why would there not still be a record in TRAMS of unpaid commissions that would match with a confirmation number regardless of whether Adtrav reconciled the commissions with a Pegasus report?" Finally, providing any more substantive response to Adtrav's argument regarding Exhibit 7 is nearly impossible because Mr. Hale simply references that he pulled this information from "the Pegasus data." Neither Mr. Hale's affidavit, Exhibit 7, nor the Response cite to any other source for this information.

tie these commissions to individual bookings. Adtrav argues throughout its Response that it is impossible to reconcile bookings using confirmation numbers, but it never bothers to explain how it actually reconciled these bookings and commissions when it was reporting those numbers/revenues to Duluth.

**VI.   Adtrav has pointed to a few specific errors but has made no effort to explain or account for the remaining $320,000 in unreported commissions and transaction fees discussed in the Supplemental Report.**

Again, Duluth has been forced to re-create a reconciliation process that was Adtrav's responsibility under the Parties' contracts. Further, Adtrav had a duty to preserve this information and admitted it failed to do so. As a result, Duluth had to subpoena 25 separate third parties to obtain the backup information that Adtrav should have retained. In most instances, Duluth had to go back and forth for months with these third parties to obtain the specific information which is still mostly partial or incomplete. Duluth's forensic accounting expert, Howard Zandman, re-created the reconciliation process from scratch with the information available to him. In the meantime, and despite Adtrav having been provided all of the same third-party data, it has made no attempt whatsoever to reconcile this same information.

Adtrav has simply pointed to isolated examples of inconsistencies in Duluth's Supplemental Report. Some of these errors appear due to the fact that Adtrav retained access to Duluth's TRAMS for five (5) months after the relationship ended. (Doc. 77-1, ¶ 11). Adtrav included the first five (5) months of 2014 in its TRAMS

data in its production to Duluth as if that production was what was requested, namely Adtrav's TRAMS data for the period of the Parties' agreements. Duluth mistakenly believed Adtrav to have produced what was requested. However, even conceding Adtrav's alleged errors for argument's sake, a very liberal estimate puts the total of those errors at approximately $100,000 of the $420,000 in revenues that Duluth has identified as unreported. Adtrav has made no effort to justify or explain the remaining $320,000 in unreported commissions and transaction fees that should have been reported to Duluth.

**VII.   The surge in hotel bookings immediately upon Duluth taking over the accounting is indisputable.**

Mr. Zandman's Supplemental Report demonstrated an enormous increase in hotel bookings for 2014 and 2015 when Duluth took control of accounting. Adtrav argues that this increase is impossible. Adtrav claims that Exhibit 8 of its Response represents a report that Adtrav ran on the bookings. Adtrav offers no supporting documentation for Exhibit 8, but purports to show that based on Adtrav's access to Duluth's TRAMS data for part of 2014, the bookings were estimated to be $10.35 million. This number itself would have represented a 20% increase over what Adtrav had reported over the previous three (3) years.

As previously mentioned, Duluth believed that the TRAMS data Adtrav produced was in fact Adtrav's TRAMS data. As a result, Mr. Zandman included Adtrav's TRAMS data for bookings in 2014. When Mr. Zandman removed Adtrav's

TRAMS data for 2014, the bookings still totaled $12.5 million which actually represents a greater than 50% increase over what Adtrav had reported for 2011, 2012, and 2013. Mr. Zandman's number is based on actual bookings, not estimates. Further, the bookings in 2015 remain unchanged at $16 million which is a 100% increase over Adtrav's reported bookings. Adtrav also acknowledges in Exhibit 8 that from 2011-2013, Adtrav's reported bookings did not increase at all. Even Adtrav's estimate for 2014 represents a significant increase in bookings, and it has offered no potential explanation for this surge.

## Conclusion

In summary, since the Court's November 30, 2015 Order, Duluth has had to 1) respond to a completely specious summary judgment motion; 2) depose Adtrav's expert; 3) vet that expert's report; 4) move to strike the expert report; 5) respond to a motion to strike Duluth's expert's report; 6) attempt to re-create the revenue reconciliation process from what Duluth was able to obtain from third parties against the TRAMS information Adtrav finally produced on December 22, 2015, once compelled by the Court;[4] and, finally 7) have its expert draft a Supplemental Report based on the "new" information from Adtrav before Duluth could file its Motion. The basis of Duluth's Motion is not a "discovery issue." The Motion for Sanctions

---

[4] Adtrav should have produced that same TRAMS information a year and a half earlier during the normal course of discovery instead of forcing Duluth to file a Motion to Compel.

squarely addresses Adtrav's failure to comply with this Court's Order on the Motion to Compel, and Duluth was under no obligation to make Adtrav "aware" of its intent to file the Motion for Sanctions.

Based on the foregoing, there are more than ample grounds for this Court to grant Duluth's Motion and impose the appropriate sanctions against Adtrav. In fact, Duluth submits that the grounds for granting the relief requested are absolutely compelling.

WHEREFORE, Duluth respectfully requests that its Motion for Contempt, Sanctions, and Additional Relief be granted.

              Respectfully submitted,

              /s/ D. *Michael Sweetnam*
              D. MICHAEL SWEETNAM
              KYLE W. BRENT

OF COUNSEL:

Sweetnam & Schwartz, LLC
Suite 190
1200 Ashwood Parkway
Atlanta, GA  30338
Phone: (678) 528-6739

              /s/ *Jim H. Wilson*
              LYNNE STEPHENS O'NEAL
              JIM H. WILSON

              Attorneys for
              Defendant/Counterclaim Plaintiff
              Duluth Travel, Inc.

OF COUNSEL:

LEITMAN, SIEGAL & PAYNE, P.C.
Wells Fargo Tower
420 20th Street North, Suite 2000
Birmingham, AL 35203
Phone: (205) 251-5900

## CERTIFICATE OF SERVICE

I hereby certify that I have filed a copy of the foregoing using the Court's CM/ECF electronic filing system which will serve a copy upon the following counsel of record on this the 6th day of May, 2016:

Roger L. Bates, Esq.
Tracy R. Davis, Esq.
Hand Arendall, LLC
2001 Park Place North
Suite 1200
Birmingham, AL 35203

Rod Cate, Esq.
RSA Tower
11 North Water Street
Suite 30200
Mobile, Alabama 36602

/s/ *Jim H. Wilson*
OF COUNSEL