UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ADTRAV CORPORATION,** ) | |
| ) | |
|     **Plaintiff/Counterclaim Defendant,** ) | |
| ) | |
| **V.** ) | **CASE NO: 2:14-cv-0056-TMP-S** |
| ) | |
| **DULUTH TRAVEL, INC.,** ) | |
| ) | |
|     **Defendant/Counterclaim Plaintiff.** ) | |

<u>**ADTRAV CORPORATION'S SUR-REPLY TO DULUTH TRAVEL, INC.'S REPLY TO ADTRAV'S RESPONSE TO MOTION FOR CONTEMPT, SANCTIONS, AND ADDITIONAL RELIEF**</u>

COMES NOW ADTRAV Corporation ("ADTRAV") and responds to Duluth Travel Inc.'s ("Duluth") Reply to ADTRAV's Response to Motion for Contempt, Sanctions, and Additional Relief ("Motion for Contempt") as follows:

## Introduction

The Court's November 30, 2015 Order relating to ADTRAV searching electronically stored information ("ESI") states as follows:

> Accordingly, Duluth is directed, within 7 days, to provide to ADTRAV a list of keywords to be used in a keyword-search of all ESI at issue in this case. The search will be conducted by or at the direction of ADTRAV, and all responsive documents which pertain to the contract with the Veterans Administration at issue here, shall be produced to Duluth within 24 days after the keywords are provided.

(Doc. 53, p. 4 of 5). Duluth provided ADTRAV a list of keywords to be used in a keyword-search of ADTRAV's ESI at issue in this case. ADTRAV conducted a search of its ESI and produced the documents that were responsive to the keyword-search ADTRAV performed. ADTRAV complied with the Court's Order. Duluth's complains that ADTRAV did not produce (1) a search report that would reveal search metrics used for each source of ESI as to how it conducted its ESI search; (2) information regarding how it conducted its ESI search or what sources of ESI were searched; and (3) its metadata contained in the sources of ESI.

The Court's November 30, 2015 Order did not require ADTRAV to produce a search report revealing search metrics, information regarding how it conducted its search, or metadata contained in the sources of ESI. ADTRAV never agreed to the instructions Duluth requested that went above and beyond the Court's November 30, 2015 Order. Duluth is asking the Court to find ADTRAV in contempt and to sanction ADTRAV for not agreeing to adopt Duluth's instructions that went beyond the Court's November 30, 2015 Order.

As the basis for its Motion for Contempt, Duluth relies primarily on the Supplemental Report of its accounting expert Howard Zandman, CPA, by arguing his Supplemental Report shows ADTRAV collected revenue under the VA Contract that was never disclosed to or shared with Duluth. Duluth argues an

independent search of ADTRAV's ESI would uncover documents not produced by ADTRAV that would corroborate Zandman's opinions.

Even after ADTRAV has proven to the Court that Zandman's Supplemental Report contains both mathematical and assumption errors rendering it useless, Duluth still relies upon Zandman's Supplemental Report as support for its Motion for Contempt. The following is a brief reply to some of the incorrect points Duluth makes in its Reply to ADTRAV's Response to Motion for Contempt.

**Duluth concedes Zandman's Supplemental Report incorrect.**

Duluth's Motion for Contempt is based upon Zandman's Supplemental Report. Specifically, Duluth states: "The supplemental report from Duluth's expert ("Supplemental Report") highlights ADTRAV's manipulation of accounting based on accounting data it produced pursuant to the November 30, 2015 Order." (Doc. 78, p. 2 of 15). Zandman's Supplemental Report contains calculations supposedly evidencing ADTRAV did not disclose hotel bookings to Duluth and misclassified hotel bookings in the amount of $270,000. (See Schedule 4 to Supplemental Report, Doc. 75-1, p. 22 of 390). Duluth does not even attempt to argue and concedes Zandman's Supplemental Report contains $100,000 of errors.[1] Duluth characterizes this $100,000 of errors as "isolated examples of

---

[1] ADTRAV has previously shown the errors and incorrect assumptions made by Zandman and Duluth total more than $100,000. The vast majority of the remaining $170,000 was deposited in either a Duluth controlled bank account or a jointly controlled bank account and split and paid according to booking allocation percentages.

inconsistencies in Duluth's Supplemental Report." (Doc. 78, p. 11 of 15). These isolated examples of inconsistencies represent 37% of the total of Zandman's calculations ($100,000 divided by $270,000). Based on a typical grading system, Zandman would receive a 63 or a "D-" on his Supplemental Report. Duluth relies upon this "D-" report in support of its Motion for Contempt. As pointed out before, Zandman consistently makes assumption and calculation errors rendering all of his reports and opinions unreliable.

### Zandman's $161,000 unreported transaction fees error.

As pointed out by ADTRAV in its Response to Duluth's Motion for Contempt, in his initial report, Zandman listed as damages approximately $161,000 in unreported transaction fees. Zandman's genesis for this calculation and the assumption supporting this calculation was his incorrect belief that 65 names reported on ADTRAV's ARC 016 report were also reported on Duluth's CBA report leading Zandman to the conclusion that transactions associated with these 65 individuals were not reported to Duluth by ADTRAV. Zandman subsequently conceded that he was incorrect.

In his Supplemental Report, after acknowledging he was incorrect that the transactions associated with the 65 names were, in fact, reported to Duluth by ADTRAV, Zandman then represented he went back to the weekly net remit reports produced by ADTRAV to summarize all the ARC 016 transactions that were

reported to Duluth.  Zandman claims the sum total from 2011 through 2013 for all the transactions reported in the net remit under ARC 016 was a net credit of $379. Based upon his "calculations", Zandman made the leap that $161,000 of ARC 016 transactions was unreported by ADTRAV to Duluth.  In its Reply to ADTRAV's Response to Motion for Contempt, Duluth still relies upon Zandman's calculations and states "ADTRAV has not attempted to address these unreported transaction fees." (Doc. 78, p. 6 of 15).

To put an end once and for all to this allegation that ADTRAV withheld $161,000 in transaction fees related to ARC 016, ADTRAV has compared the data used by Zandman in his initial report included on Schedule 16 to ADTRAV's TRAMS data.[2]  (Aff. of Roger Hale, ¶ 6, Ex. 2-5; attached as Ex. A).  Each ticket within the ARC 016 data used by Zandman is represented by a booking in the TRAMS data, which includes the traveler name and the account name. (*Id*.).  Only $1,657.63 of the $161,378.80 Zandman claims was VA business, was actually VA business. (*Id*., ¶ 6, Ex. 2-6).[3]  The remaining $154,721 is related to ADTRAV's non-VA business.  The exhibits attached to Roger Hale's Affidavit prove that Zandman is again completely wrong when he alleges ADTRAV withheld money under the VA contract due to Duluth.  The $1,657.63 of transactions contained on

---

[2] The TRAMS data previously produced to Duluth did not include account names as this field was not requested.

[3] ADTRAV took Zandman's dollar amount calculations as correct for this analysis.  However, as will be shown at the appropriate time, Zandman double, triple and quadruple counted commissions in several instances to arrive at his $161,378.80 figure.

ARC 016 that were in fact related to VA business were reported to Duluth through weekly net remit reports and split accordingly. (*Id.*, ¶ 8, Ex. 7).

### Duluth's argument it did not control the Pegasus ARC 119 hotel commission dollars is wrong.

Although Duluth concedes all hotel commission dollars related to Pegasus ARC 119 were paid into a bank account wholly owned and controlled by Duluth, Duluth attempts to argue ADTRAV nevertheless withheld from and did not share with Duluth alleged reported or misclassified hotel commission dollars because ADTRAV "was able to manipulate the reconciliation of actual commissions versus what commissions were reported to Duluth."  (Doc. 78, p. 8-9 of 15).  Duluth then makes the 100% false statement: "Duluth had no way of knowing what was booked on the front end in TRAMS nor whether it closed out on the backend when payments were received." (*Id*. p. 9 of 15).  ARC 119 was and is Duluth's ARC number.  VA bookings were made under Worldspan.  All Worldspan bookings were tied to ARC 119.  Worldspan sent directly to Duluth the identical TRAMS data Worldspan sent to ADTRAV.  Additionally, Pegasus transmitted all booking information directly to Duluth.  Duluth had all information it needed to determine the hotel bookings for commissions paid into Duluth's bank account.

Hotel commission splits were based upon percentages of hotel bookings by either ADTRAV or Duluth.  For instance, if Duluth was responsible for 60% of the hotel bookings and ADTRAV responsible for 40%, Duluth would be entitled to

6

60% of the hotel commission dollars for that particular month. The booking information that governed the hotel commission splits was contained in information sent directly to Duluth by Worldspan and Pegasus. Duluth's claim that it was at ADTRAV's mercy on hotel commission splits for Pegasus ARC 119 is simply wrong.

### Inability to match confirmation numbers.

ADTRAV noted in its Response to Duluth's Motion for Contempt that there are times hotel commissions cannot be matched to a specific hotel booking within TRAMS. (Doc. 77, pp. 14-15 of 23). Duluth argues that because sometimes hotel commissions cannot be matched to a specific hotel booking "ADTRAV could have reported any number it desired in phantom commissions." (Doc. 78, p. 10 of 15). Duluth further asked the question: "How is ADTRAV able to determine that these commissions were VA transactions?" (*Id.*). The answer is simple. These unmatched hotel commissions were deposited in either the bank account jointly owned by Duluth and ADTRAV or the bank account solely controlled by Duluth <u>because they were VA transactions</u>. As ADTRAV pointed out before, these unreconciled hotel commissions were set out in monthly commission reports sent to Duluth and divided between Duluth and ADTRAV. It is difficult to conceive what dastardly plot in which ADTRAV engaged by disclosing to Duluth unreconciled hotel commissions and dividing these commissions with Duluth.

### The alleged "surge" in hotel bookings immediately upon Duluth taking over the accounting is anything but indisputable.

Duluth, through Zandman, attempts to make the argument that once it took over the accounting from ADTRAV in 2014, the hotel bookings dramatically increased, which Duluth concludes shows ADTRAV manipulated and underreported booking data. Duluth concedes that Zandman again made a "mistake" in his calculations for hotel bookings for 2014, which improperly inflated the hotel bookings calculated by Zandman by more than $3.5 million. After acknowledging this "mistake", Duluth argues Zandman concluded hotel bookings in 2014 totalled $12.5 million and increased to $16 million in 2015. Zandman provides no actual calculations supporting these figures. Duluth notes even ADTRAV's estimate for hotel bookings for 2014 represents a significant increase from 2013 hotel bookings (20%), but ADTRAV "has offered no explanation for that surge." (Doc. 78, p. 13 of 15). If Zandman's calculations are correct, then from 2014 through 2015 when Duluth had control over all the accounting, the hotel bookings "surged" almost 20%. What is Duluth's explanation for that "surge"?

Duluth has made a similar argument in Zandman's initial report relating to an alleged increase in airline tickets booked after Duluth took over the accounting in January 2014. On Schedule 18 to Zandman's initial report, he lists airline tickets booked from August 2009 through June 2015. (See Schedule 18 attached as

Ex. B).[4]  He left a blank for the number of airline tickets booked for January 2014 when Duluth took over the accounting.  Zandman makes a point that the number of airline tickets booked after Duluth took over the accounting increased substantially compared to airline tickets booked during the time ADTRAV was in charge of accounting.  Based upon this alleged increase in airline tickets booked, Duluth has argued, similar to this alleged increase in hotel bookings, that ADTRAV was manipulating reports by not disclosing and sharing with Duluth all of the VA travel business.  However, a comparison of Zandman's Schedule 18 shows for the year 2012[5] (when ADTRAV was in charge of the VA accounting), the airline tickets booked were 123,309 versus 130,580 for the same time period in 2014 (when Duluth was in charge of the accounting).  This is not a great difference.

Duluth has offered no explanation as to why, even after it took over the accounting, the airline tickets booked substantially increased in 2015 versus 2014.  According to Zandman's Schedule 18, the total number of tickets booked from February through June 2014 was 53,621.  For the same time period in 2015, the number of airline tickets booked increased to 99,290.  The number of tickets booked in the same time period of 2015 compared to 2014 increased approximately 100%.  According to Zandman, in April 2014, Duluth booked 9,960

---

[4] Schedule 18 has been enlarged from its original form to make it readable.
[5] The total 2012 figures exclude January as the 2014 figures compared thereto in Schedule 18 do not include January 2014 figures.

airline tickets.  In April 2015, Duluth booked 27,436 airline ticket, an unprecedented threefold increase in airline tickets booked.  Duluth is quick to insinuate ADTRAV manipulated data if airline and hotel bookings increased from the time ADTRAV was in charge of accounting versus the time Duluth was in charge of accounting.  However, what is Duluth's explanation as to the incredible increase in airline ticket bookings and hotel bookings from 2014 to 2015, <u>a time when Duluth was in control of the accounting</u>?  This analysis by Zandman is once again faulty and unreliable.

## CONCLUSION

ADTRAV has complied with the Court's November 30, 2015 Order.  ADTRAV conducted the ESI search using Duluth's keyword terms.  ADTRAV produced responsive documents.  Duluth's attempt, through Zandman, to suggest ADTRAV has manipulated data and not reported and shared commissions with Duluth has clearly failed.  Zandman's Supplemental Report is flawed and unreliable.  Duluth's Motion for Contempt is due to be denied.

Respectfully submitted,

ROGER L. BATES (ASB-8176-T65R)  
TRACY R. DAVIS (ASB-5086-C62D)

OF COUNSEL:  
HAND ARENDALL LLC  
2001 Park Place North, Suite 1200  
Birmingham, AL 35203  
(205) 324-4400  
rbates@handarendall.com

tdavis@handarendall.com

/s/ Rodney R. Cate
RODNEY R. CATE (ASB-8568-T46R)

OF COUNSEL:
HAND ARENDALL LLC
P. O. Box 123
Mobile, AL 36601
(251) 432-5511
rcate@handarendall.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Lynne Stephens O'Neal, Esq. (loneal@lspclaw.com)
Jim H. Wilson, Esq. (jwilson@lspclaw.com)
LEITMAN SIEGAL PAYNE & CAMPBELL, P.C.
420 20th Street North, Suite 2000
Wells Fargo Tower
Birmingham, AL 35203

D. Michael Sweetnam, Esq. (dms@msweetnam.com)
THE SWEETNAM FIRM
P.O. Box 2089
Suwanee, GA 30024

/s/ Rodney R. Cate
RODNEY R. CATE (ASB-8568-T46R)

2899680