FILED
2016 Sep-06  PM 03:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ADTRAV CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| Vs. | ) | Case No. 2:14-cv-56-TMP |
| | ) | |
| DULUTH TRAVEL, INC., | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

## MEMORANDUM OPINION and ORDER

Pending before the court are the motion for partial summary judgment (doc. 61) and the motion to strike the expert testimony of Howard Zandman (doc. 64), filed by plaintiff ADTRAV Corporation ("ADTRAV"). The defendant, Duluth Travel, Inc., ("Duluth") has filed a motion to strike the expert report of Ralph Summerford (doc. 54), and a supplemental motion to strike Summerford's testimony (doc. 65). Also pending is the defendant's motion to amend its counterclaim. (Doc. 82). All of the motions have been fully briefed. The court will address the various motions to strike expert testimony in a separate order. This Memorandum Opinion will focus on the motion for partial summary judgment and the motion to amend the counterclaim. The parties have consented to the full dispositive

2

jurisdiction of the undersigned pursuant to 18 U.S.C. Section 636(c); accordingly, the court enters this order.

## PROCEDURAL HISTORY

This lawsuit arises from an agreement reached between the parties, two companies engaged in the provision of travel services, which called for the two companies to work together to provide travel management services to the Department of Veterans Affairs ("VA").   Defendant Duluth was awarded a contract with the VA to arrange for travel services for VA employees and beneficiaries. Essentially, the contract made it the official travel agency to arrange travel for all VA employees and beneficiaries.   Duluth, which was too small to fulfill all of the duties of the VA contract, arranged to subcontract some of the work, such as accounting, to ADTRAV.   The parties first entered into a contract governing the provision of VA services and the allocation of revenues in 2005 ("the 2005 Contract") and then entered a subsequent agreement in 2010 ("the 2010 Contract"). ADTRAV prepared weekly and monthly reports to record the revenue earned as a result of the VA travel, and showed the allocations of the revenue to Duluth or ADTRAV in accordance with the contracts.

The complaint commencing the action was filed by ADTRAV on January 10, 2014.   The plaintiff alleges two claims: (1) that Duluth breached its contractual

2

obligations by failing to pay to ADTRAV portions of the revenue earned through VA travel, and (2) that Duluth was unjustly enriched by failing to properly distribute or share the revenues from the VA travel arrangements with ADTRAV.  Duluth filed an answer and a counterclaim (doc. 4), asserting three claims: (1) that ADTRAV breached the 2005 Contract by failing to share business with Duluth, (2) that ADTRAV breached the 2010 Contract by failing to properly allocate funds in accordance to the 2010 Contract, and (3) that ADTRAV fraudulently induced Duluth to execute the 2010 Contract and fraudulently distributed the revenues received for the VA travel arrangements.

The court entered a scheduling order in this case on April 8, 2014, setting an August 1, 2014, deadline for adding any new causes of action, defenses, or parties for the plaintiff and of September 2, 2014, for the defendant.  (Doc. 25).  The court also set, *inter alia*, a deadline of February 16, 2015, for the completion of all discovery.  (Id.)  The parties jointly sought an extension of the time for conducting discovery on January 9, 2015, citing "scheduling conflicts and the holidays" as reasons that it was "impossible" for the parties to conclude discovery before the court's deadline.  (Doc. 31).  The parties submitted a proposed revised scheduling order, which noted that the deadline for adding causes of action, defenses, or parties had passed, and which proposed no reopening of the window for additional

pleadings or parties.  (Doc. 31-1).   The proposed order sought more than six months of additional time for conducting discovery, proposing a deadline of July 24, 2015, and setting a trial-ready date of October 1, 2015.  (Id.)   After conducting a telephone conference with counsel, the court entered a revised scheduling order, adopting the discovery deadline as proposed, and expressly forbidding the addition of causes of action, defenses, or parties.  (Doc. 33).  On April 30, 2015, the parties again filed a joint motion for an extension of the deadline for discovery, seeking until July 31, 2015, to conduct fact discovery and seeking to postpone expert discovery until August 14, 2015, for the defendant, and September 14, 2015, for the plaintiff.  (Doc. 34).  The parties cited "unavoidable scheduling conflicts and delays in third-party responses to subpoenas" as reasons it was "impossible" to conclude fact and expert discovery in accordance with the court's deadline.  (Id.)  The court granted the motion, and again noted that the deadlines previously established regarding the addition of any claims, defenses, or parties had passed and was not affected by the revised scheduling order.  (Doc. 35).  On August 5, 2015, ADTRAV filed a motion to permit additional discovery, citing requests for production and interrogatories to which Duluth had filed objections and had not substantively responded.  (Doc. 37).

In response to notices to the court that the parties were amenable to mediation, the court on August 12, 2015, entered an order directing the parties to engage in mediation and stayed the remaining deadlines for 60 days.  (Doc. 38).   Mediation was unsuccessful, and, after the stay expired, on October 16, 2015, Duluth filed a response in opposition to the motion for additional discovery.  (Doc. 40).   The court directed counsel to meet and confer regarding the discovery disputes, and to file a status report regarding the issues no later than October 30, 2015; the court also set the matter for hearing on November 3, 2015.  (Doc. 41).   The parties filed a status report, and therein notified the court that Duluth intended to file a motion to compel certain discovery it sought.  (Doc. 42).   Accordingly, the motion hearing was continued, pending the filing of the motion to compel.  (Doc. 43).   On November 2, 2015, Duluth filed a motion to compel (doc. 44), and the two pending discovery motions were set for hearing.  (Doc. 45).    A hearing was held on the motions on November 13, 2015, and the court directed the parties to report back to the court after attempting to resolve some issues; the court further extended the deadline for the completion of all expert discovery until January 13, 2016.  (Doc. 46).   The parties filed a joint status report on November 20, 2015, in which Duluth sought a further hearing on unresolved issues.  (Doc. 48).    A hearing was held on

November 30, 2015, and the court ordered certain further discovery, granting in part and denying in part both motions.   (Doc. 53).

On January 4, 2016, Duluth filed a motion to strike the expert report of ADTRAV's expert, Ralph Summerford (doc. 54), which was supplemented on February 2, 2016.   (Doc. 65).   On January 27, 2016, ADTRAV filed a motion for partial summary judgment as to Duluth's counterclaim.   (Doc. 61).   On the same date, ADTRAV filed a motion to exclude the expert testimony of Duluth's expert, Howard Zandman.   (Doc. 64).

On March 3, 2016, Duluth filed a motion to strike the plaintiff's motion for partial summary judgment (doc. 72), which was denied (doc. 73).   On April 4, 2015, Duluth filed a motion for sanctions (doc. 75), which was fully briefed. Duluth sought a hearing on the motion (doc. 80), and the court heard oral argument on June 17, 2016.   While the motion for sanctions was pending, Duluth filed a motion to file an amended counterclaim.   (Doc. 82). The court entered an order on July 5, 2016, denying the motion for sanctions, but requiring ADTRAV's chief executive officer to execute an affidavit describing the records search conducted in response to a previous court order.   (Doc. 85).   In response, ADTRAV filed the affidavit of Roger Hale on July 15, 2016.   (Doc. 87).

## DISCUSSION

### A.   Duluth's Motion to Amend Counterclaim

This action has been pending for more than two and a half years.   Discovery has been repeatedly extended, and the parties have engaged in extensive discovery. The motion for leave to file the amended counterclaim was filed in June of 2016. Duluth supports its motion to file the amendment at this belated date by arguing that it did not have any "proof" to support the expanded claims until ADTRAV produced additional discovery responses in December of 2015.

While the court notes that leave to amend is generally "freely given" pursuant to Federal Rule of Civil Procedure 15(a), that standard applies to timely requests to amend the pleadings.   In this case, the time for filing amended pleadings expired on August 1, 2014, almost two years before the motion to amend was filed.   Because the motion came after the court's scheduling order allowed, Duluth's motion is held to a more exacting standard.   The motion to amend must meet the "good cause" standard set forth in Rule 16(b), which requires that the party seeking to untimely amend must demonstrate diligence.   Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998).   Absent a showing of good cause and diligence, the court is precluded from modifying the scheduling order.   A failure to impose the stricter standard of Rule 16(b) "would render scheduling orders meaningless" and would

ignore Rule 16(b)'s purpose and effect.   133 F.3d at 1419.   Even when a movant

establishes good cause and diligence, an untimely motion to amend the pleadings

may be denied pursuant to Rule 15(a) on grounds of undue delay, undue prejudice,

or futility.[1]   See, *e.g.*, Allstate Ins. Co. v. Regions Bank, 2014 WL 4162264 (S.D.

Ala. Aug. 19, 2014)(allowing amendment to base claims on newly discovered

evidence where the movant filed within three weeks of the deadline for adding

claims and parties, and just 16 days after the discovery of the evidence).

    As ADTRAV points out, Duluth's CEO testified that he suspected that

ADTRAV was withholding revenues early in the contractual relationship -- which is

the foundation of the claims Duluth seeks to amend.   To allow for amendment of

the counterclaim almost three years into the litigation of this matter would cause

undue delay in an already lengthy and contentious process.   The deadlines for the

filing of discovery and dispositive motions would have to be extended yet again.

ADTRAV would be prejudiced in that it already has filed a motion for partial

summary judgment.

    The court has been lenient in providing the parties with additional time for

fact discovery, for expert discovery, and for the filing of dispositive motions.   The

---

[1]     Although the plaintiff/counter-defendant asserts that the amendment would be
futile in that claims arising from the 2005 time period would be barred by the statute of limitations,
the court offers no opinion on whether such claims would be time-barred.

time for leniency has passed, however, and some end to this lawsuit must be brought into sight.   Because the movant has failed to demonstrate the requisite good cause and diligence, and because the court finds that allowing this amendment would create undue delay and would prejudice the counter-defendant, the court finds the motion for leave to file an amended counterclaim (doc. 82) is due to be DENIED.

### B.   Motion for Partial Summary Judgment

#### 1.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).   The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its

case on which it bears the ultimate burden of proof.   Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."   Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.   Celotex, 477 U.S. at 324.   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   The substantive law will identify which facts are material and which are irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all

justifiable inferences are to be drawn in his favor.   <u>Anderson</u>, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### 2.  Facts

Viewing the evidence in a light favorable to the non-moving Duluth, the following facts appear to be undisputed by substantial evidence.   On December 23, 2005, ADTRAV and Duluth entered into the 2005 Contract, which set forth each company's responsibilities and revenue distribution goal related to the travel contract awarded to Duluth by the VA to handle travel arrangements for VA employees, VIPs, and beneficiaries.   The two companies worked in concert to draft the 2005 Contract.   The parties modified the 2005 Contract once to remove a "shared business obligation," and again a few days later to restore that provision.

As of December 23, 2005, Ed Arias was vice president of Duluth and was Duluth's principal contact with ADTRAV.   He was responsible for day-to-day operations, but not exclusively for the VA matters.   Arthur Salus, Duluth's CEO, relied upon Arias to perform the day-to-day functions of the 2005 Contract, but Duluth did not renew Arias's employment contract in December 2012 after it made a determination that Arias was not performing his job.

Duluth is a travel agency that, prior to December 23, 2005, had qualified as a Service Disabled Veteran-Owned Small Business ("SDVOSB").   As such, Duluth had an advantage in the bidding process for certain government accounts, including the VA account.   ADTRAV was not a SDVOSB and could not have been awarded the 2005 Contract.   ADTRAV had, however, serviced other major government accounts prior to the 2005 Contract.   As of December 23, 2005, Duluth did not have the structure in place to service the VA contract, especially in the area of accounting, but ADTRAV did.   At the time the parties entered into the 2005 Contract, Roger Hale was the CEO of ADTRAV.

Duluth and ADTRAV worked together to submit Duluth's bid for the VA contract.   The 2005 Contract contains the following pertinent provisions:

> Under this agreement, Duluth Travel will strive to distribute the work (reservations) and total income by company to be made for the Veterans Administration (VA) in a proportion so that Duluth Travel maintains at least 51% of revenue at all times and ADTRAV as close to 49% of revenue as possible.
>
> * * *
>
> After the end of the 1st, 2nd, and 3rd month of execution, an analysis will be made to ascertain transactional revenue generated by each company since offline and online reservation usage by the different agencies may distort the 51% to 49% revenue distribution goal if only transactions are taken into account.   No retroactive action will be taken.   However, both Duluth Travel and ADTRAV (contractors) will use their best

13

efforts to transfer transactions to each other over the next evaluation period to achieve the 51% to 49% distribution.

\* \* \*

Agencies have agreed to pool all of the revenue generated from the VA account.  All revenues, including but not limited to, transaction fees, hotel/car commissions and overrides, airline commissions and overrides, and all GDS revenues, shall be collected and deposited into an escrow bank account established exclusively for the VA account.

\* \* \*

Considering that Duluth Travel has presented to ADTRAV this VA business opportunity, ADTRAV is also committed to allow Duluth Travel to share in any future business ventures that it (ADTRAV) may generate being of similar type and add up to at least the same revenue as presented to ADTRAV by Duluth Travel.

(Doc. 4-1, pp. 20-24).

Until his termination on December 31, 2012, Ed Arias received revenue reports from ADTRAV that provided information from which the percentage splits could be derived.[2]  Salus asked Arias to demand the "backup" information from ADTRAV to support the revenue reports, but the underlying information was not supplied.

---

[2]     In general terms, each party would make reservations and travel arrangements for VA employees and beneficiaries under the VA contract, and those reservations would generate commissions and fees payable to whichever party made the arrangement.  At the end of each week and month, reports would be prepared to show the amount of revenue-producing business performed by each.

14

During the time the 2005 Contract was in effect, ADTRAV entered into several other contracts to provide travel services to government agencies other than the VA.   None of these contracts involved a Service Disabled Veteran-Owned Small Business ("SDVOSB").   Duluth was aware of these contracts and complained to ADTRAV in 2009 that they should be shared business under the 2005 Contract. (Doc. 63-8, Salus Depo., pp. 113-116).   The parties also became involved in a dispute concerning a State of Pennsylvania government travel project, which was awarded to ADTRAV and a third company based in Pennsylvania, even though it was Duluth who brought the business opportunity to ADTRAV's attention.   Duluth did not share in the business, and complained that ADTRAV had stolen the business. In order to resolve the issue over whether that business opportunity had been usurped, the parties verbally agreed, effective August 17, 2009, that Duluth would handle the dedicated phone line used for the beneficiary travel revenue and would receive 60% (up from 51%) of the revenue from the VA Contract.[3]

---

[3]      The parties dispute whether Duluth was intended to receive all of the revenue from the beneficiary business, or whether that business was part of the entire revenue to which Duluth would receive 60%.   The parties agree, however, that the new revenue goal became effective on August 17, 2009, and was agreed upon in order to resolve the dispute over the Pennsylvania contract.

On December 16, 2010, Duluth and ADTRAV entered into a new agreement relating to the VA travel contract.   The 2010 Contract increased Duluth's revenue share goal from 60% to 75%.   The 2010 Contract provides, *inter alia*:

> This Agreement is the sole agreement between the parties relating to the subject matter hereof and supersedes all prior understandings, writings, proposals, representations, or communications, oral or written, of either party.   This Agreement may be amended only by instrument executed by the authorized representatives of the parties.

(Doc. 4-2, p. 8).   The 2010 Contract[4] further provided:

> 1.
>
> This Agreement is entered into by and between ADTRAV and Duluth in preparation and anticipation of the "rebid" of the Department of Veterans Affairs (VA) travel services which are expected to commence on October 1, 2011 (the 2011 Services). .... This Agreement concerns how ADTRAV and Duluth will handle the operations of the VA account and shall govern the parties in the event that Duluth is awarded the contract for the provision of the 2011 services.
>
> 2.
>
> This Agreement sets forth and describes the operations and services to be provided by Duluth and ADTRAV in the event the Veterans Affairs travel services contract for the provision of 2011 Services (the 2011

---

[4]   The court must clarify its references to the various paragraphs in the 2010 Contract.   Although most of the paragraphs in it are numbered, the very first actual paragraph is not numbered.   Accordingly, when the court uses a reference such as "Paragraph No. 1," it refers to the paragraph assigned that number in the text of the contract.   References to the "second paragraph" or the "fifth paragraph," refer to the actual numerical location of the paragraph while counting the unnumbered first paragraph.   Thus, the "second paragraph" is the same as "Paragraph No. 1," because it appears as the second actual paragraph in the contract even though it is assigned the designation "1."

Contract), whether extended under the present contract or rebid and is [sic] awarded to the incumbent. ....

3.

Under this agreement, both companies will strive to distribute the work (reservations) and total income by company to be made for the VA in a proportion so that Duluth Travel maintains 75% (seventy-five percent) of the revenue and ADTRAV maintains 25% (twenty-five percent) of the revenue.   To simplify the work distribution and obtain the mentioned percentage, Duluth will handle all the Beneficiary Travel, VIP travel and the proportion of employee travel necessary to complete the agreed upon percentage of business distribution.   Other type of VA travel work distribution can be considered that will also suffice the revenue distribution percentage.

4.

Based upon the terms set forth in Paragraph 3 above, both agencies will retain the amount of the reservation service fee generated by that agency's employee(s). .... The parties agree to work together in good faith to ensure that the percentage requirements set forth in Paragraph 3 herein are met.

(Doc. 4-2, pp. 2-3).

The contract recited an "effective date" of December 16, 2010 (doc. 4-2, p. 2), but also stated that it "shall govern" the handling of the VA contract "in the event" that the rebid contract was awarded to Duluth. (Id.)   The 2010 Contract called for Duluth to handle all beneficiary travel, except that calls regarding beneficiary travel

17

that came in "after hours" would be handled by ADTRAV.[5]   One way the revenues could be balanced between the parties was to adjust staffing: An increase in staffing of one party meant more reservations would be handled by the company that had increased the number of agents answering calls.

The VA chose to rebid the travel contract and the rebid contract was not initially awarded to Duluth, but Duluth protested the award of the contract to another company.  Duluth was awarded a bridge contract with the VA effective April 1, 2012.

On December 31, 2012, Ed Arias's employment contract with Duluth expired. About six months later, Duluth ceased making regular payments to ADTRAV, asserting that there were "accounting problems" with ADTRAV reports.  This action was filed by ADTRAV on January 10, 2014.

### 3.   Duluth's Counterclaims

Duluth has asserted three counterclaims: two alleging breach of contract, respectively of the 2005 Contract and the 2010 Contract, and a third count alleging "fraud in the inducement" by ADTRAV with respect to the 2010 Contract. (Doc. 4).   In count one of the counterclaim, Duluth alleges that ADTRAV breached

---

[5]        The parties dispute whether the beneficiary travel revenue counted toward the revenue split or was calculated separately and "on top" of the 75 percent.   Duluth further avers that ADTRAV was taking revenue from beneficiary travel in violation of the agreement that all beneficiary travel revenue was due to be awarded to Duluth.

18

the 2005 Contract by failing to share with Duluth business opportunities realized by ADTRAV during the term of the contract.   In count two of the counterclaim, Duluth alleges that ADTRAV breached the 2010 Contract by manipulating "the accounting aspects" of the Contract in several different ways to avoid paying Duluth its proper share of the revenue generated under the Contract, including (1) failing to account for and divide all VA-contract revenues pursuant to the proper percentage splits, (2) failing to attribute 100% of VA beneficiary travel revenues to Duluth, (3) claiming online travel revenues at greater than the contract percentage splits, and (4) delaying the date the contract required the percentage split to change from 60/40 to 75/25. Duluth alleges that all of these issues, separately and in combination, resulted in a reduction of its share of VA revenue below the 75/25 percent requirement.   Finally in count three, Duluth alleges that ADTRAV committed fraud by inducing Duluth to enter into the 2010 contract on promises that ADTRAV would (1) split the VA revenues on a 75% to 25% basis and (2) discharge all of its obligations under the contract, including accounting functions, "in a fair and reasonable fashion."

ADTRAV has moved for summary judgment on each of these theories, except the claim that it failed to account properly for all revenue it received under the VA contract.   ADTRAV admits there are fact disputes about its accounting for VA

revenues received that make summary judgment improper on that theory.   The court will address each of the remaining arguments for summary judgment.

### 4.   Discussion

#### a.   Breach of 2005 Contract Regarding Sharing of Future Business

ADTRAV seeks summary adjudication of count one of Duluth's counterclaim alleging that ADTRAV breached the 2005 Contract by failing to share "future business" ADTRAV generated "of similar type and [which] add[ed] up to at least the same revenue as presented to ADTRAV by Duluth Travel."   ADTRAV asserts that any dispute regarding the sharing of future-business revenue was resolved by the 2009 verbal agreement to increase Duluth's revenue goal from 51% to 60%, and from 60% to 75% in the 2010 contract.   ADTRAV has pleaded that the counterclaim is subject to the affirmative defense of accord and satisfaction in that the first percentage change was raised expressly as a solution to the dispute over unshared business related the Pennsylvania contract.   Likewise, ADTRAV contends that, in return for increasing Duluth's revenue share of VA business under the 2010 Contract increase to 75%, the 2010 Contract did not include any obligation on the part of ADTRAV regarding shared business and, therefore, precludes any

claim relating to business after 2010.   In other words, ADTRAV asserts that Duluth cannot recover on this claim because it already has agreed to a settlement of the claim.

Arthur Salus, the CEO of Duluth, testified about this matter as follows:

Q.     Do you recall a time in 2009 that Duluth and ADTRAV changed their percentage from 51-49 to 60-40?

A.     Yes.

Q.     Do you know why?

A.     I think it was because we did not share in the revenue in the State of Pennsylvania.

Q.     Well, I thought that's why you told me you went to 75-25.

* * *

Q.     (By Mr. Bates) Did I misunderstand you?

A.     Went 75-25.
       Oh, no.  No, no.  No.  75-25 because he didn't share in any of the business prior to that time, the shared business we were supposed to get.

Q.     All right.   What business?

A.     Any government business that he obtained on his own--

Q.     And what—

A.     --he was supposed to share.

21

Q.   And what government business did he obtain on his own that he didn't share with you other than Pennsylvania?

A.   GSA.   Department of Energy.   Could be Commerce.   I mean he had several accounts.

(Doc. 68-3, Salus Depo. pp. 92-93).   Thus, Salus understood that the shift from Duluth receiving 51% of VA revenue to 60% was a resolution of the Pennsylvania matter, while the shift in the 2010 Contract to Duluth receiving 75% of VA revenue was due to the alleged unshared government business obtained by ADTRAV.

Under Alabama law, accord and satisfaction may be shown "when parties agree to substitute some performance different from that originally contemplated in the terms of the contract, and is thus a means through which parties discharge their duties under a contract."   Shufford v. Integon Indem. Corp., 73 F. Supp. 2d 1293, 1297 (M.D. Ala. 1999), citing 6 Arthur Linden Corbin, Corbin on Contracts § 1276 at 115 (1962); see also Ex parte Meztista, 845 So. 2d 795, 787 (Ala. 2001).   The elements of a defense of accord and satisfaction are "(1) proper subject matter, (2) competent parties, (3) assent or meeting of the minds, and (4) consideration." Shufford, 73 F. Supp. 2d at 1297, quoting Austin v. Cox, 492 So. 2d 1021, 1022 (Ala. 1986).   The Alabama Supreme Court has noted that whether parties have reached an accord and satisfaction is "almost always a question for the jury." Newson v. Protective Ind. Ins. Co. of Ala., 890 So. 2d 81, 87 (Ala. 2003), quoting

Leisure Amer. Resorts, Inc., v. Carbine Constr. Co., 577 So. 2d 409, 411 (Ala. 1990). [6]   "There can be no accord and satisfaction 'without the intentional relinquishment of a known right.' "   Ex parte Meztista, 845 So. 2d 795, 797 (Ala. 2001), quoting O'Neal v. O'Neal, 227 So. 2d 430 (1969).

In response to the motion for partial summary judgment, Duluth asserts that ADTRAV cannot prove a "meeting of the minds," or that the consideration given was adequate.   An argument that the consideration was inadequate is without merit. While *sufficient* consideration must involve more than the obligation a contracting party already is obligated perform, see Waide v. Tractor and Equipment Co., 545 So. 2d 1327 (Ala. 1989), the courts generally do not entertain questions of whether the consideration is *adequate*.   If the contracting party gives new or different consideration in return for the release of a previously-existing contractual obligation, the adequacy of the new or different consideration is not a basis on which the accord and satisfaction agreement can be challenged.   It is clear under Alabama law that the adequacy of consideration is "for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced." Colburn v. Mid-State Homes, Inc., 266 So. 2d 865, 871 (Ala. 1972), quoting 17 C.J.S. Contracts Section 127, p. 843.   It further is well settled that mere inadequacy

---

[6]   Newson, however, was based on a motion to dismiss, and the only facts before the court were the face of the complaint, the insurance policy at issue, and the checks.

of consideration, alone, is "never sufficient to vitiate a contract."   Seier v. Peek, 456

So. 2d 1079, 1082 (Ala. 1984).

It appears to be undisputed that Duluth and ADTRAV reached a verbal

agreement to alter the revenue split to 60/40 in August 2009.   Salus testified

explicitly that the reason for the change was the dispute over the State of

Pennsylvania travel business.   After that verbal agreement was reached, the parties

continued to do business under the 2005 Contract for at least another year before the

2010 Contract was negotiated, bolstering the conclusion that the Pennsylvania

matter was satisfactorily resolved by the verbal agreement.   Once the 2010 contract

was negotiated, the court must look to the language of the Contract.   It provided in

relevant part:

> This Agreement is the sole agreement between the parties relating to
> the subject matter hereof and *supersedes all prior understandings,*
> *writings*, proposals, representations, or communications, oral or
> written, of either party.  This Agreement may be amended only by
> instrument executed by the authorized representatives of the parties.
> [Italics added].

The "subject matter" of the 2010 Contract was defined as "how ADTRAV and

Duluth will handle the operations of the VA account and shall govern the parties in

the event that Duluth is awarded the contract for the provision of the 2011 services."

This plainly had the effect of supplanting the 2005 Contract as well as the 2009

verbal agreement to split VA revenues 60/40. To the extent the language is ambiguous because it does not address any past disputes between the parties, Salus's deposition testimony makes clear that one purpose of the Contract's change in the revenue division to 75/25 was to resolve the dispute over ADTRAV's refusal to share the business from its other government contracts.

In support of the assertion that there was an assent or a meeting of the minds, ADTRAV offers the testimony of Duluth's own employees, Ed Arias and Arthur Salus, who both testified that the increase in the revenue split to 60% for Duluth was an agreement reached because of a dispute related to the failure to share revenue as called for in the 2005 Contract. (ADTRAV's brief, doc. 62, pp. 13-14). Although Duluth has offered an affidavit of Arthur Salus that states that the split was not changed as a means to resolve past disputes, (doc. 70-1), Salus's deposition testimony clearly states that the revenue split of 51/49 percent was increased to 60/40 "because we did not share in the revenue in the State of Pennsylvania" and that the later 75/25 split was "because [ADTRAV] didn't share in any of the business prior to that time, the shared business we were supposed to get." (Doc. 63-8, Salus Depo., pp. 92-93).[7] Salus identified contracts with the GSA, the Department of

---

[7]       These page numbers refer to the pages of the deposition itself. The page number assigned to the exhibit by the court's electronic filing system is page 25 of 33.

Energy, and the Department of Commerce as examples of business obtained by

ADTRAV that Duluth claims it should have shared in, but did not.     (Id.)

ADTRAV argues that Salus's affidavit on this point is a sham and must be

disregarded.   Under the Eleventh Circuit's sham-affidavit rule, a party may not

create a dispute of fact to avoid summary judgment merely by offering an affidavit

that contradicts, without explanation, clear testimony to the contrary in an earlier

deposition.   The court of appeals has explained:

> A district court may disregard an affidavit as a sham when a party to the
> suit files an affidavit that contradicts, without explanation, prior
> deposition testimony on a material fact.  *Van T. Junkins & Assocs.,
> Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).   The sham
> affidavit rule should be applied sparingly, *Latimer v. Roaring Toyz,
> Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010), and only when "[t]he earlier
> deposition testimony ... consist[s] of clear answers to unambiguous
> questions which negate the existence of any genuine issue of material
> fact," *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir.1986)
> (quotations omitted).

Kernel Records Oy v. Mosley, 694 F.3d 1294, 1300 n. 6 (11th Cir. 2012); see also

Santhuff v. Seitz, 385 F. App'x 939, 944 (11th Cir. 2010).   The court is persuaded

that, at least on this point, Salus's affidavit is a sham.   In his deposition he clearly

and unequivocally testified that the shift to a 60/40 split of VA revenues was to

resolve the dispute over the Pennsylvania travel business and that the later 75/25

percent split negotiated in the 2010 contract was to resolve the dispute over

ADTRAV's other government travel contracts.   It is a sham for Salus to offer a later affidavit claiming that "[t]his change in percentage revenue distribution had nothing to do with Adtrav's prior breaches of contract [with respect to unshared business]."[8] The sham-affidavit rule prevents him from contradicting his own sworn deposition testimony, without explanation, simply to create a genuine issue of fact to avoid summary judgment.   Salus's affidavit will be disregarded on this particular point.

Duluth also argues that Arias is not credible and that his testimony does not bind Duluth; however, the court need not rely upon Arias to find that ADTRAV has demonstrated that the parties reached an agreement no later than 2010 to resolve the issue of any failure to share business, and that after the 2010 Contract, no duty to share business existed.   Accordingly, ADTRAV is entitled to summary judgment in its favor on the counterclaim for breach of contract relating to shared business.

b.   Breach of 2010 Contract Regarding 75/25 Percent Split

ADTRAV seeks summary adjudication in its favor on Duluth's counterclaim that ADTRAV breached the 2010 Contract by failing to properly share the revenues

---

[8]       Salus contends in his affidavit that the shift to a 75/25 split of VA revenues in the 2010 contract was to compensate Duluth for the loss of shared business in the future, as ADTRAV no longer wanted such a shared business provision in the contract.   This explanation, however, flies in the face of his deposition testimony that the shift occurred because ADTRAV "didn't share in any of the business *prior to that time*, the shared business we were supposed to get."   (Italics added).   Plainly, at the time of his deposition testimony, Salus viewed the shift in the revenue split as a retrospective compensation for the government business ADTRAV failed to share "prior to that time."

under the VA contract pursuant to the provision calling for a 75/25 split.  Duluth identifies a number of ways in which it claims ADTRAV improperly failed to account for and distribute VA revenue, including simply failing to report some revenue, failing to credit 100 percent of beneficiary travel revenue to Duluth, claiming more revenue from online reservations than allowed under the contract, and delaying the date the percentage distribution was to shift from 60/40 to 75/25.  The governing provision of the 2010 Contract states that "both companies will strive to distribute the work (reservations) and total income by company to be made for the VA in a proportion so that Duluth Travel maintains 75% (seventy-five percent) of the revenue and ADTRAV maintains 25% (twenty-five percent) of the revenue."  On first reading, this provision does not mandate a strict distribution of "revenue."  Rather, it clearly states that the parties agree "to strive" to "distribute the work (reservations) and total income by company" in order to try to achieve a distribution of revenue in which 75 percent goes to Duluth.    Further, the parties agreed to work "in good faith" to accomplish the revenue split set out in the agreement.   (Doc. 4-2, p. 2-3).

Neither party discusses the law that governs the interpretation of the instant contract.  The parties cite to Alabama state law frequently, although ADTRAV makes some reference to Georgia law.  Duluth does not expressly contend that

Georgia law should apply.   The court has looked to the 2010 Contract for an applicable provision, which states:

> This Agreement and all obligations of the parties hereunder shall be interpreted, construed, and enforced in accordance with the laws of the State of Georgia and Alabama; provided, however, that if Georgia's conflict or choice of law rules, statutes or constitutional provisions would choose the law of another state, each party waives such rules, statutes or constitutional provisions and agrees that Georgia substantive, procedural and constitutional law shall nonetheless govern.

(Doc. 4-2, p. 8).[9]   The court has applied Alabama law to construction of the contract language, based on the parties' failure to express any opinion otherwise, or to point out any Georgia "rule, statute or constitutional provision" that would "choose the law of another state."   The court further notes that none of the Alabama case authority applied herein appears to conflict with Georgia law, but state general, well established principles of black-letter contract law.

Even an express contractual promise to proceed "in good faith" does not provide a remedy under Alabama law.   Tanner v. Church's Fried Chicken, Inc., 582 So. 2d 449, 452 (Ala. 1991).   As the court explained in Tanner, the party seeking a remedy must prove that the other party "expressly breached some other specific

---

[9]   The 2010 Contract also contains an agreement to submit disputes to arbitration; apparently the parties have chosen not to avail themselves of this provision.   (Doc. 4-2 p. 7).

term" of the contract.   582 So. 2d at 452.   Consequently, Count Two of the counterclaim raises only issues of whether ADTRAV substantially performed the provision to "strive" to split revenues as planned, and whether 100 percent of the beneficiary travel revenues were owed to Duluth regardless of whether the 75/25 split was otherwise achieved.

By the language of the 2010 Contract, the parties clearly anticipated that it would not be possible to assure an exact 75/25 distribution of revenue while also attempting to divide the actual work in that same proportion.   Certainly, if the parties wanted to require a strict 75/25 division of *revenue* alone, they could have drafted the contract to do so, simply by requiring that all VA income, regardless of which company performed the work to earn it, be pooled together and then divided on an arithmetical percentage.   But they did not do this.   Rather, they devised a system under which they "strive[d]" to divide the *work* to be performed between the two companies so that the division of revenue would come as close as possible to a 75/25 split.   This division of *work* model for the contract (as distinct from a strict division of revenue) is confirmed in the next sentences following the description of the 75/25 division, where the contract states, "To simplify the *work* distribution and obtain the mentioned percentage, Duluth will handle all the Beneficiary Travel, VIP travel and the proportion of employee travel necessary to complete the agreed upon

*percentage of business distribution*.   Other type of VA travel work distribution can be considered that will also suffice the revenue distribution percentage."   (Italics added for emphasis).

Count two of Duluth's counterclaim alleges in essence that ADTRAV failed to distribute revenues according to the 75/25 split under the 2010 Contract.   In part, Duluth alleges that ADTRAV simply hid and failed to report some VA revenue with the effect of shorting Duluth's 75% share.   Consequently, to be entitled to summary judgment on this claim, ADTRAV must show that there is no genuine issue of fact as to whether it substantially performed the obligation to "strive" to divide the revenues according to the 2010 Contract.   As the voluminous exhibits provided by both parties in support and in opposition to this motion and to other motions demonstrates, there is ample dispute over the motives, integrity, and credibility of the parties, and relating to the reliability of the records that have been produced. The evidence produced is sufficient to demonstrate that ADTRAV did not "achieve" a precise 75/25 percent split of revenue, but it is not sufficient to erase the factual questions as to whether ADTRAV was "striv[ing]" to do so, or made adequate efforts to achieve the agreed-upon split.   As the Alabama Supreme Court noted in <u>Tanner</u>, the parties "could have included protective language in the Contract to ensure a finder's fee in the event that restaurants were closed ... but they did not

include any such language."   582 So. 2d at 453.   Similarly, ADTRAV and Duluth could have included language that required all revenues to be pooled and then divided on a precise 75 to 25 percent split.   But they did not.   They chose instead to impose a duty to "strive" toward a division of work and not to split revenues at a definitive rate.

To interpret this provision of the contract under Alabama law, the court must read the contract as a whole, and the terms should be given their plain meaning. City of Gadsden v. Boman, 143 So. 3d 695, 704 (Ala. 2014).   The court must apply the common meaning of the language used, and "strive" is defined by Merriam-Webster's Collegiate Dictionary (10th ed.) as "to devote serious effort or energy."   Where a contract term is ambiguous, the court should next apply the rules of construction to resolve the ambiguity.   Ohio Cas. Ins. Co. v. Holcim, 744 F. Supp. 2d 1251, 1259-60 (S. D. Ala. 2010).   The rules of construction generally permit a court to construe the terms against the drafter.   744 F. Supp. 2d at 1260. Although the parties do not address whether the term is ambiguous, the court finds that it is not.[10]   When read as a whole, including the provision regarding beneficiary

---

[10]       The parties, both sophisticated business entities, have confirmed that they "worked together" to draft the contract.   Therefore, the court cannot construe the term "strive" against either party, even if the term were ambiguous.   See, e.g., FabArc Steel Supply, Inc., v. Composite Constr. Systems, Inc., 914 So. 2d 344, 359 (Ala. 2005).

travel, the contract does reveal that the 75/25 split was a goal or a guideline, and that the parties did not anticipate that some consequential or unintended deviation therefrom would constitute a breach of the contract.

In sum, an inquiry into whether ADTRAV breached the 2010 Contract with regard to the split of revenues requires a determination of whether ADTRAV did "strive" to meet the revenue distribution goal and what division of work under the contract was "necessary" to fulfill the contractual provision.   These issues require a jury to assess the credibility and the conduct of the parties related to their good faith in reporting and accounting for revenue earned from the VA.   There is a genuine issues of material fact whether ADTRAV failed to report and account for all VA revenue it received under the 2010 Contract, and this part of the counterclaim alleged by Duluth that ADTRAV improperly failed to split revenues in accord with the 75/25 percent agreement.   Accordingly, the motion for summary judgment as to this claim is due to be denied.

In addition to alleging that ADTRAV simply failed to account for all VA revenue it received, Duluth asserts that it was supposed to receive all revenue from "beneficiary" travel arrangements *plus* 75% of all other VA travel revenue.   The plain language of the contract provision quoted above is to the contrary, stating that the beneficiary travel revenue was used as part of the calculation of the 75/25 split,

not apart from it.   When the contract language stated, "To simplify the work distribution and *obtain the mentioned percentage*, Duluth will handle all the Beneficiary Travel, VIP travel and the proportion of employee travel necessary to complete the agreed upon *percentage of business distribution* [italics added]," it can have no other reasonable meaning than that beneficiary travel revenue was one of the elements of revenue used to calculate the agreed "percentage of business distribution."   In other words, Duluth's 75% of "business distribution" consisted of "Beneficiary Travel," "VIP travel," and such other "proportion of employee travel necessary to complete" its agreed 75% share of the business distribution.   While Duluth was entitled to 100% of revenue from "beneficiary travel," that sum of revenue was counted toward Duluth's 75% share of the total amount of VA revenue generated under the 2010 Contract, not a separate and distinct stream of revenue. To be clear, Duluth was not entitled to 100% of beneficiary travel revenue *plus* 75% of all other VA travel revenue.   Thus, insofar as Duluth's counterclaim alleges that ADTRAV breached the contract by calculating beneficiary travel revenue as part of Duluth's 75% of revenue, ADTRAV is entitled to judgment as a matter of law.   The contract language is unambiguous on this point.

Next, Duluth alleges in count two that ADTRAV breached the duty to distribute revenue under the 75/25 percent provision by claiming that, with respect

to online reservation revenue, it was initially entitled to 50% of such revenue and, then later, to 33.33%, rather than the 25% provided in the 2010 Contract. ADTRAV contends in support of its summary judgment motion that the parties exchanged a series of emails to confirm agreement between them as to how online reservation[11] revenue would be distributed. This, ADTRAV, contends represents a "course of conduct" under the 2010 Contract that amounted to a waiver of the provision requiring that modifications of the contract had to be in a signed writing.

Paragraph No. 4 of the 2010 Contract states the following:

> Based upon the terms set forth in Paragraph 3 above, both agencies will retain the amount of the reservation service fee generated by that agency's employee(s). For full service reservations, agents of both companies are authorized to work on any record to improve customer service and attention but are not allowed to make any changes to a record that may modify the originating full service agent's information. Any disputes on the authentication of the originating agent will be determined through written agreement between the supervising managers designated for both companies.

---

[11]    Online reservations are fundamentally different from other travel services. For example, if a VA travel arranger or other person entitled to VA travel services telephoned one of the dedicated phone lines for such services, that person would be connected with an agent employed by either Duluth or ADTRAV, and that agent would assist the person with whatever travel arrangements were needed. For revenue accounting purposes, whatever reservations that agent made could be attributed to the company that employed the agent. Thus, if a person calling the telephone lines got an agent from Duluth, revenue from that agent's assistance would be credited to Duluth. If the caller reached an ADTRAV agent, the revenue would be attributed to ADTRAV. Online reservations, however, did not require the services of an agent, being performed directly online by the traveler. For that reason, revenue from such reservations had to be divided between Duluth and ADTRAV on some other basis.

>New Online reservations will be tagged to a corresponding agency, Duluth or ADTRAV, in accordance with the agreed revenue split. Online reservations that are bumped up to a full service fee will change ownership to the agent who claimed the original bump up of the reservation.   The parties agree to work together in good faith to ensure that the percentage requirements set forth in Paragraph 3 herein are met.

(Doc. 4-2, p. 3).   This provision unequivocally states that online reservation revenue would be divided "in accordance with the agreed revenue split."   The meaning of that reference is made clear in the last sentence of the provision, stating, "The parties agree to work together in good faith to ensure that the percentage requirements set forth in Paragraph 3 herein are met."   There is no ambiguity that, on the face of the written agreement itself, the parties agreed to divide the online reservation revenue in accordance with the 75/25 percent distribution described in Paragraph 3 of the contract.   Moreover, Paragraph No. 1 of the contract expressly provided that the contract could be amended only "by an instrument executed by the authorized representatives of both parties."

ADTRAV argues that this agreed division of online reservation revenue was modified[12] by the parties in an email exchange between Ed Arias for Duluth and

---

[12]    Another aspect of this issue, which will be addressed below, is when the 2010 Contract took operative effect.   Although the contract was dated December 16, 2010, which date was expressly referred to as "the Effective Date," ADTRAV points to another provision in the contract that appears to make it contingent upon Duluth successfully winning the VA contract "rebid," expected to occur on October 1, 2011.   Based on this, ADTRAV contends that,

Lynn Slaughter for ADTRAV in late March 2012.   On March 30, 2012, Ed Arias emailed Lynn Slaughter, asking, "Is the online split ready to be modified from 1 for Duluth to 1 for ADTRAV to 2 to 1?   Let me know since I am rearranging personnel for queues."   (Doc. 63-13, p. 14 of 44).   Slaughter responded to the email that day with a simple, "Yes."   Arias then reported to Duluth CEO Salus that "Lynn confirms that they adjusted the percentage of online from 1 to 1 to 2 to 1 for Duluth." (Id.).   Based on this email exchange, it appears that, notwithstanding the December 16, 2010, date of the contract, the parties understood from that date until March 30, 2012, that online reservation revenue was being divided 50/50.   Indeed, Arias, on behalf of Duluth, seeks confirmation from ADTRAV that the division would change to two-thirds for Duluth and one-third for ADTRAV.

The legal question is whether this email exchange or the parties' course of conduct could modify the express provision in Paragraph No. 4 of the contract that online reservation revenues were to be divided pursuant to the agreed 75/25 percent split.[13]   The court believes this issue raises a question of fact for the jury to

---

notwithstanding the "Effective Date," the provisions in the contract requiring a shift in revenue splits actually did not go into effect until April 1, 2012, when Duluth finally was awarded a bridge contract by the VA.

[13]   The "General Provisions" in Paragraph 25 of the contract contain two provisions indicating that the contract may be amended or modified only in a signed writing.   Within the first subparagraph appears the sentence: "This Agreement may be amended only by an instrument executed by the authorized representatives of both parties."   Also, in the fourth subparagraph appears, "Neither this Agreement nor any provision hereof, may be changed, waived, discharged,

determine.

At the outset, the court is not convinced that an email exchange, even arguably in writing, constitutes an amendment made by "instrument" executed by authorized representatives of the parties.   Although Arias and Slaughter had actual authority to make the change, they did not execute an "instrument."   An email exchange lacks the formalities implied by the use of the term "instrument."   As that dusty tome Black's Law Dictionary (4th ed.) states, an "instrument" is "[a] written document; a formal or legal document in writing," and "[a]nything reduced to writing, a document of a formal or solemn character…."  Id. at 719-720.   Plainly, emails exchanged between contracting parties, even in the Twenty-First Century, cannot be said to be a "formal document," or a document "of a formal or solemn character."   The email exchange was not, therefore, an "instrument" executed by authorized representatives to effectively amend the 2010 Contract.

ADTRAV contends that the parties amended the contract by their course of conduct.   Both Georgia law and Alabama law recognize that a written contract can be modified by the course of conduct of the parties to the contract where that conduct manifests an intent by the parties to modify the written contract.   For

---

or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought."   (Doc. 4-2, p. 8).   As is discussed in text below, even these provisions may be waived by the manifest intent of the parties demonstrated through a course of conduct.

example, the Georgia Supreme Court has acknowledged that private parties (but not State agencies) "may be able to modify and extend written contracts by manifesting their intent to do so even without a written agreement…"   Georgia Dep't of Labor v. RTT Associates, Inc., 299 Ga. 78, 82, 786 S.E.2d 840, 843 (2016); see also Ryder Truck Lines v. Scott, 129 Ga. App. 871, 873–874(4), 201 S.E.2d 672 (1973)("a written contract may be modified by mutual consent of the parties, which need not be expressed in words, in writing or signed, but the parties must manifest their intent to modify the original contract"); Medical Doctor Associates, Inc. v. Lab–Quip Co., 201 Ga. App. 880, 882(1)(b), 412 S.E.2d 625 (1991) (accord); Dan Gurney Indus. v. Southeastern Wheels, 168 Ga. App. 504, 505(1), 308 S.E.2d 637 (1983) (accord). Likewise, the Alabama Supreme Court has explained that, while the waiver of a contract right requires an "intentional relinquishment of a known right," "[an] intention to waive a right may be found where one's course of conduct indicates such an intention or is inconsistent with any other intention."   Ford v. Jackson Square, Ltd., 548 So. 2d 1007, 1013 (Ala.1989); see also Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 930 (Ala. 2007). The Alabama Court of Civil Appeals also has addressed this point:

> Waiver is defined as the voluntary surrender or relinquishment of some known right, benefit, or advantage.  *City of Montgomery v. Weldon*, 280 Ala. 463,

> 195 So. 2d 110 (1967). However, it is well established that a party's intention to waive a right is to be ascertained from the external acts manifesting the waiver. *Givens v. General Motors Acceptance Corp.*, 56 Ala. App. 561, 324 So. 2d 277 (1975).   This intention to waive a right may be found where one's course of conduct indicates the same or is inconsistent with any other intention.

> *Waters v. Taylor*, 527 So. 2d 139, 141 (Ala. Civ. App. 1988).   *See also T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir.1980) (despite contractual provision requiring notice of breach of warranty to be sent by registered mail, seller's responses to buyer's initial noncomplying complaints established a course of performance allowing that notice provision to be disregarded); and *Becker Roofing Co. v. Pike*, 230 Ala. 289, 160 So. 692 (1935) (contractual provision requiring buyer to notify seller in writing of leaks in roof held waived in view of undisputed evidence indicating that buyer had repeatedly notified seller by telephone, that seller had accepted those calls and promised to repair, and that seller's efforts to repair had been unsuccessful).

Stewart v. Bradley, 15 So. 3d 533, 543–44 (Ala. Civ. App. 2008).   This rule applies equally to waiver of the provision in a written contract that it may be modified or amended only by another writing.   The Alabama Supreme Court has explained:

> [U]nder Alabama law a written agreement may be modified by a subsequent oral agreement of the parties, unless some statutory provision provides otherwise.   *Hall v. Integon Life Insurance Co.*, 454 So. 2d 1338 (Ala. [1984]).   This is so even where the contract contains a requirement that all modifications be in writing. *Commercial Contractors, Inc. v. United States & Guaranty Co.*, 524 F.2d 944 (5th Cir. 1975) (applying Alabama law).

40

*Duncan* [*v. Rossuck*], 621 So. 2d [1313,] 1315 [(Ala. 1993)] (emphasis added).

* * *

The rule allowing proof of an oral modification notwithstanding a requirement that all changes to a contract must be in writing is based upon the premise that a party who has included such a provision in a contract for that party's benefit can certainly waive that provision.   *Id.* Proof of an oral modification therefore serves not only as proof of the modification itself but also as proof of a waiver of the requirement for a writing.   Maddox [v. Westcott, 156 Ala. 492, 47 So. 170, 171 (1908)].

Ex parte Coleman, 861 So. 2d 1080, 1084–85 (Ala. 2003).

As discussed in much more detail below, the provision of the 2010 Contract defining the 75/25 split of work and revenue did not become effective until the parties won the rebid for the VA travel contract.   Thus, from the date of its execution on December 16, 2010, until at least April 1, 2012, the division of online reservation revenue remained unchanged from the one-to-one basis the parties had followed for several years.   This is confirmed by the email exchange between Arias and Slaughter on March 30, 2012, of which Duluth president Arthur Salus was aware.   Insofar as Duluth now contends that ADTRAV failed to distribute online reservations to Duluth on a 75/25 percent split between December 16, 2010, and April 1, 2012, the contention is contrary to the 2010 Contract and is meritless.

Duluth also argues that ADTRAV failed to distribute online reservation

41

revenue pursuant to the 75/25 percent split even after April 1, 2012, when the new VA rebid contract triggered the full provisions of the 2010 Contract.   ADTRAV has responded that, by their course of conduct, the parties modified the 2010 Contract, at least with respect to the division of online reservation revenue, changing the distribution to two-to-one rather than 75/25 percent.   As discussed above, it is legally possible that the parties' course of conduct under the 2010 Contract modified the agreement for distributing online reservation revenue notwithstanding the explicit provisions in Paragraphs No. 3 and No. 4 of the contract that divide the revenue 75/25.   The question is whether, in fact, that is what happened.

On this question, ADTRAV has presented the affidavit testimony of Ed Arias, Duluth's former vice president and the person tasked with management of the VA contract.   In the affidavit, Arias testified that "[o]nline reservations were split between Duluth and ADTRAV on a one-to-one basis until April l, 2012 when the December 2010 Agreement went into effect," and further that he and Slaughter exchanged emails in March 30, 2012, with a copy to Arthur Salus, that expressly changed the online reservation division from one-to-one to two-to-one. (Doc. 63-13, Arias Aff., p. 3).   Even more important, however, Arias testified that the two-to-one split of online reservation revenue "was just one of the methods in increasing revenue for Duluth in an attempt to reach the 75-25% revenue goal split

that became effective April 1, 2012."   Id.

In response, Duluth offers the affidavit of Arthur Salus to the effect:

Both the 2005 agreement and the 2010 agreement were intended to ensure that the revenue distribution between the parties meet the established percentages.   Despite that reality, while Adtrav was in charge of the accounting for the VA contract it retained for itself initially, 50% of all online transactions and thereafter 33 1/3% of all online transactions.   Throughout the course of the agreements this practice by Adtrav was contrary to the terms of the contracts and the intent of the parties.

(Doc. 70-1, Salus Aff., p. 3).   This evidence, however, fails to create a genuine issue of fact to preclude summary judgment.   First, all but the last sentence just confirms the testimony of Arias that the parties had contracts calling for certain percentage divisions of revenue and that ADTRAV received 50% of online reservation revenue before it was reduced to retaining one-third of that revenue. The final sentence – that such division of online reservation revenue was "contrary to the terms" of the contracts and "the intent of the parties"—is a legal conclusion masquerading as a statement of fact, which the court must disregard.   Even if the court could take it as proper affidavit testimony about a fact, it is not substantial evidence sufficient to create a genuine issue of fact.   This conclusory statement is directly contradicted by Duluth's own former employee who was directly responsible for administering the

VA contract.   Even more critical, the statement that the two-to-one split of online reservation revenue was contrary to the intent of the parties is patently contradicted by contemporaneous documents showing that both Duluth and ADTRAV were aware of and agreed to the two-to-one split of online revenue.   On March 30, 2012, Arias, Slaughter, and Salus exchanged emails explicitly confirming that the division of online revenue was to be changed from one-to-one to two-to-one in favor of Duluth.   Duluth fully intended for this to be the agreement.   In light of this objective and undisputed evidence, Salus's testimony that the parties did not intend to do what the emails clearly did is too insubstantial to create a genuine issue of fact. A mere scintilla of evidence is not enough to show a genuine issue of fact.

Additionally, the entire controversy over the division of online reservation revenue is immaterial to Duluth's claim that ADTRAV failed to properly distribute all of the revenue to which Duluth was entitled under the 2010 Contract.   As Arias points out, the two-to-one split of online revenue was merely one of several ways in which the parties were striving to reach the 75/25 split of *all* revenue under the VA contract.   Although Paragraph No. 4 of the 2010 Contract says that online reservations were to be tagged "in accordance with the agreed revenue split,"[14] this

---

[14]      This reference to the "agreed revenue split" is itself ambiguous, in light of the course of dealing between the parties.   The court might assume that it meant the 75/25 percent split defined in Paragraph No. 3, but it must be remember that, at the time this provision was written in the 2010 Contract, it was contingent upon the parties winning the 2011 VA rebid and, as

means simply that online reservation revenue would be counted toward the 75/25 percent split defined in Paragraph No. 3.   Even is one assumes that it was improper for ADTRAV to distribute only two-thirds of the online revenue it received, there was no breach of the 2010 Contract as long as Duluth received 75% of *all* revenue under the VA account.   The split of online revenue became important only if Duluth's share of *all* revenue fell below 75%.   Thus, it remains incumbent on Duluth to prove that its share of all revenues was insufficient, not just that one constituent part of the revenue was insufficient.   Insofar as Duluth attempts to plead the issue of the division of online revenue as a separate breach of contract, distinct from the claim that ADTRAV failed to distribute 75% of all VA revenue to Duluth, it is meritless.   Duluth may not prevail simply by showing that ADTRAV distributed only two-thirds of the online revenue if, in fact, Duluth properly receive 75% of all revenue after April 1, 2012.

The last issue touching on whether ADTRAV failed to distribute VA revenue properly under the 2010 Contract relates to when the operative provisions of the contract became effective.   Duluth contends that the 2010 Contract became effective immediately upon its execution by the parties on December 16, 2010.

a matter of history, the parties had been splitting online revenue on a 50/50 (one-to-one) basis for several years.   Because the 75/25 split provision was contingent at the time it was written, it could not have had any meaning with respect to online revenue received before the contingency occurred.   The "agreed revenue split" mentioned in Paragraph No. 4 had to refer to something else, perhaps the longstanding practice of splitting the online revenue one-to-one.

ADTRAV, on the other hand, argues that the contract expressly made itself contingent on a future event that did not occur until April 1, 2012.  Under these competing interpretations, Duluth says the 75/25 percent revenue split took effect on December 16, 2010, but ADTRAV contends that the 60/40 percent split existing under the 2005 Contract continued and did not change to a 75/25 percent split until April 1, 2012, when the contingent future event (a bridge contract from the VA) occurred.

As noted above, the contract was signed on December 16, 2010, which date was even termed the "Effective Date" of the contract.  Nevertheless, the next two paragraphs introduce a future contingency as a trigger for performance of the contract.  The relevant parts of the first three paragraphs of the contract read as follows:

> This Master Services/Operating Agreement (the "Agreement") is *entered into as of December 16, 2010 (the "Effective Date")* by and between Duluth Travel ("Duluth"), a travel company having a principal place of business at [address omitted], Duluth, GA. 30097, (hereinafter referred to as "**DT**"), and ADTRAV Travel Management ("ADTRAV"), having a principal place of business at [address omitted], Birmingham, Alabama, 35244.
>
> 1.
>
> *This Agreement is entered into by and between ADTRAV and Duluth in preparation and anticipation of the "rebid" of the Department of Veterans Affairs (VA) travel services which are expected to commence*

46

*on October 01, 2011* (the 2011 Services). .... Upon execution by both ADTRAV and Duluth of this Agreement, this Agreement shall supersede all prior understandings, writings, proposals, representations or communications, oral or written, of either party related to the subject matter of this Agreement.   This Agreement may be amended only by an instrument executed by the authorized representatives of both parties.   *This Agreement concerns how ADTRAV and Duluth will handle the operations of the VA account and shall govern the parties in the event that Duluth is awarded the contract for the provision of the 2011 services.*

2.

This Agreement sets forth and describes the operations and services to be provided by Duluth and ADTRAV *in the event* the Veterans Affairs travel services contract for the provision of 2011 Services (the 2011 Contract), whether extended under the present contract or rebid and is [sic] awarded to the incumbent. Since the conditions and terms of the VA RFP [Request for Proposals] are not known at the time of this agreement, it is agreed by both parties that any changes to the condition or status of the Offeror in the rebid by VA will not have any effect on the obligations of the parties as indicated in this Agreement. ….

(Italics added for emphasis).   In construing a contract, the court is required to read the contract as a whole, attempting to give meaning to every provision consistent with every other provision of the contract.[15]   The beginning point for that effort is the plain language of the contract itself; the court must give the terms of the contract their clear and plain meaning.   " 'When interpreting a contract, a court should give

---

[15]      "In determining whether a term is ambiguous, 'an isolated sentence of the policy should not be construed alone, but in connection with other provisions of the said policy in order to arrive at a construction reasonably calculated to accomplish the intent and purpose of the parties.'" Mega Life And Health Ins. Co. v. Pieniozek, 516 F.3d 985, 991 (11th Cir. 2008) (quoting North River Ins. Co. v. Jackson, 278 Ala. 604, 179 So. 2d 731, 733 (1965)).

the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.' " Dawkins v. Walker, 794 So. 2d 333, 339 (Ala. 2001) (quoting Ex parte Dan Tucker Auto Sales, Inc., 718 So. 2d 33, 35–36 (Ala. 1998)); Public Bldg. Auth. of City of Huntsville v. St. Paul Fire & Marine Ins. Co., 80 So. 3d 171, 180–81 (Ala. 2010).  But if the language of the contract is ambiguous, that is, susceptible to more than one reasonable meaning,[16] the court must resort to rules of construction to attempt to resolve the ambiguity.  Applying Alabama law, the Eleventh Circuit has said:

> The existence of an ambiguity in a contractual term, however, does not automatically require that we remand for the fact-finder to resolve the ambiguity.  "[I]f the trial court finds the contract to be ambiguous, it 'must employ established rules of contract construction to resolve the ambiguity.'  If the application of such rules is not sufficient to resolve the ambiguity, ... the resolution of the ambiguity becomes a task for the jury." *Johnson*, 822 So. 2d at 405 (emphasis added) (citations omitted); see also *Extermitech*, 951 So. 2d at 694 ("Some of this Court's decisions indicate that, once the court determines that a contract is ambiguous, it is for the finder of fact to resolve the ambiguity. However,... the court, as a matter of law, should apply rules of construction and attempt to resolve any ambiguity in the contract before looking to factual issues to resolve the ambiguity."); *Am. & Foreign Ins. Co. v. Tee Jays Mfg. Co.*, 699 So. 2d 1226, 1228 (Ala. 1997) ("If the policy is unclear and ambiguous in its terms,... then it must be interpreted and construed under well-settled rules of construction applicable to all contracts."); *Vesta Fire Ins. Corp. v. Liberty Nat'l Life Ins. Co.*, 893 So.2d 395, 404 (Ala. Civ. App. 2003)

---

[16]     Whether contract language is ambiguous is a question of law for the court to decide. State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 308 (Ala.1999); Mega Life And Health Ins. Co. v. Pieniozek, 516 F.3d 985, 991 (11th Cir. 2008)

("[A] court is to evaluate the contract on its face and apply rules of contract construction in an effort to resolve ambiguities before submitting the case to a jury."). "It is... the province of the court, not the jury, to construe a policy, even though ambiguous and unclear...." *Home Indem. Co. v. Employers Nat'l Ins. Corp.*, 564 So. 2d 945, 947 (Ala. 1990) (quoting *Upton v. Miss. Valley Title Ins. Co.*, 469 So. 2d 548, 555 (Ala. 1985)) (emphasis omitted) (internal quotation marks omitted).

Mega Life And Health Ins. Co. v. Pieniozek, 516 F.3d 985, 992 (11th Cir. 2008)

Turning to the language of the 2010 Contract, the court first must ask whether the plain language of the contract is unambiguous concerning *when* its terms and provisions were intended by the parties to go into effect. On this, the court finds that the contract is ambiguous and susceptible to more than one reasonable reading. One reading of the contract is that the parties intended for it to go into effect immediately upon its execution on December 16, 2010. Not only is that date denominated by the parties as the "Effective Date," the merger provision in the second paragraph (designated as Paragraph 1)[17] clearly states that it became effective immediately "[u]pon execution by both ADTRAV and Duluth of this Agreement...." By its terms, the 2010 "Agreement" immediately superseded all other agreements and representations of the parties related to the subject matter of

---

[17]   The provision states: "Upon execution by both ADTRAV and Duluth of this Agreement, this Agreement shall supersede all prior understandings, writings, proposals, representations or communications, oral or written, of either party related to the subject matter of this Agreement."

49

the Agreement, which was the anticipated 2011 rebid of the VA travel contract. Nevertheless, another reasonable reading of the contract focuses on the future contingency language used in both the second and third paragraphs.   In the second paragraph, the parties stated plainly that "[t]his Agreement concerns how ADTRAV and Duluth will handle the operations of the VA account and shall govern the parties *in the event* that Duluth is awarded the contract for the provision of the 2011 services."   Further, in the third paragraph, they repeated that "[t]his Agreement sets forth and describes the operations and services to be provided by Duluth and ADTRAV *in the event* the Veterans Affairs travel services contract for the provision of 2011 Services (the 2011 Contract), whether extended under the present contract or rebid and is [sic] awarded to the incumbent [Duluth]."   (Italics added).   This repeated use of "in the event" can be read reasonably as binding the parties to the obligations of the contract only "in the event" an identified future contingency occurred, namely Duluth being awarded the 2011 VA travel contract.   Given these two reasonable readings of when the 2010 Contract was to go into effect, it is ambiguous and the court is required to attempt to resolve the ambiguity through well-established rules of contract construction.

The purpose of the rules of construction, and the first rule of construction itself, is that the court must construe a contract "'to express the intent of the

parties.'" BellSouth Mobility Co. v. Cellulink, Inc., 814 So.2d 203, 216 (Ala.2001); FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc., 914 So. 2d 344, 358 (Ala. 2005).   In resorting to the rules of construction for contract language, the court must remember that "[w]ith a choice between a valid construction and an invalid construction, the court has a duty to accept the construction that will uphold, rather than destroy, the contract." Voyager Life Ins. Co. v. Whitson, 703 So. 2d 944, 948 (Ala. 1997).   The goal is to give effect and meaning to *all* of the terms of the contract.   Once Upon a Time, LLC v. Chappelle Properties, LLC, 2016 WL 3031347, at *2 (Ala. May 27, 2016).   Also, "when an examination is limited to the four corners of the agreement itself,… the first of two conflicting provisions prevails over the second provision.   Any inconsistencies between clauses or conditions that cannot be reconciled must be resolved in favor of the first clause." Id. at 949, citing City of Fairhope v. Town of Daphne, 282 Ala. 51, 208 So. 2d 917 (1968), appeal after remand, 284 Ala. 556, 226 So. 2d 383 (1969), appeal after remand, 286 Ala. 470, 241 So. 2d 887 (1970).   But when the examination "must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity." Id., citing Walls v. Bank of Prattville, 575 So. 2d 1081 (Ala. 1991).

51

As the Alabama Supreme Court has explained:

> In construing an ambiguous contract to determine the intent of the parties, the Court should be guided by the following principles. The Court derives the intent of the parties from the contract as a whole. *Ex parte University of South Alabama*, 812 So. 2d 341 (Ala. 2001); *Land Title Co. of Alabama v. State ex rel. Porter*, 292 Ala. 691, 299 So. 2d 289 (1974). The relations of the parties, the subject matter of the contract, and the object to be accomplished may be looked to in construing the contract to ascertain the intention of the parties. *Pacific Ins. Co. v. Wilbanks*, 283 Ala. 1, 214 So. 2d 279 (1968); *City of Birmingham v. I.E. Morris & Assocs.*, 256 Ala. 273, 54 So. 2d 555 (1951); *Merchants' Nat'l Bank of Mobile v. Hubbard*, 220 Ala. 372, 125 So. 335 (1929).

FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc., 914 So. 2d 344, 358–59 (Ala. 2005). The most common rule of construction is not helpful in this case. Although a rule of last resort, FabArc Steel Supply, Inc. v. Composite Const. Sys., Inc., 914 So. 2d 344, 357 (Ala. 2005), the rule of *contra proferendem* -- that ambiguous language in a contract is construed against the drafter of the language -- does not apply here because the drafter is not readily identifiable. The parties agree that they worked jointly to draft the 2010 Contract.

Applying these rules of construction, the court finds that the parties intended to make certain parts of the 2010 Contract immediately effective upon execution, but to trigger other provisions only upon the occurrence of the future contingency. The clearly stated purpose of the contract was to work jointly to win the VA "rebid"

anticipated for October of 2011.   The parties executed the contract on December 16, 2010, to create an alliance to compete more effectively in the rebid.   A portion of Paragraph No. 2 confirms this underlying purpose of the contract: "ADTRAV and Duluth commit to abide by the conditions stipulated in this agreement and *agree to work together in good faith to maximize the likelihood that Duluth will be awarded the 2011 Contract.*   ADTRAV agrees that it will not work with or communicate with any other TMC [travel management company] and *will communicate jointly with Duluth Travel for any contact with a VA representative, in attempting to procure the 2011 Contract.*"   (Italics added).   Thus, indeed, the effective date of the contract was December 16, 2010, for on that date the parties committed themselves to jointly compete for the VA contract.

Having created the contract on December 16, 2010, however, they expressly left certain provisions of it contingent upon successfully winning the rebid for Duluth.   Those contingent provisions would be triggered, that is to say, become operative, only "in the event" Duluth won the rebid.   Because of this contingency feature, the 2010 Contract did not immediately supersede the 2005 contract.   The merger clauses in Paragraph Nos. 1 and 25 were expressly limited to superseding other agreements "relating to the subject matter" of the 2010 Contract.   The plainly stated subject matter of the agreement was winning and operating under the 2011

53

VA rebid contract, which did not occur until April 1, 2012. Paragraph No. 1 says the agreement was being entered by the parties "in preparation and anticipation" of the rebid and that "this Agreement concerns how ADTRAV and Duluth will handle the operations of the VA account and shall govern the parties in the event" Duluth won the rebid.[18]   Clearly, the subject matter of the agreement was the future rebid of the VA contract and how that business would operate if Duluth succeeded in winning the rebid. Nowhere in the contract does it address the *ongoing* business between Duluth and ADTRAV, at least not until that ongoing business was replaced by the anticipated 2011 VA contract. Thus, the merger clauses did not operate immediately to terminate the 2005 contract between the parties; that contract would be terminated or superseded only upon Duluth winning the 2011 VA contract.

Important to the issues in this case, Paragraph No. 3, which described the 75/25 percent division of work and revenue, also was contingent on the future event of Duluth winning the 2011 VA rebid contract. The paragraph starts, "[*u*]*nder this agreement*, both companies strive to distribute the work (reservations) and total

---

[18]     Other parts of the contract also make clear that its focus was the 2011 VA contract. For example, Paragraph No. 15 required the parties to pool all revenue they received "from the VA account via the 2011 Contract," which could not occur, of course, until the VA awarded the contract. Also, Paragraph No. 23 states that both parties "recognize[d] that the reason to enter into this agreement is based on the benefits derived from pooling each company's assets and strengths *to increase the possibility of winning the VA bid*." Finally, Paragraph 24 states, "The intent of this agreement is to permit both companies to share in the VA account *during the duration* of the rebid of the accommodated TMC services and any subsequent extensions that may be awarded Duluth." (All italics added). This last provision had the express effect of limiting the scope of the contract to "the duration" of the rebid VA contract.

income by company to be made for the VA…."   (Italics added).    Because the "subject matter" of the agreement was the 2011 VA rebid, the 75/25 percent split was contingent upon winning the rebid.   Importantly, Paragraph No. 3 does not specify any date for the new split to commence, or that it should commence upon execution of the contract by the parties.

This construction of the 2010 Contract gives meaning and operation to all of the provisions of the contract.   Only by construing the contract to make the award of the 2011 VA contract a future contingency triggering changes in the relationship between Duluth and ADTRAV can the apparently contradictory provisions of the first three paragraphs be reconciled.   The parties entered into the 2010 Contract on December 16, 2010, which at that time resolved prior disputes between them, merged all agreements and understandings into the new contract, and made changes in the division of work and revenue between Duluth and ADTRAV "in the event" that, in the future, they successfully won the rebid of the VA travel contract.   When that contingency occurred on April 1, 2012, the new division of work and revenue went into effect.

This understanding of the contract is confirmed by the deposition testimony of Ed Arias, Duluth's vice president and representative tasked with managing the VA travel contract, both at the time the 2010 Contract was signed in December 2010

and on April 1, 2012, when the VA bridge contract was awarded to Duluth.   He

testified as follows:

> Q.     Mr. Arias, I place in front of you Exhibit 8, which is a Master
>        Services Agreement and Operating Agreement for the rebid of
>        the VA account.
>               Do you recognize that document?
>
> A.     Yes, I do.
>
> Q.     And this was to guide the relationship between Duluth and
>        Adtrav for purposes of attempting to secure a rebid of the
>        Veterans Administration account?
>
> A.     Correct.
>
>                           * * *
>
> Q.     Do you agree that this 2010 rebid contract was made in order to
>        resolve any  differences between Duluth and Adtrav with regard
>        to all earlier contracts we've talked about today?
>
> A.     Yes.
>
> Q.     And that included any claims of revenue or other awards that had
>        been   received by Adtrav, is that correct?
>
> A.     Correct.
>
> Q.     And while we --- I believe the last percentage split we talked
>        about was 60/40,   did the parties change that split pursuant to
>        this agreement?
>
> A.     Yes, sir.
>
>                           * * *

Q.     So the split, I believe was the question that was on the table, as provided by Exhibit 8, was to be what, sir?

A.     75 for Duluth and 25 for Adtrav.

Q.     And that was to take effect when?

A.     If we won the new contract, the rebid contract for the Department of Veterans Affairs, which would have been late 2011 or early 2012.

* * *

Q.     Did you and Arthur [Salus] specifically discuss that this contract would be the contract that would govern the relationship if the VA contract rebid was won?

A.     Yes.

Q.     And did you understand that the 75/25 split was to start when Duluth won the rebid?

A.     Yes.

* * *

Q.     Was it ever contemplated that Exhibit 8 would become effective prior to the VA awarding you the 2011 services?

MR. SWEETNAM:       Object to the form of the question.

THE WITNESS:        No.

* * *

Q.     This E-mail between Lynn Slaughter and Roger Hale references that Ed, said April 1st we need to do 75/25 split.

57

Do you see that?

A.       Yes.

Q.       Do you have any recollection of having communicated this split
         and the April 1st timeline for the commencement of the split?

A.       That was the initiation of that new award by the VA to us, so that
         would have coincided.   April 1st.

Q.       Would you have communicated that to Ms. Slaughter?

A.       Of course.

(Doc. 63-5, Arias Depo., pp. 64-66, 69-70).   This testimony is not disputed by any

evidence offered by Duluth, and it is not disputed that Arias was the manager for

Duluth with the greatest responsibility for managing the VA travel contract and the

relationship with ADTRAV.[19]

     Thus, both by applying well-established rules of construction and by

examining the actions of the parties outside the four corners of the agreement, the

court concludes that the proper construction of the 2010 Contract is that it was

executed and went into effect on December 16, 2010, including therein a future

---

[19]       The way in which the parties handled the distribution of online reservation revenue
also confirms that the 75/25 split was not intended to take effect until they won the VA rebid.
Even though the 2010 Contract containing the 75/25 split was signed in December 2010, the
parties continued to divide online reservation revenue on a one-to-one basis until March 30, 2012,
two days before the April 1, 2012, beginning of the new VA contract, when Arias and Slaughter
exchanged emails to confirm that the one-to-one split would change to two-to-one.   Duluth
president Salus received a copy of the email exchange.   These facts confirm that, notwithstanding
the execution of the 2010 Contract, the division of online reservation revenue did not change.

contingency that certain changes in work and revenue division between the parties would take effect "in the event" they won the VA rebid.   Those contingent provisions were triggered on April 1, 2012.

c.   Fraudulent Inducement to Enter the 2010 Contract

Count three of Duluth's counterclaim alleges that it was fraudulently induced to enter into the 2010 Contract "based upon [ADTRAV's] promise to discharge all of its obligations under the agreement in a fair and reasonable fashion."   (Doc. 4, para. 16).   ADTRAV seeks summary adjudication of the fraud counterclaim on the grounds that the claim is simply a restatement of the breach-of-contract claim and that Duluth has failed to offer evidence that ADTRAV had any intention at the time of contracting not to meet its contractual duties.

Under Alabama law,[20] "[i]t is clear that to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud."   Hunt Petroleum Corp. v. State, 901 So. 2d 1, 11 (2004)(J. Houston, concurring specially), quoting Deupree v. Butner, 522 So. 2d 242, 245 (Ala. 1988).   In Hunt, as in the instant case, the parties entered

---

[20]      Again, the parties cite Alabama law in support of their arguments, along with some reference to Georgia law.   Because the contract language allows for the application of both laws, and because the parties appear to agree that Alabama law applies, the court applies Alabama law.

into a contract by which certain revenues would be divided, and they subsequently disagreed as to how to interpret the contract provision regarding the division of the funds.   As in <u>Hunt</u>, there is no evidence in the instant case that one party made a representation that was false and that the other party relied upon that statement to the extent that it adopted a different course of action.   901 So. 2d at 8-9.

The fraud counterclaim asserted by Duluth is simply that ADTRAV promised to relinquish 75 percent of the revenues generated from the VA contract to Duluth, and it did not do so.   There is no evidence that Duluth was induced to enter the contract because ADTRAV misrepresented a material fact about the contract, even though Duluth attempts to fit the contractual relationship into that scenario.   There also is no evidence to support a claim of promissory fraud.[21]   Accordingly, the motion for summary adjudication of the fraud counterclaim is due to be granted.

---

[21]      ADTRAV correctly points out that the fraud claim premised upon its failure to take the actions required under the contract must be evaluated as a claim of promissory fraud under Alabama law.   A promissory fraud claim requires proof not only of a false representation and reliance, but also the additional elements that, at the time of the misrepresentation, the defendant had the intention not to perform the act promised and that the defendant had a present intent to deceive the other party.   <u>Southland Bank v. A & A Drywall Supply Co., Inc.</u>, 21 So. 3d 1196, 1210 (Ala. 2008).   There is no evidence in this case that, at the time the 2010 Contract was negotiated, ADTRAV had any intent not to perform as required by the contract or the intent to deceive Duluth about its performance.   While a dispute about execution of the contract has now developed between the parties, that dispute does not prove promissory fraud at the time of the making of the contract.

## CONCLUSION

In accordance with the foregoing, the court finds as follows:

The motion for leave to amend the counterclaim (doc. 82) is due to be and hereby is DENIED.

The motion for partial summary judgment filed by plaintiff ADTRAV (doc. 61) is due to be GRANTED IN PART and DENIED IN PART.    By separate order, the court will GRANT the motion for summary judgment and DISMISS WITH PREJUDICE count one of Duluth's counterclaim regarding the provision for sharing business opportunities contained in the 2005 Contract.   Likewise, by separate order, the court will GRANT the motion and DISMISS WITH PREJUDICE count three of Duluth's counterclaim alleging fraud, fraudulent inducement, and/or promissory fraud with respect to the 2010 Contract.   Finally, the motion for summary judgment will be DENIED with respect to count two of Duluth's counterclaim alleging that ADTRAV breached the 2010 Contract by failing to perform its duty to "strive" to distribute VA revenue pursuant to provisions of the contract after April 1, 2012.[22]

---

[22]       To be clear, this claim consists primarily of the allegation that ADTRAV failed to report and account to Duluth VA revenue due to be divided pursuant to the terms of the 2010 Contract.   As part of its claim that ADTRAV failed to perform its duty to strive for a 75/25% revenue distribution, Duluth will not be allowed to argue several issues that raised questions about the proper legal construction of the contract.   These issues include whether it was entitled to 100% of VA beneficiary travel revenue *plus* 75% of all other VA travel revenue; whether online

Also by separate order, the court will set a final pretrial conference in anticipation of setting a trial date for this case.

DONE this 6th day of September, 2016.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

---

reservation revenue was subject to the 75/25 split; and whether the revenue split changed on December 16, 2010, or later when the VA contract rebid was won.   All of these questions turned on a proper construction of the contract, which in this case, were questions of law for the court. The court has applied well-established rules of contract contraction to answer these questions as a matter of law.