UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ADTRAV CORPORATION,                    CV-14-TMP-56-S

          Plaintiff,                   March 20, 2017

vs.                                    Birmingham, Alabama

DULUTH TRAVEL, INC.,                   9:00 a.m.

          Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S OFFICIAL TRANSCRIPT OF
NON-JURY TRIAL
VOLUME I

BEFORE THE HONORABLE T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama  35203

```
 1                         * * * * *

 2                     A P P E A R A N C E S

 3                         * * * * *

 4    FOR THE PLAINTIFF:

 5    Roger Lee Bates
      Tracy Davis
 6    Hand Arendall, LLC
      1801 5th Avenue North
 7    Suite 400
      Birmingham, Alabama  35203
 8

 9

10    FOR THE DEFENDANT:

11    Dennis Michael Sweetnam
      P.O. Box 2089
12    Suwanee, GA  30024

13    Jim H. Wilson
      Leitman, Siegal, Payne & Campbell
14    420 North 20th Street
      Suite 2000
15    Birmingham, Alabama  35023

16    Kyle William Brent
      Sweetnam & Schwartz
17    1200 Ashwood Parkway, Suite 190
      Dunwoody, GA  30338
18

19

20

21

22

23

24

25
```

```
 1                     I N D E X
 2   WITNESS              D      C      RD     RC
 3   Roger Hale           7      169
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                        * * * * *

               P R O C E E D I N G S

                        * * * * *
```

1

2

3

4        THE COURT:  Good morning.  This is in the matter

5    of ADTRAV Corporation, plaintiff, versus Duluth Travel,

6    Inc., defendant, case number 2:14-CV-56-TMP.

7            And we're scheduled this morning to begin a

8    nonjury trial of this matter.  A preliminary matter that

9    caught my attention in the witness list, particularly, was

10   the listing of two lawyers as being potential witnesses, I

11   think it was Mr. Wilson and Mr. Sweetnam, that were listed

12   as potential witnesses.  And that raised a concern with me

13   under Rule of Professional Conduct 3.7.  So I wanted to get

14   that addressed, if possible.

15       MR. SWEETNAM:  I think that we've stipulated to

16   the issue of attorneys' fees as between counsel outside,

17   which would make testimony unnecessary.

18       THE COURT:  Certainly to the extent that the

19   lawyers are required to present evidence and information

20   regarding their fees and the reasonableness of fees, that's

21   well within 3.7.

22           I was concerned about whether there may be some

23   testimony that goes into the factual merits of this case.

24   But that's not the case?

25           MS. DAVIS:  No, Your Honor.  All of the attorneys

1   would have been for purposes of attorneys' fees, but I think

2   we've worked out something for that so that nobody has to

3   testify.

4         THE COURT:  Very good.  Any other preliminary

5   matters we need to take up?  Ms. Davis, anything you need to

6   take up before we get started with witnesses?

7         MS. DAVIS:  No, sir.

8         THE COURT:  Mr. Sweetnam, anything else you need

9   to take up?

10         MR. SWEETNAM:  Should we discuss the stipulations

11   or no?

12         MS. DAVIS:  Yeah, we can do that.

13         MR. SWEETNAM:  In trying to save the Court as much

14   time as possible and make this as easy as we could, we

15   conferenced outside for about twenty minutes, half an hour,

16   this morning.  There are a couple of items of damages that

17   ADTRAV is claiming that we do not dispute, subject to our

18   claim of set-off with regard to the amounts that we contend

19   they owe us.

20         One of them is the weekly net remit, I think, for

21   five thousand some odd dollars and the other is with regard

22   to Worldspan segment fees in 2013, we agree with, I think

23   it's ten months, it's a hundred six dollar difference but

24   we're not going to quibble about that.

25         The only issue is a two month, I think it was

1    March and April, of 2013 where Duluth did not actually earn

2    segment fees, they're contending they are entitled to them,

3    we're saying, well, we didn't get them, so how can you be

4    entitled to them.

5         But as to the remainder, we don't dispute that

6    those numbers are accurate and don't feel like they need to

7    go to the trouble of putting up proof as to that number.

8         THE COURT:  At an appropriate time, I assume

9    somebody will give me the actual dates and numbers and all

10   of that sort of thing as a form of stipulation.

11        MS. DAVIS:  Yes, Your Honor, we will.

12        THE COURT:  That's fine.  All right.  All right.

13   And it's my understanding then also that the parties wish to

14   waive opening statements, just proceed on with testimony; is

15   that correct?

16        MS. DAVIS:  Yes, sir.

17        THE COURT:  Either side wish to invoke the rule?

18        MS. DAVIS:  Yes, sir, we do.

19        THE COURT:  Ladies and gentlemen, if any of you

20   expect to be called as a witness, if you wait out in the

21   hall until you're called in to testify, please, go out in

22   the hall if you expect to be a witness.

23        Certainly you can keep a corporate representative.

24   But other than that, witnesses should go out in the hall.

25        I would ask the lawyers to help me keep up with

1    enforcing the rule, please.

2              First witness for the plaintiff.

3              MR. BATES: Your Honor, ADTRAV would call Roger

4    Hale.

5                    ROGER HALE SWORN

6              THE CLERK:  State your name for the record.

7              THE WITNESS:  It's Roger Hale.

8                    DIRECT EXAMINATION

9    BY MR. BATES:

10   Q    Good morning, Mr. Hale.  Could you give us your

11   current residence address, please?

12   A    7514 Stratford Place, Vestavia Hills, Alabama, 35242.

13   Q    And how long have you lived in Birmingham?

14   A    In Birmingham, forty plus years.

15   Q    And can you briefly describe to the judge your

16   educational background, please?

17   A    Yeah.  Graduated from Vestavia High School, and then

18   earned a bachelor of science in engineering from Vanderbilt

19   University.

20   Q    And I understand that you are affiliated with

21   ADTRAV Corporation; is that correct?

22   A    Yes, that's true.

23   Q    What is your title and role with the company, please?

24   A    I am the CEO and owner of the corporation.

25   Q    For the rest of our examination, would it be all

1  right with you if I refer to your company as ADTRAV?

2  A      Yeah, that would be great.

3  Q      When did you first get involved in the travel

4  industry?

5  A      That would be when we started the agency in 1977.

6  Q      And what jobs or functions have you personally

7  performed in that industry during your tenure?

8  A      Pretty much everything.  I started off in delivering

9  tickets, all the way up from being an agent, to managing

10  agents, to sales, to operations, accounting, pretty much

11  every facet of the business.

12  Q      And can you just briefly describe the history of

13  ADTRAV as a company?

14  A      Yeah.  We started in 1977, it was —— my family

15  started the business.  And we originally were under the name

16  Adventure Travel and our focus had always been on the

17  corporate travel space.

18         And as we grew, I came —— I went off to school,

19  worked during the summers, came back in '82 and our, again,

20  our focus was on the corporate travel.

21         In the mid—eighties, I led our efforts into the

22  federal government space and began serving federal

23  government accounts that were located in the State of

24  Alabama, things, you know, we continued to grow as a

25  company.

1          In 2000, we moved from just handling federal

2  government travel on a state basis to a nationwide basis.

3  And so we've continued to grow in both the corporate and the

4  government space to where now probably forty percent of our

5  business is from the federal government and sixty percent is

6  from corporate -- corporations around the country.

7  Q      And are you currently the sole owner of the company?

8  A      Yes, I am.

9  Q      And how long have you been the sole owner?

10  A      Since about 2005.

11  Q      Now, you went through some items there at my request

12  briefly, I would like to drill down a moment.  If you could

13  explain to the judge what the customers in the government

14  work, explain the actual type of work ADTRAV performs for

15  these customers.

16  A      Sure.  We're a travel management company, so our job

17  is to help the federal agencies by handling the

18  reservations, airline, hotel, car rental reservations for

19  the agency employees.  We help manage the overall travel

20  program through enforcing travel policy, helping them to set

21  travel policy.

22          We do a lot of reporting for the government as far

23  as, you know, reconciling their centrally billed accounts.

24  And again, just really act almost like a business consultant

25  to them with regards to their travel program.

1  Q      And you mentioned that you got into this government

2  travel business in the mid-eighties.

3        More specifically, what was the first government

4  job in the mid-eighties that you became involved with?

5  A      Well, we got a -- we got a contract which is really a

6  hunting license which enables us -- we get approved by GSA

7  and they -- and once they approve you, then you have the

8  ability to go out and solicit government agencies in a,

9  defined at that time, in a defined geographic area which was

10  the State of Alabama.

11        So I can't recall our, you know, our first

12  customer, but basically what I did is I went around to all

13  the federal agencies that I could find in the state and, you

14  know, pitch them on us handling their business.

15        So I know we handle the Department of Justice here

16  in town, we handled the VA, the local VA hospital, we

17  handled -- just a number of the federal agencies that were

18  located within the State of Alabama.

19  Q      Now, with regard specifically to government agencies,

20  can you describe a little bit of the actual services that

21  are provided for those employees or purchasers within those

22  federal government travel management programs?

23  A      Sure.  We basically serve as their one-stop shop for

24  anything travel related.  From about 2002 on, we've

25  partnered with different online booking tools to give the

1  folks another opportunity or method for which they can book

2  travel with us.

3        So the way it works for us is that a federal

4  employee will call into a dedicated number which goes to a

5  team of trained agents who then help them with their airline

6  reservations, their hotels, makes recommendations for

7  hotels, car rentals, and then actually issues the tickets,

8  provides all the itinerary support, and we also provide

9  twenty-four hour, if they get somewhere and have a problem

10  with a hotel or something gets cancelled, then we have a

11  twenty-four hour service they can call back in to our folks

12  and get help.

13        They also have the ability to book online which

14  they go online and select all of their own flights and

15  hotels and cars but then that comes to us for quality

16  control, policy enforcement and the actual issuance of the

17  ticket.

18  Q     And included within the government travel services,

19  did you provide any accounting or management reporting

20  services?

21  A     Yeah, absolutely.  The -- one of the big things that

22  we do for all of the federal agencies is provide a

23  comprehensive group of management reports to help them to

24  understand where they're spending their money on travel, how

25  are they spending it effectively, are there areas or

1  opportunities for savings, which are typically identified

2  through these reports.

3      And then we also perform a reconciliation of the

4  charges that go to -- it's typical -- most of the federal

5  agencies will use one credit card for all of their charges,

6  and so we actually perform that reconciliation between what

7  the credit card company billed them and what we actually

8  issued as tickets and from that they pay their bill.

9  Q    I would like to focus our attention, if we could, on

10  the relationship with the Veteran's Administration and

11  Duluth Travel with respect to the matters we're here about

12  today.

13  A    Sure.

14  Q    How did the relationship between ADTRAV and Duluth

15  begin?

16  A    You know, to the best of my recollection, I met

17  Arthur and Ed at an industry --

18  Q    Let me interrupt them.  You say Arthur and Ed.  Tell

19  the judge who these people are and who they work for.

20  A    Okay.  Absolutely.  So I met Arthur Salus and Ed

21  Arias who work for Duluth at an industry event, there's a --

22  called Society of Government Travel Professionals and to the

23  best of my recollection that's when we first met and started

24  talking about -- there was -- the VA business because we

25  knew that the VA business was coming up for bid.

1    Q     We're going to talk about an agreement in 2005 in a

2    few moments.

3          But before that agreement was signed, do you have

4    a judgment about how long before that agreement was signed

5    that this conversation may have taken place with Mr. Salus

6    and Mr. Arias?

7    A     You know, to the best of my recollection, I would say

8    probably at least a year, you know, we talked about it for a

9    while and, again, we were kind of waiting on the VA to come

10   up with something.

11   Q     Now, did you specifically talk about the VA issuing a

12   request for proposal?

13   A     Yes.

14   Q     When you first were introduced?

15   A     Yes.

16   Q     And why, if you could, explain to the judge was it

17   significant for you to be discussing this topic with Duluth

18   Travel.

19   A     Well, the -- we had heard that the VA was going to

20   make this contract a set-aside for a service-disabled

21   veteran-owned organization and Duluth Travel has that

22   designation as a service-disabled veteran-owned

23   organization.

24         So we -- ADTRAV, on its own, could not have

25   submitted a bid for the VA business.

1            So, in talking with Arthur Salus and Ed Arias of

2    Duluth, we were talking about, hey, let's jointly do this

3    because you've got the designation that we need to be able

4    to file a proposal and we've got the expertise to run the

5    business.

6    Q       And to be clear, that service-disabled veteran status

7    was a result of Arthur Salus having a military injury,

8    correct?

9    A       That's my understanding.

10   Q       And ADTRAV did not have that?

11   A       No, we did not.

12   Q       Now, what did ADTRAV bring to the table that made the

13   formation of this relationship desirable?

14   A       Well, we brought, really, the expertise in the

15   federal government space.  And really, at that time, Duluth

16   Travel was not in a position really to be able to service

17   the VA on their own.  They didn't have the management

18   expertise, they didn't have the reporting, they didn't have

19   the accounting to or the staff to do it.

20           So really what we brought to the table was the

21   management expertise and the experience of past performance

22   that's so important to the federal agencies.

23   Q       Let me show you Exhibit 1313.

24   A       Can I get some water, too?

25           THE COURT:  Sure.

```
1   Q       (By Mr. Bates)  Can you the tell the Court what this
2   exhibit is?
3   A       This is a PowerPoint proposal that I put together for
4   one of our meetings with the VA.
5   Q       And was this in pursuit of the request for proposal
6   that you mentioned a few moments ago?
7   A       Yes, it was.
8           MR. BATES:  Your Honor, we move the introduction
9   of Exhibit 1313.
10          THE COURT:  Any objection?
11          MR. SWEETNAM:  No objection, Your Honor.
12          THE COURT:  It will be received.
13  Q       (By Mr. Bates)  And if you would, turn over to Page
14  11.  Do you see the Bates stamp numbers on there?
15          Now, look at this page and this is a description
16  in the PowerPoint, first off, this has got Duluth Travel and
17  ADTRAV Travel on it, correct?
18  A       Yes.
19  Q       What is the purpose of this slide?
20  A       This slide was -- the purpose was to show the
21  experience that Duluth Travel had in the government and
22  corporate travel space.
23  Q       All right.  And go to the next page, Page 12.  And
24  what was the purpose of this slide?
25  A       This was to show ADTRAV's experience in the
```

1    corporate -- in the government and corporate travel space.

2    Q      So, Mr. Hale, would it be accurate that with regard

3    to this particular Veteran's Administration program that

4    ADTRAV could not and would not have pursued the VA business

5    without Duluth?

6    A      That is correct.

7    Q      And is it also true that Duluth could not and would

8    not have pursued this business at this juncture without

9    someone like ADTRAV?

10   A      That's true.

11   Q      And that's because of the accounting and reporting

12   and back office work that your company was skilled at?

13   A      Yeah, along with the past performance.

14   Q      All right, sir.  Now, in anticipation of receiving

15   the VA work, did ADTRAV and Duluth enter into an agreement

16   on how this account would be handled?

17   A      Yes, we did.

18   Q      Let me show you, first off, Exhibit 1.

19          Do you have that in front of you?

20   A      Yes, I do.  I see it.

21   Q      Now, tell the Court what this document is, please.

22   A      This is the first page of the operating agreement

23   that Duluth Travel and ADTRAV entered into in order to serve

24   the VA business.

25   Q      And who worked on the verbiage of this agreement?

1  A      Myself, Arthur Salus of Duluth and Ed Arias of

2  Duluth.

3  Q      And did you both sign this particular document?

4  A      Yes, we did.

5          MR. BATES: Your Honor, we offer Exhibit 1.

6          THE COURT:  Any objection?

7          MR. SWEETNAM:  No objection.

8          THE COURT:  It will be received.

9  Q      (By Mr. Bates)  Shortly after this agreement was

10 entered into, and I believe on the last page of that

11 document it shows the date of December 23rd, 2005; is that

12 right?

13 A      Yes.

14 Q      Shortly after the two parties executed this document,

15 was the document modified or changed in some way?

16 A      Yes.

17 Q      Let me show you Exhibit Number 2.  Do you have that

18 in front of you?

19 A      Yes.

20 Q      What is this?

21 A      This is the agreement that was, you know, kind of

22 superceded the agreement that we had previously, again,

23 between ADTRAV and Duluth to service the VA account.

24 Q      And go to the last page of that document.  And that

25 was also signed by yourself and Mr. Salus?

1    A       Correct.

2    Q       And that document appears to be dated --

3    A       The 11th or 12th of January, 2006.

4    Q       Was that document modified at all?

5    A       I don't -- not to my recollection.

6    Q       Let me see if I can refresh your memory, Exhibit

7    Number 3.

8    A       Oh, okay.

9    Q       Do you remember this?

10   A       Yes.

11   Q       A long time ago?

12   A       Yeah.

13   Q       And you and Mr. Salus signed this amended agreement

14   January the 15th of 2006 according to the document?

15   A       Yes.

16          MR. BATES:  Your Honor, we move Exhibit 3 into

17   evidence.

18           THE COURT:  Any objection?

19           MR. SWEETNAM:  No objection.

20           THE COURT:  It will be received.

21   Q    (By Mr. Bates)  Now, Mr. Hale, with regard to this

22   slight modification, Exhibit 3, and Exhibit 2 which is the

23   final big document in January 2006, can you describe to the

24   Court what that business agreement was doing, the

25   relationship of the parties?

1    A      That last, what that last one --

2    Q      Exhibit 2, specifically.

3    A      Okay.  Well, basically, what Exhibit 2 was doing was,

4    it was establishing the, you know, how our partnership would

5    work and kind of the rules and, you know, we were trying to

6    come to an agreement to make sure we all understood exactly

7    how we were going to split the business and the revenue --

8    the associated revenue from that business with the VA.

9    Q      Let me ask you this:  At the time this document was

10   signed, had the VA contract been won?

11   A      No.

12   Q      So this was in anticipation of winning the bid?

13   A      Correct.

14   Q      Now, it says, I believe, in the first paragraph, if I

15   can draw your attention to this, that both companies will

16   strive to distribute the work (reservations), do you see

17   that?

18   A      Yes, I do.

19   Q      Why was the word "strive" used in this document?

20   A      Well, we talked about this.  And what we were trying

21   to accomplish here was, we didn't want to get into a

22   mathematical computation to say that, oh, hey, here's how

23   much business you'll exactly get, you know, fifty-one

24   percent and we'll exactly get forty-nine percent.  Because

25   the way that we were splitting the business, we were doing

1     it based on the number of agents that were serving the

2     account.

3          So we wanted to make sure that, hey, you know, if

4     it's 51/49, we'll both have the same number of agents on the

5     account and that way, in theory, we should get right at

6     50/50 split of business.

7          So since we were doing it in that manner and we

8     wanted the partner whose agents actually worked the

9     business, we wanted them to get credit for it.

10          So we just -- so we, again, managed it by the

11     number of agents assigned to the account by each entity.

12    Q     All right.  For clarification, then, did Duluth

13     Travel have some agents that worked in their offices over in

14     Atlanta on the phone answering calls and providing

15     reservation services for customers?

16    A     Yes, they did.

17    Q     Did ADTRAV have agents in its office answering the

18     phone and providing travel arrangements for VA customers?

19    A     Yes, we did.

20    Q     So both of you were generating commissions and fees

21     that were then aimed to be split 51/49 percent under this

22     particular agreement?

23    A     Absolutely.

24    Q     Now, was it -- let me withdraw that.

25          Why did you not agree to just an absolute

1  mathematical formula?

2  A     Well, we just really figured it would be impossible

3  to do and really didn't want to try to get into back and

4  forth about that.  It was, hey, we were both going to use

5  our best efforts to achieve the required split.

6          And again, as I mentioned, the real driving factor

7  here was that we were going to manage it through the agents

8  and the work that they -- the number of phone calls they

9  answer and tickets they issue, and we felt it was important

10 that if agent Sally who worked for Duluth handled the

11 booking, well, then Duluth should get the credit for that

12 and the same thing with ADTRAV.  So we just felt like that

13 was the best way to do it.

14 Q     Look at the second paragraph, first page of Exhibit

15 2, about the middle of the paragraph, the phrase appears

16 there, no retroactive action will be taken.  Do you see

17 that?

18 A     Absolutely.

19 Q     Explain to the judge why that sentence was in this

20 document.

21 A     Again, this was to kind of keep everything from, you

22 know, as easy as possible to manage.  Our goal was to, if

23 for some reason during any month or quarter that, say,

24 Duluth got sixty percent and ADTRAV got forty percent, we

25 didn't want to go back and say, oh, we need to make

1   adjustments because, again, in that case, Duluth would have

2   done sixty percent of the work and so they should get sixty

3   percent of the revenue.

4          What we would do moving forward to try and take

5   that into account is we would say, okay, well, now, let's

6   make it up moving forward by you taking some people off the

7   phone and let's get that average back together.

8          So, again, we were just trying to be fair in

9   who -- whoever did the work got the money.

10  Q     All right.  Now, what specific actions were taken by

11  the parties to strive to meet this 51/49 percentage under

12  this 2006 agreement?

13  A     Well, Ed Arias from Duluth was the operations manager

14  and he was also designated as kind of the account liaison to

15  the VA, so he took it upon himself really to be the one to

16  manage how the telephones were, you know, being routed and

17  the split, so he was -- he was the one that was actively

18  managing that.

19  Q     Did ADTRAV and Duluth implement an automatic

20  telephone system that would distribute the VA travel calls

21  evenly between the company?

22  A     Yes.

23  Q     Describe that to the Court, please.

24  A     Yeah, absolutely.  It's a -- we implemented a

25  telephone system that has ACD capabilities which is

1   automatic call distribution.  And what happens in an ACD

2   telephone system is that when a call comes in, we have both

3   the Duluth agents and the ADTRAV agents all in one group.

4   So as an in-coming call came in, it looks for the agent who

5   has been off the phone the longest and whoever has been off

6   the phone the longest they get that call and then the next,

7   next -- that's the way it worked.

8   Q     Just so we're clear, is that a technology-driven

9   assignment of that phone call or is that a human making that

10  decision as to who to promote the call to?

11  A     No, it's a technology-driven solution.

12  Q     All right.  Were there reports -- monitoring reports

13  generated that helped you know whether or not the system was

14  working as you had intended?

15  A     Absolutely.

16  Q     And were those reports shared between the parties?

17  A     Absolutely.

18  Q     Let me show you Exhibit 9.  Do you have it in front

19  of you?

20  A     Yes.

21  Q     First of all, without the contents of it, can you

22  describe what it is?

23  A     This is an email that was sent from Ed Arias to Lynn

24  and copied to both Brenda, me, and Arthur Salus.

25  Q     And is this an example of the call monitoring

1    information that was shared between the parties?

2    A      Yeah, this is a good example of how it was managed.

3    Q      And just look at the -- in that first paragraph, Ed

4    Arias is writing to Lynn Slaughter at your company, right?

5    A      Right.

6    Q      And you and Mr. Salus are both copied on this email,

7    correct?

8    A      Correct.

9    Q      In that first paragraph the words appear, my initial

10   conclusion is that even though ADTRAV agents handled

11   fifty-two percent of the calls, we need more login during

12   peak times.  Do you see that?

13   A      Yes.

14   Q      What was that sentence directed at, please?

15   A      Well, as I mentioned, you -- the call -- an agent

16   needed to be -- they were in the group, but they needed to

17   be logged in to accept calls in order to receive a call.

18          So our agents, as you can see here in this

19   particular month that he's talking about or two-month period

20   appears, that the system was kind of working as designed and

21   our acts were getting fifty-two percent of the calls and so

22   obviously Duluth agents would have been getting forty-eight.

23          But he's requesting that even though we're

24   handling more calls that we go ahead and sign-in during peak

25   times.  And really what drove this was our agents and

1  management was more experienced in handling travel and so

2  our agents were simply more efficient and were able to get

3  back on the phones quicker than the Duluth agents.  And

4  that's why you had this kind of disparity between, even

5  though we're on, you know, we have the same number of

6  agents, our agents are producing more.  And basically what

7  he's saying here is, gosh, during peak times, you need to

8  even do more because my agents can't get back on the phones

9  fast enough.

10  Q    Did ADTRAV work cooperatively with Duluth to make the

11  staffing adjustment?

12  A    Oh, absolutely.

13  Q    Now, this particular report we have in front of us

14  shows that the monitoring was for January, February, so it

15  was by the week; is that right?

16  A    Correct.

17  Q    Was that typical of the monitoring analysis?

18  A    Yes.  Typically we would look at it by the week.

19        MR. BATES:  Your Honor, we move introduction of

20  Exhibit 9.

21         THE COURT:  Any objection?

22         MR. SWEETNAM:  No objection, Your Honor.

23         THE COURT:  It will be received.

24  Q    (By Mr. Bates)  Now, did there come a time when

25  ADTRAV and Duluth opened a joint bank account at Red

1    Mountain Bank with the intent of placing revenue into this

2    joint account so that both parties could monitor the income?

3    A     Yes.

4    Q     Let me show you Exhibit 4.  First of all, can you

5    tell the Court what this document is?

6    A     This looks to be the account registration form from

7    Red Mountain Bank in which we're opening the account for

8    both ADTRAV and Duluth as joint owners and it's signed by

9    myself, Ed Arias of Duluth, and Arthur Salus of Duluth.

10   Q     Now, this is Red Mountain Bank, correct?

11   A     Correct.

12   Q     And in the left-hand column, about midway of the

13   document, can you tell the judge the date this account was

14   put in service?

15   A     That looks to be, I can't make out that first month,

16   it's either a four or six or eight, but it's the 27th of a

17   month in 2007.

18   Q     Would it -- to your judgment, would it have been in

19   August --

20   A     That looks like an eight.

21   Q     Okay.  And up at the top right-hand corner of the

22   document has the names of the account holders, correct?

23   A     Correct.

24   Q     And that lists both ADTRAV and Duluth.

25   A     Yes, it does.

1  Q     And at the bottom right-hand corner, you signed,

2  Mr. Salus signed and who else signed?

3  A     Ed Arias.

4  Q     Was Ed Arias an officer of Duluth at this time?

5  A     My understanding is he was.

6        MR. SWEETNAM:  Objection, Your Honor, speculation.

7        THE COURT:  All right.  We'll find out through the

8  rest of the testimony.  Go ahead.

9        MR. BATES:  I believe that will all be connected

10 up through the testimony here.

11 Q     Now, did there come a time when that joint account

12 was moved to Aliant Bank?

13 A     Yes, a few years later.

14 Q     Let me show you Exhibit 26.  What is this document?

15 A     This is -- looks like a new account registration form

16 from Aliant Bank that is for a joint account of ADTRAV

17 Corporation and Duluth Travel and signed by the same three

18 parties -- myself, Arthur Salus of Duluth and Ed Arias of

19 Duluth.

20 Q     And what's the date that that account was created?

21 A     To the best of my recollection and ability to read

22 this, it was, looks like February the 2nd of 2011.  No,

23 that's better.  February the 9th, 2011.

24 Q     All right.  Sorry about that.

25 A     You're testing me here.

1  Q      I'll try to blow these up.

2          So the same parties were signatories, owners on

3  that account?

4  A      Yes, they were.

5          MR. BATES:  Your Honor, we move introduction of

6  Exhibit 4 and 26.

7          THE COURT:  Any objection?

8          MR. SWEETNAM:  No objection, Your Honor.

9          THE COURT:  It will be received.

10 Q      (By Mr. Bates)   With regard to these two accounts,

11 did Duluth have the same access to these joint accounts that

12 ADTRAV had?

13 A      Absolutely.

14 Q      Did Duluth write checks out of these joint accounts

15 over time?

16 A      Yes, they did.

17 Q      Who reconciled the in-coming revenue from these

18 accounts?

19 A      Lisa McGowen of ADTRAV.

20 Q      And was the information of that reconciliation

21 provided to Duluth?

22 A      Yes, it was.

23 Q      We're going to get into this a little deeper, but

24 you're familiar with something called a dual MIR, M-I-R?

25 A      Yes, I am.

1  Q      Did ADTRAV insure that a dual MIR was created so that

2  Duluth had access to the Worldspan and ARC reports that

3  flowed into this account?

4  A      Yes, we did.

5  Q      Was that a majority of the income related to this VA

6  account?

7  A      Yes.  Yeah.  That was the majority of the income.

8  Q      If we could go back and bring back Exhibit 2 which

9  has been introduced into evidence.

10         Under this agreement, Mr. Hale, were both parties

11 suppose to have access to ARC reports to tie back in to the

12 back office reporting systems at ADTRAV?

13 A      Yes.

14 Q      Let me direct your attention specifically to Page 3

15 of this document under the category "reports."  Do you see

16 that?

17 A      Yes, I do.

18 Q      Could you read that first sentence into the record?

19 A      "Duluth Travel and ADTRAV will have access to ARC

20 reports and tie in to back office reporting systems."

21 Q      Was there a time when the parties clarified in more

22 detail how the revenue split was going to be accomplished?

23 A      Yes.

24 Q      Specifically did that occur in 2007?

25 A      Yes.

1   Q      Let me show you Exhibit 5.  Do you recognize this

2   document?

3   A      Yes.

4   Q      And is this a true and accurate copy of the details

5   that were agreed upon by the parties to clarify how the

6   revenue split would be accomplished?

7   A      Yes, it is.

8          MR. BATES:  Your Honor, we would move Exhibit 5

9   into evidence.

10  Q      (By Mr. Bates)   Mr. Hale, what was the --

11         THE COURT:  Any objection?

12         MR. SWEETNAM:  No objection.

13         THE COURT:  It will be received.

14         MR. BATES: I was on a role.

15         MR. SWEETNAM:  I'm here, you know.  I'm sitting

16  right behind you.

17         MR. BATES:  Judge, I'm sorry.  I got a little --

18         THE COURT:  No problem.

19  Q      (By Mr. Bates)  What did this agreement provide,

20  Mr. Hale?

21  A      Well, it basically, as you mentioned, it went to

22  further clarify what the, you know, how we were going to

23  handle certain things that came up from time to time within

24  the agreement.  And specifically what we have highlighted is

25  the fact that, again, if, you know, the intent was for us to

1  split it 51/49.  But unless we varied by more than five
2  percent, then we weren't going to do anything about it, just
3  kind of, again, kind of figuring the way we were doing it
4  was agents answering the phone, and so we went ahead and
5  just set up parameter, said okay, a threshold, so to speak,
6  of up to five percent we just rock on, you know, like we are
7  doing, but if it gets above five percent, then, hey, let's
8  get together and develop a plan to try and get that back
9  down to closer to 51/49 which -- and that plan primarily
10 would have been us taking people off the phones or Duluth
11 putting more people on the phones to start to get that
12 business closer to the 51/49.
13 Q     And from the time this document was entered into in
14 October of 2007 all the way through 2009, did the parties
15 operate under this document without too much trouble?
16 A     Yes, absolutely.
17 Q     Occasional adjustments?
18 A     Occasional adjustments.
19 Q     But no big disputes?
20 A     No big disputes.
21 Q     Was ADTRAV at this time under the impression that
22 Duluth was monitoring these splits weekly and monthly?
23 A     Oh, they were.  Yes.
24 Q     Did ADTRAV ever get any impression from anyone at
25 ADTRAV that Duluth was unhappy with ADTRAV and how it was

1  collecting and splitting the VA revenue during this period

2  of '07 to '09?

3  A     Never.

4  Q     Was ADTRAV ever apprised in 2007, 2008 or 2009 that

5  Duluth wanted more information than it was getting from

6  ADTRAV to verify its collections and splits?

7  A     No, we were not.

8  Q     Did there come a point in time when relationship

9  between Duluth and ADTRAV hit a bump in the road in 2009?

10  A     Yes.

11  Q     And what was that about?

12  A     Well, that -- it centered around the Common Wealth of

13  Pennsylvania bid.  Do you want me to go on?

14  Q     No.  I want to ask you more specifically about that.

15        What was the subject of the dispute in the Common

16  Wealth of Pennsylvania?

17  A     Well, we had -- the Common Wealth of Pennsylvania had

18  put out an RFP for -- a request for proposal.  And in that,

19  one of the parameters of that was that you had to have a

20  small business plan and work with the small business.  And

21  so, again, we looked at that and said okay, hey, let's go

22  after this together because we're going to have to do a

23  small business in here, might as well be with Duluth.  So we

24  did that.

25        But upon getting into the actual review of the RFP

1   and clarifications, they had a question and answer session,

2   it came to light that really it was not any small business

3   that would qualify under this, but it had to be a

4   Pennsylvania-based small business to be able to qualify as a

5   small business.

6   Q      Excuse me, did the service-disabled veteran status

7   have anything to do with this Pennsylvania contract?

8   A      No.

9   Q      You're saying small business?

10  A      Correct.

11  Q      Did y'all have any understanding as to whether or not

12  service-disabled veteran status had anything to do with the

13  contract?

14  A      No, it was not designated as that being a

15  requirement.

16  Q      All right.  And did you offer to pursue the

17  Pennsylvania contract?

18  A      Yes.

19  Q      But you wanted to pursue it as a prime contract or

20  not subbed out through Duluth?

21  A      Correct.

22  Q      And Duluth objected to that?

23  A      Yes.

24  Q      And you pursued it anyway, didn't you?

25  A      Yes.

1   Q     And Mr. Arias then wrote you an email and accused you

2   of being unethical for doing that, didn't he?

3   A     Yes, he did.

4   Q     And you responded to that charge at that time, didn't

5   you?

6   A     Yes, I did.

7   Q     Let me show you Exhibit 7.  What's this document,

8   Mr. Hale?

9   A     This is an excerpt -- it's an email from -- it's a

10  chain of emails and the latest email is an email from me to

11  Ed Arias and Arthur Salus of Duluth.

12  Q     And this relates to the dispute over Pennsylvania

13  RFP?

14  A     Yes, it does.

15  Q     And this is where Mr. Arias accused you of maybe

16  being unethical about this, right?

17  A     Yes.

18  Q     And you responded to that in kind?

19  A     Yes, I did.

20  Q     Did y'all resolve this bickering or dispute between

21  yourselves over the Pennsylvania contract?

22  A     Yes, we did.

23  Q     How did you do that?

24  A     We agreed to take the -- to up the percentage of the

25  VA business from 51/49 to 60/40.

1    Q      And was that negotiated between you and Mr. Salus?

2    A      Yes, along with Ed Arias.

3    Q      Along with Ed Arias.  And this was to become a part

4    of your future revenue splits?

5    A      Correct.

6    Q      Did you make that change and were the revenue splits

7    changed?

8    A      Yes, they were.

9           MR. BATES:  We would offer Exhibit 7 at this time.

10          THE COURT:  Any objection?

11          MR. SWEETNAM:  Is it just the -- those two pages?

12          MR. BATES:  Two emails.

13          MR. SWEETNAM:  No objection.

14          THE COURT:  It will be received.

15          MS. DAVIS:  It's four pages.

16   Q      (By Mr. Bates)  By going 60/40 instead of 51/49, did

17   that resolve the contentiousness between ADTRAV and Duluth?

18   A      Yes, it did.

19   Q      And did there come a time where the parties started

20   talking about changing the split again?

21   A      Yeah.  It was shortly thereafter and just as we were

22   coming up -- the VA was rebidding the account, and so in

23   preparation for that rebid, we negotiated a new agreement.

24   Q      And when you say negotiated for the rebid, were those

25   splits to take place immediately or if the new VA contract

1    was obtained?

2    A      They were -- and I clarified this with them via email

3    and it was -- both of us agreed that the splits would take

4    effect if and only if we were both awarded the new VA

5    contract when that contract went into effect.

6    Q      Now, Mr. Hale, before we get into the 2010 contract,

7    which is the reason we're in this courtroom today, can you,

8    first of all, explain to the Court the types of revenue that

9    were collected and paid to Duluth and ADTRAV under the VA

10   contract.

11          I would like to take those various revenue

12   segments one at a time, if we could.

13   A      Sure.

14   Q      Were there transaction fees?

15   A      Yes, there were.

16   Q      What were those?

17   A      Transaction fees were the amount of -- was a fee that

18   we charged to the VA to complete a -- either an online

19   booking, an agent-assisted booking, and some other ancillary

20   services that we provided to the VA.  But they were billed

21   by ADTRAV and Duluth directly to VA.

22   Q      Was there something called GDS segment fees?

23   A      Yes, there was.

24   Q      What was that?

25   A      As -- in the travel industry, we all use a Global

1  Distribution System, aka, GDS, that the agents use and the

2  online booking tool uses to get all of the hotel data, car

3  data, and airline data.

4        And there's three primary GDSs that serve the

5  market in the U.S.  And as part of your agreement with the

6  GDS, they rebate to the travel company a portion of the

7  segment fees that they charged the airlines, hotels and car

8  rental companies to display their product in the system.

9  Q     Would that be what we referred to throughout this

10  case as Worldspan fees?

11  A     Yes.  Worldspan is the name of the GDS and the fees

12  are those segment fees and also bonuses.

13  Q     Let's talk about that.

14        The bonuses are different from the segment fees,

15  correct?

16  A     Yes, they are.

17  Q     Explain to the judge what the GDS bonuses are.

18  A     Well, when -- it's typical when you sign a new

19  agreement, which, again, are typically five years in length,

20  that the -- in addition to providing you a transaction or

21  segment fee for each booking that you make, the GDS

22  companies, in this case Worldspan, would offer, for lack of

23  a better term, a signing bonus.

24        And so like when we first started the VA account,

25  ADTRAV earned a signing bonus from Worldspan which we put

```
1    into the joint account and split with Duluth, you know, for
2    the percentage, I think it was 50/50 at that time.
3    Q      Did the parties earn hotel commissions?
4    A      Yes, we did.
5    Q      And who paid those?
6    A      Those were paid by the individual hotels.  The actual
7    individual hotels are responsible for the payment, which is
8    typically a ten percent commission.  And it's paid, the
9    majority of them are paid by, for lack of a better term,
10   consolidators that get all of the Holiday Inn or Marriott
11   properties to participate with them, they collect the
12   commission from all the Marriotts and then pay the related
13   TMC their portion of the commission.
14   Q      Were there car rental commissions?
15   A      Yes, a little bit.
16   Q      All right.  And who paid those?
17   A      The car rental companies.
18   Q      Now, those were revenue items.  Under this
19   arrangement for this VA business, were there also expenses
20   that were charged to this account?
21   A      Yes.
22   Q      And can you tell the judge what those expenses that
23   were properly assigned to this account included?
24   A      Some of the ones that were included were, like long
25   distance charges for, you know, the in-coming eight hundred
```

1   number as well as the outbound calls by the agents.

2           There was also an accounting fee that -- the way

3   we set this up was we mutually agreed on a set accounting

4   fee, which I believe was around twenty-five hundred dollars

5   a month, if memory serves, and that was charged by ADTRAV

6   to, again, lack of a better term, a partnership for the

7   accounting services that were being provided by ADTRAV.

8           There was also a technology fee, ADTRAV had a

9   significant amount of proprietary technology that we

10  deployed on this account to help, you know, service the

11  account and we charged a nominal per segment or per

12  transaction fee to the partnership for the use of that

13  technology.

14  Q     Were there -- we talked about revenue from Worldspan,

15  were there any Worldspan charges?

16  A     Yes.  Worldspan would have some charges for a Pseudo

17  City Code or for a -- they had -- they had a proprietary

18  software application that would automatically reprice

19  tickets for exchange.  So you could take one non-refundable

20  ticket and exchange it for another, they had an automated

21  system, so we had to pay every time you did that.

22          There was also -- we had after-hours service that

23  we had as a back-up to the ADTRAV after-hours team and there

24  was a monthly fee associated with that.

25  Q     We heard referenced in this case the term ARC.

1    A       Yes.

2    Q       What is ARC?

3    A       Arc is the Airline Reporting Corporation.

4    Q       So ARC is A-R-C?

5    A       A-R-C, correct.

6    Q       And that is the Airline Reporting Corporation?

7    A       Yes, sir.

8    Q       And were there fees or expenses for that account?

9    A       Yes, there were.

10   Q       Charged against the VA revenue?

11   A       Yes.

12   Q       What about Worldspan XML support fees?

13   A       Yeah.  That was a fee -- that was one of the fees

14   charged by Worldspan that was -- our technology, instead of

15   going through the pipe that the agents use on the screen,

16   the XML fee is kind of a behind-the-scenes connection

17   between our systems and Worldspan so that our technology

18   could talk in a digital-type interchange.

19   Q       And I think the last category that we'll talk about

20   will be bank fees.

21   A       Yeah.  There were some fees charged by the bank based

22   on the number of checks you wrote and the number of deposits

23   that were put into the account.

24   Q       Now, with regard to the VA account, who were the

25   actual customers, who were the people you were providing

1    service for?

2    A      Well, it would have been employees of the Veteran's

3    Administration and it would have been beneficiaries which --

4    beneficiaries are defined as individuals who, say, who are

5    getting treatment for a variety of illnesses or injuries

6    that they sustained while they were a member of the armed

7    services.

8    Q      And I believe I saw somewhere that there were VIPs?

9    A      Yes.  And there were also VIPs which were the top

10   echelon of the VA employees.  This would have been the

11   secretary, the undersecretary.  So there were a few people

12   who were designated as VIPs, very important people is what

13   we call them.

14   Q      After the 60/40 split was put in place, following the

15   Pennsylvania event that we mentioned earlier, was Duluth

16   tasked with handling the beneficiary travel to the exclusion

17   of ADTRAV?

18   A      Yeah.  The way -- and where that came from was, we,

19   once we decided to go 60/40, we sat down and said, okay,

20   what's the best way to accomplish this, what is the easiest

21   way to accomplish this and still serve the customer.

22   Because at the end of the day, we wanted to serve the

23   customer -- the customer doesn't care what the percentage

24   split is, they just want to get service.

25              So we determined that the best way to do this was

1    to direct all of the beneficiary calls over to Duluth, and

2    we were able to do that because we had a separate eight

3    hundred number for beneficiary travel.

4            So it just made sense that, okay, in order for us

5    to achieve this split that we're going for, let's just

6    change that phone number to strictly go to the Duluth agent

7    and that way they would handle one hundred percent of the

8    beneficiary travel and that would go to help make the

9    overall percentage closer to the 60/40.

10   Q    Did ADTRAV handle some beneficiary travel after that?

11   A        Yeah, absolutely.  I mean, we would get some, you

12   know, sometimes when they had people out and they needed

13   assistance, we had after-hours folks who work, you know, we

14   had beneficiaries who called after hours.  So there was a

15   small number of the beneficiaries that ADTRAV actually

16   handled.

17   Q    And would ADTRAV have received some assignment of

18   revenue for the amount of beneficiary travel it handled?

19   A        Yes.

20   Q    Did ADTRAV send weekly and monthly reports to Duluth

21   indicating that ADTRAV was being credited revenue for the

22   work it did for these after hours or overflow of beneficiary

23   travel?

24   A        Absolutely.

25   Q    Was there ever an agreement that Duluth would receive

1   one hundred percent of the beneficiary travel revenues even

2   though Duluth didn't handle one hundred percent of the

3   beneficiary travel transaction?

4   A      No, there was not.

5   Q      Who made the decision on increasing or decreasing

6   staffing at Duluth and ADTRAV in an attempt to reach the

7   agreed upon revenue goals?

8   A      That would be Ed Arias of Duluth.

9   Q      Can you explain how the communications occurred

10  between ADTRAV and Duluth regarding the financial reporting?

11  A      The financial reporting is -- we provided a weekly

12  communication, I believe it's referenced in the documents

13  here as the weekly net remit, which was a weekly accounting

14  of the airline tickets that were issued for VA and reported

15  to the Airline Reporting Corporation.

16         And then we also did a monthly reconciliation

17  which was basically the entire, you know, month's activity,

18  all the revenue, all the expenses, a summary of that was

19  prepared with line items of every -- every revenue source

20  and every expense source, and then the details that made up

21  that summary were included in that email as well.

22  Q      Who decided what types of reports were going to be

23  generated and shared between ADTRAV and Duluth?

24  A      Well, when we first started, it was kind of a mutual,

25  you know, thing that we said, hey, here's the type of

1    reporting that, you know, depicts everything and gives

2    everybody a clear picture and is transparent as far as the

3    revenue and expenses.

4              And then Ed Arias, you know, made some adjustments

5    for things he liked, he wanted to see differently on those

6    reports.

7    Q       I want to go over these.

8              Did you send monthly reconciliation reports?

9    A       Yes, we did.

10   Q       What is a CBA report?

11   A       CBA report is, as I mentioned earlier, it's a

12   Centrally Billed Account.  And this is where a -- and in

13   this case, the VA had -- instead of -- you know, if there

14   were a thousand travelers out there, instead of using each

15   person's individual credit card, government-issued credit

16   card for their airline tickets, they designated one

17   centrally billed account to handle all of the airline

18   tickets.

19             So as part of the process, now that you've charged

20   these thousand tickets to one number, then you have to

21   figure out and reconcile who gets those charges and where

22   they go to make sure they were accurate and valid.

23   Q       Were CBA reports shared between ADTRAV and Duluth?

24   A       Oh, absolutely.

25   Q       What is an IBA report?

1   A     An IBA is that Individual Business Account, which

2   would be that individual traveler credit card,

3   government-issued credit card.  And so we did have travelers

4   who didn't use one of the many CBAs that the VA had, they

5   would actually use their IBA.  So we had a report that

6   documented, okay, here is everybody who used their IBA this

7   last month.

8   Q     And were those shared between the parties?

9   A     Oh, absolutely.

10  Q     What is a CLIN, C-L-I-N, report?

11  A     That is a contract line item number report.  And

12  basically what that does is, as I mentioned, we charged the

13  VA fees.  And, as an example, there was a fee for a domestic

14  ticket that was booked through an agent, there was a fee for

15  a domestic ticket that was booked online, same thing with an

16  international, there was a fee for hotel only reservations

17  without an air charge with it.

18        So each one of those items is a contract line

19  item.  So a CLIN report was basically a summary of every fee

20  classification that we charged the VA for for a previous

21  month, we said, okay, like the domestic, the domestic CLIN,

22  we would say, CLIN number 001, CLIN, you know, ten thousand

23  tickets at X number of dollars equal, you know, ten times X.

24  Q     Were those reports shared with Duluth?

25  A     Absolutely.

1   Q      And what about ARC net remit reports?

2   A      Yeah.  The ARC net remit report is what was filed

3   with ARC and then returned by ARC to us which accounted for

4   every single ticket that we issued.  And ARC is, you know,

5   their job from the airlines is basically to make sure that

6   travel agencies are not issuing tickets that they -- and

7   collecting money for tickets that they don't report to the

8   airlines.

9          So, in order to combat that possibility of fraud,

10  ARC requires a weekly report that is audited and then sent

11  back to the agency that accounts for every single document

12  that is issued for an airline ticket.

13  Q      I would like to show you an example, Mr. Hale, of one

14  of these reports.

15         If we could have Exhibit 221-A.  Can you tell the

16  judge what this exhibit is?

17  A      This is an ARC report or a report that shows the

18  weekly net remit.

19  Q      What's the time period for this particular example?

20  A      This would be the 9th of April, 2012 through the 15th

21  of April, 2012.

22  Q      All right.  So this is a weekly report?

23  A      Yes.

24  Q      And was this report, not this particular one on the

25  screen, but reports like this, this is an ARC net remit

1  report, correct?

2  A      Yes, it is.

3  Q      And this particular document in some form would have

4  been shared with Duluth back in 2012?

5  A      Oh, absolutely.

6  Q      From 2010 to the end of 2013, what percent of the

7  total VA revenue were these air service fees, if you know?

8  A      I don't know, you know, they were a lot.  They were,

9  I believe they were probably the majority of the revenue, if

10  memory serves.

11  Q      Seventy-five percent or more?

12  A      Absolutely, yes.

13          MR. SWEETNAM:  Your Honor, I apologize for making

14  this late objection or request for clarification.  But

15  Mr. Bates' question was this report was shared in some form

16  which is kind of just sort of vacuous out there.  I would

17  like to know what form it was shared in.

18          MR. BATES:  Judge, I'm going to tie all that up.

19          THE COURT:  Okay.

20          MR. BATES:  They were sent every month with an

21  email, the ones that go monthly and weekly in an email, so

22  they were submitted to him electronically.  I will tie that

23  up.

24          THE COURT:  Cover that with the witness.

25  Q      (By Mr. Bates)  Mr. Hale, let's go ahead and clear

1   that up right now.

2          I asked you, was this -- these reports shared with

3   Duluth.  Do you remember that?

4   A      Yes.

5   Q      How were they shared?

6   A      They were shared weekly via email.

7   Q      All right.  Thank you.

8          How were the air service fees paid?

9   A      The way that the air service fees were paid was that

10  ARC, in addition to being the clearinghouse for the airline

11  tickets, also serves as a merchant for the various credit

12  card companies.

13         So we would actually charge -- and if you're

14  looking at the display right now on the screen, if we look

15  at that top line --

16  Q      That's the last page of the document, 221-A, correct?

17  A      Correct.

18  Q      Okay.

19  A      So you look at that Patrick Herron, the thirteen

20  hundred seventy-three dollars and twenty cents was the cost

21  of the airline ticket that was billed to Mr. Herron, and

22  then the twenty-two fifty on the line below that was the

23  service fee charged by ADTRAV and Duluth.

24         And you notice the -- there's a -- next to the

25  total there's a line or a column of commission which is

1   twenty-one seventy-one, the difference between twenty-two

2   fifty and twenty-one seventy-one is the fee charged by ARC

3   to process the credit card transactions.

4   Q     And so the category here that says net remit --

5   A     That would have been the amount --

6   Q     -- represents what?

7   A     That net remit would have been the amount that was

8   sent to us.

9         So you see on that thirteen hundred seventy-three

10  dollars and twenty cents, nothing was sent to us because

11  there's no commission, nothing due, that went all to the

12  airlines.

13        That twenty-two fifty -- of that twenty-two fifty,

14  twenty-one seventy-one was sent back to us as our fee, you

15  know, the collection of our fee from the charge to the VA

16  credit card.

17  Q     As it relates to this report, tell the judge what the

18  net remit for the VA business represented by this report

19  equaled.

20  A     This particular report, it equaled forty thousand

21  seven zero one point eighty-nine.

22  Q     And then at the bottom underneath that there's a box

23  that shows tickets, tickets percentage and net remits, do

24  you see that?

25  A     Yes, I do.

1    Q      What does that box represent?

2    A      What this part of the report represents is, okay,

3    looking at each one of these tickets, if you look at -- in

4    the report, body of the report, the second column in from

5    the right, it's titled UDID71, that designation there

6    depicts who handled the travel, either Duluth or ADTRAV.

7    And so based on that UDID of who handled the travel, it

8    would then split the number of tickets.

9          So you see that, in this case, Duluth, this month

10   or week, Duluth issued four thousand thirty-nine tickets

11   which represented sixty-four point nine percent of the

12   business and ADTRAV issued twenty-one hundred eighty-six

13   tickets which represented thirty-five point one percent of

14   the business, and then the net remit based on that

15   calculation for each partner and then how it totals up to

16   forty thousand seven zero one point eighty-nine.

17   Q      So somebody wrote a check for forty thousand seven

18   zero one eighty-nine.

19   A      The, actually, it was not a check.  It's a bank

20   transfer from ARC to the joint account of ADTRAV and Duluth.

21   Q      So it went into the joint account?

22   A      Went into the joint account.

23         MR. BATES:  Your Honor, we'd move the introduction

24   of Exhibit 221-A.

25         THE COURT:  Any objection?

1          MR. SWEETNAM:  No objection.

2          THE COURT:  It will be received.

3    Q     (By Mr. Bates)  How did ADTRAV reconcile and report

4    on the ARC service fees each week?

5    A     How did they reconcile -- it's a program within

6    TRAMS, our back office system, that would reconcile up and

7    running this report would tell us hey, which amount went to

8    Duluth and which amount went to ADTRAV.

9    Q     Explain to the judge what TRAMS reports are.

10   A     Yeah.  TRAMS is the accounting system and computer

11   system that we use.  It's an industry-leading back office

12   accounting and reporting system.

13   Q     And essentially can you describe for the judge how

14   the TRAM system aided you in that reconciliation process?

15   A     Yeah, absolutely.  So when -- when we issue -- either

16   Duluth agents or ADTRAV agents issue a ticket via Worldspan,

17   then that information, all the information -- reservation

18   information, cost information, everything was transmitted

19   via a MIR to TRAMS.

20          And once it was in TRAMS, then we had all the data

21   in our accounting system.  So we were able to produce an ARC

22   report by saying, okay, here is every ticket that was issued

23   by anybody connected to the VA account, here is that listing

24   and here's, you know, the file that we need to make with ARC

25   to report on those sales.  So everything -- so really, TRAMS

1    is the Bible.

2    Q      You mentioned MIR.

3    A      Yes.

4    Q      Explain to the Court what a MIR is.

5    A      Yeah.  And I can't tell you -- I think it's a machine

6    interface record is the term, you know, what it stands for.

7           But basically what happens with a MIR, as I said,

8    when Worldspan -- when you make the reservation in Worldspan

9    and then issue the ticket, all of the accounting data needs

10   to be transferred from Worldspan into some type of back

11   office accounting system, in this case we use TRAMS.

12          So it's the -- the MIR is that actual record being

13   digitally transferred from Worldspan to the TRAM system.

14   Q      Were the reconciliations for all the air bookings and

15   service fees that were paid each week sent to Duluth every

16   week from April 12 -- April 1, 2012 until the end of your

17   relationship?

18   A      Yes, they were, and they were signed off on.

19   Q      That was my next question.  You anticipated it.

20   A      Sorry.

21   Q      Did Duluth sign and approve or authorize a form which

22   broke down how the air service fees were to be split?

23   A      Yes.

24   Q      Let me show you Exhibit 221-B.  If you would explain

25   to the judge what this document is.

1   A     Sure.  This is a document that we jointly developed
2   with Duluth in order to distribute the money that was earned
3   through the ARC and the service fees charged to VA on a
4   weekly basis.
5        We wanted to get this -- since it represented such
6   a large amount of money, we wanted to get this distributed
7   on a weekly basis to each one of the partners.
8        So this form was developed.  And based on the ARC
9   report, Lisa would develop this split, detail everything
10  out, sent it over to Duluth travel, typically Ed, as the
11  operations person, would review it, if he had any questions,
12  he would call Lisa and ask for an explanation.  Typically,
13  it's pretty straight forward.
14       ARC reporting is very straight forward because you
15  have to account for every nickel.  So once that -- he
16  approved it, then he would sign off on it, then he would
17  write a check for Duluth Travel, in this case, he would
18  write a check to Duluth Travel for twenty-eight thousand
19  four fifty-four point forty-two and he recorded that, in
20  this case it was check number 1170, and then ADTRAV would
21  cut a check to ourselves of twelve thousand two forty-seven
22  point forty-seven.
23  Q     In this particular authorization form 221-B ties back
24  to 221-A which was the actual ARC weekly report?
25  A     Yes.

1   Q      And in fact, that forty thousand seven zero one

2   eighty-nine was the exact number we just looked at on the

3   previous exhibit?

4   A      Absolutely.

5          MR. SWEETNAM:  Your Honor, I'm going to object to

6   that last question which was more like a statement really.

7   221-A is not an actual ARC report.  221-A is something that

8   was generated by ADTRAV presumably from an ARC report, but

9   it's not an ARC report.

10         MR. BATES:  Well, he's going to get to

11  cross-examine him all he wants to, Judge.

12             THE COURT:  It's fine.  Go ahead.

13         MR. BATES:  If I'm in error that that is not tied

14  to that first exhibit, I'll stand correct.  But I believe it

15  ties to it to the penny.

16             The Court:  Go ahead.

17  Q      (By Mr. Bates)  So 221-B, let me just ask you, does

18  221-B relate to 221-A?

19  A      Yes.

20  Q      So, it's a sign off on that report?

21  A      Yes, absolutely.

22         MR. BATES:  Your Honor, we would move 221-A and B

23  into evidence.

24             THE COURT:  Any objections?

25             MR. SWEETNAM:  No objection, Your Honor.

1           THE COURT:  It will be received.

2           MR. BATES:  Judge, I'm going to start another

3    subject matter, I don't want to overtax the court reporter,

4    if we need to take a --

5           THE COURT:  Why don't we go ahead and take about a

6    ten minute recess and then we'll come back at 10:25.  10:25.

7                     (Break taken)

8                     (Open court)

9           MR. BATES:  Judge, a matter of housecleaning.

10   Tracy has advised me I failed to offer Exhibit 2 into

11   evidence.  I would like to do that.  That was the January

12   2006 contract.

13          THE COURT:  Any objection?

14          MR. SWEETNAM:  That's the -- what did it show?

15          MR. BATES:  It's the January 2006 --

16          MR. SWEETNAM:  No objection.

17          THE COURT:  It will be received.

18          MR. BATES:  Your Honor, at this time, rather than

19   go through each monthly remit and approval document as we

20   just did with 221-A and B, we're going to offer Exhibits

21   219-A and B through Exhibit 310-A and B, less 221 A and B,

22   since it's already in evidence, as a composite set of

23   exhibits and I believe there's no objection.

24          THE COURT:  All right.  That was 219 through 310

25   you said?

1          MR. BATES: Yes, sir.

2          MR. SWEETNAM:  Just go ahead and identify them for

3   me, are we talking weekly net remits?

4          MR. BATES:  Yes.  These are the weekly net remit

5   reports submitted, we say, from ADTRAV to Duluth during

6   April 1st, 2012 through the end of 2013.

7          MR. SWEETNAM:  Are these the one-page documents

8   with the signatures at the bottom?

9          MS. DAVIS:  It's both.

10         MR. BATES:  It's both.  The detail backup and the

11  one page sign off.

12         MR. SWEETNAM:  When you say the detailed backup,

13  are you talking back to the 221 --

14         MR. BATES:  221-A.

15         MR. SWEETNAM:  We have no objection, Your Honor.

16         THE COURT:  219-A and B through 310-A and B minus

17  221-A and B is received.

18  Q    (By Mr. Bates) Mr. Hale, prior to our break, we were

19  focused on weekly reports.  I would like to move now to

20  monthly reports, if I could.

21  A    Okay.

22  Q    I'm going to show you Exhibit 371 at this time, if

23  you could take a look at it, please.

24         Do you have the exhibit in front of you?

25  A    Yes, I do.

1   Q      First of all, could you identify the document and

2   tell the judge what this is?

3   A      Yes.  This is an email that was sent from Lisa

4   McGowen to Alan Salus, Arthur Salus, Brenda Corbin, John

5   Lawless, Olita Jenkins, all of Duluth Travel, and this is

6   the October 2013 commission and expense split which would be

7   what we're referring as to the monthly reconciliation.

8   Q      And Lisa McGowen is the staff accountant for ADTRAV,

9   is she not?

10  A      Yes, she is.

11  Q      And this particular email has three attachments to

12  it, correct?

13  A      Yes, it does.

14  Q      What are those three attachments?

15  A      The first one is an Excel sheet that is the breakdown

16  of the, you know, the summary, the actual monthly

17  reconciliation.

18  Q      This particular document, by the way, was for October

19  of 2013; is that correct?

20  A      Yes, it was.

21  Q      And explain to judge what this Excel spreadsheet is

22  doing, Mr. Hale.

23  A      Yeah.  So, what we were doing on a monthly basis was

24  basically accounting for all the revenue and all the

25  expenses associated with the VA account.

1          So it's broken down into different buckets, in

2     here, as you see, from number of Worldspan tickets issued,

3     Sabre tickets issued, car rentals, hotel bookings, like

4     I say, it's basically a recap of all the activity.

5     Q     Let's go backup.  There is something there called

6     Sabre revenue.  We've not talked about that today.

7          Can you tell the judge what Sabre revenue was?

8     A     Yeah.  As I mentioned, there's three predominant GDS

9     companies, Global Distribution Systems, that market inside

10    the United States.  Sabre is another -- is a competitor to

11    Worldspan.

12         And the reason that we have Sabre on here is

13    because Southwest Airlines does not participate in the

14    Worldspan GDS.  And so in order to get Southwest tickets to

15    display on the online booking tool and to be easily booked

16    by the agents, we needed to also have a Sabre interface.

17         And so, in this particular case, four hundred

18    eighty-nine would have most likely been four hundred

19    eighty-nine Southwest tickets.

20    Q     So this document, this Excel spreadsheet that we're

21    looking at now, contains a recordation of the revenues

22    achieved in October of 2010; correct?

23    A     Yes, it does.

24    Q     Why is there a Duluth column and ADTRAV column?

25    A     Because that's where, again, we were trying to split

1   the revenue and so it was a way of accounting for who -- who

2   did what on the revenue side.  As I alluded to earlier, the

3   transactions were handled by the agents or the number of

4   agents that we had on the phone.  So in this case, you can

5   see the Worldspan tickets, actually eighty-four percent of

6   the tickets were issued by Duluth agents and they got credit

7   for and ADTRAV did almost approximately sixteen percent.

8   Q     All right.  Let's go down to the bottom of this

9   document and there are monthly expenses that are also

10  recorded against this revenue.

11  A     Yes, there are.  These were the expenses that I

12  alluded to earlier in my discussion.  And in this particular

13  month, the expenses were the ADTRAV accounting salary, the

14  long distance, the technology fee, and the bank fees were

15  the three fees or expenses that hit this month.

16  Q     All right.  And then is there a reconciliation at the

17  bottom of the document?

18  A     Yes, there is.

19  Q     And explain that to the judge.

20  A     So, at the end of the day, we would add up, you know,

21  everything -- the revenues that Duluth was, that, you know,

22  was assigned to Duluth during the month, then -- and ADTRAV,

23  and then we would have the expenses that were assigned to

24  both Duluth and ADTRAV in this column down here, due Duluth

25  would be the difference between the revenue, total revenues

1    that Duluth got minus the net revenue or, I'm sorry, minus

2    the expenses to do the split.

3    Q    Now, let's go backup to the revenue column for a

4    moment, right there.

5         These Worldspan and Sabre fees, where were those

6    fees deposited?

7    A    Initially, as called for in the agreement, those

8    Worldspan fees were deposited into the joint account when

9    ADTRAV held the Worldspan contract.

10        In 2010, when Duluth took over the Worldspan

11   contract, you know, we moved the VA to their Worldspan

12   contract, they decided to deposit those directly into a

13   Duluth controlled account and not the joint account.

14   Q    And did you dispute that?

15   A    Oh, absolutely.

16   Q    Now, with regard to the hotel and car commissions

17   shown on this document, where were those revenues deposited?

18   A    Well, there were three places that revenue from the

19   hotel commissions could be deposited.  And that was either

20   into an ADTRAV bank account, a Duluth bank account, or the

21   joint bank account.

22        And the reason that it could go into all three

23   was, like in our case, based on just the way the industry

24   works, we would get checks, even though they were made and

25   referenced to the ARC number that was controlled by Duluth

1    and assigned to the VA account, we would get some payments
2    of checks directly from the hotels, you know, and a lot of
3    times they were included in other ADTRAV business.
4           So, we would identify those as VA and we would
5    deposit them into our account but then include them on the
6    monthly reconciliation.
7           The -- I talked about how the -- there are these
8    consolidators in the hotel arena that consolidate the
9    commission payments from the various hotel chains, Pegasus,
10   TACS, Paymode, these are the names that you probably have
11   seen in some of the discovery documents of these companies.
12          So, when they do this consolidation, they send,
13   instead of getting a whole bunch of separate checks, they
14   send you one check and they send you a file and tell you
15   what was on that check.  That money was either deposited
16   into the joint account or deposited into the
17   Duluth-controlled account.
18          And as you can see here, that was a substantial
19   amount of money this month, the hotel commission, of the
20   roughly twenty-five thousand dollars in hotel commission
21   that was received, nineteen thousand of it went into the
22   Duluth account, four thousand went into the joint account,
23   and thirteen hundred went into an ADTRAV account.
24   Q       All right.  Look at the second attachment on this
25   email.

1            Can you tell the Court what the second attachment

2    is, please?

3    A      Yes.  This is the cross approval for agency --

4    basically, this is us to the document, very similar to the

5    weekly net remit document that we pass back and forth, this

6    was a variation of that document that we used on a monthly

7    basis, basically to disperse the hotel and car commission,

8    this one was used -- that was in the joint bank account.  So

9    we needed to both write a check to get that money out of the

10   joint bank account.

11   Q      All right.  And the third document that was attached

12   to this email, obviously by the use of the word zip file, I

13   would figure it contains lots of paper.

14   A      Yeah.

15   Q      What is that zip file that's the third attachment?

16   A      This is basically everything that goes in to make up

17   the summary document.  So, if you look at, like the very

18   first thing on there is all Sabre tickets.  So that is going

19   to be the actual, you know, we said over here, hey, we

20   issued, you know, whatever it was, four hundred seventy-nine

21   tickets, and okay, here, okay, four eighty-nine, here are

22   the actual tickets.

23           So, again, it's just trying to be transparent in

24   where these numbers came from that were used in the summary,

25   we provided all the detail backup.

1   Q      Now, I'm looking at the Sabre ticket file that was

2   attached here, it actually is by traveler name, correct?

3   A      Yes, it is.

4   Q      And it is by amount?

5   A      Yes.

6   Q      And it shows you that, what you refer to that you did

7   number, that would be whether Duluth or ADTRAV booked that

8   ticket?

9   A      Correct.

10  Q      What are the -- you can take that down.

11         What are the other documents that were included in

12  that zip file?

13  A      Well, you've got a very similar report that takes all

14  tickets, both Worldspan and Sabre tickets.  Then you've

15  got -- yeah, that totals fifty-one hundred.  You have got

16  all Worldspan tickets, which again is going to relate back

17  to that summary page of the number of Worldspan tickets that

18  were issued.

19         The car commission, this report is going to

20  delineate any car commissions that we were paid and this

21  report happens to break it down by individual VA account.

22  We had a number of accounts and it tells where -- which bank

23  these were deposited into.

24  Q      What does that bank forty-two on this document

25  represent?

1   A      You know, I can't remember what the bank numbers are.

2   Q      Okay.

3   A      But it's either going to be the joint account, the

4   ADTRAV account or the Duluth account.

5   Q      But in any event, it's demonstrating where those

6   monies were deposited?

7   A      Right.  You can see, okay, boom, whatever

8   bank forty-two was, and I'm going to assume that was the

9   joint account, let's say, that hundred forty dollars was

10  deposited into the joint account and then the rest of this,

11  I think looking at it, probably is into one account, yeah,

12  bank fifty, which I am pretty sure bank fifty is the ADTRAV

13  bank.

14  Q      All right.  You can close that one.

15         Another car commission?

16  A      Yeah.  Now, this represents all the hotel bookings

17  that were made during the month and it's a detailed listing

18  of October 1st through October 31st of 2013 and it tells you

19  here's every passenger, here's the date that we invoiced

20  this reservation, and here's the amount, if you look at the

21  total amount of the reservation that we made for this person

22  and that ticket number is actually the confirmation number

23  for the hotel.  And then it tells you again, here is all the

24  ones that ADTRAV -- that were designated ADTRAV in unit

25  seventy-one, and here are the ones that were designated as

1    Duluth.  And it shows that of the hotel bookings, Duluth did

2    seventy-five point one percent of them and ADTRAV did

3    twenty-four point nine.

4    Q      Mr. Hale, with regard to these, all these, looks like

5    eight different documents that are attached in the zip file,

6    who physically prepared those summaries?

7    A      These summaries were prepared by ADTRAV.

8    Q      And were they prepared consistent with the reporting

9    request and agreements that you had in place with Duluth?

10   A      Yes, absolutely.

11   Q      And who worked with you to determine what information

12   should be put into these documents?

13   A      That was primarily Ed Arias of Duluth.

14   Q      And did ADTRAV provide these documents such as

15   Exhibit 371 and its attachments on a monthly basis to

16   Duluth?

17   A      Yes, we did.

18        MR. BATES:  Your Honor, we would move the

19   introduction of Exhibit 371 first.  We've just been through

20   it.

21            THE COURT:  Any objection?

22            MR. SWEETNAM:  No objection, Your Honor.

23            THE COURT:  It will be received.

24            MR. BATES:  And then, Your Honor, as we did with

25   the weekly reports, we would offer group exhibit, Exhibit

1   337 through 358 as the reports, monthly reports to Duluth as

2   these same set of documents would be that we just went over.

3            MR. SWEETNAM:  No objection.

4            THE COURT:  Be received.

5   Q     (By Mr. Bates)  Now, Mr. Hale, did ADTRAV prepare an

6   actual summary or partner split form that related to these

7   monthly documents that we just went over?

8   A     Yes, that was -- it was also contained in that

9   previous exhibit.

10  Q     All right.  Let's look at Exhibit 313.  And if you

11  could identify what this document represents to the Court.

12  A     Yeah, this is the summary split, partner split as

13  it's titled, for April --

14  Q     Excuse me.  I cannot see it.  Thank you.

15  A     April of 2012.

16  Q     This is an example of April 2012?

17  A     Yes, it is.

18  Q     Now, explain what is on this document.

19  A     Okay.  Similar to what we saw before, this is another

20  month, April 2012, where we're depicting all the revenues

21  and all the expenses associated with the VA travel.  It

22  details down to the number of tickets issued, who issued

23  them, the cars, the hotels, it looks at the monthly revenues

24  and accounts for all of the monthly revenue that was earned

25  on the accounts and it also details out the expenses that

1  were paid on the account.

2  Q      This report looks to be similar in kind to the Excel

3  spreadsheet that was a part of the email Exhibit 371 we just

4  went over; is that correct?

5  A      Correct.

6  Q      But this was a second accounting summary that was

7  provided to Duluth?

8  A      Yes.

9  Q      And this one was for 2012?

10  A      Yes, it was.

11  Q      Did ADTRAV prepare one of these for each month from

12  April 1st, 2012 through January 2012?

13  A      Each and every month.

14         MR. BATES:  Your Honor, we would offer Exhibits

15  313 through 335 that are these monthly summaries that

16  Mr. Hale just identified from April 2012 through January

17  2014.

18         THE COURT:  Any objection?

19         MR. SWEETNAM:  No objection, Your Honor.

20         THE COURT:  They will be received.  What were

21  those numbers again?

22         MR. BATES:  313 through 335.

23         THE COURT:  Thank you.

24  Q      (By Mr. Bates)  Did Duluth sign an approval or

25  authorization form related to these partner split reports

1    that we've just reviewed?

2    A     Yes, they did.

3    Q     Let me show you Exhibit 374.  And again this is

4    related to that month of April 2012, correct?

5    A     Yes.

6    Q     And does it contain a Duluth signature?

7    A     Yes, it does.

8         MR. BATES:  Your Honor, we would move the

9    introduction of 374.

10        THE COURT:  Any objection?

11        MR. SWEETNAM:  Not to 374 specifically, Your

12   Honor, but in discussions with Ms. Davis, I believe that

13   some of these documents have not been signed by Duluth, so I

14   don't object to their admissibility if Mr. Bates wants to

15   admit them en mass, I simply want to point out that they

16   can't be admitted as documents that have all been

17   countersigned by Duluth because they're not.

18        THE COURT:  Some of them are not countersigned?

19        MR. SWEETNAM:  Correct.

20        THE COURT:  All right.  374 will be received.

21        MR. BATES:  So, Your Honor, what we would then

22   offer is 375 through 390 subject to Mr. Sweetnam's statement

23   that if they are not countersigned, we're not representing

24   all of them are countersigned, but they were the monthly

25   statements, most of which we think were countersigned.  But

1    for those months of April 2012 through January 2014.

2          THE COURT:  Subject to noting that some are not

3    signed, they'll be received.

4    Q     (By Mr. Bates)  Mr. Hale, did Duluth have access to

5    the same data that ADTRAV had in developing these reports?

6    A     Yes, they did.

7    Q     And how so?

8    A     Well, they had access to the data in a couple of

9    different ways.  One, as I mentioned, part of the data that

10   we needed to compile these reports was actually received by

11   Duluth and provided to us.  And that was the hotel

12   commissions that were deposited directly into the Duluth

13   bank account from companies like Pegasus, so we relied on

14   Duluth to send us that information.  So they obviously had

15   access to that.

16         Also, as I mentioned earlier, the duplicate MIR

17   situation to where all of the data was going -- that was --

18   tickets that were being issued, the fees that were being

19   charged, were being sent to ADTRAV and an exact duplicate of

20   that was being sent to Duluth and their TRAMS system.

21         The ARC reports, we both had access to the ARC

22   reports from ARC.  And actually what you would do is you

23   would download the BOS report, B-O-S, from ARC, load that

24   into TRAMS and that was your -- what you use to reconcile to

25   make sure that everything that you reported to ARC was

1    actually reported and recorded correctly in TRAMS.  And so

2    they had access to that same information to download and to

3    load into their TRAMS to validate the veracity of the net

4    remit reports.

5              So really, every piece of data they had access to,

6    that we used to the best of my knowledge, they would have

7    had access to every, every piece of data.

8    Q      And that included the joint bank account?

9    A      Yes, that did.

10   Q      Did ADTRAV ever hide any financial data from Duluth?

11   A      Absolutely not.

12   Q      As CEO and president of ADTRAV, did you ever direct

13   any of your staff, your accounting personnel, or any agent

14   of ADTRAV to alter or change or modify any of its financial

15   data that was reported to Duluth?

16   A      Absolutely not.

17   Q      Did ADTRAV ever misappropriate any funds in favor of

18   ADTRAV to Duluth's detriment?

19   A      Ever misappropriate meaning that that was done on

20   purpose, no.

21   Q      Were there perhaps occasions where checks didn't get

22   accounted for?

23   A      Absolutely.  I mean, we received, you know, hundreds,

24   if not thousands, of checks a week.  And I'm sure there were

25   some checks that came in that our accounting clerk

1   misclassified, you know, that could happen both -- was it

2   rampant or, you know, a lot?  No, very, very few.

3   Q      Be a rare occasion?

4   A      Yeah.  I mean, just as, you know, as much as we would

5   make a mistake on situations like that, Duluth, you know,

6   had the same, you know, issue of, hey, they got a bunch of

7   checks in and actually more checks on the VA than we did, so

8   they possibly could have made a mistake on theirs, too,

9   which again, both of us, that would have been inadvertent.

10  Q      Let's focus our attention now on the December 2010

11  agreement.

12  A      Okay.

13  Q      You mentioned this agreement in your earlier

14  testimony and that the parties changed the split again.  Do

15  you recall that?

16  A      Yes, I do.

17  Q      Let me show you Exhibit 22.  Do you have that in

18  front of you?

19  A      Yes, I do.

20  Q      Now, first of all, can you identify this document?

21  A      Yes.  This is the master services and operating

22  agreement between ADTRAV and Duluth Travel that we entered

23  into as of December 16th, 2010, which basically is the

24  updated agreement of how we will handle the VA account

25  moving forward and how the revenues and expenses would be

1 | split moving forward.

2 | Q      And did you and Mr. Salus sign this agreement?

3 | A      Yes, we both did.

4 |              MR. BATES: Your Honor, we would move the

5 | introduction of Exhibit 22.

6 |              THE COURT:  Any objection?

7 |              MR. SWEETNAM:  No objection.

8 |              THE COURT:  It will be received.

9 | Q      (By Mr. Bates)  Now, once the VA awarded the travel

10 | contract contemplated by this document -- well, let me

11 | backup.

12 |              In 2005, you did a similar agreement, right?

13 | A      Yes, we did.

14 | Q      In contemplation of a VA contract?

15 | A      Yes, we did.

16 | Q      When the VA awarded its first contract to Duluth that

17 | you were involved with in 2005, was it contemplated that

18 | that VA contract would last forever?

19 | A      No, not that particular contract.  The federal

20 | contracts typically have a base period of one year and then

21 | four option years is the typical government contract.

22 | Q      And what's the process that the VA requires for you

23 | to be able to keep a contract such as that?

24 | A      Well, you have to perform under the contract to

25 | their, you know, liking.  And you have to maintain your good

1   standing with the General Services Administration as a

2   contractor in good standing to be able to serve the federal

3   government.  And you have to maintain your -- in this

4   particular case, this contract was set aside for a

5   service-disabled veteran, so we would need to have a

6   service-disabled veteran designation to continue to work

7   under this contract.

8   Q    So were you and Mr. Salus anticipating in December

9   2010 that a new VA contract would be bid?

10  A    Yes, absolutely.

11  Q    And pursuant to the first paragraph of this document

12  here, it refers to expected to commence October 1, 2011

13  (2011 services), correct?

14  A    Correct.

15  Q    Had you received the bid document at that time?

16  A    No, we had not, the best of my recollection.

17  Q    All right.  Now, as a matter of fact, this agreement

18  would not have even come in to being if you never got a VA

19  rebid.

20  A    Correct.

21  Q    The agreement goes on to state, does it not, that

22  ADTRAV and Duluth will handle the operations of the VA

23  account, and there's language about governing the parties

24  for the award after the 2011 services are awarded.

25  A    Correct.

1  Q     So, as of December of 2010, when did you anticipate

2  that the 2011 services contract would commence

3  operationally?

4  A     We thought, you know, our best estimate was that

5  probably by October of the following year would be about the

6  time it went through the bid process and all of that that it

7  would commence.

8  Q     Now, once this contract was signed, did you, ADTRAV,

9  and Duluth jointly pursue the rebid of the VA contract for

10  the 2011 services?

11  A     Yes, we did.

12  Q     And were you involved in the bidding process?

13  A     Yes, I was.

14  Q     Let me show you Exhibit 33.

15        Now, can you tell the judge what this document is?

16  A     This is the solicitation for the rebid of the

17  Department of Veteran Administration's travel contract.

18  Q     And it has a contract number in the upper left-hand

19  corner, correct?

20  A     Yes, it does.

21  Q     And the date of that solicitation was what?

22  A     The date of the solicitation was 8-8-2011.

23  Q     So, even though this solicitation didn't come out

24  until August of 2011, you were contemplating it in December

25  2010?

```
1    A       Correct.

2    Q       Now, was the VA 2011 service contract awarded to

3    Duluth?

4    A       No, it was not.

5    Q       Who won that bid?

6    A       It was won by another company called Alamo Travel.

7    Q       After the VA awarded the contract to Alamo Travel,

8    what did Duluth and ADTRAV do?

9    A       We protested the award.

10   Q       With the federal government?

11   A       With the federal government.

12   Q       And did you participate in that protest?

13   A       Yes, I did.

14   Q       Did Duluth participate in that protest?

15   A       Yes, they did.

16   Q       Was Duluth subsequently awarded a new VA travel

17   contract?

18   A       Yes, they were.

19   Q       Now, when did the contract referred to, in the

20   agreement between ADTRAV and Duluth for 2011 services,

21   become effective?

22   A       I believe it was April of 2012.

23   Q       So, from December 2010 to April 2012, can you explain

24   to the judge how you were operating?

25   A       As we were under the old agreement.  It was just, you
```

1   know, business as usual until we got awarded the new --

2   Q      Did the VA have to provide you some sort of authority

3   or bridge contract or some operating capacity to allow you

4   to function between your original contract and this bid

5   protest that occurred in April 2012 to resolve?

6   A      Yes.  They typically will do, in those instances,

7   they'll issue a bridge contract.

8   Q      Would you agree that they simply extended your

9   services for that period?

10  A      Yes.

11  Q      It was not a new bid?

12  A      No, it was not.  It was just an extension.

13          MR. SWEETNAM:  Your Honor, I'm going to object to

14  this line of questioning to the extent that it's being

15  characterized as your contract got an extension, it wasn't

16  ADTRAV's contract, it was Duluth's.

17          THE COURT:  I understand.  I understand that

18  Duluth was the prime contractor.  I understand.

19          MR. BATES:  We certainly acknowledge that, Your

20  Honor.  I'm sorry if I was too colloquial about that.

21  Q      (By Mr. Bates)  When I'm speaking of that agreement,

22  Mr. Hale, I don't mean you personally or ADTRAV.  It was

23  Duluth's prime contract, correct?

24  A      Yes.

25  Q      And you were sub?

1    A      And we were the sub.

2    Q      Now, let me show you Exhibit 44.  Do you have that in

3    front of you?

4    A      Yes.

5    Q      What is this?

6    A      This is the actual contract from the VA that was

7    awarded to Duluth for what we classified as the 2011

8    services.

9           MR. BATES:  Your Honor, I would offer Exhibits 33

10   and 44 at this point, the invitation to bid and the award.

11          MR. SWEETNAM:  No objection.

12          THE COURT:  It will be received.

13   Q      (By Mr. Bates)  Now, were there communications

14   between you and Duluth regarding when this 2010 draft

15   contract would become effective?

16   A      Yes, there were.

17   Q      Let me show you Exhibit 19.  Do you have that in

18   front of you?

19   A      Yes, I do.

20   Q      What is that document, please?

21   A      This is an email chain that starts with or it

22   contains an email that we're looking at right now, if we can

23   go back, that's from me to Arthur Salus and Ed Arias of

24   Duluth Travel, Friday, December 3rd of 2010.

25   Q      And what was your purpose of this email?

1   A      Well, I wanted to clarify, you know, things -- when

2   you write a contract, you know, you use contractual language

3   and sometimes the, you know, you want to make sure we're all

4   on the same page.

5          So that was really the purpose of this email was

6   just to say, hey, I've reviewed the document and let's just

7   make sure that we have a meeting of the minds, and I put it

8   in here as one hundred percent clear understanding of each

9   other's intent on all the provisions within the agreement.

10  Q      And was one of those provisions that you wanted to

11  make sure everybody understood the actual effective date?

12  A      Yes, that was my number one point.

13  Q      Did you address that in the document?

14  A      Yes, I did.  Number one point I made, and it's

15  highlighted here on the screen, talks about the effective

16  date.  And the last sentence, "based on this, the actual

17  effective date of this agreement will be the day Duluth

18  signs the award document with VA for the next contract."

19  Q      And then that next sentence says what?

20  A      The next sentence, which was typed in, as you can

21  tell by the change in color by Duluth, says, "the effective

22  date is commencement date of work under the new contract."

23  Q      All right.

24  A      So based on that, I felt like we were -- we had a

25  meeting of the minds that it started when the new contract

1   was awarded.

2   Q      And did Mr. Salus and Mr. Arias respond to you?

3   A      Yes, they did.  Again, the blue portion was their

4   response on each one of my points.  And then as you can see

5   here this is the next email in the chain from Arthur Salus

6   of Duluth to me copying Ed Arias that, saying, hey, here are

7   my comments, we're fine with everything as outlined by

8   yourself and us.

9              MR. BATES:  Your Honor, we'd offer Exhibit 19.

10             THE COURT:  Any objection?

11             MR. SWEETNAM:  No objection.

12             THE COURT:  It will be received.

13  Q      (By Mr. Bates)  Now, let's go back to the contract,

14  Exhibit 22.

15             Did this contract address what the split would be

16  if the VA contract were to be awarded?

17  A      Yes, it did.  And I believe that's in --

18  Q      Paragraph three?

19  A      Paragraph three, okay.  Oh, yeah, here it is.

20  Q      And was the split adjusted from the 60/40 that had

21  been in place?

22  A      Yes, it was.

23  Q      What was it going to be going forward?

24  A      It was going to be seventy-five percent to Duluth

25  Travel and twenty-five percent to ADTRAV.

1    Q      Tell the judge why the split changed.

2    A      You know, we -- as we were going through and

3    negotiating this in the fall of 2010, there was still just,

4    you know, some -- animosity or edge between the parties, and

5    I just wanted to make, you know, hey, let's calm -- whatever

6    it is, get it out on the table, let's come to an agreement

7    and put whatever happened in the past, bygones be bygones,

8    we're going to be working together for a lot of years moving

9    forward, so let's just come up to an amicable solution to

10   address any of your concerns that you might have in your

11   interpretation of, you know, previous actions or previous

12   contracts, I'll put aside my previous, you know, way I

13   looked at the contract and the way, you know, actions of

14   Duluth, how I interpreted them, and let's just come together

15   and we'll do that and I bumped it up to seventy-five percent

16   for Duluth because, again, I really wanted this to be

17   something where everything was behind us and we were just

18   working on, you know, serving the VA customer.

19   Q      Let's look at paragraph number two of the contract

20   here for a moment.

21          Did the 2010 agreement require the parties to

22   jointly bid any future VA agreements under the same terms

23   and conditions?

24   A      Yes.  And that was -- yes, absolutely.

25   Q      And what does paragraph two state regarding that?

1    It's the last paragraph of paragraph two, correct?

2    A      Yes.  It says that "ADTRAV and Duluth Travel agree to

3    jointly bid any future VA travel contracts under the same

4    terms and conditions of this agreement as long as there are

5    no substantial changes to stockholder ownership of any of

6    the two companies and abide by the other sections of this

7    agreement."

8    Q      All right.  So, is it true, then, that ADTRAV and

9    Duluth agreed to strive and distribute the work under this

10   contract for the new VA bid based on 75/25?

11   A      Yes, we did.

12   Q      And was this similar to the reasoning of why the

13   parties elected to have precise, not to have precise splits

14   as you had in the previous arrangement?

15   A      Exactly.  Again, we were going to manage it the same

16   way because it had been successful for us in the past so we

17   were just going to keep doing the same thing.

18   Q      Were you to continue providing the same weekly and

19   monthly reconciliation reports and information that we have

20   been through here this morning?

21   A      Yes, I was.  Yes, we were, ADTRAV was.

22   Q      With regard to this commitment to jointly bid future

23   VA travel contracts that we just looked at in paragraph two,

24   did Duluth comply with this section of the contract?

25   A      Up until we started this lawsuit, I was under the

1    impression that they had.  But subsequent, through things we

2    discovered during discovery, they did not.

3    Q    All right.  We now know, for example, they got a VA

4    contract after you terminated?

5    A    Correct.

6    Q    Look at section five of the contract.  Does this --

7    what does this contract say about Worldspan segment fees and

8    how they're to be distributed?

9    A    Specifically it says that Worldspan segment fees will

10   be distributed to Duluth and ADTRAV based on a monthly

11   transaction percentage.  The monthly transaction percentage

12   shall be equal to the total number of airline transactions

13   handled by each partner divided by the total number of

14   transactions processed for the month.

15   Q    And do the reports that we went over this morning

16   demonstrate that operational component of the contract?

17   A    Yes, they do.

18   Q    Did Duluth pay Worldspan segment fees as discussed in

19   this section?

20   A    For a time, yes.

21   Q    Did there come a time when they ceased doing that?

22   A    Yes, in 2013.

23   Q    In that same section five, what does this agreement

24   say about vendor overrides?  First off, explain what a

25   vendor override is to the judge.

1    A        Yeah.  A vendor override is additional commission

2    that is paid by certain vendors for achieving certain

3    thresholds that would be set, typically a sales threshold.

4            So what we were doing here was basically stating

5    that, hey, basically any revenue, you know, any revenue

6    that's associated with the VA business, be it vendor

7    overrides, commissions or any other supply or payment, it

8    was going to go into the pot and we were going to split it

9    in the same manner.

10   Q        Did Duluth pay vendor commissions for hotels and cars

11   as discussed in this section?

12   A        To the best of my knowledge they did.  Up until a

13   point.

14   Q        When was that point?

15   A        In 2013.

16   Q        We've heard reference in this case to something

17   called a debit memo.

18   A        Yes.

19   Q        What is a debit memo?

20   A        A debit memo is an invoice that is sent to the travel

21   agency for violations of the airline's, what the airline

22   feels is a violation of their ticketing and passenger

23   carriage requirements and policies.  And so if you did

24   something that violated that, then they would say, hey, you

25   violated it, here's the amount of money that you're billed.

1          It could also be from a credit card that was

2     denied, it could be -- again, we charged the wrong, you

3     know, airfare for a ticket.  Anything like that, they have

4     the ability to audit and come back to us and we have to pay

5     these debit memos.

6     Q     It's like a charge-back?

7     A     Exactly.

8     Q     What did your contract, specifically section eight,

9     say about debit memos?

10    A     It said that we will pay our corresponding debit

11    memos for the VA account according to mutually agreed upon

12    terms and responsibility of the liability.

13          And the debit memo for whom the agency liability

14    cannot be determined will be split between Duluth and

15    ADTRAV.

16          So basically what we did was we said, all right,

17    if an ADTRAV agent screwed up and charged the wrong, you

18    know, generated the debit memo, well, then that's ADTRAV and

19    ADTRAV needs to pay that money.

20          If a Duluth agent screwed up, then Duluth needs to

21    pay that.

22          There are debit memos where, and actually in this

23    case, where it was -- you couldn't assign responsibility, it

24    was, you know, probably the traveler's fault as much as the

25    agent's fault and so in those cases we would mutually agree,

1   there would be a discussion between Duluth and ADTRAV about,

2   hey, you know, here's this five hundred dollar charge, two

3   hundred dollar charge, what are we going to do, we can't

4   assign it to any one particular agent, and then we would

5   agree to split that.  And typically we were splitting those,

6   despite the 75/25 split, we were actually splitting those

7   50/50.

8   Q     Did Duluth pay all their debit memos?

9   A     No, there's outstanding debit memos.

10  Q     Look at section nine of the contract, please.  And

11  what does the contract say about what revenue will be

12  disclosed by ADTRAV and Duluth?

13  A     Well, it says that both ADTRAV -- the parties will

14  mutually disclose to each other all supplier overrides, GDS

15  segments or other income and commission statements and/or

16  reports in order to distribute the funds.  And went on to

17  say, all overrides, GDS payments and commissions will be

18  deposited into the joint VA bank account.

19  Q     Did Duluth place all GDS payments in the joint VA

20  account?

21  A     No.  Once Duluth -- once we secured the Worldspan

22  agreement through Duluth, as opposed to ADTRAV, which

23  happened in, like, December time frame of 2010, Duluth began

24  depositing all those payments into their Duluth controlled

25  account.

1   Q     Let's look now at section eleven of the contract.

2   What does this section concern?

3   A     This relates, as I mentioned earlier, ADTRAV, one of

4   the things that we have developed is a very large number of

5   proprietary technology software applications.  It's one of

6   the things -- how we differentiate ourselves in the

7   marketplace.

8            And so this technology that we had developed, we

9   allowed it to be used by both Duluth and ADTRAV for the

10  performance of our contract with the VA.  And we

11  specifically quoted it here as scripts, QC and other

12  technology for the VA account.  And we agreed that we would

13  provide this technology at a cost of fifty cents per

14  ticketed reservation.

15  Q     Has Duluth paid you for all the technology fees under

16  your contract to date as stated in that paragraph?

17  A     No, they have not.

18  Q     Now let's look at section thirteen of this agreement,

19  under the caption "shared services;" do you see that?

20  A     Yes.

21  Q     Under this provision who was responsible for

22  providing back office accounting and client services?

23  A     ADTRAV.

24  Q     Is Duluth, under this provision, able to provide back

25  office accounting and client services?

1  A     Yes.  And this was, again, as we were negotiating

2  this agreement out, I wanted to be, again, as transparent as

3  possible.  And at this point Duluth had increased their

4  ability to be able to manage certain aspects of the VA

5  contract that we were, in the beginning, solely able to

6  handle.  And part of that was the back office.

7         And so the intent of this part of the agreement is

8  to say that, hey, if, at some point, for whatever reason,

9  you want to take over the back office accounting and other

10  functions, then you have the ability to do that.  The only

11  requirement is that it happens when we mutually agree to

12  that.

13  Q     In fact, the language here says "and agreed upon by

14  both".

15  A     Correct.

16  Q     Did there come a time when Duluth attempted to take

17  over the back office responsibilities without ADTRAV's

18  consent?

19  A     Yes, they did.  In June of 2013, I received an email

20  from Arthur Salus of Duluth Travel that informed me that

21  effective immediately they were taking over the back office

22  accounting processes.

23  Q     In section thirteen of this contract, did the parties

24  address any agreement to share accounting personnel costs?

25  A     Yes, we did.

1   Q      And what does the agreement provide in that regard?

2   A      It says, "As agreed upon by both parties, both ADTRAV

3   and/or Duluth will hire additional accounting and technical

4   personnel that will be dedicated to the VA account and the

5   agency that has provided the services shall be reimbursed

6   for the cost of these dedicated employees based on a

7   transaction percentage each contractor achieves for a given

8   month".

9          So this is basically restating here that we

10  already had in place to where ADTRAV was providing the

11  accounting personnel and we were getting roughly twenty-five

12  hundred dollars a month for those accounting services.

13         This language was inserted in this agreement so

14  that if Duluth -- if the parties agreed that Duluth would

15  now take over the accounting portion of the agreement, that

16  this gave them a vehicle for which they could be reimbursed

17  for the cost of that -- of those people.

18         And also on the technical side, as you'll see,

19  I think, when we get to the point about what services they

20  could take over, there were some technical services that

21  they wanted -- if they took over the technology fee, then

22  they would get, you know, a fee for that.

23  Q      Has Duluth paid you for all the accounting fees you

24  claim are due under this contract?

25  A      No, they have not.

1   Q      Let's look at section fifteen.  This section

2   addresses what?

3   A      This section addresses the revenues that are earned

4   by each of us subject to -- well, as it states here, that we

5   have agreed to pool all of the revenue generated from the VA

6   account via the 2011 contract.  All revenues, including but

7   not limited to transaction fees, hotel and car commissions,

8   overrides, airline commissions, overrides and all GDS

9   revenues shall be collected and deposited into the Red

10  Mountain Bank account established exclusively for the VA

11  contract.

12  Q      Did there come a time when Duluth did not place

13  airline commissions into the joint bank account?

14  A      Yes.  Effective with that letter in January of 20 --

15  June of 2013, at the same time that they instructed us that

16  they were taking over the back office, they contacted ARC

17  directly and shut off our access to the ARC reports from

18  ARC.

19  Q      Did Duluth place all the GDS revenue into the joint

20  bank account?

21  A      Yeah. And let me answer, I didn't fully answer your

22  question.

23         So they cut off our access to ARC so we could no

24  longer perform reconciliation and they instructed ARC to

25  also deposit that money no longer in the joint account, they

1  instructed ARC to now deposit that money into a Duluth

2  controlled account.

3       So could you repeat your next question?

4  Q    Did Duluth place all the GDS revenue in the joint

5  bank account?

6  A    No, they did not.  As I mentioned, they did not put

7  the segment fees immediately, they stopped putting those

8  into the joint account and they put those into a

9  Duluth-controlled account of which we had no access to to

10 verify and they put all the segment fees in there.  And we

11 later came to find out that they had deposited a bonus

12 payment from Worldspan that was generated from the revenues

13 of the VA account into their own Duluth-controlled bank

14 account without telling us they had received that money.

15 Q    All right.  Let's look at paragraph seventeen of the

16 contract.  This section deals with reports, correct?

17 A    Yes, it does.

18 Q    And what does this document say about access to TRAMS

19 and ARC reports?

20 A    Well, it says that we will both have access to TRAMS

21 and the ARC reports that tie in to back office reporting

22 system.

23       So, by this meaning that Duluth was able to access

24 our reporting tool and download and generate any report that

25 they wanted at any time to, you know, verify the veracity of

1   any of the data that we had presented to them.  And in

2   addition, they had access and gave us access to download the

3   ARC reports each week.

4   Q     Now, earlier this morning you testified that some

5   time around 2008 there was something called a MIR.

6   A     Yes.

7   Q     Did that have any implications with regard to access

8   to the TRAMS and ARC reports?

9   A     You know, it didn't impact the ability to have an

10  access to that.  What it did it kind of took that to the

11  next level which -- since Duluth, by this time, had their

12  own TRAMS back office system, by creating a duplicate MIR,

13  we are actually sending -- every VA transaction was going to

14  both parties.  So now, Duluth had the ability to run not

15  only reports to verify information on the ADTRAV TRAMS, but

16  they now had the ability to generate reports on their TRAMS.

17  And could then, you know, either generate them independently

18  or if they wanted to, again, verify the data that we were

19  providing, they now had a second source that was being

20  populated directly from a third party, in this case

21  Worldspan and ARC, giving them all the data.

22  Q     Mr. Hale, let's look at section twenty-four of the

23  contract.  And what does this provision deal with?

24  A     This is basically dealing with the termination, you

25  know, what are and how this contract could be terminated,

1    this agreement could be terminated moving forward.

2    Q      Would you read the first sentence under that

3    provision into the record, please?

4    A      Yes.   "The intent of this agreement is to permit both

5    companies to share in the VA account during the duration of

6    the rebid of the accommodated TMC services and any

7    subsequent extensions that may be awarded to Duluth."

8    Q      And was that your agreement?

9    A      That was our agreement.

10   Q      And then it provides four specific items under which

11   the agreement could be terminated, correct?

12   A      Correct.

13   Q      And the first item is sixty days written notice by

14   mutual consent, correct?

15   A      Correct.

16   Q      What is the second item?

17   A      Bankruptcy of either party.

18   Q      Either party in this case filed bankruptcy?

19   A      No, sir.

20   Q      What is the third item?

21   A      Cessation of operations by either party.

22   Q      Has either party ceased to do business?

23   A      No, neither party has.

24   Q      And item four.

25   A      No, to the best of my -- from ADTRAV's perspective,

1   we have not been convicted of any felony, serious

2   misdemeanor or crime involving moral turpitude with regards

3   to the VA business.  And it's my understanding that Duluth

4   has not either.

5   Q     Now, did, in fact, Duluth rebid another VA account

6   without ADTRAV in 2013?

7   A     Yes.  During discovery, we found another contract

8   award.

9   Q     And was that in violation of this agreement that

10  we're looking at?

11  A     My interpretation, yes, it was.

12  Q     Based on your contract, could Duluth unilaterally

13  terminate this agreement under the terms we just looked at

14  in section twenty-four?

15  A     Absolutely not.

16  Q     Could ADTRAV unilaterally terminate this agreement

17  under the terms we just looked at in section twenty-four?

18  A     No, we could not.

19  Q     We have talked today about Mr. Ed Arias several

20  times, do you recall that?

21  A     Yes, sir.

22  Q     What was your understanding of Mr. Arias' position at

23  Duluth?

24  A     He was the vice-president of operations and my

25  understanding an officer of the company.

1  Q      And there came a time between 2006, January 2006, the

2  first agreement, some time after that, Mr. Arias was no

3  longer with the company, correct?

4  A      Correct.

5  Q      And prior to Mr. Arias leaving the company -- and the

6  one letter we have seen today about the Pennsylvania

7  transaction, did you and Mr. Arias communicate on this

8  account?

9  A      Yes, on rather -- very often.

10  Q      And before he left the company, did the parties

11  successfully split the VA revenues without any difficulties?

12  A      Yes.

13  Q      Before he left the company, did the parties

14  successfully split the VA revenue received in 2011 during

15  the extension period?

16  A      Yes, we did.

17  Q      We'll hear some other testimony about his

18  termination.

19         But did the parties successfully split the VA

20  revenue received in 2012 before his departure?

21  A      Yes, we did.

22  Q      So far as you knew, was Mr. Arias the person at

23  Duluth who was monitoring the splits with the weekly and

24  monthly reports that we have been through today?

25  A      Oh, absolutely, he was on top of it.

1   Q      Did ADTRAV ever get an impression from anyone at

2   Duluth that they were unhappy with Mr. Arias and his

3   communication over this revenue split on a monthly or weekly

4   basis?

5   A      No, never.

6   Q      Was ADTRAV ever apprised during 2010, 2011, or 2012

7   that Duluth wanted more information than it was getting from

8   ADTRAV to verify its collections and splits?

9   A      No, never.

10  Q      As the CEO at ADTRAV, was ADTRAV doing the best it

11  could to accurately collect and split the revenues as

12  agreed?

13  A      Absolutely.

14  Q      To your knowledge, did anyone at Duluth have any

15  better understanding of how the agreement between ADTRAV and

16  Duluth worked on a daily, weekly or monthly basis than

17  Mr. Arias?

18  A      No.  He was the contact, he was the liaison.

19  Q      Could you describe the relationship that you had with

20  Mr. Arias?

21  A      It was cordial.  We had, I felt, a good relationship.

22  We were able to talk about things when issues came up and

23  resolve them.

24  Q      Mr. Arias just accept everything you told him?

25  A      Oh, no.  No.

1   Q      Did y'all often have questions and dispute resolution

2   over items in the operational components of the contract?

3   A      We absolutely did, yes.

4   Q      Mr. Arias' job was to look out after the interest of

5   Duluth; is that right?

6   A      Yes.

7   Q      He wasn't looking out after ADTRAV's interest?

8   A      No, absolutely not.

9   Q      And you didn't pay Mr. Arias any money from ADTRAV?

10  A      No.

11  Q      He was not on your payroll?

12  A      No.

13  Q      When the parties moved under this agreement, Exhibit

14  22, from the 60/40 split to 75/25 split, who worked out the

15  work assignments to achieve those splits?

16  A      Ed Arias of Duluth.

17  Q      And did he communicate his thoughts along those lines

18  to you?

19  A      Yes, he did.

20  Q      And were phone call logs and reports continued to be

21  run to verify and monitor those assignments?

22  A      Yes, they were.

23  Q      Now, I've heard something about a parsing script.

24  A      Yes.

25  Q      First of all, explain to the Court what a parsing

1  script is.

2  A      This is part of the technology that we provided, that

3  was provided by ADTRAV to manage the VA account.  And

4  basically what would happen is that when VA travelers went

5  online to the online booking tool and booked their trip, all

6  those records would fall into a folder in the GDS system.

7  Then the parsing script, its function was to look at every

8  one of those records that came in and initially under the,

9  you know, it was initially set up to take one record over

10  to -- and send it to the Duluth cue for Duluth to manage,

11  and one record to ADTRAV, so it was basically set to do a

12  50/50 split, one here, one here of all the online booking

13  reservations that were completed by VA travelers.

14  Q      And again, was that an electronic assignment or was

15  there a human making those decisions?

16  A      That was an electronic function.

17  Q      Let me show you Exhibit 54.  If you would review that

18  document.

19  A      (Witness complies).

20  Q      Down at the bottom, down at the bottom of it,

21  Mr. Arias is writing an email to somebody, right?

22  A      Yes, he is.

23  Q      Who is he writing?

24  A      He's writing an email to Lynn Slaughter who was the

25  ADTRAV operations manager for the VA account.

1    Q      What's he asking about?

2    A      Basically what he's saying in here is, again, he was

3    managing the number of agents that were on the telephone

4    available to take calls.  So he references a phone log that

5    he attached and he said, I think that you should have, look

6    at having no less than three agents between 5:00 and

7    7:00 p.m. your time, we have five agents and you two, he

8    means your two, until 5:00 p.m. and then just two as of 5:01

9    is too drastic for VA that has seventy percent of their

10   people central to Pacific time.

11          So basically what he's saying here is he's

12   managing the agent work to, you know, better make sure, one,

13   that the VA -- his primary concern here is serving the VA

14   customer.  Because what happens is after 5:00 o'clock,

15   there's a lot of calls coming in and he wants to make sure

16   we have enough agents to answer the phone within the

17   subscribed time period that the VA required.

18   Q      And so this communication was going on, according to

19   this document, in July of 2012, correct?

20   A      Yes, it was.

21   Q      That was before Mr. Arias was terminated at Duluth?

22   A      Yes, it was.

23          MR. BATES:  Your Honor, we would move the

24   introduction of Exhibit 54.

25          THE COURT:  Any objection?

1      MR. SWEETNAM:  No, Your Honor.

2      THE COURT:  It will be received.

3  Q    (By Mr. Bates)  To your knowledge, did Mr. Arias work

4  on splits himself even though ADTRAV was responsible for

5  reporting this revenue to Duluth?

6  A    Yes.

7  Q    How do you know that, Mr. Hale?

8  A    Because he would -- the questions he would ask and

9  the requests that he would make, you know, had us understand

10 that he was looking at this stuff and he was looking at it

11 very closely.

12 Q    And have we now, through this litigation, actually

13 seen the actual hard copy?

14 A    Yes, we have.

15 Q    I will show you Exhibit Number 56.

16      Now, you didn't -- ADTRAV didn't prepare this

17 document, did it?

18 A    No, we did not.

19 Q    Tracy, scroll backup.  I believe this was an exhibit

20 in Mr. Arias' deposition, correct?

21 A    I believe so.

22 Q    This was actually his work on the splits.

23 A    Yes.

24      MR. BATES:  Your Honor, we'd move the introduction

25 of Exhibit 56.

1          THE COURT:  Any objection?

2          MR. SWEETNAM:  Yes, Your Honor.  That exhibit is a

3    document, if I'm thinking of the right exhibit, a document

4    that I believe was prepared by Ed Arias specifically for the

5    benefit of ADTRAV after his termination, after his

6    employment had been terminated.

7          So it's not something that was produced in the

8    regular normal course and scope of business.

9          THE COURT:  Ms. Davis, is that your understanding?

10          MS. DAVIS:  I disagree with counselor Sweetnam's

11    explanation of what this is and it will be introduced

12    through the deposition of Ed Arias and he will explain when

13    he created this document and how it was kept.

14          THE COURT:  Why don't we wait and offer it then at

15    that point.

16          MR. BATES:  That will be fine, Your Honor.

17    Q     Mr. Hale, you alluded to this earlier, something

18    happened in 2013 to change the relationship with these

19    parties, right?

20    A     Yes.

21    Q     Now, what's your understanding of when Mr. Arias was

22    terminated or dismissed or no longer employed with the

23    company?

24    A     December of 2012.

25    Q     Now, was there some communication to ADTRAV in early

1   2013 that Ed Arias was gone and new contact person would be

2   a lady named Cookie Jenkins?

3   A      Yes.  It was an email, I believe.

4   Q      And did ADTRAV continue to operate in the same manner

5   with Ms. Jenkins as it had with Mr. Arias?

6   A      Yes, we did.

7   Q      Did Duluth stop supplying some information after

8   Mr. Arias left?

9   A      Yes.

10  Q      In the early part of '13?

11  A      Yes, they did.  They stopped supplying the Worldspan

12  reports that would have backed up the Worldspan revenue.

13  They stopped supplying to some -- of the other information

14  that we needed to complete the monthly reconciliation, they

15  stopped providing the detailed backup.

16  Q      And did you attempt to contact Mr. Salus about this?

17  A      Yes, I did.

18  Q      Let me show you Exhibit 59.  Specifically the email I

19  directed your attention to here is Thursday, March 21st,

20  2013, do you see that?

21  A      Yes, I do.

22  Q      What did you ask him?

23  A      Well, I asked Mr. Salus because, again, it had come

24  to my attention from Lisa that we were no longer getting

25  documentation.  So I reached out to Arthur after I tried to

1   call him a few times, I sent him an email basically asking

2   him, hey, can we get together to chat about the VA.

3   Q      And included in this exhibit at the top of this email

4   chain is his response, correct?

5   A      Yes, it is.

6   Q      And what did he say to you?

7   A      Email sent to me and to John Lawless of Duluth and

8   basically he's dismissing me, he says he appreciates he

9   wanted to speak about the VA, but at this time, all is good

10  with the exception of a slow down of VA business, like other

11  federal agencies.

12          MR. BATES:  Your Honor, we'd move the introduction

13  of 59.

14          THE COURT:  Objection?

15          MR. SWEETNAM:  Yes, we do object to that, Your

16  Honor, but it may be able to be cured.  There's no Bates

17  label on it, so we're unable to compare this to anything

18  that's been produced in discovery, just to be sure that it

19  is in fact the same document that it purports to be.

20          But to the extent that they can show us an

21  identical document with a Bates number on it, then we would

22  not object to it.

23          MS. DAVIS:  Your Honor, there was many productions

24  in this case and sometimes Duluth sent information to us

25  without Bates numbers on it.  I think they will confirm

1    that.  In some instances they rectified the situation and

2    resent documents.

3         But at the time that we pulled documents, some of

4    them did not have Bates labels on it.  I certainly represent

5    to this Court that these documents were provided by Duluth

6    and, in fact, this particular exhibit, Exhibit 59, was not

7    marked by Duluth, but produced on September 30th, 2014 under

8    tab emails, RFP four and five under Arthur to Roger, page

9    forty-six of one hundred two.

10        I could go to it and show you where it was

11   produced from your documents, if you would like me to.

12        MR. SWEETNAM:  As I said, Your Honor, if we can

13   verify that it is what they say it is, then we're not going

14   to have any objection to it.

15        THE COURT:  I'll go ahead and receive it.  And if

16   it turns out that a problem with whether it was produced in

17   discovery continues to exist, then the parties can bring

18   that to my attention again.

19   Q    (By Mr. Bates)  Following this March exchange,

20   Mr. Hale, what was the next communication you had from

21   Mr. Salus?

22   A    It's what I classify as a stealth email at 8:00

23   o'clock on a Friday night in June.

24   Q    Bring up Exhibit 62, please.  This document, is this

25   the one you're referring to?

```
 1   A       Yes, it is.

 2   Q       And this was an email you received Friday night, June

 3   the 14th, 8:00 p.m. Eastern time, correct?

 4   A       Correct.

 5   Q       If you could scroll down and see who signed that

 6   letter, please.  Arthur Salus, president, correct?

 7   A       Yes.

 8           MR. BATES:  Your Honor, we would offer Exhibit 62.

 9           THE COURT:  Any objection?

10           MR. SWEETNAM:  Your Honor, Mr. Brent just advised

11   me that he found that email, so Tracy was absolutely right,

12   so I apologize for wasting the Court's time.

13           THE COURT:  Okay.  What about 62, any objection to

14   that?

15           MR. SWEETNAM:  No, Your Honor.

16           THE COURT:  It will be received.

17   Q       (By Mr. Bates)  Mr. Hale, I believe you stated this,

18   but I want to make sure.  You received this by email,

19   correct?

20   A       Yes, that's my recollection.

21   Q       Now, let's scroll down to the actual body of the

22   letter.  The first sentence says, "this is to advise you

23   that Duluth Travel has decided to assume responsibility for

24   all accounting, back office, twenty-four hour service and

25   reporting functions for the VA account."
```

1          Do you see that?

2    A     Yes, I do.

3    Q     Prior to receiving this letter, had Duluth or anyone

4    on Duluth's behalf requested that ADTRAV consent to this

5    assumption of responsibility for back office

6    responsibilities?

7    A     No, they did not.

8    Q     And what does this next sentence say as to when that

9    change is due to take effect?

10   A     Friday, June 14th, 2013 at 8:00 p.m. Eastern standard

11   time, basically upon receipt.

12   Q     So no notice?

13   A     No notice.

14   Q     I believe we looked at this, but just so we can

15   confirm it for the Court, Exhibit 22, paragraph thirteen,

16   which is the contract, according to that agreement, did

17   Duluth have the right to unilaterally make the decision to

18   assume responsibility for all accounting back office,

19   twenty-four hour service and reporting function?

20   A     No, they did not.  As it specifically states in there

21   that it must be agreed upon by both parties.

22   Q     All right.  Let's go back to the letter, Tracy.

23          Now, Mr. Salus lists out here a number of reasons

24   for this decision, correct?

25   A     Yes, he did.

1   Q      And what is the first reason that he gives you?

2   A      Says that his reason was that it was never the intent

3   of the parties under the master services operating agreement

4   of 2010, hereinafter referred to as the agreement, for

5   ADTRAV to have complete control of all aforementioned

6   operational processes.

7   Q      Now, under this agreement did, in fact, ADTRAV have

8   complete control of all of the operational processes?

9   A      No, absolutely not.

10  Q      Explain to the judge how those were shared or what

11  portion Duluth had?

12  A      Well, if you look under the operating, as we

13  testified, that Ed was actually, Ed Arias of Duluth, was the

14  one who was actually, you know, managing the time that the

15  agents were on the phone.  We didn't control their access to

16  ARC.  They had complete access to all the ARC documents and

17  the ARC reports as I -- to be able to download them from

18  the -- from ARC.

19          They had access to our TRAMS and all the reporting

20  that was done for the VA.

21          So, you know, and Ed was involved in all of the

22  discussions about, you know, hey, how are we going to serve

23  this, you know, staffing, training, you know, we did not

24  have complete control.  He was involved in every bit of the

25  operational running of the business.

1   Q      Do you know what's meant by res-reporter?

2   A      Yeah.  That's our proprietary reporting product that

3   we gave Ed access to so that he didn't have to come to us,

4   you know, to somebody at ADTRAV and say, hey, run this

5   report for me, he was able to go directly into the reporting

6   database and download every reporting information he wanted.

7   Q      And was Duluth given access through that res-reporter

8   technology to the exact information we've talked about here

9   today, meaning the weekly and monthly reports we put into

10  evidence?

11  A      Oh, yes, absolutely.

12  Q      And this included the reports that supported the

13  information that went into those monthly reconciliation

14  reports; is that correct?

15  A      That is correct.

16  Q      When Ed Arias left Duluth in December of 2012, do you

17  know of anyone at Duluth that continued to monitor and use

18  these available tools?

19  A      I don't know for sure, I'm sure someone over there

20  did.

21  Q      Let's look at the second reason in this letter that

22  Mr. Salus had for telling you he was taking over control of

23  this contract account.

24         What was the second reason?

25  A      The second reason is that it was never the intent of

1  the parties for ADTRAV to have complete unfettered control

2  over all the Duluth revenues that are generated from the VA

3  account.

4  Q      How did ADTRAV have complete unfettered control over

5  all of the Duluth revenues?

6  A      We absolutely did not have unfettered control.  And

7  as a matter of fact, we had control, quote unquote, of a

8  very small portion of the actual revenue that was generated.

9  Q      And how do you know this?

10  A      Well, because the money was being deposited into the

11  Duluth bank account, you know, a lot of it was in the Duluth

12  bank account and more of it was deposited into the joint

13  account.  And I conducted -- what I did is I put together an

14  analysis to actually look at how much revenue, where the

15  revenue was going that was being, you know, earned under the

16  VA contract.

17  Q      Let me show you Exhibit 430.  Do you have that in

18  front of you?

19  A      Yes, I do.

20  Q      First off, tell the judge what this document is.

21  A      This is basically an analysis I put together to look

22  at, okay, where were the actual funds being deposited, were

23  they --

24          MR. SWEETNAM:  Your Honor, I apologize for

25  interrupting Mr. Hale, but this exhibit that he's being

1    questioned on right now I believe was not produced until

2    March the 6th of this year for the very first time.  And as

3    such, we would object to not only it being admitted, but him

4    being -- utilizing it as a tool for testimony.  We haven't

5    seen it until two weeks ago.

6            MR. BATES:  Your Honor, Mr. Hale has already

7    testified to every item in this piece of paper.

8            THE COURT:  Is this a summary?

9            MR. BATES:  It's a demonstrative exhibit to just

10   simply make it a little bit easier for the Court to follow

11   the testimony to show the analysis that went into where

12   these transactions and these funds went.

13           Now, if we want to stop, we can go bring every

14   bank statement and we can bring every summary statement that

15   ties to each one of these things and it's going to take us

16   about three days to put all that evidence in, but we're

17   prepared to do it, Mr. Sweetnam, if that's what you want us

18   to do.

19           MR. SWEETNAM:  I did want you to do that way back

20   during the discovery process.

21           MR. BATES:  Y'all produced --

22           MR. SWEETNAM:  That aside, Your Honor, we're going

23   to assert the objection and the Court can rule on it and --

24           THE COURT:  It will be received as a summary

25   exhibit.

1          MR. SWEETNAM:  Thank you, Your Honor.

2    Q     (By Mr. Bates)  Mr. Hale, first off, explain the

3    columns to the judge so that we can understand the summary.

4    A     Yeah.  So each column represents a year from 2010

5    through 2013.

6    Q     All right.  And underneath each year, you have some

7    bank accounts, correct?

8    A     Correct.

9    Q     And one of those is the Duluth bank account?

10   A     Yes, it is.

11   Q     And another one is a joint bank account?

12   A     Yes, it is.

13   Q     And then an ADTRAV account.

14   A     Yes, it is.

15   Q     So let's just take 2010 first.

16          In 2010, where was the money deposited for the VA

17   business?

18   A     In 2010, as you can see, the lion's share of the

19   revenue associated with the VA account was deposited into

20   the joint bank account.

21          The exception to that was forty-four thousand

22   dollars that was deposited into hotel commission that was

23   deposited directly into the Duluth bank account.

24          And a total of fifty-five thousand dollars that

25   was deposited directly into the ADTRAV bank account.

1  Q      So the total revenue for 2010 then was what?

2  A      The total revenue for 2010 was three million five

3  fifty-one five hundred sixty-four.

4  Q      All right.  Now, 2011, explain what's depicted for

5  calendar year 2011.

6  A      Okay.  So 2011, you see that the amount of revenue

7  deposited into the Duluth bank account jumps considerably

8  and that is specifically the Worldspan segment revenue.

9  That goes to five hundred fifty-seven, which corroborates my

10 statement earlier that once Duluth got control of the

11 Worldspan agreement, they unilaterally decided to deposit

12 that into their own account as opposed to depositing it into

13 the joint account as required by our agreement.  So that

14 bumps up that fifteen percent of the revenue was now in a

15 Duluth-controlled account, eighty-four percent was being

16 deposited into the joint bank account, and one percent was

17 being deposited into an ADTRAV-controlled bank account.

18 Q      All right.  And would you explain the summary for

19 2012.

20 A      So in 2012, again, you see that the percent of the

21 revenue that's being deposited into Duluth-controlled

22 accounts is on the rise.  Now it represents twenty-four

23 percent of the total and that is a combination of the

24 Worldspan segment fees and now they are having more of the

25 hotel commission deposited into their bank account from

1  these consolidators, they shifted that to go directly into

2  their bank account instead of the joint account.  And you

3  see the joint account now no Worldspan revenue is being

4  deposited in there, the hotel commission is declining and

5  the total of seventy-four percent of the total now goes to

6  the joint account, ADTRAV-controlled accounts now represent

7  the same, you know, one percent of the total.

8            And in 2012, the total revenue was two million

9  seven thirty-five eight twenty-one.

10  Q    And at the end of 2012 is when Mr. Arias left the

11  company?

12  A    Yes, it was.

13  Q    And explain to the judge what happened in 2013.

14  A    Well, this continued movement of money to

15  Duluth-controlled accounts continued and, as you see, the

16  Worldspan money is still being deposited in there, the hotel

17  commissions are now being deposited in there, but now the

18  service fees that were being deposited into the joint

19  account coming from ARC are now being deposited into a

20  Duluth-controlled account, so Duluth, the amount of revenue

21  of the VA business that was deposited into a

22  Duluth-controlled account now represents sixty-five percent

23  of the total, the joint bank account has been reduced to a

24  level of thirty-four percent and ADTRAV has maintained a one

25  percent of the revenue being deposited into an ADTRAV

1   account.

2   Q      Were you or anyone at ADTRAV a signatory or have

3   access to Duluth's bank account?

4   A      No, we were not.

5   Q      And were you and Duluth both signatories and had

6   access to the joint bank account?

7   A      Yes, we did.

8   Q      And did Duluth have access or signatory authority of

9   the ADTRAV bank account?

10  A      No, they did not.

11  Q      Did ADTRAV have any control over the revenues that

12  Duluth had placed into its own bank account?

13  A      No, we did not.

14  Q      Let me go down to the next page of this exhibit, tell

15  the judge what this document does, Mr. Hale.

16  A      It just basically looks at the entire four-year

17  period.  And by doing it in shades of blue, the shades of

18  blue were revenue that was controlled by Duluth, the dark

19  yellow was controlled by ADTRAV, and the light yellow were

20  the fees that were controlled by the joint account.

21  Q      So -- I'm sorry, I was on the wrong page.  These pie

22  charts, 2011 -- '10, '11, '12 and '13, is that just placing

23  in pie chart form the numbers we went over in the grid

24  sheet?

25  A      Yes, they were or they are.

1    Q      All right.  Now, did you complain about this idea of

2    Duluth putting more and more money in its own account?

3    A      Oh, yes, I did.

4    Q      Let me show you Exhibit 30.  Actually, what's the

5    date on this document?

6    A      The date is Tuesday, May 17th of 2011.

7    Q      And who did you address?

8    A      I addressed this to Arthur Salus and Ed Arias of

9    Duluth with a copy to Robert Reynolds at ADTRAV.

10   Q      And it's specifically related to what?

11   A      To the Worldspan payments.

12   Q      What is item one of your concern?

13   A      This is me alerting them that Lisa McGowen, the

14   accounting -- our accounting clerk had advised me that the

15   Worldspan VA payment was no longer being separated and

16   deposited directly into the shared VA account.

17          And I told them if this is true, this causes me

18   some concern.

19   Q      After writing this email in 2011, did Duluth ever

20   remedy this?

21   A      No, they did not.

22   Q      Was Duluth required under Exhibit 22, the contract,

23   to place Worldspan revenue income into the joint account?

24   A      Yes, they were.

25   Q      And did this change in 2012, the Worldspan revenue,

1    did it keep going in Duluth's account or did they bring it

2    back?

3    A      Oh, no, no, it stayed in Duluth account.

4    Q      Tracy, let's go back to 430, that first pie chart.

5          Now, this is an assessment of all revenue,

6    correct?

7    A      Yes, it is.

8    Q      And explain what these various categories of revenue

9    were, very briefly.  I think we have been over them.  I just

10   want to make sure they are tied to the percentages.

11   A      Yes.  So the service fees, what this does, this is

12   saying basically how much of this revenue was represented by

13   each one of the buckets of revenue.

14          So, in this case, over the four-year period, the

15   service fees represented seventy-five percent of the total

16   revenue.

17          The Worldspan segment fees represented eighteen

18   percent, hotel and car commission represented six percent,

19   and overrides represented one percent.

20   Q      Let's go to that second pie chart, Tracy.

21          So by having access to the joint account and

22   Duluth's own account, in 2010, how much control of revenue

23   did they have?

24   A      They had control of ninety-eight percent of the

25   revenue.

1   Q      How much in 2011?

2   A      In 2011, they had ninety-nine percent.

3   Q      In 2012, how much control?

4   A      Ninety-eight.

5   Q      And in 2013, how much control?

6   A      Ninety-nine.

7   Q      Tracy, go back to Exhibit 62.

8          Mr. Hale, when you received this letter in June of

9   2013, did you know that Duluth had entered into a new

10  contract with another travel agency to perform back office

11  accounting before this letter was sent to you effectively

12  ending your services?

13  A      No, I did not.

14  Q      What have you discovered about that during the course

15  of this litigation?

16  A      Through discovery, I found that they had entered into

17  an agreement with another travel company in the first part

18  of May to perform back office services.

19  Q      All right.  Looking at this exhibit now, go back, the

20  third reason that Mr. Salus gave you for this change was

21  what?

22  A      He says that the third reason for this decision is

23  that we are quickly approaching the implementation of ETS2,

24  and it's our belief that both companies' efforts would be

25  better served in pursuing their own ETS2 solutions as

1    opposed to the current arrangement.

2    Q      First of all, what is ETS2?

3    A      That is the Electronic Travel System Second

4    Generation which is the nomenclature used by the government

5    to describe the end-to-end solution of travel from making of

6    the reservation all the way through to the reimbursement of

7    the traveler through an expense system.

8    Q      Did you agree that it was in your interest to pursue

9    your own ETS2 solution as opposed to sticking with the

10   Duluth arrangement?

11   A      Yes.  And that was -- both of us had that right in

12   the agreement, as it specifically states in there, that this

13   agreement was for, you know, accommodated contracts which

14   what we mean by accommodated is that it is not under the

15   ETS2 agreement, if you were to become a subcontractor to the

16   prime, who in this case was Concur, so as long as we were

17   not a subcontractor to Concur, our arrangement was in place.

18          So he's basically stating here, hey, we want to go

19   pursue and we'd be best served by being a subcontractor to

20   Concur, which that's fine, that was always contemplated

21   under the agreement.

22   Q      Did Mr. Salus give a fourth reason for his actions?

23   A      Yes, he did.

24   Q      What were those?

25   A      He said that it had become obvious that ADTRAV or

1  those acting on behalf of ADTRAV on many occasions have not

2  only failed to honor the terms of the agreement, but have

3  committed acts that would amount to material breach.

4  Q     Do you know what those acts were?

5  A     I have no idea.

6  Q     Anybody ever send you a letter or an email or tell

7  you what those acts of breach were?

8  A     Never.

9  Q     What else did Mr. Salus say in this letter about the

10 current VA contract?

11 A     He stated that the current VA contract expired at the

12 end of September 2013, effectively ending our agreement.

13 Q     Was that true?

14 A     That was not a true statement.  As you can see, as

15 that termination clause, you know, we talked about, there

16 were only four ways that we could end our agreement and so

17 he was basically, in my opinion, misinterpreting the

18 agreement.

19 Q     To your knowledge was there a subsequent extension of

20 the VA contract that went beyond September 2013?

21 A     We were not advised of that during that time, but

22 through discovery, we found that Duluth had, in fact,

23 entered into another agreement with the VA in October of

24 2013.

25 Q     And was ADTRAV involved and allowed to be a party to

1   that arrangement?

2   A       No, we were not.

3   Q       Was ADTRAV, in fact, even notified of Duluth's

4   pursuit of that VA arrangement?

5   A       No, we were not.

6   Q       Besides this letter that we looked at here, Exhibit

7   62, what else did Duluth do to ADTRAV on or about June the

8   14th, 2013?

9   A       Well, as I mentioned earlier, they cut off our access

10  to ARC reports.  They made, you know, just terminated our

11  access to be able to perform the back office functions is

12  part of what they did.

13  Q       Did you respond to this letter?

14  A       Yes, I did.

15  Q       Pull up Exhibit 63.  What is this?

16  A       This is an email from me to Arthur Salus at Duluth

17  Travel dated Saturday, June the 15th, I can't remember when

18  I actually got into my email and saw that letter or notice

19  from him.  But basically in here I'm telling him that I'm in

20  receipt of his letter and that I would address his

21  assertions next week.  But in the meantime, I expected him

22  to reinstate our full access to the VA portions of both

23  Worldspan and TRAMS systems by Monday to correct this

24  egregious breach of our operating agreement.  And this

25  refreshed my memory.  He also cut us off of Worldspan.  So

1    we weren't able, the agents, nobody could get into Worldspan

2    to be able to serve the VA.

3    Q      Did Mr. Salus respond to that request?

4    A      Did he respond to this request?  Yes.  He responded

5    in an email where he copied John Lawless and Cookie Jenkins

6    on Monday morning and told me that the agents will have

7    access to Worldspan this morning so they can book travel on

8    Sabre as well, also if you want to discuss, please feel free

9    to call me.

10   Q      Let me show you Exhibit 64.

11          What is this, Mr. Hale?

12   A      This was a letter that I sent back to Arthur at

13   Duluth Travel, Arthur Salus, basically addressing the issues

14   that he raised in his letter to me of June the 10th.

15   Q      And in this letter do you demand that Duluth pay you

16   the money you claim you were owed?

17   A      Yes, I do.

18   Q      And after receiving that letter, did Duluth pay you

19   the money?

20   A      No, they did not.

21          MR. BATES:  Your Honor, we would move the

22   introduction of Exhibit 62, 63 and 64.

23          THE COURT:  Objection?

24          MR. SWEETNAM:  No objection to 62, 63 or -- no

25   objection to any of them.

1              THE COURT:  They will be received, 62, 63 and 64.

2    Q       (By Mr. Bates)  After sending this letter on June the

3    24th, did ADTRAV attempt to resolve this matter with Duluth?

4    A       Yes, we did.

5    Q       Between June of 2013 until January 14th when this

6    lawsuit was filed, what efforts did you make to try to

7    resolve it?

8    A       We were pretty much in constant, you know,

9    conversation with them of, you know, delineating, as you see

10   in this letter, it pretty much addresses all the things that

11   we feel they did that were in breach of our agreement and

12   we're asking them to make payment to us that was rightfully

13   owed to us under the agreement.

14   Q       And were you able to resolve it?

15   A       No, we were not.

16   Q       Let me show you Exhibit 73.  What's this?

17   A       This was the letter dated January the 10th of 2014

18   where we're finally trying to get some action here, because

19   I just kind of felt like they were just continuing to drag

20   their feet and drag their feet on coming to a resolution.

21   Q       And this was accompanied by the filing of the

22   lawsuit?

23   A       Yes, shortly thereafter.

24            MR. BATES:  Your Honor, I am at a very convenient

25   place to stop, if you care to.

1          THE COURT:  All right.  Let's go ahead and take

2     our lunch recess then, we'll be in recess, since it's almost

3     12:10, let's be in recess until 1:30 for lunch.  1:30 for

4     lunch.  Thank you.

5                         (Lunch recess)

6                         (Open court)

7          MR. BATES:  As a matter of housekeeping, just

8     before lunch, I was told that I failed to offer Exhibit 30

9     which was the May email concerning the direct deposit of the

10    Worldspan money in Duluth's account where Mr. Hale raised

11    concerns about that deposit.

12          And the last exhibit that we were talking about

13    right before lunch, Exhibit 73, which was the letter written

14    in January of 2014 at the time the lawsuit was filed.

15          So I offer those two exhibits at this time to

16    complete the record, Your Honor.

17          THE COURT:  Any objection?

18          MR. SWEETNAM:  No, sir.

19          THE COURT:  Be received.

20    Q     (By Mr. Bates)  Now, Mr. Hale, let's talk about some

21    of these things which you told the Court this morning in

22    your testimony, things that were not done and whether or not

23    there is damage that you're claiming in this lawsuit.  Okay?

24    A     Okay.

25    Q     One of the things you spoke of was something called

1  Worldspan bonus revenue; do you recall that testimony?

2  A     Yes, I do.

3  Q     Tell the Court what bonus revenue is for.

4  A     Bonus revenue -- typically, when you sign a new

5  agreement with one of the GDS companies, they will offer you

6  a signing bonus, for lack of a better term, for your

7  commitment to book, you know, five years of business with

8  them.

9  Q     And has ADTRAV received those signing bonuses from

10 the GDS providers in the past?

11 A     Yes.

12 Q     In fact, with regard to this relationship with

13 Duluth, did ADTRAV receive GDS bonus money that it shared

14 with Duluth?

15 A     Yeah.  When we first started the agreement, we

16 received a bonus payment from Worldspan and we deposited

17 that money and split it between the parties.

18 Q     Did these Worldspan bonuses help to maximize the

19 revenue realized off of the VA account?

20 A     Yes, they did.

21 Q     And did Duluth receive, to your knowledge, a

22 Worldspan bonus payment for signing up with Worldspan in

23 about 2010, 2011?

24 A     Yes, I became aware of that.

25 Q     How did you learn of that?

1    A    Really, I -- I kept asking about it because I, you

2    know, figured that they had received one because, again, it

3    was usual and customary for that to happen.

4         So I kept calling Ed and subsequently Arthur

5    asking about, hey, didn't y'all get a bonus, where is the

6    bonus, where is our portion of it.

7         And so that's -- and they finally acquiesced and

8    admitted that they did receive a bonus.

9    Q    Was there a triggering event that occurred in that

10   time frame that caused a Worldspan contract and bonus

11   payment to be made to Duluth?

12   A    Yes.  We --

13   Q    Go --

14   A    It was triggered by the fact that in roughly around

15   the 20 -- December 2010 time period, we shifted --

16   ADTRAV was moving to Sabre as our primary GDS, and so we

17   moved the responsibility for the VA Worldspan to Duluth who

18   subsequently used that as an opportunity to renegotiate and

19   sign a deal with Worldspan.

20   Q    Was the GDS bonus payments that ADTRAV received and

21   those that Duluth received solely and only related to the

22   volume of business done for the VA contracts?

23   A    No.  I mean, typically, when you get a bonus, it's on

24   all of your business.

25   Q    Were you ever informed by anyone with Duluth as to

1    what portion of the Worldspan payment Duluth received would

2    be dedicated to the ADTRAV-Duluth relationship pertaining to

3    VA business?

4    A      You know, finally they, after many discussions, I

5    received an email from Ed Arias of Duluth which stated that

6    they had received a bonus of two hundred thirty thousand

7    dollars that was attributable to the VA business.

8    Q      And was Duluth required to share the Worldspan bonus

9    revenue with ADTRAV under the terms of the 2010 agreement?

10   A      Absolutely.

11   Q      Let me show you Exhibit 53.  Do you recognize this

12   document?

13   A      Yes.  This is an email that was sent from Ed Arias

14   with Duluth Travel to me and copied Arthur Salus with Duluth

15   Travel.

16   Q      And what was the subject matter of this email?

17   A      Basically, it was him coming back and saying, okay,

18   yes, we did receive a bonus, incentive is two hundred thirty

19   thousand dollars.  And he goes through and calculates out,

20   based on the percentage of the business, what ADTRAV's

21   portion of that bonus would be.

22          And in here, he mentions that they want to put

23   this into -- on a payment plan of three payments in 2011,

24   2012, and 2013.

25   Q      Now, was this payment by Worldspan, incentive payment

1   of two hundred thirty thousand dollars, was that made in a

2   payment plan to Duluth or was it paid in a lump sum?

3   A      Paid in lump sum, to my understanding, that's the way

4   all of those are done.

5   Q      And did Duluth make the payout payments referenced in

6   this document for 2011 and 2012?

7   A      Yes, they did.

8   Q      So, in 2011, ADTRAV received sixteen thousand nine

9   hundred eighty-seven dollars and eighty cents; is that

10  correct?

11  A      Yes, we did.

12  Q      In 2012, you received four thousand nine hundred

13  seventeen dollars; is that also correct?

14  A      That is correct.

15  Q      And the third payment, which was due in April of

16  2013, of thirty-four thousand five hundred dollars pursuant

17  to Exhibit 53, was that payment ever made?

18  A      No, it was not.

19  Q      And so since the date of April 2013 to today, has

20  ADTRAV ever received its portion of the Worldspan incentive

21  payment?

22  A      No, we have not.

23         MR. BATES:  Your Honor, we would move the

24  introduction of Exhibit 53.

25         THE COURT:  Any objection?

1          MR. SWEETNAM:  No objection.

2          THE COURT:  It will be received.

3    Q     (By Mr. Bates)  And to be clear, does ADTRAV claim

4    against Duluth in this case thirty-four thousand five

5    hundred dollars for this unpaid Worldspan bonus payment?

6    A     Yes, we do.

7    Q     Now, let's talk about Worldspan incentives, the

8    second fee.  Okay?

9    A     Okay.

10   Q     What is a Worldspan incentive?

11   A     Well, that is the fee that is paid by Worldspan to a

12   travel company in return for us booking flights on their

13   system and hotels and cars.

14   Q     And did, in fact, ADTRAV and Duluth use Worldspan for

15   booking of flights in the Worldspan system?

16   A     Yes, we did.

17   Q     And did ADTRAV receive these fees for some period of

18   time?

19   A     Yes, we did.

20   Q     Did Duluth share in those fees for some period of

21   time?

22   A     Yes.  They were deposited into the joint account, and

23   then we did a monthly reconciliation which distributed those

24   fees to the partners.

25   Q     And did there come a time when Duluth stopped paying

1   and sharing the Worldspan incentive payments with ADTRAV?

2   A      Yes.

3   Q      And when was that?

4   A      That was in the 2013 -- 2013.

5   Q      During the calendar year of 2013, twelve months

6   preceding when you finally quit doing business with one

7   another, did ADTRAV receive these Worldspan incentive

8   payments from Duluth?

9   A      No, we did not.

10   Q      Let me show you Exhibit 416.  Do you recognize this

11   document?

12   A      Yes.  This is a compilation summary of the

13   outstanding Worldspan incentive due from ADTRAV to Duluth

14   broken down by month.

15          MR. BATES:  Your Honor, I should inform the Court

16   that prior to commencing trial today, we had discussions

17   with counsel, they are not in agreement to this number, they

18   are in agreement that this number is less some penalties, I

19   believe.

20          MR. WILSON:  Your Honor, what we did was, we

21   calculated the Worldspan fees that are owed to ADTRAV, and

22   except for the months of March and April, we're about one

23   hundred six dollars off.  So there is no substantial

24   difference in what ADTRAV is claiming for January, February,

25   and then May through January.

1          We have got about a twenty -- about a seventeen

2    thousand -- eighteen thousand dollar difference.  We are

3    claiming there should be an off-set in March and April,

4    which we've got -- we'll have testimony to that.

5          But to the extent that we can save some time and

6    not make Mr. Bates and Mr. Hale and our witnesses go to

7    every month and calculate these numbers, we're only one

8    hundred six dollars off in our calculations, and that one

9    hundred six dollars actually works to their benefit.  So I

10   am trying to figure out the best way to save the Court and

11   the parties some time.

12         THE COURT:  Well, certainly I can go ahead and

13   just receive the exhibit with the understanding that as to

14   March and April that Duluth contests the accuracy of those

15   numbers and will offer testimony about that.  And we'll

16   just -- we simply have a fact dispute about the accuracy of

17   those two months.

18         MR. WILSON:  Yes, sir.  And I think -- I don't

19   know -- I'll put it in the record, the numbers for each

20   month, they never match exactly, and some months we say we

21   owe a few hundred dollars more and they say we owe -- in

22   some months we say we owe a few hundred dollars less, and in

23   some months it's seven or eight dollars difference.

24         But the numbers were so close that at the end of

25   the calculation, there is only one hundred six dollar

1  difference, March and April are really the only two that are

2  in dispute now.

3         THE COURT:  Certainly, then, I will receive the

4  exhibit subject to the understanding that Duluth contests

5  the accuracy of the March and April numbers that are

6  reflected in the exhibit and will offer testimony about that

7  dispute.

8         MR. BATES:  Your Honor, for the record, we would,

9  therefore, offer Exhibits 417 through 429 which are the

10 monthly reports submitted by Worldspan between January 2013

11 and January 2014 that tie to this summary sheet.

12        THE COURT:  All right.  Subject to, of course,

13 that same understanding there may be a fact dispute about

14 two of those months, they'll be received.

15 Q     (By Mr. Bates)  If we could, Tracy, pull up 417.

16        And I know we have offered these into evidence,

17 Mr. Hale, but for the judge's benefit, could you please just

18 describe to him this example of what this document

19 represents and those others like it, Exhibits 417 to 429?

20 A     Yes.  This is the monthly statement that is sent from

21 Worldspan whose parent company is called Travelport and it

22 details out the charges that were made that month and also

23 the credits that were applied to the account.

24 Q     And so it's your testimony, and not my statement to

25 the  Court, were these statements used in the calculations

1    that are shown in Exhibit 416?

2    A      Yes.

3    Q      Who was receiving these original Travelport or

4    Worldspan reports between January 2013 and January 2014,

5    please, sir?

6    A      That was Duluth Travel.

7    Q      And why were they receiving them?

8    A      Well, it was their, since they held the contract, the

9    information was being sent to them by Travelport.

10   Q      Were these Travelport reports, Exhibits 417 to 429,

11   provided by Duluth to ADTRAV during the course of business

12   in 2013?

13   A      Not in a timely manner.  Prior to 2013, Lisa would

14   get these pretty much like clockwork as soon as they came in

15   by Worldspan.

16          Beginning in 2013, there became a significant

17   delay in obtaining these reports.

18   Q      Were these reports needed in order to be able to

19   perform the revenue split calculations?

20   A      Oh, yes, absolutely.

21   Q      Let me show you Exhibit 210.  What does this document

22   purport to be?

23   A      This is a document that basically goes through and

24   calculates the amount of incentive that is ultimately to be

25   split between the parties.

1    Q      And there is a -- on the right-hand side of this

2    document, some calculations?

3    A      Correct.

4    Q      And who did those?  Who performed those calculations?

5    A      Those would have been performed by ADTRAV.

6    Q      And what is the purpose of that calculation?

7    A      Just to show at the end of the day how much money

8    needs to be split between the parties.

9    Q      And were those documents supplied like Exhibit 210 to

10   Duluth?

11   A      Yes, they were.

12   Q      And does Exhibit 210 and the compiled exhibit

13   there -- there's thirteen pages of that document; is that

14   right?

15   A      Yes, there are.

16   Q      And I believe there's one sheet for each month,

17   January '13 through January '14, am I correct?

18   A      Yes.

19   Q      Do those documents, as compiled in Exhibit 210, show

20   what ADTRAV is owed in the monthly amount shown in Exhibit

21   416?

22   A      Yes.

23          MR. BATES:  Your Honor, we would offer 210.

24          THE COURT:  Any objection?

25          MR. SWEETNAM:  No objection, Your Honor.

1          THE COURT:  It will be received.

2     Q     (By Mr. Bates)  Now, Mr. Hale, when we look at this

3     series of documents we just introduced, is there a total

4     amount of money that ADTRAV claims of Duluth in this lawsuit

5     of one hundred twenty-two thousand one hundred twenty-six

6     dollars as depicted in Exhibit 416?

7     A     Yes.  That is the amount of incentive payments that

8     are due from Duluth to ADTRAV that they have not paid.

9     Q     All right.  Let's talk now about hotel and car

10    commissions.  All right?

11    A     Uh-huh.

12    Q     Do you claim in this lawsuit that we're here about

13    hotel and car commissions due from Duluth from the period

14    January 2013 to February 2014?

15    A     Yes, we do.

16    Q     And let me show you Exhibit 400 and ask if you can

17    identify Exhibit 400.

18    A     Yeah.  This is a summary of the expenses and revenues

19    for each one of the partners broken down by what was due to

20    ADTRAV and what was due to Duluth by month.

21    Q     Is that by month, by week, what --

22    A     By month.

23    Q     By month.  And give the judge a reference for the

24    time period this document covers.

25    A     So, that would be from January of 2013 through

1  February of 2014.

2  Q     And what's the total amount of money due to ADTRAV as

3  a result of these calculations?

4  A     That would be the total in the bottom right corner,

5  which is ninety thousand zero seventy-three fifty-seven.

6  Q     Now, let's go through these categories that you have

7  got on this document.  I believe most of them we've seen

8  before, but I want to make sure.

9         You have at the top of this page calculations for

10  revenue from various sources, correct?

11  A     Yes.

12  Q     And that says due to ADTRAV in the first block.

13  A     Yes.

14  Q     And the lower half of the page says due to Duluth,

15  correct?

16  A     Correct.

17  Q     And you have those same calculations?

18  A     Yes.

19  Q     For different amounts of money?

20  A     Yes.

21  Q     Now, where did the information come from that was

22  used to create Exhibit 400?

23  A     This came from the monthly reconciliation reports.

24  Q     And we have those already introduced into evidence

25  this morning, correct?

1   A      Correct.

2   Q      And did you also utilize information concerning the

3   joint bank accounts for this information?

4   A      Yes.

5   Q      And did you use the Exhibits 337 through 358 that we

6   had in evidence this morning concerning the revenue splits?

7   A      Yes.

8   Q      Now, we had some testimony this morning, and I

9   believe I might have messed that up.

10         Let me ask you, there's a reference in this

11  document to bank fees, and I referenced some codes, I

12  believe.  You mentioned about a code fifty.

13         But let me just ask you specifically, in these

14  documents that the Court has before it, if he sees reference

15  to bank code fifteen, whose bank account is that?

16  A      That is a Duluth account.

17  Q      And if he sees reference to a bank code with a forty,

18  a number forty in it, whose bank account would that be?

19  A      That would be an ADTRAV account.

20  Q      And if he sees a bank code fifty, whose account would

21  that be?

22  A      That would be a joint account.

23  Q      All right.  Now, looking at this exhibit, is there a

24  line item in it which calculates the accounting fees that

25  ADTRAV claims that it's owed by Duluth in this litigation?

1    A       Yes.

2    Q       What number is that?

3    A       That is the fifth one down and that would be

4    twenty-four thousand zero zero eight point three five.

5    Q       Again, you testified this morning about the contract,

6    but were those accounting fees called for in the contract?

7    A       Yes, they were.

8    Q       And have those -- you have been waiting on those fees

9    since January of 2013?

10   A       Yes, we have.

11   Q       Tracy, pull up the contract Exhibit 22 right quick,

12   that would help us, I think.

13           And are those accounting fees the same ones we

14   talked about this morning that are referenced in section

15   thirteen of the contract?

16   A       Yes, they are.

17   Q       And we've got a highlighted sentence there, "as

18   agreed the parties, ADTRAV and Duluth, will hire additional

19   accounting and technical personnel" to the end of the

20   sentence, correct?

21   A       Correct.

22   Q       You mentioned this morning a twenty-five hundred

23   dollar figure.  This Exhibit 400 actually shows a

24   calculation of slightly more than that, doesn't it?

25   A       It comes out to -- for the twelve months, twenty-four

1    thousand dollars.

2    Q      Okay.  How was the accounting salary split or paid by

3    the parties?

4    A      It would have been paid seventy-five percent to --

5    would have been paid by Duluth -- depending on whatever the

6    split was.

7              So, you know, it was paid out depending on the

8    split, the business.

9    Q      Did ADTRAV calculate that percentage in the same

10   manner for January '13 to January '14, the accounting fee,

11   that is?

12   A      Yes, yes.

13   Q      Did ADTRAV summarize those amounts due each month in

14   Exhibit 400?

15   A      Yes, we did.

16   Q      Thus, some numbers are higher than others?

17   A      Correct.  This is the amount that ADTRAV would be

18   paying of the fees or Duluth would be paying.

19   Q      All right.  Did Duluth ever pay those accounting fees

20   required under the 2010 agreement and summarized here in

21   Exhibit 400?

22   A      No, they did not.

23   Q      And what, again, is the total amount ADTRAV claims

24   for accounting fees?

25   A      Twenty-four thousand zero zero eight point thirty-

1    five.

2    Q     All right.  Let's talk about technology fees.

3          I see on this Exhibit 400 the next line item there

4    is technology fees; do you see that?

5    A     Yes, I do.

6    Q     Again, the time period here is January 2013 to

7    February 2014, correct?

8    A     Yes, it is.

9    Q     And are there technology fees ADTRAV claims in this

10   lawsuit against Duluth for that time period?

11   A     Yes, there are.

12   Q     And tell the judge what those fees are based on.

13   A     Those fees are based on the fact that per the

14   agreement ADTRAV provided certain technology products and

15   for those products ADTRAV was to be paid fifty cents per

16   ticketed transaction.

17   Q     And, again, is that the same fifty cent transaction

18   that we looked at in the contract earlier this morning?

19   A     Yes, it is.

20   Q     Did Duluth develop and apply its own scripts to the

21   operations of the VA account for the support of ADTRAV?

22   A     They -- no, they deployed our scripts.

23   Q     And did that change during this time period of

24   January 2013 to February 2014?

25   A     Not to my knowledge.

1    Q     Did you calculate the technology fees by the month?

2    A     Yes, I did.

3    Q     And are these amounts calculated the same way each

4    month from January '13 through January '14?

5    A     Yes, they are.

6    Q     And they are detailed in this expense item, right?

7    A     Yes, they are.

8    Q     How much did Duluth owe in technology expense from

9    January '13 to January '14?

10   A     Forty-one thousand four hundred twenty-four dollars

11   and fifty cents.

12   Q     And is ADTRAV claiming that amount of money from

13   Duluth in this litigation?

14   A     Yes, we are.

15   Q     Has Duluth ever paid those sums?

16   A     No, they have not.

17   Q     Mr. Hale, I hate to ask you to do this, but to

18   complete this document, we have a one hundred fifty dollar

19   charge on here that I need you to explain it.

20         CCRA, what is that?

21   A     That is a third party provider that provides after-

22   hours support to travel companies.

23   Q     And was there amounts due for that service?

24   A     Yes.  Although ADTRAV was primarily providing that

25   service as part of our service provision to the VA, we had

1   CCRA set up to be a backup in case we had a period of peak

2   demand.

3          And so this was the monthly fee they charged to

4   have an account with them and be prepared to handle backup.

5   Q    And the next item that we're looking at here is bank

6   fees.  Are you familiar with that charge?

7   A    Yes.  That would be the charges from the joint

8   account that the Red Mountain Bank or Aliant Bank would

9   charge to, you know, X amount per check coming in, X amount

10  per deposit coming in were the fees that they charged.

11  Q    And how much does Exhibit 400 indicate?

12  A    Yeah.  Two hundred fourteen dollars and twenty cents.

13  Q    And these CCRA fees and bank fees, are ADTRAV

14  claiming those two sums in this lawsuit?

15  A    Yes, we are.

16  Q    Let's talk about something called Sabre PCC code; do

17  you see that?

18  A    Yes.

19  Q    First off, tell the judge what that is.

20  A    That are -- those are the charges that are from --

21  since we had -- ADTRAV held the Sabre contract, and so those

22  charges are very similar to the charges from the Worldspan

23  where they charged for Pseudo City Code and for some other

24  activities.

25          The differences under the Sabre agreement, since

1   we were only booking Southwest tickets through Sabre,

2   Southwest tickets do not generate any segment fees, so

3   Worldspan, we ended up with a credit at the end of each

4   month because the segment fees offset the charges.  On

5   Sabre, since there were no fees to offset the charges, we

6   were just -- due to pay the charges.

7   Q      And does this document fairly and accurately

8   demonstrate what happened with those Sabre PCC code for the

9   time period in question here of January 2013 to February

10  2014?

11  A      Yes, they do.

12  Q      Was Duluth required to pay the Worldspan segment

13  income for the JC4C and 41HF?

14  A      Those are the Sabre codes.

15  Q      Yes.

16  A      So they were required, under the terms of the

17  agreement, to pay the expenses associated with that, yes.

18  Q      And did they pay them?

19  A      They did not.

20         MR. BATES:  Your Honor, we move the introduction

21  of Exhibit 400.

22         THE COURT:  Any objection?

23         MR. SWEETNAM:  No, Your Honor.

24         THE COURT:  It will be received.

25  Q      (By Mr. Bates)  Mr. Hale, I would like to talk to you

1    now about technology fees related to the time period after

2    January 2014 through September 2014.  Okay?

3    A      Yeah.

4    Q      You have already made a technology claim for fifty

5    cents a ticket from January 2013 to January '14 in this

6    Exhibit 400 we just looked at; correct?

7    A      Correct.

8    Q      Do you make a claim for technology fees after the

9    February 2014 --

10   A      Yes, I do.

11   Q      What is that based on, please, sir?

12   A      Well, based on the fact that, as we were going

13   through the negotiations to try to settle this matter,

14   starting in November, I advised Duluth that if we weren't

15   able to come to an agreement on them paying us this money

16   they owed us that they would no longer be authorized to use

17   our technology.

18   Q      Are you talking about January 2013 or January 2014?

19   A      I'm talking about November and December of 2010 -- I

20   mean, no, 2013.  And then --

21   Q      All right.  Thank you.

22   A      And then finally in January is when we told them

23   again, you are not authorized to use our technology since

24   you are not -- you have not paid for the technology.  So we

25   assumed that they stopped using it.  Subsequent --

1  Q      I need to show you an exhibit, please, sir.

2  A      Sorry.

3  Q      We can't talk on forever.

4         Let me show you Exhibit 73 which was introduced

5  into evidence before lunch or right after lunch; do you

6  remember this letter?

7  A      Yes.

8  Q      What did Duluth or what did ADTRAV communicate to

9  Duluth in this letter about technology fees and use of

10 technology?

11 A      We stated that on January 17, 2014 and effective on

12 that date Duluth will no longer be authorized to utilize any

13 of ADTRAV's technology or software.

14 Q      All right.  So you got your letter in June of 2013

15 from Mr. Salus saying he was taking on back office, correct?

16 A      Correct.

17 Q      From June of 2013 to January 17th of 2014, the time

18 frame in that letter, were you paid technology fees?

19 A      No, I was not.

20 Q      Did they continue to use your technology?

21 A      Yes, they did.

22 Q      In January 2014, you wrote this letter, correct?

23 A      Yes.

24 Q      After you wrote this letter, did Duluth stop using

25 your technology?

1    A      No, I came to understand that they did not.

2    Q      Let me show you Exhibit 74.

3           Now, this letter was your lawyer writing to

4    Mr. Salus' lawyer, right?

5    A      Yes, it was.

6    Q      And did you address the technology or have your

7    lawyer address the technology again?

8    A      Yes, I did.

9           MR. BATES:  Your Honor, we would move in Exhibit

10   74.

11          THE COURT:  Objection?

12          MR. SWEETNAM:  No, Your Honor.

13          THE COURT:  Be received.

14   Q      (By Mr. Bates)  What does it say about technology?

15   A      It says that ADTRAV Travel Management, Inc., ADTRAV,

16   has reason to believe that Duluth Travel, Inc., Duluth, is

17   currently using technology and software owned by ADTRAV

18   without ADTRAV's permission and without compensating ADTRAV

19   for its use.  And further highlighted to say that Duluth is

20   not authorized to use ADTRAV's technology and software and

21   must immediately cease using it and remove all such

22   technology and software from its computers and systems.

23   Q      Did it stop?

24   A      No, it did not.

25   Q      What is WOW, W-O-W software?

1   A      That is a slang term for one of the pieces of

2   software that we provided as part of this agreement.

3   Q      Is that the software that Duluth was using without

4   your permission?

5   A      Yes, it was.

6   Q      After the split up?

7   A      After the -- after -- after we repeatedly told them

8   to cease use of it.

9   Q      Did you undertake a review to determine whether or

10   not the software was, in fact, being used by Duluth?

11   A      Yes, I did.

12   Q      What did you discover?

13   A      Well, I discovered that the software, there is a --

14   there's coding in the software that documents every time

15   that it is used.  And I was able to obtain a report from

16   the, you know, the software that showed that it was being

17   used on -- it had not slowed down, the amount of usage was

18   just as it was prior to us telling them to stop using it.

19   Q      Let me show you Exhibit 414.  Do you recognize this

20   document?

21   A      Yes.  This is a report that we printed out of

22   Worldspan from January of 2014 through May 31st, 2014, and

23   it shows, as I mentioned, it shows a traveler name, the DK

24   number, which means the account number, the airline ticket

25   number, the issue date of that ticket, and then that DID95

1   is where the software would put this comment that the

2   WOW was used and the date that it was used.

3          So I printed this report off which shows that the

4   ADTRAV technology was being used by Duluth during that time

5   period.

6   Q     Am I correct that this exhibit is eight hundred and

7   ten pages long?

8   A     Yes, sir.

9   Q     Covering the time period January 14, 2014 to May 31,

10  2014?

11  A     Yes, this is just to May.

12         MR. BATES:  Your Honor, we introduce Exhibit 414.

13         THE COURT:  Any objection?

14         MR. SWEETNAM:  No objection.

15         THE COURT:  Be received.

16  Q     (By Mr. Bates)  If my math is correct, there were

17  over fifty-one thousand times the software ticked in that

18  eight hundred ten pages that we just introduced, correct?

19  A     Yes.

20  Q     Were you able to run a report after May 31st, 2014?

21  A     No, we were not.

22  Q     Why not?

23  A     Because at that time Duluth cut our access off to

24  Worldspan.

25  Q     Did they tell you they were doing that?

1    A       No, they did not.

2    Q       Did Duluth cease using the technology after May 31st,

3    2014?

4    A       Common sense would tell you no, they did not.  And I

5    think their testimony also bears that out in the

6    depositions.

7    Q       Now, how did you calculate the number of tickets for

8    the fifty cents technology fee that you calculated you're

9    owed after February 2014?

10   A       So, in discovery, they provided the Worldspan reports

11   up through September 30.  So I looked at the information in

12   Worldspan and was able to determine, to the best of my

13   ability, the number of tickets that were issued based on the

14   number of -- based on the information contained in those

15   reports.

16           But I only had through September 30, which my

17   understanding now through further discovery was not the --

18   all of the months where this was happening.

19   Q       Let me show you Exhibit 497.  Sorry, Tracy, I don't

20   know what I was looking at.

21           MR. BATES:  Excuse me.  What did I say, 497?

22           MS. DAVIS:  Yes.

23           MR. BATES:  My error.  429.  Sorry, Tracy.

24   Q       This is a Worldspan report for January 2014, correct?

25   A       Yes.

```
 1   Q     This is one of the documents you say we got in
 2   discovery?
 3   A     Yes, sir, it is.
 4         MR. BATES:  Exhibit 407 through 412, we'll
 5   represent to the Court are Worldspan reports for February
 6   2014 to July 2014, we would offer those in conjunction with
 7   429, if there's no objection.
 8         MR. SWEETNAM:  No objection.
 9         THE COURT:  Be received.
10   Q     (By MR. Bates)  Now let me show you Exhibit 413.
11   What is this, Mr. Hale?
12   A     This was a summary that I put together based on the
13   reports that you just saw an example of where I took the
14   total segments shown on the report, I subtracted the
15   segments that -- from that that were ADTRAV segments,
16   because those -- because ADTRAV had -- Duluth had allowed us
17   to continue to use Worldspan for a couple of our customers
18   that we had not moved over to Sabre yet, so I had a couple
19   of Pseudo City Codes that I had two customers that, you
20   know, were ADTRAV customers, so I subtracted those, and that
21   left me with the number of Duluth segments.  And I took the
22   industry averages that each ticket issued on average is
23   represented by two and a half segments, that's just the
24   industry average.  So I took that in January to nineteen
25   thousand four seventy-two and divided it by two and a half
```

1  which came up to seven thousand seven hundred eighty-nine

2  transactions.  And I then multiplied that by fifty cents

3  which then correlated to an amount owed of three thousand

4  eight hundred ninety-four dollars and forty cents.  And I

5  did that same exercise through July --

6  Q      Let me stop you right there.

7          With regards to the calculations you made January

8  through July, your testimony is those were based on the

9  Worldspan reports?

10 A      Yes, they were.

11 Q      Was the calculation using the two point five percent

12 multiplier the same methodology that was used for the

13 calculation of the technology fees for 2013 and prior?

14 A      Well, no, we didn't have to because we knew how many

15 transactions because they were reporting that to us.

16         So we would just take the transactions that were

17 the tickets issued off of 2013 and -- prior to 2013, and

18 then just put that into the -- into the summary.

19 Q      And with regard to August and September, I notice you

20 have asterisks there for estimating, correct?

21 A      Correct.

22 Q      What were those estimates based on?

23 A      Well, Duluth didn't provide the full Worldspan

24 reports in discovery, so I had to make an assumption that

25 August and September would be at least equal to July.  And

1  that is typical -- and actually, probably, I'm

2  underestimating here because the government fiscal year ends

3  September 30, so it's not unusual for there to be an extreme

4  spike in transaction volume for the month of September as

5  the federal agencies and departments use up their budget

6  money so they don't lose it.

7          So I feel confident that that twelve thousand

8  dollars for August and September is a fairly accurate number

9  that I computed to the best of my ability given the

10  information I had at the time.

11  Q     Could you have calculated a more accurate number if

12  Duluth had provided the Worldspan reports for those two

13  months?

14  A     Absolutely.

15          MR. BATES:  Your Honor, we move the introduction

16  of 413.

17          THE COURT:  Any objection?

18          MR. SWEETNAM:  No, Your Honor.

19          THE COURT:  Be received.

20  Q     (By Mr. Bates)  And so with regard to these

21  technology fees that were post 2014, January 2014, what's

22  your claim in this litigation?

23  A     My claim is a minimum of forty-seven thousand four

24  hundred seventy dollars and forty cents.

25  Q     You say a minimum.  Why is that?

1   A     Well, because, again, through discovery, we found

2   that Duluth had been awarded another contract with the VA

3   and so it was for a year, and then another six month

4   extension, and so I feel confident that our technology was

5   used up and until the time that they became a subcontractor

6   to Concur on the VA business and, therefore, any time that

7   they did business underneath that contract, we're owed that

8   technology fee.

9   Q     Mr. Hale, does ADTRAV claim in this case that it's

10  due funds from Duluth for Worldspan segment income for

11  non-VA account codes?

12  A     Yes.

13  Q     What is that claim based on, please, sir?

14  A     That goes back to my earlier point that we had a

15  couple of customers, when we made the switch from Sabre to

16  Worldspan, that for a variety of reasons we could not get

17  off of the Worldspan system.

18        So we made a separate agreement with Duluth Travel

19  to allow us to have control of two Worldspan Pseudo City

20  Codes.

21        And we did -- issued tickets and used those city

22  codes to provide the service to these two customers.

23        And so all the revenue and expenses associated

24  with those pseudo cities would have been owed to ADTRAV.

25  And so when you make -- when you look at the segment revenue

1    minus the expenses, then that net amount is what's due

2    ADTRAV.

3    Q      Take a look at Exhibit 406.  And tell the Court what

4    this is, please.

5    A      This is a calculation that I did in an attempt to

6    ascertain the amount of money that was owed to ADTRAV based

7    upon the Worldspan reports that we discovered, had shown to

8    us in the discovery process.

9    Q      And you pulled out by month what those segments were?

10   A      Yes, I did.

11   Q      What is the total amount due to ADTRAV from Duluth

12   based on those Pseudo City Codes?

13   A      Yes, it was.

14   Q      What was it?

15   A      That total was six thousand two hundred sixty-five

16   dollars and ten cents.

17   Q      Let's move now to something called ARC net remits.

18   Do you remember us talking about those reports earlier this

19   morning?

20   A      Yes, I do.

21          MR. BATES:  Your Honor, we will state to the Court

22   that there's an agreement on this one in terms of the

23   amount.  I'm sure that we're disputing all of these in terms

24   of whether I should get them, but not in the actual proof --

25          MR. SWEETNAM:  Right, subject to our right to

1   set-off, if your number is accurate.

2          MR. BATES:  Right.  But the ARC net remit claim is

3   five thousand one seventy-four point twenty-six.

4          And we move the introduction of Exhibit 405 in

5   that regard.

6          THE COURT:  No objection, it will be received.

7   Q     (By Mr. Bates)  The next item, Mr. Hale, has to do

8   with this issue of debit memos; do you remember us talking

9   about that?

10  A     Yes, sir.

11  Q     Do you have a claim in this case for a sum due

12  related to debit memos?

13  A     Yes, we do.

14  Q     What is that amount?

15  A     That amount is -- represents a number of -- debit

16  memos that we received from Southwest Airlines, so the total

17  due from Duluth is eleven hundred dollars and eighty cents.

18  Q     And have you summarized that in this Exhibit 399?

19  A     Yes, I have.

20  Q     Has Duluth paid those monies to ADTRAV?

21  A     No, they have not.

22  Q     And does ADTRAV claim these sums as damages in this

23  case?

24  A     Yes, we do.

25          MR. BATES:  Your Honor, we move the introduction

1    of Exhibit 399.

2              THE COURT:  Any objection?

3              MR. SWEETNAM:  No objection.

4              THE COURT:  It will be received.

5    Q    (By Mr. Bates)  And we talked about some bank fees, I

6    believe, earlier.

7              Do you have a claim for joint account funds left

8    over in this relationship?

9    A    Yes.

10   Q    Would you look at Exhibit 404.  What is that sheet?

11   A    This represents that commissions that were deposited

12   into the joint account but have not been distributed to the

13   partners.  We had sent numerous requests to Duluth to, you

14   know, sign one of the forms so we could distribute the money

15   between us and sign the checks but they have not.  So this

16   money is still sitting in the joint account.  And of the

17   nineteen hundred seventy-seven dollars and seventy-five

18   cents in the joint account, Duluth is owed fourteen eighty-

19   three thirty-one and ADTRAV is owed four ninety-four forty-

20   four.

21             MR. BATES:  Your Honor, we move the introduction

22   of 404.

23             THE COURT:  Any objection?

24             MR. SWEETNAM:  No, sir.

25             THE COURT:  Be received.

1    Q      (By Mr. Bates)  The next item, Mr. Hale, let's talk

2    about is any claim that ADTRAV has concerning lost revenue.

3    You make a claim for lost revenue in this case?

4    A      Yes, I do.

5    Q      Now, does ADTRAV have a claim for this related to the

6    VA contract specifically?

7    A      Yes.

8    Q      Why does ADTRAV believe it's owed money for lost

9    revenues under the VA contract?

10   A      Because the agreement we had with Duluth required

11   that we split the business under this agreement moving

12   forward as long as there was a direct contract with VA.  And

13   so we're owed the money from January of 2014, the 18th of

14   January 2014, through any such time period that Duluth held

15   or currently holds a direct contract with the VA.

16          MR. SWEETNAM:  Your Honor, if this is the lost

17   revenue claim that was disclosed to us for the very first

18   time, I believe in pretrial order, some year and a half or

19   two years after the close of discovery, I'm going to object

20   to any testimony or evidence being considered by the Court

21   because of the extreme prejudice suffered by Duluth Travel

22   in not having had any opportunity to evaluate this claim,

23   cross-examine anybody about the numbers, about how it was

24   calculated.

25          Beyond that, I also believe that since ADTRAV

 1    ceased performing services in January 2014, I understand

 2    there's a certain amount of -- well, spin is probably not

 3    the right word, but parsing about how you want to interpret

 4    the language.  As far as I'm concerned, they terminated the

 5    subcontract in January 2014, they say they ceased to provide

 6    services.  I don't see how you can legally make a claim for

 7    lost profits under a contract that you abandoned and/or

 8    terminated.

 9          So, for the record, I'm objecting to any evidence

10    along these lines, any testimony along these lines both

11    because of surprise, prejudice, failure to disclose in a

12    timely manner and they are legally barred from seeking them

13    since they terminated the contract in the first place.

14          MR. BATES:  May I respond?

15          THE COURT:  Mr. Bates.

16          MR. BATES:  Your Honor, first of all, we would

17    offer to the Court that this lost revenue claim has been in

18    this lawsuit since the day the lawsuit was filed in January

19    2014.

20          Paragraphs twenty-seven, thirty-two and thirty-

21    three of the complaint address this claim.  We noted these

22    again in ADTRAV's initial disclosures which is court

23    document number twenty-two in the Court's record and in our

24    first amended disclosures which is your document number

25    twenty-four in your record.

1          We also noted them again, Your Honor, the second
2     amended disclosures which is document twenty-nine in the
3     Court's record.
4          Moreover, I don't want to get into semantics about
5     argument of these letters about who fired who or who
6     terminated what, but I think we have seen clear evidence in
7     this court today that Duluth usurped this entire contract by
8     virtue of the Friday night letter at 8:00 p.m. transmitted
9     in here by Mr. Salus.
10          So we don't want to get to parsing out who was
11    trying to displace who, but what obligations existed under
12    that contract going forward, whether someone ceased to
13    provide an agent service or not, and these items have been
14    disclosed and they have every opportunity to know where
15    these claims come from because we're going to see in just a
16    few minutes that they are calculated based off of Mr. Salus'
17    own testimony of the revenue generated off the VA business
18    after the parties separated this business with one another.
19          THE COURT:  All right.
20          MR. SWEETNAM:  Your Honor, I looked at the
21    complaint, and I do remember seeing an unjust enrichment
22    claim, but point it out to me if I'm wrong, I don't remember
23    seeing anything about lost future revenue in the complaint.
24    They may have used that language in subsequent disclosures,
25    but I know even Mr. Bates would contend that they had ever

1   placed a number on that claim until the pretrial order just

2   a couple of weeks ago.

3          So, you know, whether they are contending that if

4   you interpret the way that they pled their claim broadly

5   enough, it might stretch out to get to the lost revenue

6   claim, they can say that all day long.

7          But the bottom line is no number was ever put on

8   it until just two to three -- two to three weeks ago.  And

9   then the letter that Mr. Bates is talking about from Arthur

10  Salus wasn't terminating the contract, they were trying to

11  take over the accounting functions in June of 2013.  They

12  continued working together and continued trying to negotiate

13  a resolution of the ongoing contract that was being not

14  implemented, but that they were still operating under until

15  ADTRAV sent the letter in January of 2014 saying we're not

16  going to do this anymore.

17         I mean, to my mind, I don't think there can be any

18  serious question that allowing this evidence in would work

19  an incredible prejudice upon Duluth Travel under the

20  circumstances of this case and because of its incredibly

21  late disclosure.

22         MR. BATES:  Your Honor, one last point.  I refer

23  the Court to the Court's document number twenty-two, the

24  disclosure that I mentioned, the following appears:  In

25  addition, ADTRAV also claims damage on additional and future

1    revenue and profits under the VA rebid contract for the

2    anticipatory breach of that contract by Duluth.

3         That was filed with this Court April the 4th,

4    2014.  This isn't new.  It's been here the whole time.

5         The problem was, we didn't know what the number

6    was until Mr. Salus finally answered the interrogatories and

7    gave us the answer to the question because they were in sole

8    possession of the documents that would have told us what

9    they have been paid.  And even now, we only know a portion

10   of what they have been paid, not the full body of what was

11   paid under the new accommodated contract that Duluth took

12   out with VA.

13        THE COURT:  All right.  Well, I will go ahead and

14   conditionally receive the testimony.  In the event, in light

15   of all the testimony that comes out in the trial it appears

16   that it was not fairly presented for purposes of conducting

17   discovery, then I'll exclude it from my consideration.

18        But I'll go ahead and receive it at this point and

19   see what we get.

20        MR. SWEETNAM:  Your Honor, may I make one more

21   remark?

22        THE COURT:  Sure.  Absolutely.

23        MR. SWEETNAM:  I just want to point out that it's

24   wonderful that we can be contentious and still be friends

25   which is a good thing.

1             When Mr. Bates said that they didn't have the

2    information until Mr. Salus responded to interrogatories,

3    I'm assuming that that is probably accurate.

4             I would simply point out that if he's basing this

5    argument on a response to interrogatories, discovery closed

6    in this case in July of 2015, almost two years ago, and they

7    finally put a number on this element two weeks ago.

8             THE COURT:  All right.  Go ahead.

9             MR. BATES:  What was my last question?

10                 (Record read)

11   Q     (By Mr. Bates)  Now, we have seen some evidence this

12   morning, I go back to the exhibit this morning, when you

13   wrote Mr. Salus in March of 2013 and asked if everything was

14   going all right with the VA contract; do you remember that?

15   A     Yes, I do.

16   Q     He wrote you back and said everything was going fine,

17   didn't he?

18   A     Yes, he did.

19   Q     Did he tell you at any time before you got in this

20   lawsuit that he had already signed the contract and

21   agreement for someone else to take your place?

22   A     No, he did not.

23   Q     And did you learn about that in this lawsuit?

24   A     Yes, I did.

25   Q     But that wasn't in his June 2013 letter, was it?

```
 1   A      No, it was not.

 2   Q      And these damages that you talked about here so far,

 3   before we talk about these future ones, you have asked for

 4   those monies, haven't you?

 5   A      Yes.

 6   Q      And Duluth has never paid you those monies?

 7   A      Absolutely, they have not.

 8   Q      Now, we talked a little bit about this, and I need

 9   you to be very clear and precise and explain to the Court

10   the difference between an accommodated and an embedded

11   contract in the travel management business.

12   A      Sure.  So, when you -- with a VA, as I mentioned, we

13   originally, starting back in 2006 or so when we first

14   started working together, we were under an accommodated

15   contract, and that is the industry jargon for a direct

16   contract with the VA or any federal agency.  But in this

17   case directly with VA --

18   Q      In that relationship who was the direct prime

19   contractor?

20   A      The prime contractor was Duluth Travel.

21   Q      And who was the subcontractor?

22   A      And ADTRAV was the subcontractor to Duluth.

23   Q      Was there anybody between Duluth and the VA?

24   A      No, there was not.

25   Q      All right.  That's an accommodated contract?
```

1    A      Yes, sir.

2    Q      What is an embedded contract?

3    A      An embedded contract is when the travel company

4    becomes a subcontractor to a prime contractor who then has a

5    direct contract with the VA.  In this instance, under the

6    ETS2, Concur is the prime contractor with VA.  Concur

7    then --

8    Q      Hang on.  Tell the judge what ETS2 is.

9    A      ETS2 is the industry nomenclature for the government

10   travel program that is to provide an end-to-end solution

11   from resurrection through expense reimbursement to the

12   traveler.

13          So, Concur got that contract.  The TMC, Duluth,

14   was a subcontractor to that and handled the portion about

15   handling the reservations.

16          Then Concur did all the other stuff with the

17   expense reports and approvals and all that.  But Concur

18   holds the prime contract with the VA.

19   Q      When did Concur become the prime contractor for ETS2

20   purposes with the VA?

21   A      That, I do not know.

22   Q      After the 2010 contract, Exhibit 22, did ADTRAV and

23   Duluth enter into any further accommodated arrangement with

24   the VA?

25   A      No.  That 2010 agreement specifically states that we

1  will continue working together under any direct contracts

2  with the VA.

3         To my knowledge, at that time, and any time prior

4  to this litigation, there was not another direct contract

5  with the VA.

6         I subsequently learned through the discovery

7  process that Duluth had entered into another direct contract

8  with the VA effective October 1st of 2013.

9  Q     That's where I want to just try to understand this.

10  In October 2013, your September '13 prior agreement was due

11  to expire; is that right?

12  A     Right.

13  Q     Or your accommodated agreement was due to expire the

14  end of September.

15  A     Yes, it was.

16  Q     If Duluth continued to operate in an accommodated

17  model after the end of September 2013, was ADTRAV due to

18  continue to participate in the accommodated relationship?

19  A     Absolutely.

20  Q     If Duluth, however, entered into an embedded

21  relationship after September 2013, ADTRAV would not

22  participate?

23  A     Correct.

24  Q     So are you making any claim in this lawsuit here

25  today for participation in any VA relationship Duluth

1    carried on that was in an embedded model?

2    A      No.  No claim for them as a subcontractor to Concur.

3    Q      Are you making a claim in the litigation against

4    Duluth to the extent they were engaged in an accommodated

5    model after September 2013?

6    A      Yes, absolutely.

7    Q      With regard to the accommodated model, after 2013,

8    how much does ADTRAV claim it's owed by Duluth earned under

9    the VA contract before it became embedded?

10   A      Well, again, this was based off of testimony from

11   Mr. Salus, and to the best of, you know, he just gave us

12   what the revenue they had earned from January of 2014

13   through August 31st of 2014 which actually isn't even --

14   doesn't even include the last month of the current

15   agreement.

16   Q      All right.  So, look at Exhibit 78, is this the

17   testimony from Mr. Salus you're referring to?

18   A      Yes.

19   Q      And the question here, number twenty-five to

20   Mr. Salus was, "identify in detail and with specificity the

21   exact amount of revenue obtained by Duluth on the VA account

22   from January 2014 until Duluth moved to the new agreement

23   with VA under ETS2", correct?

24   A      Correct.

25   Q      And down below his answer was what?  In total.

1   A      Basically, you know, he says there's no specific

2   start date but that he claims one point seven four three six

3   hundred fifty-six point eighty-four dollars in revenue.

4   Q      For the time period January through August of 2014?

5   A      Correct.

6   Q      But you don't know of your own knowledge when it

7   became embedded under the new relationship, do you?

8   A      No.  I don't know whether he became embedded and I

9   don't know whether he entered into any other direct

10   agreements with VA.

11         MR. BATES:  Your Honor, I'm at a very good place.

12         THE COURT:  All right.  Why don't we go ahead and

13   take a fifteen minute recess, we'll be in recess fifteen

14   minutes.

15                        (Break taken)

16                        (Open court)

17         THE COURT:  Go ahead, Mr. Bates.

18         MR. BATES:  Thank you, Your Honor.  I would offer

19   Exhibit 406, I think we discussed that document, and I

20   failed to offer it.

21         THE COURT:  Any objection to 406?

22         MR. SWEETNAM:  What was 406?

23         MR. BATES:  406 was the summary -- I've lost it.

24         THE WITNESS:  It's on the screen.

25         MR. SWEETNAM:  Yeah, no objection.

```
 1              THE COURT:  It will be received.
 2              MR. BATES:  The PCC codes.  78 we were on when we
 3   broke.  I'll go ahead and offer that at this time,
 4   Mr. Salus' interrogatory response.
 5              THE COURT:  Any objection to that?
 6              MR. SWEETNAM:  No objection.
 7              THE COURT:  It will be received.
 8   Q    (By Mr. Bates)  Mr. Hale, with regard to this VA
 9   revenue in Exhibit 78, does ADTRAV make a claim to any
10   portion of this one million seven forty-three six fifty-six
11   point eight four?
12   A    Yes.  Twenty-five percent of that, which is
13   approximately four hundred thirty-five thousand nine hundred
14   fourteen dollars.
15   Q    And is that based on the revenue split as contained
16   in Exhibit 22?
17   A    Yes, it is.
18              MR. BATES:  Your Honor, at this time, we offer
19   Exhibit 396, 397 and 398 which are the expert and attorney
20   fee invoices related to the litigation.  The lawyers,
21   I believe, have agreed for those to come in without
22   testimony.  I would simply ask Mr. Hale to confirm that
23   ADTRAV has paid those bills to date and there are two months
24   outstanding which will be supplemented to the record.
25              THE COURT:  Any objection?
```

1          MR. SWEETNAM:  No objection, Your Honor.  But I

2     just want to be clear my understanding of the discussion

3     that we had was to save everybody a lot of time and trouble,

4     yeah, they'll put theirs in and we'll put ours in.  And what

5     we had discussed -- obviously, it's not up to us -- but it's

6     going to take some time to review that, and we discussed the

7     possibility of asking the Court's permission to brief the

8     issue of attorneys' fees post-trial, so that's all I have to

9     say.

10          THE COURT:  Well, we'll hear about that when we

11     get through the testimony.  We'll take up any kind of

12     procedures that seem to be fair once we get completed with

13     the testimony.

14          Go ahead.  Those documents will be received, if I

15     didn't say that, they will be received.

16     Q     (By Mr. Bates)  With regard to Exhibit 396, these

17     were invoices for Mr. Ralph Summerford, correct?

18     A     Yes, they are.

19     Q     Have those invoices been paid by ADTRAV?

20     A     Yes, they have.

21     Q     And his services related to expertise and expense for

22     his work in this litigation?

23     A     Yes, they were.

24     Q     And Exhibit 397, Attorney Oscar Price invoices.  And

25     did you employ his services in 2014 to assist with this

1    litigation?

2    A      Yeah, started in 2013 and through the first part of

3    2014, specifically for this litigation.

4    Q      Have those invoices been paid in full?

5    A      Yes, they have.

6    Q      Exhibit 398, I believe, was Hand, Arendall's invoices

7    with the exception of the last two months, correct?

8    A      Correct.

9    Q      And have you paid those bills current?

10   A      Yes, we have.

11   Q      Do you claim that 396, 397 and 398 are due to be

12   reimbursed to you as a result of your having to pursue this

13   litigation?

14   A      Yes, I do.

15   Q      Just so we're clear, Exhibit 396 contains a claim for

16   Mr. Summerford of ninety-seven thousand one twenty-five,

17   correct?

18   A      Yes.

19   Q      And Exhibit 397 related to Mr. Price claims

20   thirty-four thousand seven sixty-eight?

21   A      Yes.

22   Q      And the Exhibit 398 for Hand, Arendall claims three

23   sixty-four three eighty-five through January?

24   A      Yes.

25   Q      Should the Court rule in your favor, would you also

```
 1  request pre-judgment interest on the liquidated sums that
 2  you claim in this case?
 3  A     Yes, I would.
 4        MR. BATES:  Your Honor, that is all we have at
 5  this time.
 6        THE COURT:  All right.  Any cross-examination?
 7                    CROSS-EXAMINATION
 8  BY MR. SWEETNAM:
 9  Q     Good afternoon, Mr. Hale.
10  A     Good afternoon.
11  Q     How you hanging in there?  You doing all right?
12  You've been on the stand a long time.
13  A     Let's do it.  Power through.
14  Q     Have you ever subcontracted your revenue collection
15  and financial reporting to another travel agency?
16  A     No.
17  Q     Okay.  So you have never entered into a deal like the
18  one you entered into with Duluth?
19  A     No.
20  Q     Okay.  Do you recall how much revenue was paid to
21  ADTRAV during the life of the subcontract between Duluth and
22  ADTRAV?
23  A     No.
24  Q     Okay.  If I told you it was six million dollars,
25  would that sound reasonable to you?
```

1    A       Yes.

2    Q       Okay.  Well, ADTRAV was collecting that money from

3    Duluth over the life of the contracts between the parties.

4    Did ADTRAV ever share any business of its own with Duluth?

5           MS. DAVIS:  Object, Your Honor, this was part of

6    our motion in limine, I believe you have ruled that any

7    shared business was interrupted by --

8           THE COURT:  That was partial summary judgment that

9    I granted, wasn't it?

10          MS. DAVIS:  That is correct.

11          THE COURT:  It was accord and satisfaction based

12   on the -- or at least with respect to the Pennsylvania

13   business, and then there was an agreed calculation or an

14   agreed change because of the dispute over not sharing

15   business.

16          I think it's already been ruled on, hasn't it,

17   Mr. Sweetnam?

18          MR. SWEETNAM:  Oh, absolutely, Your Honor.  And

19   we're not eliciting this testimony for the purposes of

20   making a claim.  We're just telling the historical story of

21   the parties.

22          And I think that the plaintiff was able to do that

23   when it talked about how -- so I'm not trying to make a

24   claim.

25          THE COURT:  Well, as long as there is an

1  understanding that the previous claim asserted in the

2  counterclaim that Duluth was entitled to share in some

3  future business by ADTRAV, as long as it's understood that

4  that claim has been ruled out on summary judgment, I will

5  let you go into context and background and all that.  But

6  understand, that claim is gone.

7            MR. SWEETNAM:  Absolutely.  That's not why I

8  brought it up at all.

9            THE COURT:  All right.  Go ahead.

10  Q     (By Mr. Sweetnam)  All right.  So, I believe the last

11  question I asked you, Mr. Hale, was while you were earning

12  the six million dollars from Duluth, ADTRAV never shared any

13  of its business with Duluth, did it?

14  A     No, they weren't entitled to.

15  Q     I'm sorry, you said because you weren't --

16  A     I said they weren't entitled to it.

17  Q     They weren't entitled to it.  Okay.

18        Are you a service-disabled veteran-owned small

19  business?

20  A     No, I am not.

21  Q     Okay.  And was it your testimony in your deposition

22  that that clause would have applied only to special

23  set-asides for service-disabled veteran-owned small

24  businesses?

25  A     I don't understand the question.

```
 1   Q      I recall when I took your deposition quite some time
 2   ago you indicated that ADTRAV never had any federal
 3   government contracts that it would have been obligated to
 4   share with Duluth because that provision in your mind
 5   applied only to special set-asides for service-disabled
 6   veteran-owned small businesses; do you recall that?
 7   A      Correct.
 8   Q      Okay.  And since you're not a service-disabled
 9   veteran-owned small business, you could never have brought
10   anything to Duluth under that clause, could you?
11   A      Correct, as a service-disabled veteran, no.
12   Q      Now, Duluth did bring to Pennsylvania a government
13   contract opportunity to ADTRAV, did it not?
14   A      It was kind of a mutual, I mean, it was posted out
15   there or we discussed it, yes.
16   Q      But Duluth did not share in that contract, did it?
17   A      That was because Duluth was offered the opportunity
18   to participate in that contract but instead chose to up the
19   percentage of the VA revenue split to off-set that, that was
20   a negotiation that we did between the parties.
21   Q      Okay.  So, when you say Duluth chose, what you really
22   mean is that there was an agreement between the parties to
23   switch the VA revenue to 60/40 to make up for the fact that
24   ADTRAV was handling Pennsylvania to the exclusion of Duluth?
25   A      No.  What I said was Duluth chose to.  We were -- we
```

1   talked about it and they were given the option of either

2   participating in the Pennsylvania contract or to up the

3   percentage of the VA business that they handled, the revenue

4   portion of that, and they chose the later.

5   Q     So it was Duluth's choice to go to 60/40 is what

6   you're saying?

7   A     Correct.

8   Q     All right.  Now, under the 2010 agreement that the

9   two of you, your company and Arthur Salus' company, entered

10  into, any obligations to share business in the future was

11  removed, wasn't it?

12  A     Correct.

13  Q     Why was that removed?

14  A     It was -- any language, anything about future

15  business was not in there because we had -- this was an area

16  of disagreement between the companies.  And so in order to,

17  as I said earlier in my testimony, to take the rear-view

18  mirror off and move forward, we entered into a new agreement

19  which we were very specific about getting to a clear

20  understanding of when it would come into effect and what it

21  would pertain to.

22  Q     Okay.  And that agreement bumped the percent split up

23  to 75/25; is that correct?

24  A     That is correct.

25  Q     And ADTRAV no longer had the obligation to share

1  business with Duluth under that agreement?

2  A     We did not have an obligation under that agreement to

3  share any business with Duluth.

4  Q     2010 is what I'm talking about.

5  A     The 2010 agreement did not call for any sharing of

6  revenue by either party.

7  Q     Now, ADTRAV retained control of the accounting for

8  the VA contract throughout the life of the agreement; isn't

9  that true?

10  A     Well, I guess it all depends on how you define

11  control.  Because we performed the reporting function, but

12  as I testified earlier today, each party had access to all

13  the information, the accounting information.  And in fact,

14  ninety-seven to -- I mean, ninety-eight to ninety-nine

15  percent of the revenue was deposited either in a Duluth-

16  controlled account or a joint account.

17         So to characterize it as us having control, I

18  don't think that's a fair characterization of it.

19  Q     Okay.  Let me rephrase it.

20         Throughout the entire life of these contracts, you

21  created and reported all of the weekly and monthly net

22  remits; isn't that true?

23  A     Yes, we did.

24  Q     You had to have full information concerning the

25  revenue that was generated in order to do that, right?

1    A      Yes.  That was revenue and information that we got

2    from, either our internal sources, ARC and also information

3    from Duluth.

4    Q      So even in 2013 when Duluth ceased paying some

5    portions of the revenue, including the Worldspan segments,

6    you were still getting the Worldspan reports, correct?

7    A      They were very delayed in coming.  They were not

8    coming -- prior to 2013, we were getting them on a monthly

9    basis as they came in.

10           After that time, they were very late in coming,

11   like months late, after repeated requests for them.

12           And then I think we finally got some of the last

13   ones towards the end of the year.

14   Q      Well, how did you generate the monthly net remits if

15   you didn't have the reports?

16   A      We just -- and they were aware of this, we just made

17   an estimate based on other information.

18   Q      So you're saying that most of your monthly net remits

19   in 2013 would have been estimates?

20   A      Well, they were later corrected once we got the

21   information from Duluth.

22   Q      Okay.  So are there two sets of monthly net remits

23   out there for 2013, the original estimates and then the

24   corrected ones?

25   A      No, I believe there's just one set.

1  Q    And which set would that be:  The estimates or the
2  corrected ones?

3  A    The corrected ones.

4  Q    Now, Duluth had the right to perform the accounting
5  functions under the contract, if it wanted to, didn't it?

6  A    No.  They had -- not if they wanted to.  They had the
7  right to do it if we mutually agreed that that would be --
8  that they would do that.

9  Q    And they attempted to do that in June of 2013,
10  correct?

11  A    Well, they attempted to take over it without my
12  consent, yes.

13  Q    Okay.  So they tried to take over the accounting
14  functions in June of 2013?

15  A    Yes, they did, without my consent.

16  Q    And you wouldn't agree to that?

17  A    I'm not -- no, I wouldn't say that.

18  Q    You wouldn't say you --

19  A    I wouldn't --

20  Q    Did you agree to it?

21  A    I didn't agree to it because I wasn't asked.  I was
22  just sent an email in the middle of the night telling me
23  that this was done.  And so -- so no, I did not agree to it
24  based on that because there was a lot -- you can't just
25  throw a switch and say, boom, we're taking over the

1   accounting functions tomorrow because there's a lot that

2   goes into it as far as reporting goes.

3          In fact, Duluth discovered that and later, within

4   the week, returned those back office accounting functions to

5   ADTRAV because they couldn't do it.

6   Q    Wasn't it true that ADTRAV refused to allow Duluth

7   access to its Sabre city or its Sabre Pseudo City Code?

8   A    Not that I recall.

9   Q    So that wasn't the reason that Duluth backed off and

10  said, you know what, you continue with the accounting?

11  A    No, not to my recollection.

12  Q    Okay.  The bottom line is, when they tried to take

13  over the accounting in June of 2013, they were unsuccessful,

14  correct?

15  A    Because they couldn't do it.  And nothing from --

16  what ADTRAV prevented them from doing.

17  Q    But ADTRAV -- well, you didn't agree, right?

18  A    Well, I didn't agree but that didn't stop them from

19  changing the ARC by cutting off our access to ARC and they

20  cut off our access to Worldspan, so there was no way for me

21  to do the reporting, so they made -- they made the decision

22  to do that.

23  Q    Okay.  Whatever transpired, the bottom line is that

24  you continued to perform the accounting until the time that

25  you wrote to Duluth in January of 2014 that you weren't

1    going to do anymore work with them, correct?

2    A     Well, we performed -- we did not -- we performed the

3    accounting from June of 2013 once Duluth returned, told us

4    that, hey, we can't do this, we want you back doing this.

5           So we continued to provide that.  And then in

6    January of 2014, as we were negotiating to try and get the

7    money that was rightfully owed to us, we expressed the fact

8    that we wouldn't continue to provide services.  But I later

9    clarified that and said that, hey, we will provide agent

10   services but if you are going to do the back office, do the

11   back office, that's going to be on you because you're not

12   paying us for it.

13   Q     So up until that time, you continued to retain all

14   the accounting functions under the contract, correct?

15   A     The reporting functions, not all the accounting

16   functions, again, because a lot of this stuff was going to

17   Duluth.  And again, it's not a fair characterization to say

18   that we were doing all the accounting because we were

19   relying on Duluth to provide us -- at this point, we didn't

20   have access to the ARC reports, we were reliant upon Duluth

21   to send us that information, we were reliant on Duluth to

22   send us the Worldspan information because they were getting

23   all the deposits into their account, and we were relying

24   upon Duluth to send us information regarding all the hotel

25   commissions or at least ninety percent of the hotel

1    commissions.

2            So to say that we were in control of it, again,

3    it's a mischaracterization.

4    Q    Okay.  You were performing all of the reporting;

5    isn't that true?

6    A    We were -- yes, we were providing the reporting.

7    Q    Which is really all I meant, so I apologize if the

8    question led you astray.

9            Let's talk about your technology fee claim of

10   forty-seven thousand four hundred seventy dollars and forty

11   cents.

12           Now, that claim is based on a multitude of

13   assumptions that you don't know for a fact to be true; isn't

14   that correct?

15   A    On -- some assumptions, do I know that they're true

16   or -- well -- not -- tell me what -- what parts --

17   Q    Well, I mean, for instance, how do you know for a

18   fact that Duluth was utilizing ADTRAV's proprietary script

19   January, February, March, April, May, June, July, August and

20   September of 2014, how do you know that for a fact?

21   A    Well, a couple of ways.  One, depositions by John

22   Lawless and deposition testimony by Brenda Corbin -- no,

23   Brenda -- what's the other Brenda's name?  The operations

24   manager?

25   Q    I can't think of it now either.

```
 1   A     The other Brenda.  In their deposition testimony,

 2   they acknowledged that they were -- they never told anyone

 3   to stop using and they were using it.

 4            Secondly, as we offered into evidence, I produced

 5   a report that was generated from the Worldspan system that

 6   showed that these records were appended with the, you know,

 7   WOW script used and the date and that would only go on there

 8   if the technology was being used by Duluth.

 9   Q     Well, isn't it true that that could also go on there

10   simply because that's what it's called inside the system,

11   WOW?

12   A     No.  Because that is a -- are you -- that is a tag

13   that is programmatically put into the software to document

14   when it was used and to time stamp that it was used.

15            So, if you're saying was it possible for the

16   agents to go in and manually update every record they did

17   with saying WOW used and the date that it was used, I guess

18   they could do that, but I would think that would be a safe

19   assumption that they wouldn't take the time to do that.

20   Q     Okay.  So you're saying deposition testimony by two

21   Duluth Travel witnesses --

22   A     Yes.

23   Q     -- told you that we were using or Duluth Travel was

24   using the proprietary script belonging to ADTRAV through

25   September of 2014?
```

1  A      Not through September, just that they were using it,

2  they didn't put a date on it, but they were using it.

3  Q      So that could have stopped in February of 2014?

4  A      Well, no, I know it went through May because that is

5  the report we put into evidence was that record, as long as

6  I had access to Worldspan through May, and so I was able to

7  run a report that showed that it was being used by Duluth up

8  and through May 31st.  So I would feel very confident May

9  31st.  And you know, beyond that, that is an assumption.

10 Q      Now, you also said in your testimony earlier that you

11 applied some kind of an industry standard factor of two and

12 a half.

13 A      Right.

14 Q      In creating these calculations.

15 A      Right.

16 Q      Okay.  So that's the -- that's an assumption, is it

17 not?

18 A      That would be an assumption.

19 Q      And the final two entries in here, August and

20 September, both say with an asterisk "estimated" next to

21 them; isn't that correct?

22 A      Yes, they do.

23 Q      So this item of your damages is not certain or

24 liquidated, is it, it's an estimate at least in part?

25 A      Part of it is an estimate.  Like I say, it's a

1  minimum because I don't know if Duluth continued to use it

2  past September.  There's been no evidence to say that they

3  did not use it past September.

4  Q     So far?

5  A     So far.

6  Q     Pull up 7.  Now, I am showing you what's been marked

7  as Defendant's Exhibit 7.  (Indicating).

8  A     You know, I'm not seeing these on mine.  Is there a

9  reason for that?

10        THE COURT:  For some reason this screen is not

11  coming on.

12              (Brief pause)

13  Q     (By Mr. Sweetnam)  Now, I'll represent to you,

14  Mr. Hale, that that's simply Page 1 and the final page of

15  that eight hundred page exhibit that ADTRAV has identified.

16  A     Correct.

17  Q     Go ahead and look at the last page, if you would.

18  A     (Witness complies).

19  Q     Now, explain this to me, if you would.  At the bottom

20  down there it says, count:  Normal, forty-seven thousand

21  three ninety-three; exchange, five forty-three; refund, four

22  thousand seventeen.

23        Am I guessing that that means that there were --

24  well, am I guessing -- am I correct in guessing that that

25  means that normal and exchange are ticketed transactions and

1    four thousand seventeen were voided or refunded?

2    A       Correct.

3    Q       Okay.  So you've got total tickets here of

4    approximately forty-seven thousand nine hundred?

5    A       Right.

6    Q       Okay.

7    A       In tickets that were refunded.

8    Q       Well, assuming for the sake of argument that I'm just

9    adding the forty-seven three ninety-three and the five

10   forty-three since -- well --

11   A       Yes, forty-seven three ninety-three plus five

12   forty-three is equal to forty-seven nine thirty-six.

13   Q       Now, if ADTRAV is charging a fifty cent fee per

14   ticketed transaction, and we have here basically forty-eight

15   thousand transactions, how is it that you get to a forty-

16   seven thousand four hundred seventy dollar number?

17   Shouldn't it be half of forty-eight thousand?

18   A       Well, show me the number of the calculation, put that

19   backup.

20   Q       Okay.

21   A       Because our calculation goes through September and

22   this is only through May.

23   Q       That answered my question.  The difference between

24   Defendant's 7, which is the first and last page of one of

25   ADTRAV's exhibits, and Defendant's 6, which is your chart

1    that runs through September, is the months of June, July,

2    August, and September.

3    A      Correct.

4    Q      August and September estimates?

5    A      Right.

6    Q      And all of which are subject to an assumption of two

7    and a half segments.

8    A      Correct.

9            THE COURT:  Mr. Hale, touch that screen and see if

10   it's on.

11                         (Brief pause)

12   Q     (By Mr. Sweetnam)  Mr. Hale, we're actually done with

13   this one.

14           Let's talk about your claim for thirty-four

15   thousand five hundred dollars in Worldspan bonus money.

16   A      Yes.

17   Q      Now, it's your contention that the contract gives you

18   the right to participate in all revenue received from the VA

19   travel contract, correct?

20   A      Yes.

21   Q      Okay.  So, if some of the Worldspan bonus money that

22   was received by Duluth was not derived from the VA contract,

23   you wouldn't claim that you had any entitlement to that,

24   would you?

25   A      No.

1   Q    Did I hear you testify earlier that you were

2   convinced, for lack of a better term, that the entire two

3   hundred thirty thousand dollars that Duluth was paid was

4   based on VA revenue alone?

5   A    Yeah.  My understanding from the information that we

6   shared back and forth was that -- two hundred thirty

7   thousand dollars was the portion of the bonus that applied

8   to VA travel.

9   Q    Now, I'm showing you -- this is actually Exhibit 19,

10   I think, of the Arias deposition, ADTRAV's Exhibit and I

11   believe P-53 from yours.  This is an email from Ed Arias to

12   you; do you recognize that?

13   A    Yes, I do.

14   Q    Now, look, if you would, I'm looking at the wrong

15   exhibit.

16         MR. SWEETNAM:  Bear with me for one minute, Your

17   Honor.

18         THE COURT:  Sure.

19                 (Brief pause)

20   Q    (By Mr. Sweetnam)  So that is an email from -- part

21   of an email from Ed Arias to you?

22   A    Yes, it is.

23   Q    It's got some calculations.

24   A    Yes, it is.

25   Q    If you look to the Worldspan incentive split, move on

1   down to -- VA percentage of total segments, seventy-eight

2   point five seven.  Would that change your mind about your

3   right to claim essentially twenty-five percent of the two

4   hundred thirty thousand?

5   A     No.  Because I don't know what the total amount that

6   was paid to Duluth.  I'm under the understanding that Duluth

7   was paid or the two hundred -- here we go.  That the two

8   hundred thirty thousand dollars that Ed and Arthur put into

9   the email was the portion that was ascribed to the VA

10  business.  And like I say, they didn't deposit this in the

11  joint account and they never provided me any backup of what

12  the actual payment was from Worldspan.

13  Q     Okay.  Well, you see at the top, this column right

14  here (indicating), total Worldspan incentive two thousand

15  thirty thousand; do you see that?

16  A     Yes.

17  Q     And then you've got Worldspan VA portion, seventy-

18  eight point six percent, one hundred eighty thousand seven

19  hundred twenty dollars and eighty-seven cents.

20  A     Okay.

21  Q     So do you see now that that seventy-eight point six

22  percent factor is applied to the two hundred thirty

23  thousand?

24  A     Yes.

25  Q     So all I'm trying to ask you, Mr. Hale, is if in fact

1  only seventy-eight point six percent of the two hundred

2  thirty thousand dollar bonus was attributable to the VA,

3  that would be the number against which you would be allowed

4  to make a claim, correct?

5  A     Well, and that is the number we used for the claim,

6  if you look at these calculations.

7  Q     Okay.  You're saying that you assessed your twenty-

8  five percent against the one hundred eighty thousand seven

9  twenty eighty-seven?

10  A     That's what -- appears to be what Ed did here.

11  Because we wrote a total of -- he says that if you look at

12  the summary line, he's got Duluth one hundred thirty-one

13  thousand two twenty-eight and he's got ADTRAV at forty-nine

14  thousand four ninety-two for a total of one hundred eighty

15  thousand, then he deducts the legal feels, us paying seven

16  thousand and Duluth paying nineteen thousand for the

17  protest, leaving a balance owed to ADTRAV of forty-two

18  thousand two twenty-four.

19  Q     And you were paid --

20  A     Go down, it should be -- it's on that email

21  somewhere, that one that we have offered into evidence.

22  Q     Do you agree that that forty-two thousand --

23  A     Here it is.

24  Q     That forty-two thousand two twenty-four fifty-eight

25  represents the total bonus due ADTRAV?

```
1    A      No, because -- there is a -- and I have to look at
2    these because there's a discrepancy here between this email
3    and an email we entered into evidence.  And I'm not -- I
4    can't tell you what that differential is.
5    Q      Okay.  So it's your contention that your bonus
6    calculation was applied only against the hundred eighty
7    thousand, not the two hundred thirty thousand?
8    A      It's my contention, if you'll pull up that exhibit
9    that we showed that was an email from Ed that provided the
10   breakdown, that's what -- that's what I'm going off of.
11          I don't know where the differences are between
12   this exhibit and our exhibit, so I can't -- I can't speak to
13   that.
14   Q      Pull up P-53.  This is an email from Ed to you.  Do
15   you see that, Mr. Hale?
16   A      Yes.
17   Q      Now here you see that denotes Worldspan incentive is
18   two hundred thirty thousand; do you see that?
19   A      Yes.
20   Q      And then he applies a payout over a five year period,
21   thirty-six point nine three percent to ADTRAV in 2011.
22   A      Yes.
23   Q      Twenty-five percent in '12; twenty-five percent in
24   '13; twenty-five percent in '14; twenty-five percent in '15.
25   A      Correct.
```

1    Q     So it seems apparent that Ed Arias actually gave you

2    credit for the entire two hundred thirty thousand dollar

3    bonus even though it was only seventy-eight percent VA;

4    isn't that what this demonstrates?

5    A     If that was the total of -- two hundred thirty

6    thousand was the total amount received by Duluth, then yes.

7    But I don't know if that's the total amount or not.

8    Q     All right.  And two of the segments that added up to

9    the total commission -- I'm sorry, the total bonus

10   participation you contend that you were entitled to, which

11   here it says sixty-two nine eighty-seven eighty were

12   attributed to services in 2014 and 2015; do you see that?

13   A     Yes.

14   Q     Okay.  But you had stopped performing service in

15   January of 2014, correct?

16   A     I sent a letter saying that we were going to stop

17   performing services for lack of payment.

18   Q     Okay.  And we will get to that.  But you have got

19   twenty-three thousand dollars in payments under the amount

20   of the Worldspan bonus that Duluth apparently was willing to

21   pay you at this time or at least that's what this

22   calculation says, that would have come after you had already

23   terminated your services, right?

24   A     I didn't follow that.

25   Q     Well, you can see a line item for 2014, eleven

1   thousand five hundred dollars to ADTRAV.

2   A      Yes.

3   Q      And then you can see a line item for 2015, eleven

4   thousand five hundred dollars for ADTRAV.

5   A      Correct.

6   Q      Now, both of those time periods were after you had

7   ceased performing services under the contract, right?

8   A      Yes.

9   Q      Okay.  So I'm suggesting to you that that's a

10  twenty-three thousand dollar credit that should come off of

11  whatever it is that ADTRAV contends it's owed because it was

12  for services that ADTRAV never performed.

13  A      I disagree with your assumption, assertion and

14  assumption.

15  Q      If, in fact, and you have testified that you don't

16  contend that you're entitled to revenue that was not VA

17  derived, it wasn't based on actual VA transactions.

18  A      Correct.

19  Q      If, in fact, the amount of Worldspan incentive or

20  Worldspan bonus that's attributable in the VA was the

21  hundred and eighty thousand dollar figure that Mr. Arias

22  had, you wouldn't contend that you were entitled to

23  participate in the difference between the two thirty and the

24  one eighty, would you?

25  A      No.  If I was shown documentation that that is

1   what -- the percentage that was put to that, then correct.

2   Q     Okay.  So the Worldspan bonus claim is also an

3   estimate based on what we've discussed in the past few

4   minutes.

5   A     Well, it was based on the information that I had at

6   the time from these emails where Ed -- so I don't think it

7   was an estimation, it was taken off of these.

8             MR. SWEETNAM:  Can I take a short break, Your

9   Honor?  I just want to look at what I haven't identified so

10  we don't lose track of what we need to offer.

11            THE COURT:  Sure.  Go ahead and take a ten-minute

12  recess.

13                      (Break taken)

14                      (Open court)

15            THE COURT:  All right.

16            MR. SWEETNAM:  We would offer D-6, D-7 and D-48.

17  P-53 has already been admitted.

18            THE COURT:  Any objection to those exhibits?

19            MR. BATES:  No objection.

20            THE COURT:  They will be received.

21  Q     (By Mr. Sweetnam) Let's go back to the bonus again

22  for a moment, Mr. Hale.

23            Did you ever pay Duluth bonus money derived from

24  accounts other than the VA?

25  A     No, I did not.

1   Q      So you wouldn't expect them to pay you money from

2   bonuses derived from sources other than the VA either, would

3   you?

4   A      You know, where the origin of this two hundred thirty

5   thousand dollars came from, I'm not sure.  So again, I can

6   just testify to this two hundred thirty thousand dollars.

7   Q      Let me ask you the question again.

8          You wouldn't expect Duluth to share with you bonus

9   money that was not derived from the VA contract, would you?

10  A      No, not directly.

11  Q      Okay.  Let's also go back to technology fees for a

12  moment.

13         What did the technology fee compensate ADTRAV for

14  doing?

15  A      It was for the -- us writing -- writing the

16  technology, the software, maintaining the software and

17  troubleshooting it.

18  Q      Did it not also cover mid-office and reporting?

19  A      Some of -- the technology fee primarily was for the

20  WOW script and there were some other components of it, but

21  we didn't break it down as to --

22  Q      My point is this:  My understanding is it also

23  covered reporting and mid-office reconciliation on the

24  transactions that were being booked through that script; do

25  you disagree with that?

1   A      No.

2   Q      But after January of 2014, you weren't performing any

3   mid-office reconciliation or doing any reporting, were you?

4   A      No.

5   Q      So wouldn't you agree that you shouldn't be allowed

6   to charge the entire fifty cents per transaction since you

7   weren't providing two-thirds of the service?

8   A      No, because the fact that we weren't providing those

9   services, you know, I probably should have charged double

10  the price because they were using it -- they were using the

11  software illegally.

12  Q      But you weren't providing mid-office reconciliation

13  or reporting, and that's part of the fee?

14  A      That was part of the fee when we were performing

15  those services under the contract.  But once they started

16  illegally using the software, we felt fifty cents segment

17  was generous.

18          MR. SWEETNAM:  I'm going to object to the

19  responsiveness of that answer, Your Honor.

20          THE COURT:  All right.

21  Q      (By Mr. Sweetnam)  Now, let me show you, I think this

22  has already been entered into evidence, what I've got as

23  Defendant's Exhibit 75, it's the January 10th, 2014 letter.

24  You guys entered that already, I think.  Go to the second

25  page.

1          Now, read, if you would, Mr. Hale, that final

2     paragraph on the second page of D-75.

3     A     "We regret that Duluth chose to continue to refuse to

4     pay ADTRAV for services rendered.  In light of Duluth's

5     unjustified refusal to make payment and after months of

6     trying to obtain payment, ADTRAV has no choice but to

7     immediately commence litigation to recover these past due

8     amounts, as well as its damages from Duluth's breach of the

9     contract."

10    Q     Now, in reality, Duluth had offered to pay ADTRAV

11    everything ADTRAV was asking for other than the Worldspan

12    bonus just weeks earlier, correct?

13    A     Not to my recollection.

14    Q     D-47.  I'm showing you what's been marked as D-47,

15    Mr. Hale.  Go ahead and take a moment to look at that.  And

16    I can give you a -- I don't know if you can scroll down.

17         MR. BATES:  Your Honor, pardon me, before we get

18    into this.  I believe this is an exchange of settlement

19    communications between the two lawyers in the case, it

20    doesn't have to do with the parties in the litigation.  We

21    would object to the document and to the testimony regarding

22    settlement negotiations once this litigation was imminent

23    and already ensued.

24         THE COURT:  Is this settlement discussions?

25         MR. SWEETNAM:  Your Honor, first of all, they

1   opened the door on direct examination with Mr. Hale to this
2   testimony asking him if he made efforts to resolve his
3   differences with Duluth.  He even used the word "settlement"
4   in his direct examination testimony.
5          Furthermore -- so, in other words, for one thing,
6   they have already opened the door to it.
7          The second thing is, I don't really view this as
8   settlement negotiations, these are ongoing communications
9   between two businesses while a contract is actually being
10  performed and there is no litigation either pending or even
11  threatened at this point in time.
12         Furthermore, under the rule, while settlement
13  negotiations are not admissible for the purpose of trying to
14  determine the merits of the claim, they are admissible for
15  other factors concerning issues like attorneys' fees.
16         And my contention with regard to this is that they
17  were in a position where Duluth was willing to pay them one
18  hundred percent of what they were asking for, with the
19  exception of the disputed Worldspan bonus, and chose to sue
20  us anyway, which to me goes directly to their right to claim
21  attorneys' fees.
22         THE COURT:  All right.  Mr. Bates.
23         MR. BATES:  Your Honor, I'm going to be forced to
24  talk about this letter when I'm trying to keep the Court
25  from delving into the settlement negotiations.

1          But in part, this letter dictates some terms that

2     they want to withhold from the parties as a result of this

3     which is exactly why the settlement negotiations shouldn't

4     be before this Court in terms of what they were trying to

5     hold on to in order to go forward.

6          Lawyer Sweetnam was involved in this matter from

7     the very first get go of the June 2013 8:00 Friday night

8     letter, he's copied directly on it and he began his

9     representation right then and there all the way through 2013

10    of these people.  This letter comes from Oscar Price after

11    he's engaged because of the dispute, it cannot possibly be

12    directed to the comments I asked this witness about because

13    my questions to this witness were about his efforts with

14    Mr. Salus to resolve disputes of the Pennsylvania situation,

15    to resolve disputes about the segment fees and the reports

16    that resulted in the 75/25 split.

17         They have nothing to do with the settlement

18    negotiations of claims that were involved in these litigated

19    issues.

20         THE COURT:  All right.  Well, I'll receive the

21    exhibit for a conditional purpose.  Again, this is a

22    non-jury case.  In the event that it turns out that this

23    fits into a settlement situation, then everybody will notice

24    I'm going to exclude it at that point, and I'll give you

25    notice of that when I do it, if I do it, but I'll go ahead

1    and let everybody make whatever record they want to make at

2    this point.  But I will go through and -- to the extent

3    there is something that turns out to be improper evidence,

4    then I will exclude that and notice everybody to that

5    affect.

6            MR. SWEETNAM:  The only other point I would like

7    to make about that, Your Honor, and I appreciate your ruling

8    on that, is that beyond everything I have already said, the

9    letter that they have already admitted into evidence, which

10   is their January 2014 letter, makes the statement at the end

11   of the letter that Duluth isn't paying them.  So this could

12   also be utilized to impeach what Mr. Hale was saying in that

13   letter.

14           THE COURT:  All right.

15           MR. SWEETNAM:  And leave it at that.

16           THE COURT:  All right.

17   Q    (By Mr. Sweetnam)  Go to the last page -- you know

18   what, let's go through this item by item.  I'm sorry.

19           At that time ADTRAV was claiming, and I'm looking

20   at this paragraph right here (indicating), at that time

21   ADTRAV was claiming thirty-nine thousand five hundred

22   thirty-one dollars for expenses; is that correct?

23   A    Yes.

24   Q    And at the end of that paragraph what does it say in

25   italics?

1  A     "Duluth will pay this in full upon execution of a

2  written agreement between the parties limited to these

3  issues."

4  Q     Okay.  And the next amount of indebtedness that

5  ADTRAV was claiming was owed was twenty-eight thousand eight

6  hundred sixty-one dollars for net commissions, correct?

7  A     Correct.

8  Q     Again, what does it say in italics at the end of that

9  paragraph?

10 A     "Duluth will pay this in full upon execution of a

11 written agreement between the parties limited to these

12 issues."

13 Q     Now, at the bottom of the next full paragraph, which

14 is on Page 2, so the top of Page 2, ADTRAV is making a claim

15 for twenty-eight thousand eight hundred sixty-one dollars;

16 do you see that?

17 A     Yes.

18 Q     Again, what does it say in italics?

19 A     "We do not agree nonetheless and for the limited

20 purposes of the present dispute Duluth will pay this number

21 as discussed above."

22 Q     The next paragraph says, "ADTRAV is owed thirteen

23 thousand one hundred seventy-four dollars for ADTRAV's share

24 of the expenses and hotel commissions"; do you see that?

25 A     Yes.

1   Q      Again, what does it say in italics there?

2   A      "If you can provide proof of the accuracy of this

3   claim, Duluth will pay same."

4   Q      Now, the next is thirty-four thousand dollars for the

5   final Worldspan bonus.  What does it say in italics there?

6   A      "We do not agree that any such indebtedness exists

7   and point out that this is unrelated to the services ADTRAV

8   is obligated by contract to provide Duluth."

9   Q      And then the next paragraph deals with the Worldspan

10  incentive payments in the first quarter or first third of

11  2013; do you see that?

12  A      Yes.

13  Q      And ADTRAV is saying that if Duluth can provide proof

14  that we didn't receive that revenue, then ADTRAV wouldn't

15  claim it.

16  A      Right.

17  Q      Then the last item in here is the seventy-six

18  thousand six hundred thirty dollars in Worldspan incentive

19  payments for April through October; do you see that?

20  A      Yes.

21  Q      And what does it say in italics?

22  A      "Duluth has provided this information to ADTRAV and

23  agrees to pay the expressed amount."

24  Q      Thank you.

25          MR. SWEETNAM:  I move to or I offer D-47 subject

1   to the plaintiff's objections.

2        THE COURT:  It will be received conditionally.

3   Q    (By Mr. Sweetnam)  Isn't it true, Mr. Hale, as of

4   December of 2013, Duluth was willing to pay ADTRAV

5   everything it was asking for with the exception of the

6   Worldspan amounts?

7   A    According to this letter, do you want me to testify

8   to this letter?

9   Q    Well, I'm just asking you based on what you have just

10  read and what we have just discussed, doesn't it appear to

11  you that in December of 2013 Duluth was willing to pay

12  everything except the Worldspan bonus?

13  A    They were willing to pay what was in this letter, the

14  terms that were in this letter, yes.

15  Q    Which was -- I understand your claim has changed.

16  But that was your claim at that time, correct?

17  A    They were willing to pay what was in this letter,

18  yes.

19  Q    D-74.  Can you see that, Mr. Hale?  You have your

20  screen up?

21  A    I've got my screen back.

22  Q    Now, this is documentation produced by ADTRAV in this

23  litigation representing VA deposits made into ADTRAV's bank

24  accounts; is that correct?

25  A    No.  This represents deposits that contained at least

1    partial parts of the deposit-contained VA revenue that were

2    deposited into ADTRAV bank accounts.  As it states up there,

3    the total amount of the deposit may contain non-VA revenue,

4    which in most cases it did.

5    Q     If in most cases it did, why does it say total amount

6    of deposit may contain non-VA revenue?

7    A     Well, because some of the deposits like the Hampton

8    Inn, Harlingen, Texas for nine dollars and ninety cents,

9    that probably was solely VA business.  But when you get to

10   the larger amounts like Pegasus, then those are going to

11   include both VA and non-VA business.

12   Q     I want to make sure I understand your explanation.

13         Because when I look at the title "total amount of

14   deposit may contain non-VA revenue", it seems like we're not

15   sure whether or not VA revenue is included in this or not.

16         Why am I wrong in thinking that?

17   A     Well, because we are -- I don't know why you're

18   confused.  But the -- what the point of this is is y'all

19   asked for, in discovery, give us all the deposits that

20   contained at least some VA revenue in it.  So we gave you

21   the deposits that contained -- because a lot of deposits are

22   multiple checks, multiple things, and so this is the deposit

23   amount that had VA -- some type of VA revenue included in

24   it.

25   Q     Okay.  So every single one of these deposits has some

1    VA revenue in it?

2    A     Correct.

3    Q     Am I safe in assuming that the individual hotel

4    deposits that are all in small amounts -- nine ninety, three

5    hundred forty dollars, twenty dollars and seventy cents --

6    would those be with regard to a single booking?

7    A     No, not necessarily.  Like, if you look at that

8    airport, that Hilton airport, O'Hare, Chicago, Illinois,

9    that could be for three, you know, one-night stays, it

10   really varies.

11   Q     So you're talking about Hilton Airport O'Hare,

12   Chicago, that looks like it's the fourth entry down?

13   A     Right.  I just used that as an example.

14   Q     So you're saying that could comprise either one

15   traveler staying for three nights or three different

16   travelers staying for one night?

17   A     Correct.

18   Q     And there's no way from looking at this whether

19   that's all VA revenue, whether one of the travelers is

20   VA revenue, all you know is that some of it is VA revenue.

21   A     Correct.

22   Q     Go to the fifth page of that exhibit, if you would.

23   I'm just taking this page by way of example.  I went through

24   it this morning before coming over here.

25               Now, if you go through that page and count them up

1    yourself, if you want to, but I see a total of forty-two

2    deposits.

3              Do you want to take the time to run through there

4    and see if that's accurate or not?

5    A      I'll take your word for it.

6    Q      Now, only three of those deposits come from the, did

7    you call them consolidators, like Pegasus and TACS, how

8    should we refer to those people?

9    A      Consolidators is a good name for them.

10   Q      So you've got Pegasus at the top for forty-seven

11   thirty-seven eighty-one, correct?

12   A      Yes.

13   Q      And halfway down, you've got two entries from NPC,

14   one is twenty-one eighty-seven eighty, one is twelve twenty-

15   six zero six.

16   A      Correct.

17   Q      So the remaining thirty-nine on this page are all

18   individual hotels making direct pay by virtue of checks to

19   ADTRAV.

20   A      That would be my assumption.

21   Q      Okay.  I also went through the numbers and added them

22   up on a calculator.

23              On that page, there's a total of nine thousand

24   nine hundred sixty-two dollars and twenty-seven cents in

25   deposits.  Eighteen hundred ten dollars and sixty cents of

1    those deposits came directly from individual hotels.

2           Would you agree that that's approximately twenty

3    percent of the total?

4    A       Yeah.

5    Q       Eighteen ten versus --

6    A       Yeah.

7    Q       Ninety-nine sixty-two twenty-seven.

8    A       Okay.

9    Q       All right.  Now, do you recall testifying at the

10   evidentiary hearing in this matter, Mr. Hale?

11   A       What specifically?

12   Q       Back on January 12th when we were all brought here.

13   A       I remember testifying in the evidentiary hearing.  I

14   don't know what you're --

15   Q       Do you recall testifying that less than one percent

16   of the commission deposits from hotels on the VA account

17   came directly from individual hotels?

18   A       Yeah.  I was speaking over the length of the

19   contract, not any one particular month.

20   Q       Okay.  But that testimony would certainly not be in

21   keeping with what we see on this sheet, would it?

22   A       No, you're mixing apples and oranges.

23   Q       Why?

24   A       Because I testified that it was one percent, and I

25   was looking at the, like I say, I was not looking at one

1    particular month in saying that, it was over the length of

2    the contract.

3           I think we just showed that it was less than one

4    percent of the total, you know, from 2010 on.

5    Q    If somebody wanted to take the time to add up all of

6    these deposits and it turned out it was twenty percent of

7    the total, that would be in conflict with your testimony,

8    wouldn't it?

9           MR. BATES:  Judge, I want to interpose an

10   objection.  This is very misleading to the witness because

11   the lawyer himself has cleared up with this exhibit that

12   this contains VA and non-VA commissions.  Yet, he is trying

13   to get him to answer this in light of a VA percentage that

14   was testified before the Court.

15          We are indeed not being fair to the witness, we're

16   mixing apples and oranges with this examination, and most of

17   it is leading to the situation at hand.

18          THE COURT:  All right.  Well, it's

19   cross-examination.  I think Mr. Hale can understand the

20   difference between a VA deposit and a non-VA deposit or

21   mixed deposit or whatever his testimony is, we'll see about

22   that.  I'll overrule.  Go ahead.

23          MR. SWEETNAM:  I offer D-74, Your Honor.

24          THE COURT:  Any objection?

25          MR. BATES:  No objection, Your Honor.

1          THE COURT:  It will be received.

2    Q     (By Mr. Sweetnam)  Let me ask you something,

3    Mr. Hale.  You testified earlier about all the detailed

4    backup that was provided by ADTRAV to Duluth Travel over the

5    life of the contract; do you recall that?

6    A     Yes.

7    Q     Now, the reality is that all of that backup was self-

8    generated by ADTRAV, was it not?

9    A     Part of it was, yes.  I don't know -- I couldn't say

10   all of it was.  Some of it was because a lot of it was taken

11   off -- downloaded off of websites.

12   Q     For instance, with regard to perhaps TACS or ARC, you

13   weren't provided that documentation, you were taking the

14   information from that documentation, compiling it on a

15   report that was prepared by ADTRAV and submitting it to

16   Duluth; is that correct?

17   A     On part -- parts of it we were doing that.  Parts of

18   it we were getting from Duluth who was performing that same

19   thing of getting the information, downloading it and

20   providing it in a report to us to put on the monthly

21   reconciliation.  And like the ARC report, we both would

22   download that.

23   Q     But what I'm talking about, there was not what you

24   might have been downloading, but there was a stack of

25   material that your counsel provided at the evidentiary

1    hearing and represented that it was the detail that was

2    provided, I think every month, done by ADTRAV, so that's

3    what I'm talking about, stuff that you're sending to Duluth.

4    I'm saying that all of that was self-generated by ADTRAV,

5    wasn't it?

6    A      Most of it.  I can't testify to all because I don't

7    believe all of it was.

8    Q      Now, you talked about having, I believe you talked

9    about having shared a GDS bonus with Duluth, did you not?

10   A      Yes, I did.

11   Q      Now, that was a conversion bonus, was it not?

12   A      Yes, it was.

13   Q      Can you explain to the Court what the difference is

14   between a conversion bonus and a contract bonus?

15   A      Well, actually, this was -- well, the difference

16   between a conversion bonus and a contract bonus, the

17   conversion bonus is when the business is coming from another

18   GDS, from like Sabre to Worldspan.

19   Q      Okay.  Well, a conversion bonus then, am I correct in

20   believing that you have ADTRAV, a very successful government

21   contractor, you've got your own GDS contracts, somebody

22   comes to you and they bring another account to you, in this

23   case the VA, and you go to Sabre or I guess it was

24   Worldspan, and you say okay, I'm bringing this VA contract

25   to you guys pursuant to the subcontract that we have with

1  Duluth, they pay you a conversion bonus on that, right?

2  A      Correct.

3  Q      And that's the bonus that you shared with Duluth,

4  correct?

5  A      Correct, it was part of all the revenues associated

6  with the VA account.

7  Q      But it was revenue that was derived from Duluth's VA

8  contract that you shared with Duluth?

9  A      It was revenue that was derived from Duluth's VA

10 contract that we shared, yes.

11 Q      Okay.

12 A      I am trying to make sure --

13 Q      Now, what's your understanding of the Worldspan bonus

14 that you have claimed entitlement to?  Is it your

15 understanding that's a conversion bonus or a contract bonus?

16 A      That's really irrelevant in my mind.  It's revenue

17 associated with the contract.

18 Q      Well, the contract bonus is paid when you switch GDS

19 providers, isn't it?  Strike that.

20         The contract bonus is paid when you enter into a

21 new GDS contract after the initial five-year term expired.

22 A      That's one of the type of bonuses paid, yes.

23 Q      Did you earn a contract bonus at any point as opposed

24 to a conversion bonus, did you earn a contract bonus at any

25 point during your relationship with Duluth Travel?

```
 1    A       No.

 2    Q       So between 2007 and January of 2014 you never entered

 3    into a new contract with the GDS provider pursuant to which

 4    you were paid a bonus?

 5    A       No.  We entered into a new agreement but we entered

 6    into an agreement in 2010 with Sabre.

 7    Q       Okay.

 8    A       And that was what precipitated us to move the VA

 9    business over to Duluth and have them own the Worldspan

10    contract and we owned the Sabre contract, but no business on

11    the Sabre was dedicated, you know, was used by the VA on any

12    business that was paid that earned revenue.  There was

13    Southwest bookings made on Sabre but, as I testified, those

14    don't pay any revenue.

15    Q       Okay.  So if I understand what you're saying, and

16    correct me if I'm wrong, are you saying that any contract

17    bonus you received from Sabre did not include any VA

18    revenue?

19    A       Correct.

20    Q       Okay.  That's all I wanted to know.

21            Now, you spent a lot of time this morning talking

22    about transparency and how transparent you wanted to be.

23            Now, during the course of the performance of the

24    subcontract with Duluth Travel, you never actually gave

25    Duluth Travel any reports from any of your commission
```

1    collection agencies, did you?

2    A      Not to my knowledge.

3    Q      Okay.  And we looked at an exhibit earlier today, I

4    think it was 221-A and it was referred to as -- well, ARC

5    data, but that's not an actual ARC report, it was something

6    that was prepared by ADTRAV, correct?

7    A      Can you pull it up?

8    Q      I'll try.  This was something that was actually self-

9    generated by ADTRAV, correct?

10   A      It was generated, as I testified, what -- how we got

11   the information for this report was that you download the

12   information from ARC, so ADTRAV and Duluth, we would both

13   download the information from ARC.  And then in TRAMS, it

14   would make this comparison of everything that matched and

15   that was the result of that matching between what ARC

16   reported as the total versus what we had in the TRAM system.

17   Q      Okay.  But it was generated by ADTRAV, correct?

18   A      It was generated by ADTRAV based on ARC data, yes.

19   Q      Do you recognize that exhibit, Mr. Hale?

20   A      Yes, I do.

21   Q      This was your response to Duluth Travel seeking to

22   take over the accounting functions, correct?

23   A      This was my response to his letter basically shutting

24   off all services to us.

25   Q      Go down to the middle paragraph that begins "Duluth

1    asserts".

2    A      Yes.

3    Q      Go down one, two, three, four lines to the sentence

4    beginning "we have been," read that if you would.

5    A      "We have been performing under this contract for over

6    two years and this is the first indication, either verbal or

7    in writing, that ADTRAV was in breach of the agreement."

8    Q      And you're talking about the 2010 contract for 2011

9    services, correct?

10   A      No.   Yeah.   And actually, as I testified previously,

11   that that was a, you know, that was a mistake and me quoting

12   two years in here because I think you tried to tie that back

13   to the additional agreement.

14   Q      So that would have been June of 2011, if that was not

15   a typo?

16   A      Right.

17   Q      And when you proofread it on June 24th, 2013, you

18   didn't notice the typo?

19   A      Correct.

20   Q      But after the litigation started and there was

21   controversy about when the contract was suppose to go into

22   affect, now it becomes a typo?

23   A      Well, I think we've already established -- both

24   parties already established when the contract began.

25   Q      We're just going --

1    A      A typo in a letter doesn't mitigate that.

2    Q      Now, I think you have already testified to this but I

3    want to be clear.  The embedded subcontract that Concur

4    offered to Duluth for ETS2 is not in any way in violation of

5    the agreements that existed between ADTRAV and Duluth

6    Travel, is it?

7    A      Correct.

8    Q      Now, you also testified, and I don't want to beat a

9    dead horse, but you testified at length about Duluth

10   depositing money into Duluth accounts as opposed to in the

11   joint account, right?

12   A      Correct.

13   Q      Yet, we know that ADTRAV identified something like

14   two point one million dollars in deposits that went into

15   ADTRAV individual accounts, some of which may not be VA

16   deposits; isn't that true?

17   A      I don't know what you're -- what two point one

18   million --

19   Q      I'm talking about the exhibit we just went over that

20   says total amount of deposit may contain non-VA revenue.

21   A      Okay.

22   Q      Those were all deposits into ADTRAV into individual

23   bank accounts, correct?

24   A      I'm not sure if that was in the ADTRAV -- I would

25   have to look at the report to see if any of those were in

1  the joint account.  I think it says in there.

2  Q      Well, assuming that it was, and that's what it was

3  identified as, ADTRAV was depositing VA revenue into its own

4  accounts as well, wasn't it?

5  A      During the first part of the agreement, yes, there

6  was some -- there was some revenue going into ADTRAV

7  accounts.

8  Q      Let me show you Plaintiff's Exhibit 30.

9        MR. SWEETNAM:  I think this has already been

10  offered, hasn't it?

11        MR. BATES:  Yes.

12  Q      (By Mr. Sweetnam)  Read the first paragraph, if you

13  would, please, numbered one.

14  A      "I understand from Lisa that the Worldspan VA payment

15  is no longer separated and will not be deposited directly

16  into our shared VA bank account.  If this is true, this

17  causes me some concern.  I don't understand why this would

18  change just because we are now using a Duluth Worldspan

19  agreement.  Please get with Worldspan and have them break

20  out this payment as we did under our agreement."

21  Q      Do you have any idea why it was that Worldspan wasn't

22  breaking out VA revenue for Duluth Travel like they were for

23  ADTRAV?

24  A      I can make a supposition, I have no -- they never

25  provided me a reason as to why they were not breaking that

1    out and why they wouldn't deposit that in there.

2    Q      When you say they weren't breaking it out, you mean

3    Worldspan?

4    A      I'm sorry, Duluth was not -- when I broke it out, we

5    were getting all of our money deposited into an ADTRAV bank

6    account.  When we entered into this agreement, I called up

7    Worldspan and said, hey, I need you to deposit, break it

8    out, and deposit the money that is associated with these VA

9    business and deposit that into this bank account.  It took

10   one phone call and it was done the next month and everything

11   was there.

12         So that is what prompted me to say, hey, make the

13   phone call and they'll break it out.

14   Q      So if Duluth had made that phone call to Worldspan

15   and Worldspan had said, you know, you're too small a player

16   for us to do that, we're just going to send you one check,

17   they wouldn't have been able to do that, would they, Duluth?

18   A      If that's what -- if that's the answer they took from

19   Worldspan, I'd be surprised.

20         MR. SWEETNAM:  Just a minute, Your Honor.

21         THE COURT:  Sure.

22         MR. SWEETNAM:  I'm close to wrapping up.

23               (Brief pause)

24         MR. SWEETNAM:  Your Honor, I've just got one more

25   question to ask Mr. Hale.  We had anticipated that the

1   plaintiff's financial expert, Mr. Summerford, was going to

2   testify.  We have now been advised that he's not going to

3   testify.

4            So Mr. Wilson had just a couple of questions that

5   he really needs to ask Mr. Hale now because he was going to

6   cross Summerford and Summerford's not here, so if that's all

7   right with you.

8            THE COURT:  That's fine.

9   Q      (By Mr. Sweetnam)  Mr. Hale, you brought this loss of

10  future revenue claim that you heard me strenuously objecting

11  to, you know what I'm talking about?

12  A      Yes.

13  Q      Now, that number is a pure twenty-five percent

14  application against the total revenue, correct?

15  A      Yes.

16  Q      Includes no cost of doing business, no cost of

17  performing services, no expenses that you would incur in

18  performing under that contract, does it?

19  A      Correct.

20  Q      So that's not an accurate number, is it?

21  A      In my mind it is an accurate number.

22  Q      Wouldn't you have incurred costs in performing under

23  the contract in order to obtain that revenue?

24  A      Yes, I would have.

25  Q      And those costs aren't reflected in that number, are

1  they?

2  A      Yeah.  But they, again, that's a number that I feel

3  is accurate for what Duluth did to ADTRAV in this agreement.

4  Q      Okay.  But it doesn't reflect any cost of

5  performance, does it?

6  A      I don't think we -- I don't think we said it did.

7           MR. SWEETNAM:  Okay.

8  Q      (By Mr. Wilson)  I have just got a couple of follow-

9  up questions on some of the damages claims, specifically the

10  Worldspan segment fees.

11  A      Sure.

12  Q      We noted to the Court earlier that in doing the math

13  for January and February, excuse me, January and April, May

14  through June -- January '14, the numbers were close.  So the

15  only -- the only place where I think the parties have a

16  disagreement is for the Worldspan segment fees for March and

17  April.  And these have already been entered, do you want to

18  use their copy or blow up ours?  Pull up Defendant's Exhibit

19  29.

20           Mr. Hale, do you recognize Defendant's Exhibit 29?

21  A      Yes, it's a statement from Worldspan dated March

22  2013.

23  Q      Okay.  And on this first page it shows an open

24  balance of seventy-nine thousand eight hundred five dollars

25  and twenty-five cents.

1    A       Correct.

2    Q       Did you understand that amount to be an amount that

3    was owed back to Worldspan as a penalty?

4    A       No.

5    Q       Okay.  If you look at the numbers, that open balance,

6    I will represent to you is an amount that's owed.  You also

7    have to conclude the current charges that Worldspan has

8    included, so you add the seventy-nine thousand, the three

9    thousand three hundred sixty-eight forty, then there's an

10   adjustment, which I'll represent to you is the money that

11   was -- the segment fees that were brought in, which leaves

12   still an ending balance of forty-one thousand five hundred

13   thirty-four dollars and twenty-five cents; do you see that?

14   A       Yes, I do.

15   Q       Do you see at the bottom of the page it says amount

16   due, forty-one thousand five hundred thirty-four dollars and

17   twenty-five cents?

18   A       Yes, I do.

19   Q       And did you understand that that was money that

20   Duluth was having to pay back in penalties?

21   A       No, I did not.

22   Q       So, in your damages claim for March of 2013, you

23   claim nine thousand sixty-one dollars and sixty-one cents;

24   is that correct?

25   A       Yes, that's correct.

1    Q      Under the contract the parties agree to share the VA

2    revenue, right?

3    A      Correct.

4    Q      Would you not agree that if there's no revenue to

5    share that Duluth doesn't owe ADTRAV bonus money or, excuse

6    me, segment money for that month?

7    A      Well, I don't know what that forty-one thousand

8    represents or that seventy-nine thousand represents because

9    this is Duluth's overall business.  I don't know what they

10   have negotiated or are doing.

11          But if you go down further in this statement, it

12   shows that the VA accounts earned an incentive and it gives

13   you that incentive amount.

14   Q      And there's going to be some additional testimony and

15   all I'm asking you is, if that is indeed VA revenue, segment

16   revenue and Duluth did not earn or ended up having to

17   earn -- ended up having to pay back that revenue that month

18   and there wasn't any segment revenue, then it wouldn't owe

19   ADTRAV any segment revenue for that month?

20   A      I don't know what those numbers are, what they

21   represent.

22   Q      Pull up 30.  Basically the same kinds of questions.

23   If you'll look on Page 1 of Defendant's Exhibit 30, you

24   start with an opening balance of forty-one thousand five

25   hundred thirty-four dollars and twenty-five dollars which is

1    the amount that was shown due on the March statement,

2    correct?

3    A      Correct.

4    Q      And then if you add in the current charges and take

5    out the adjustments, you're left still with a balance of

6    four thousand one hundred ten dollars and twenty cents owed

7    by Duluth --

8    A      Correct.

9    Q      Do you see that at the bottom?

10   A      Yes.

11   Q      Again, I guess my question is, assuming -- I'm not

12   saying you agree with it, but I'm asking, assuming that that

13   is -- the penalty is for not earning the VA segment

14   requirements and there wasn't any money -- segment money

15   related to the VA account, Duluth wouldn't owe ADTRAV any

16   segment fees for April either, would it?

17   A      You're asking me to conjecture on assumptions and I

18   can't do that.

19   Q      Let me ask you quickly about the debit memos.

20          MR. WILSON:  Your Honor, a housekeeping matter, I

21   would like to offer Defendant's Exhibit 29, 30 and I don't

22   think we offered Exhibit 67 earlier, so those three

23   exhibits.

24          THE COURT:  All right.  Any objection?

25          MR. BATES:  No objection.

1           THE COURT:  They'll be received.

2           Mr. Hale, I am just looking at this statement of

3  April 2013, and it's addressed to Duluth Travel and it shows

4  the ending balance four thousand one hundred ten dollars and

5  twenty cents, and right below that in the text it says, the

6  balance of this statement is due within fifteen days,

7  interest may accrue on past due balances at the rate of

8  one-and-a-half percent per month.  Doesn't that on its face

9  indicate that Travelport is saying that Duluth Travel owes

10  four thousand one hundred ten dollars and twenty cents back

11  to Travelport?

12           THE WITNESS:  Yes.  I was just saying that I

13  didn't know what caused them to have that indebtedness.

14           THE COURT:  All right.

15  Q     (By Mr. Wilson)  Mr. Hale, you also testified earlier

16  that you claimed Duluth owes ADTRAV eleven hundred and some

17  change in unpaid debit memos; is that correct?

18  A     Correct.

19  Q     Just generally, do you know what would happen to

20  Duluth if it had refused to pay the debit memos?

21  A     What would happen to Duluth?

22  Q     Yes.

23  A     If it refused to pay the debit memos?

24  Q     If it hadn't paid those debit memos.

25  A     The airlines would have continued to request payment.

1   Q      Well, isn't it true that they would have restricted

2   Duluth's ability to issue tickets until the debit memos were

3   paid?

4          And I think the terminology in the industry is

5   they would have pulled Duluth's plates.

6   A      Yeah.  But I guess my question is, my understanding

7   is those debit memos were sent to us.

8   Q      Okay.  I guess -- so I understand your testimony,

9   you're saying that ADTRAV paid the debit memos but Duluth

10  didn't pay its share?

11  A      Correct.

12  Q      Did you, in looking at and going through these debit

13  memos, did you compare the debit memo number, look up the

14  traveler and then go to the page that shows the ticket to

15  see whether or not you could reconcile whether or not ADTRAV

16  had paid -- excuse me, Duluth had paid those debit memos?

17  A      To the page of what?

18  Q      Well, to the debit memo related to the ones that you

19  claim are not paid.

20  A      Yeah.  My understanding was that's a report I got

21  from the accounting department from our person who handled

22  all the debit memos and those are the ones that we put on --

23  they were paid by ADTRAV because they were from Southwest

24  and all Southwest were issued by -- an ADTRAV ARC number and

25  those were the ones that were put into the monthly

1   reconciliation and were never paid.

2   Q     Did you look at this -- excuse me, at the debit memos

3   themselves and calculate that eleven hundred dollar figure

4   yourself?  I think you just told me someone in accounting

5   had done it for you.

6   A     In this -- I'm trying to remember because this was a

7   long time ago.  I think that I originally got the documents

8   and everything from our accounting department, but in

9   looking at it to put it together to get to the attorneys, I

10  did look it over and make, you know, make sure it made sense

11  to me.

12  Q     Okay.  So did you look for ticket numbers and compare

13  those with ticket names?

14  A     I really don't recall.  It was eleven hundred

15  dollars.

16  Q     Did you look at the net remit information from

17  October of 2013 -- excuse me, the week of October 27, 2013,

18  and then the following week, November 3rd, 2013, to see if

19  the debit memos had indeed been paid by Duluth Travel?

20  A     My understanding is, again, these were on an ADTRAV

21  ARC number and so ADTRAV paid them, so that ARC report would

22  have been ADTRAV's ARC report so that would have shown that

23  ADTRAV paid for it, not Duluth, and that's why it was

24  included on the monthly reconciliation for Duluth to pay

25  because we had already paid Southwest.

1    Q    And there's going to be some testimony to show that

2    those were actually paid.  And I just wanted to know if you

3    had actually sat down and looked at the ticket number and

4    the passenger --

5    A    I'll look at it now.  But my understanding, again,

6    that they -- they were paid, but I think what's at odds here

7    is who paid them.  We're saying that they were on an ADTRAV

8    report with ARC and so ADTRAV paid them.  I guess you're

9    saying something different.

10   Q    If Duluth claims that it paid all of the debit memos

11   claimed except for fifty dollars for which it couldn't find

12   backup, you disagree with that?

13   A    Yes.

14        MR. WILSON:  Thank you, sir.

15        THE COURT:  It's almost 4:30, why don't we just go

16   ahead and recess for the evening before we begin any kind of

17   redirect.

18        So we'll be in recess until 9:00 o'clock tomorrow

19   morning.  Thank you very much.

20                   (Court in recess)

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4         I hereby certify that the foregoing is a correct

5    transcript from the record of proceedings in the above-

6    referenced matter.

7

8    _____

9    Teresa Roberson, RPR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25