# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ADTRAV CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| Vs. | ) | Case No. 2:14-cv-56-TMP |
| | ) | |
| DULUTH TRAVEL, INC., | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

## MEMORANDUM OPINION[1]

This is a breach of contract action between two travel agencies involved in providing travel-related services to the Veterans Administration.  After initially joining forces to win and execute a contract with the VA, disputes between them resulted in a breach in their contractual relationship and ultimately to this action. The court conducted a non-jury bench trial on March 20-22, 2017, allowing the parties to file post-trial briefs by May 18, 2017.  Based on the testimony, evidence, and arguments of counsel, the court reaches the following findings of fact and conclusions of law.

---

[1]  At the outset, the court owes the parties an apology for the delay in resolving this matter.

I.  Findings of Fact

1.  Plaintiff ADTRAV Corporation is a commercial travel management company located in Birmingham, Alabama, specializing in providing travel services to corporate and governmental clients.  The sole owner and CEO of ADTRAV is Roger Hale.  Since 2000, ADTRAV has operated as a national travel agency for various governmental entities, with about 40% of ADTRAV's business being government travel management.[2]

2.  Defendant Duluth Travel, Inc., is a smaller travel agency headquartered in Duluth, Georgia, near Atlanta.  Its owner and principal is Arthur Salus.  The VA regarded Duluth as being a "Service Disabled Veteran-Owned Small Business," eligible to compete for a set-aside contract for travel services for VA employees and beneficiaries.

3.  In the mid-1980s ADTRAV gained approval from the General Services Administration ("GSA") to provide travel services for government agencies.  This required setting up a dedicated telephone line which government employees could call to arrange official travel.  Under its government contracts, ADTRAV was required to make periodic reports related to the costs, fees, and charges incurred for official government travel.

---

[2]  As used in this Memorandum Opinion, travel-management services include making reservations for air and train travel, as well as hotel and rental-car reservations.  These services include issuing tickets, collecting payment, and accounting for and reconciliation of the fares, fees, and other charges associated with government travel for the appropriate government agency.

4. In 2004, Hale met Salus and Ed Arias, an employee of Duluth, at a travel trade conference and they began discussing how they could work together to obtain a travel-services contract from the VA. Duluth had the proper designation as a "Service Disabled Veteran-Owned Small Business" and ADTRAV had the experience and resources to run a government contract.

5. In December 2005, ADTRAV and Duluth entered into the first of a series of agreements[3] to jointly solicit and carry out a contract with the VA. That agreement was soon superseded by another agreement on January 12, 2006, then by an amended agreement later in January 2006, which became the operative contract between Duluth and ADTRAV for the next several years.

6. Under the 2006 agreement, the parties agreed to divide the VA work between them, "striving" to reach the goal that Duluth would perform 51% of the work and ADTRAV 49%. The parties set up a dedicated telephone line for VA clients to call for travel-related services. The telephone was programmed to divide incoming calls between the agencies on the basis of 51% of calls to Duluth and 49% of calls to ADTRAV. It was always understood, however, that "whoever did the work, got the money."

7. Ed Arias, Vice President of Operations at Duluth, was tasked with

---

[3] The court has chosen to refer to the contracts entered into between Duluth and ADTRAV as "agreements" to avoid confusion with the VA-awarded contract the two joined together to administer. The use of that term is not meant to suggest that they were anything but legal and binding contracts establishing rights and duties between Duluth and ADTRAV.

monitoring the division to work between the parties to strive to the goal of a 51% to 49% division of the work.

8. The arrangement was understood as a division of work, not necessarily income. The 2006 contract did not require a strict arithmetic division of income on a 51% to 49% basis. Rather, the agreement divided the work between the parties with a goal of achieving a 51% to %49 division of income.

9. The parties recognized that the division of income in any particular timeframe would not necessarily reach the 51% to 49% goal. Because ADTRAV was performing the "back office" accounting, it sent weekly and monthly reports to Duluth, detailing the income and expenditures related VA travel. Arias was responsible for receiving and reviewing the reports for Duluth and making any adjustments in workload between Duluth and ADTRAV to try to achieve the goal. The parties clarified this understanding in a modification to their joint operating agreement, dated October 23, 2007, which stated:

> **Distribution of Worldspan Segment Fees and Vendor Commissions and Overrides:** Worldspan segment fees will be distributed to Duluth and ADTRAV based on a monthly transaction percentage. *The monthly transaction percentage shall be equal to the total number of airline transactions handled by each partner divided by the total number of transaction processed for the month.* Both partners understand that the intent is for this distribution to be made on a 51%/49% (Duluth/ADTRAV) basis. If the actual percentage for any month varies from this amount by more than 5%, both partners agree to develop a plan to modify the business practices in order to achieve the 51%/49% distribution. [Italics added].

(Pl.'s Ex. 5, Doc. 134-6).[4] This modification made clearer that the 51% to 49% distribution was based on the division of *work*, not a strict division of the revenue.

10.   The joint operating agreement between the parties also included a license from ADTRAV for Duluth to use proprietary software and "scripts" developed by ADTRAV, including "with respect to the all Worldspan scripting ('Scripts') developed by ADTRAV, specifically the 'ticketing script', 'WOW script['] and any other scripts that ADTRAV may develop for use by Licensee on the Department of Veteran's Affairs (VA) account; and any of the 'RezSuite' software including but not limited to RezProfiler, RezTracker, RezProfiler [sic], RezCritique, RezViewer, RezOptions, RezRequest and RezReporter and is effective October 3, 2007 (the 'Effective Date')."   (Pl.'s Ex. 6, Doc. 134-6).   In return for that license, Duluth was to pay ADTRAV $0.50 for each reservation made by Duluth pursuant to the VA contract.

11.   Under the 2006 (and later) agreement, revenue for travel services to the VA came from distinct streams.   First, the VA would pay a "transaction fee" (sometimes referred to as an "air service fee") for every reservation or booking made by Duluth or ADTRAV under the VA contract.   Second, segment fees were

---

[4] This provision also appears verbatim in the 2010 Agreement reached later by the parties. *See* Plaintiff's Ex. 22, Doc. 134-10, ¶ 5.

paid by Worldspan, an airline reservation service,[5] for every "segment" of an airline flight booked by Duluth or ADTRAV through the Worldspan system. Segment fees were in the nature of a commission, collected from the airline and paid to the travel agent making the booking. These fees were collected from the airlines by Worldspan and reported and paid to Duluth or ADTRAV using an "ARC" (Airline Report of Commission) number. (*See* Tr. at 565). For purposes of the VA contract, both Duluth and ADTRAV used Duluth's ARC number to make airline reservations. Third, Worldspan paid a $230,000 "signing bonus" for entering into a five-year contract with it. Fourth, hotels paid commissions for reservations, usually equal to ten percent of the total room charge for the reservation. In most instances, commissions were collected from hotels and paid to travel agents through "consolidators" such as Pegasus, TACS, and Paymode, although some hotels paid commissions directly to travel agents by mailing them a check. Frequently such a check would represent commissions from multiple reservations with little information concerning the amount of each separate booking and commission. Finally, rental car companies also paid commissions,

---

[5]    Worldspan operated as a "Global Distribution System," or "GDS," under which it would provide a way for travel agents to search for flights, makes reservations, and buy and obtain tickets from multiple airlines on one platform. Once a ticket was purchased by an agent, it was paid for through the GDS and commissions were credited to the agent by the GDS. At the end of regular reporting periods (weekly and monthly) the GDS provided in electronic format a report of all the reservations, tickets, payments, commissions, and refunds, performed during the reporting period, broken down by the "ARC" number under which the reservations were made. In this case, that electronic report was input directly into ADTRAV's TRAMS travel accounting system.

but this was a relatively small part of the VA-contract business.

12.  To administer the revenue from the VA contract, Duluth and ADTRAV opened a joint banking account in 2007, into which all VA-related revenue was to be deposited.  That account was replaced by another joint bank account in February 2011.

13.  The majority of income flowing into the joint bank account came from the transaction fees paid by the VA for each travel-related transaction (airline booking, hotel reservation, etc.) performed by Duluth or ADTRAV under the contract.  Approximately seventy-five percent of the revenue attributable the VA travel business came from these transaction fees paid by the VA.[6]

14.  Worldspan provided a "double MIR" reporting system that electronically populated ADTRAV's TRAMS accounting system with ARC data related to airline bookings, passenger information, fees, and charges.  Because this was a "double MIR," Duluth also received an electronic copy of the Worldspan reports directly from Worldspan.  Arias used these reports to check the accuracy of the net weekly and net monthly reports submitted to Duluth by ADTRAV.

15.  From 2007 to 2009, Duluth made no complaints to ADTRAV about the accuracy or completeness of the financial reports it submitted.

---

[6]   When an agent employed by Duluth or ADTRAV made travel arrangements for someone under the VA contract, the cost of the travel arrangement (airline ticket, hotel room charge), plus the transaction fee, was charged to a VA credit card number.

16. In 2009, a controversy developed between Duluth and ADTRAV over bidding on a travel contract for the Commonwealth of Pennsylvania. Duluth first identified the business opportunity and brought it to ADTRAV's attention. Initially ADTRAV believed that it could partner with Duluth to bid on the Pennsylvania "small business" contract, but soon discovered that the "small business" had to be a Pennsylvania business. ADTRAV then pursued the Pennsylvania contract without Duluth, which Duluth believed was unethical since it was Duluth who brought the potential business to ADTRAV in the beginning.

17. To settle the dispute, the parties renegotiated the VA joint operating agreement to increase Duluth's share of the work (and corresponding income) to 60% in return for elimination of the provision in the 2006 agreement requiring the parties to share future business opportunities unrelated to the VA contract.

18. By 2010, the parties became aware that the VA planned to rebid its travel-management contract. In anticipation of participating in the rebidding, the parties entered into a new joint operating agreement, dated December 16, 2010,[7] (referred to hereafter as the "2010 Agreement"). Parts of the agreement became effective immediately, while other parts became effective only if and when the

---

[7] In its previous Order granting in part and denying in part summary judgment (Doc. 92), the court determined as a matter of contract construction that some provisions of the December 16, 2010, contract were intended to take effect immediately, while others were contingent upon Duluth and ADTRAV winning the VA rebid contract.

parties successfully won the VA travel-contract rebid.[8]  The division of work (and corresponding revenue) was changed to 75% for Duluth and 25% for ADTRAV, effective upon successfully obtaining the VA travel contract anticipated to be let in October 2011.

19.  Beginning in 2010, pursuant to the 2010 Agreement, all Worldspan revenue was shifted to the Duluth ARC number and reported to Duluth.[9]  Duluth caused the revenue to be deposited into its exclusive bank account, rather than the joint account set up by the parties.  ADTRAV protested the fact that the ARC revenue was not going into the joint bank account, but Duluth continued to have the deposit made to its account.

20.  In March 2011, Duluth also deposited all of a $230,000.00 incentive bonus paid by Worldspan, although this was unknown to ADTRAV at the time and was discovered only later.  When discovered later, Duluth and ADTRAV reached

---

[8]  This reading of the contract is confirmed by an email from Arias to Hale, stating:

> To expand on the first point, there are several commencement dates. The obligations of the agreement stipulations are effective between ADTRAV and Duluth at time of signing.  The effective date for the work itself as it concerns the VA contract is on commencement of the new contract or extension by VA.  The effective date for transfer of the PCC is as soon as possible.  I will send a modified copy of the contract for your final analysis.

Plaintiff's Ex. 19 (Doc. 134-9).

[9]  ADTRAV explained that in 2010, it shifted its primary GDS ("Global Distribution System") from Worldspan to Sabre for non-VA related business.  This meant that VA-related travel had to be booked under Duluth's ARC number in Worldspan by both Duluth and ADTRAV.  GDS is a reference to computer systems operated by Worldspan, Sabre, and other companies, through which travel agents book and manage airline reservations and the issuance of air tickets.

agreement on June 19, 2012, that Duluth would pay ADTRAV its share of the incentive bonus in three installments, of which $34,500 was due in April 2013. (Plaintiff's Ex. 53, Doc. 134-15). The April 2013 installment was never paid.

21. It was not until August 8, 2011, that the VA issued its solicitation for bids on the new travel-services contract, to be effective October 1, 2011. However, the VA awarded the new contract to Alamo, not Duluth. Duluth and ADTRAV jointly protested the award, and the VA awarded Duluth a "bridge" contract while the protest was underway. Ultimately, the VA upheld the protest and awarded the new travel contract to Duluth, effective April 1, 2012. (Plaintiff's Ex. 44, Doc. 134-14).

22. By 2012, however, Arthur Salus had determined that he no longer wanted Duluth to partner with ADTRAV for VA business and he was seeking a way to end the relationship. On December 31, 2012, Duluth refused to extend Arias's employment contract and he ceased working for Duluth.

23. Beginning in January 2013, Duluth stopped paying ADTRAV its share of Worldspan segment fees, hotel and car rental commissions, and Duluth's share of airline "debit memos."[10] Duluth also stopped paying technology fees for the use of ADTRAV's "scripts," although it continued to use the "WOW" script for some

---

[10] An airline "debit memo" was a chargeback of segment fees, payable to an airline when a passenger's airline booking is canceled. Just as Duluth and ADTRAV divided the segment fees generated by an airline booking 75% to 25%, the chargeback was to be repaid to the airline in the same manner.

time.  Duluth stopped paying accounting fees to ADTRAV.

24.  Unknown to ADTRAV and in apparent anticipation of the bidding of a new VA travel contract in the fall of 2013, Duluth entered into an agreement on May 1, 2013, for another company, Travel Incorporated, to provide the "back office" accounting ADTRAV had been providing under the 2010 Agreement.

25.  On June 11, 2013, Duluth received notice of a new VA solicitation for bids for travel services.  Three days later, on Friday, June 14, 2013, Duluth notified ADTRAV by email letter that it would no longer need ADTRAV to perform "back office" accounting and reporting for the VA contract.  (Plaintiff's Ex. 62, Doc. 134-21).  Duluth shut off ADTRAV's access to the Duluth ARC number and Worldspan, depriving ADTRAV of the ability to make VA-related airline reservations.  Importantly, although the June 14 letter states that Duluth was undertaking the action because ADTRAV "failed to honor the terms of the Agreement" and "committed acts that would amount to material breach," Duluth explicitly stated that it "is not our intent… even to terminate the Agreement." (Plaintiff's Ex. 62, Doc. 134-21).  Rather, Duluth asserted that the 2010 Agreement would expire at the end of September 2013, upon the expiration of the then-ongoing VA travel contract.

26.  ADTRAV responded to the email notice, demanding that Duluth "reinstate our full access to the VA portions of both the Worldspan and TRAMS

systems by Monday to correct this egregious breach of our operating agreement."
(Plaintiff's Ex. 63, Doc. 134-22). Access was restored by Duluth on Monday,
June 17, 2013.

27. On June 24, 2013, ADTRAV mailed a letter to Duluth, responding to
the assertions made in the June 14 letter. ADTRAV's letter outline eight ways in
which it believed Duluth was in violation of the 2010 Agreement and the
corrections needed to remedy the violations. The letter also demanded four
payments ADTRAV claimed were due under the 2010 Agreement:

> 1. ADTRAV's portion of the January 2013 to May 2013 VA revenue
> in the amount of $40,018.29 as shown on [an] attached reconciliation.
>
> 2. ADTRAV's final payment of the Worldspan "signing bonus" in
> the amount of $34,500 that was due in April 2013.
>
> 3. ADTRAV's portion of the Worldspan revenue in the amount of
> $30,378.84 that was withheld during Duluth's negotiation with
> Worldspan (Travelport) for the waiver of the shortfall penalty[.]
>
> 4. ADTRAV to distribute $6,560.72 to ADTRAV and $13,416.15 to
> Duluth representing the hotel and car commission collected during the
> January to May, 2013 period. This money [was then] in the joint bank
> account.

(Plaintiff's Ex. 64, Doc. 134-23). Duluth made none of the payments demanded.

28. Also unknown to ADTRAV, Duluth bid on the new VA contract
without the participation of ADTRAV, and was awarded a new VA accommodated
contract on October 1, 2013, lasting for one year to October 1, 2014.

29.   In November and December 2013, the parties met several times to negotiate a resolution of their disputes.   It appears, however, that ADTRAV continued to actively partner with Duluth to provide travel-related services to the VA during this period.   *See* Plaintiff's Exs. 331-335, Docs. 134-254 through 134-258.   Using the "Partner Splits" documents from October 2012 to September 2013 (Plaintiff's Exs. 319-330. Docs. 134-242 through 134-253) as a measure of VA-business activity during those months, Duluth had average monthly net revenue of approximately $9,644, compared to ADTRAV's average net revenue of $6,362.[11] Together, Duluth and ADTRAV issued a monthly average of 9,387 tickets for all airlines through Worldspan and Sabre.   By comparison, in the months of October 2013 through January 2014 (*see* Plaintiff's Exs. 331-334, Docs. 134-254 through 134-257), Duluth's monthly average revenue was approximately $5,252 and ADTRAV's was $2,624.   In October 2013 through December 2013, they issued an average of 5,781 tickets in each month through Worldspan and Sabre.[12]

30.   Ultimately, on January 10, 2014, ADTRAV mailed the following letter to Duluth:

---

[11]   It must be remembered that ADTRAV's net monthly revenue also included the technology and accounting fees paid to it by Duluth, which increased ADTRAV's net revenue relative to Duluth's.

[12]   The court has not included the Partner Split report for the month of January 2014 for purposes of gauging the number of airline tickets issued under the VA contract because that is the month in which ADTRAV sent its notice of cessation of services and the report indicate that only two airline tickets were issued by the parties in that month.   The court is not confident that the airline ticket numbers for that month are reliable.

This letter is to notify Duluth Travel, Inc. ("Duluth") that because of Duluth's nonpayment of amounts owed to ADTRAV, Inc. ("ADTRAV"), ADTRAV will cease providing services to Duluth on January 17, 2014. Duluth should make appropriate arrangements prior to that date.

Duluth owes ADTRAV over $200,000.00, some of it for services rendered over a year ago. ADTRAV has been extremely patient with Duluth and has been trying since June to get paid for services rendered. It is undisputed that Duluth owes ADTRAV $86,751.32 through November 2013 for work performed on the VA account. In spite of the fact that this undisputed amount is owed, Duluth has refused to pay it to ADTRAV. In addition, Duluth owes ADTRAV $143,646.13 as ADTRAV's portion of World Span revenue earned and payable under the contracts.

On November 21, 2013, ADTRAV advised Duluth that ADTRAV would cease providing services if ADTRAV did not receive payment. In spite of not being paid, ADTRAV continued to work in hopes that Duluth would do the right thing and pay ADTRAV the amounts due. On December 13, 2013, ADTRAV again advised Duluth that it would cease providing services if it was not paid for the services previously rendered. Notwithstanding ADTRAV's reasonable request that it be paid for services rendered, Duluth has refused to do so. Duluth continues to withhold payment and try and use these withheld funds to force ADTRAV to make concessions to Duluth. ADTRAV is not willing to modify its agreement or release amounts owed to it in order to obtain money clearly due it. Furthermore, ADTRAV is not willing to continue working without compensation. Accordingly, ADTRAV will cease to provide services to Duluth on January 17, 2014, and, effective on that date, Duluth will no longer be authorized to utilize any of ADTRAV's technology or software. Upon receipt of payment in full along with appropriate assurances of timely future payments, ADTRAV will discuss resuming services.

This termination of services will not apply to Duluth's access to and use of the VA pseudo city numbers with SABRE that are currently assigned to ADTRAV. Likewise, ADTRAV expects Duluth to continue providing the same access to the Worldspan pseudo city

numbers currently assigned to Duluth for the provision of services used by ADTRAV.

In light of Duluth's conduct, ADTRAV is not interested in pursuing with Duluth the contract for VA embedded travel services. Since the embedded travel services are not included in the contract, each party is free to pursue those services separately or in conjunction with another party.

We regret that Duluth chose to continue to refuse to pay ADTRAV for services rendered. In light of Duluth's unjustified refusal to make payment and after months of trying to obtain payment, ADTRAV has no choice but to immediately commence litigation to recover these past due amounts, as well as its damages from Duluth's breach of the contract.

(Plaintiff's Ex. 73, Doc. 134-25). ADTRAV filed the instant complaint that day, January 10, 2014.

31. Despite this letter, ADTRAV stated in an email exchange on January 16, that it would continue to make two agents available to take VA-travel calls, but Duluth declined to utilize ADTRAV's agents, believing that ADTRAV was "trying to back up on [its] notice that they were cutting all services." (Plaintiff's Ex. 125, Doc. 134-29).

32. Despite the January 10 letter, Duluth continued to use ADTRAV's "WOW" script without paying a technology fee of $0.50 per transaction. On January 30, 2014, ADTRAV's attorneys emailed and mailed a letter to Duluth's counsel, saying:

ADTRAV Travel Management, Inc. ("ADTRAV") has reason to believe that Duluth Travel Inc. ("Duluth") is currently using technology and software owned by ADTRAV without ADTRAV's permission and without compensating ADTRAV for its use. In fact, it appears that Duluth actively reinstalled an earlier version of the software without authorization, in order to enable Duluth to obtain unauthorized access to ADTRAV's software and technology in conscious violation of the proprietary rights of ADTRAV. As previously stated, Duluth is not authorized to use ADTRAV's technology and software and must immediately cease using it and remove all such technology and software from its computers and systems. Please confirm in writing when this has been done.

If Duluth does not immediately cease using ADTRAV's software and technology in violation of ADTRAV's proprietary rights, then ADTRAV will seek assistance from the Court to address this willful conversion of ADTRAV's proprietary rights.

(Plaintiff's Ex. 74, Doc. 134-26). Plaintiff's Ex. 414 (Docs. 134-334 through 352) shows the use of the "WOW" script from at least January 1 through May 31, 2014. After May 31, Duluth cut off ADTRAV's access to Duluth's Worldspan reports.

33. Duluth received total revenue of $1,743,656.84 under its VA accommodated contract from October 1, 2013, to September 30, 2014, when it expired.

## II. Conclusions of Law

This is a breach of contract action in which both parties allege that the other substantially breached the material terms of their 2010 Agreement for managing travel-related services for the Veterans' Administration. Plaintiff ADTRAV initiated the action by filing the complaint in 2014, to which Duluth answered and

counterclaimed.

### A. Choice of Laws

The first question the court must confront—one that neither party briefed—is whether to apply the substantive contract law of the State of Alabama or the State of Georgia to the issues raised in this matter. The 2010 Agreement itself is ambiguous, containing the following provision:

> This Agreement and all obligations of the parties hereunder shall be interpreted, construed, and enforced in accordance with the laws of the State of Georgia and Alabama; provided, however, that if Georgia's conflict or choice of law rules, statutes or constitutional provisions would choose the law of another state, each party waives such rules, statutes or constitutional provisions and agrees that Georgia substantive, procedural and constitutional law shall nonetheless govern.

(Plaintiff's Ex. 22, Doc. 134-10, ¶ 25). While the first clause of the provision seems to indicate that the contract be construed *simultaneously* under both Alabama and Georgia law, the latter clause seems to point to application of Georgia law, even if Georgia's own choice of law rules dictate the use of the law of another state.

In its earlier Memorandum Opinion granting partial summary judgment (Docs. 92), the court clearly relied on Alabama law to interpret and apply the provisions of the 2010 Agreement, and neither party has raised any issue with the court having done so. Indeed, to the extent any state-law authority is cited in either

party's post-trial briefs, it is almost exclusively Alabama law.[13]  *See, e.g.*, Duluth's Post-Trial Brief, Doc. 146, at pp. 11, 18, 24; ADTRAV's Post-Trial Brief, Doc. 145, at pp. 8, 20, 21, 22.  The parties seem to agree that Alabama law should control, as no one has argued otherwise, even after the court expressly used Alabama law to resolve summary judgment motions.  By and large, moreover, there appears to be little material difference between Alabama law and Georgia law on the substantive contractual issues discussed here.  For these reasons, the court will rely on Alabama law, noting any significant differences that may exist in Georgia law.

### B.  Breach of Contract

The parties do not dispute the existence of a contractual agreement between them or that it was based on sufficient consideration.  The question presented here is whether either party breached the 2010 Agreement by failing to substantially perform under it.

The elements of a breach-of-contract claim are "(1) a valid contract binding on the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.  *ECR Properties, LLC v. Camden County Dev., LLC*, 998 F. Supp. 2d 1295, 1303 (M.D. Ala. 2014) (citing *Barrett v.*

---

[13]  There is one small, but important exception, found in Duluth's post-trial brief, at page 25, where Georgia law relating to the availability of pre-judgment interest is cited.  *See* Duluth's Post-Trial Brief, Doc. 146, at 25.

*Radjabi–Mougadam*, 39 So.3d 95, 98 (Ala.2009)).  Both parties allege, either in the complaint or the defendant's counterclaim, that the other failed to perform the substantial obligations of the Agreement.

To state and prove a claim for breach of contract, Alabama law requires a plaintiff to prove its own substantial performance[14] of its obligations under the contract.  For example:

> In order to prevail on a breach-of-contract claim, a plaintiff must prove, among other things, "[its] own performance under the contract." *State Farm Fire & Cas. Co. v. Williams*, 926 So.2d 1008, 1013 (Ala. 2005).  In order to satisfy that element, the plaintiff must prove that it substantially performed its obligations under the contract. *See Mac Pon Co. v. Vinsant Painting & Decorating Co.*, 423 So.2d 216, 218 (Ala.1982).  "Substantial performance of a contract does not contemplate exact performance of every detail but performance of all important parts." *Id*.  "Whether a party has substantially performed a promise under a contract is a question of fact to be determined from the circumstances of each case." *Cobbs v. Fred Burgos Constr. Co.*, 477 So.2d 335, 338 (Ala.1985).

---

[14]    The court is aware of authority in the Eleventh Circuit stating the observation that the Alabama Supreme Court has applied the "substantial performance" doctrine almost entirely in connection with construction contracts. *See Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1367 (11th Cir. 1983) ("Alabama has applied the substantial performance doctrine in only one situation outside the field of construction contracts and then on facts that it found were analogous to a building contract situation") (citing *Bruner v. Hines*, 295 Ala. 111, 324 So. 2d 265 (Ala.1975)).  Nonetheless, the court believes it is properly applicable to the contract in this case, given the nature of the services performed.  Certainly for "non-performance" to amount to a breach of contract, the non-performance must be more than trivial, it must be material in the sense that it undermines the "'fundamental purposes of the contract and defeats the object of the parties in making the contract.'" *Bentley Systems, Inc. v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (quoting *Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1248 (Ala.1988)).  In the context of this contract, a minor miscalculation or error in accounting for tens of thousands of transactions and millions of dollars cannot be said to be a "non-performance" so serious as to deprive the contracting parties of the "fundamental purposes" of the contract or to defeat "the object of the parties in making the contract."

*Superior Wall & Paver, LLC v. Gacek*, 73 So. 3d 714, 721 (Ala. Civ. App. 2011);

*see also Sweetwater Investors, LLC v. Sweetwater Apartments Loan LLC*, 810 F.

Supp. 2d 1288, 1295 (M.D. Ala. 2011). "If a plaintiff substantially performs,

'immaterial deviations will not prevent recovery of the contract price, less the

amount required to indemnify for injuries sustained by such deviations.'" *ECR*

*Properties, LLC v. Camden County Dev., LLC*, 998 F. Supp. 2d 1295, 1304 (M.D.

Ala. 2014) (quoting *Huffman–East Dev. Corp. v. Summers Elec. Supply Co.*, 288

Ala. 579, 263 So.2d 677, 680 (1972)).[15] Furthermore, "[a] material breach of a

contract 'is one that touches the fundamental purposes of the contract and defeats

the object of the parties in making the contract.'" *Bentley Systems, Inc. v.*

*Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (quoting *Sokol v. Bruno's, Inc.*,

527 So.2d 1245, 1248 (Ala.1988)). "'Substantial performance is the antithesis of

material breach. If a breach is material, it follows that substantial performance has

not been rendered.'" *Harrison v. Family Home Builders, LLC*, 84 So. 3d 879, 889

(Ala. Civ. App. 2011) (quoting John D. Calamari & Joseph M. Perillo, THE LAW

OF CONTRACTS § 11.18(b) (4th ed. 1998)). ""'Breach' consists of the failure

without legal excuse to perform any promise forming the whole or part of the

---

[15] Georgia law is materially the same. *See Jenkins v. BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1379 (M.D. Ga. 2011) (explaining that under Georgia law, "The breach must be more than de minimus [sic] and substantial compliance with the terms of the contract is all that the law requires." *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008)).

contract.'" *Hanuman, LLC v. Summit Hotel OP, LP*, No. 2:13-CV-02234-HNJ, 2017 WL 4508158, at *4 (N.D. Ala. Oct. 2, 2017) (quoting *McGinney v. Jackson*, 575 So. 2d 1070, 1071 (Ala. 1991)).

Likewise, the plaintiff must prove that the defendant's non-performance is material, not merely trivial or insignificant. The non-performance must be "one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.'" *Bentley Systems, Inc. v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (quoting *Sokol v. Bruno's, Inc.*, 527 So.2d 1245, 1248 (Ala.1988)); *see also Hanuman, LLC v. Summit Hotel OP, LP,* No. 2:13-CV-02234-HNJ, 2017 WL 4508158, at *4 note 5 (N.D. Ala. Oct. 2, 2017); *Nationwide Mut. Ins. Co. v. Clay,* 525 So.2d 1339, 1343 (Ala. 1987) ("Under general principles of contract law, a *substantial* breach by one party excuses further performance by the other.") (emphasis added); *Birmingham News Co. v. Fitzgerald,* 133 So. 31, 32 (Ala. 1931) ("Every breach of a contract is, of course, inconsistent with the contract; but every breach by one party does not authorize the other to renounce it in toto") (citation omitted).

Before a party to a contract may terminate the contract based on the alleged failure of the other party to substantially perform, the first party must be able to show that second party's failure of performance was so serious that it constitutes a defense to any action by the second party due to the termination of the contract by

the first party.  As the Alabama Court of Civil Appeals has explained:

> "'[N]ot every partial failure to comply with the terms of a contract by one party... will entitle the other party to abandon the contract at once.'"  *Birmingham News Co. v. Fitzgerald*, 222 Ala. 386, 388, 133 So. 31, 32 (1931) (quoting 6 R.C.L. p. 926).  In the case now before us, in order for the [plaintiffs] to establish that they had the right to unilaterally terminate the contract…, they bore the burden of proving that [defendant] had committed a breach of the contract that was "'of so material and substantial a nature as would constitute a defense to an action brought by [defendant] for [plaintiffs'] refusal to proceed with the contract.'"  *Id.* (quoting 3 WILLISTON ON CONTRACTS § 1467).  "Whether or not a given breach is so material or essential may be frequently a question of fact to be determined by the jury, yet if in a particular case the question is so clear as to be decided only in one way, it is a question of law for the court."  *Id.*

*Harrison v. Family Home Builders, LLC*, 84 So. 3d 879, 889 (Ala. Civ. App. 2011).  Even so, a contracting party faced with such a material and substantial breach by the other party to the contract is not *required* to terminate the contract immediately for non-performance.  Such a party may either terminate the contract and excuse his own further performance, or continue the contract and seek damages for the non-performance of the other party.  The Alabama Supreme Court has explained this rule within the provisions of the Restatement (Second) of Contracts, saying:

> The *Restatement (Second) of Contracts* discusses two separate questions that arise if one party breaches its obligations under a contract in which the parties have promised to exchange performances.  The first is whether the injured party is excused from

performing his duties following the breach. If the defaulting party materially breaches its duties, the injured party may repudiate the agreement and not perform prospectively. *See Restatement (Second) of Contracts*, Ch. 10, intro. n. (1981) (the injured party is justified in not performing his own obligations if the other party materially fails to perform); *Smith v. Clark*, 341 So. 2d 720, 721 (Ala. 1977).… In lieu of repudiation following a material breach by the other party, the injured party may elect to continue the contract and retain its economic benefits. *See Restatement* § 246, cmt. c, illus. 3.

The second question is whether the injured party may claim damages for the breach. Contrary to the trial court's ruling, the injured party is not required to repudiate the contract in order to preserve its right to sue the other for breach of the contract. *See Restatement*, Ch. 10, intro. n. (parties ordinarily desire and bargain for performance by the defaulting party rather than a lawsuit). After a breach the injured party may elect to continue the agreement and claim damages from the defaulting party for his nonperformance. *See Restatement* § 246, cmt. b (injured party's acceptance of defective performance from the defaulting party does not preclude recovery of damages for the breach). When the parties have exchanged promises of performances, however, the injured party is not excused from performing his remaining duties if he continues the agreement with knowledge of the default by the breaching party. "'A plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions.'" *Southern Energy Homes, Inc. v. Gregor*, 777 So. 2d 79, 82 (Ala.2000)(quoting *Southern Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1134 (Ala.2000)). As stated in § 246 of the *Restatement*, "an obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge or reason to know of the [obligee's failure to perform], operates as a promise to perform in spite of that non-occurrence...."

*Edwards v. Allied Home Mortgage Capital Corp.*, 962 So. 2d 194, 207–08 (Ala. 2007); *see also Hanuman, LLC v. Summit Hotel OP, LP*, No. 2:13-CV-02234-HNJ, 2017 WL 4508158, at *4 (N.D. Ala. Oct. 2, 2017).

The parties agree that a binding contract existed between them, embodied in the 2010 Agreement. With these above-stated principles in mind, the court will examine each other element of the plaintiff's breach-of contract claim: whether ADTRAV performed its obligations under the 2010 Agreement, whether Duluth failed to perform substantially its obligations, and, if so, whether ADTRAV suffered damages as a result of Duluth's non-performance.

## 1. ADTRAV's Performance

This issue arises both as part of ADTRAV's *prima facie* showing of a breach of contract by Duluth, but also as Duluth's defense and counterclaim to ADTRAV's action. Duluth alleges that ADTRAV was the party who first breached the 2010 Agreement by failing to properly report and account for revenue received under the VA-travel contract, thus depriving Duluth of income to which it was entitled under the Agreement. Duluth points to two particular reporting issues. First, it contends that ADTRAV failed to report to Duluth and account for all of the hotel commissions it received from December 2010 to January 2014. Duluth argues that ADTRAV failed to report or misclassified hotel/car commissions it was paid in the amount of $64,256.44, depriving Duluth of its contractual portion of this revenue. Second, Duluth contends that ADTRAV improperly apportioned revenue from segment fees, commissions, and overrides in a manner and in amounts inconsistent with the 2010 Agreement, depriving Duluth of $88,295.89 in

revenue over this period of time. ADTRAV denies that these accounting problems occurred, or, alternatively, they were not material breaches of the Agreement.

To prove the former allegation, Duluth offers an analysis performed by Howard Zandman, a forensic accountant, in which he compared ADTRAV's reports of commission payments to records from a commission consolidator, Pegasus, to show that certain hotel commissions paid to ADTRAV by Pegasus were not reported to Duluth by ADTRAV. (Defendant's Ex. 137, Doc. 135-32). Mr. Zandman purports to have found $64,256.44 in commission payments from Pegasus to ADTRAV that were either not reported to Duluth by ADTRAV or were misclassified.

As the court understands Mr. Zandman's testimony about this analysis, he used a computer database search to compare confirmation numbers for hotel reservations in ADTRAV's TRAMS database to confirmation numbers found in three spreadsheets produced by Pegasus, the consolidator through whom the hotels paid the commissions to the travel agents who booked the reservations. Through this analysis, Mr. Zandman claims to have found many commissions reported by Pegasus that could not be identified in ADTRAV's TRAMS data. As Mr. Zandman noted, the Pegasus data should have been input directly into ADTRAV's TRAMS accounting system and, therefore, all of the Pegasus data should be found there, but was not. *See* Tr. at 550-552. The conclusion Duluth wants the court to

reach is that, because Mr. Zandman could not find some commission payments reported by Pegasus in ADTRAV's TRAMS database, ADTRAV failed to report those "unmatched" or "misclassified" commissions, depriving Duluth of its share of the revenue. Mr. Zandman's analysis, however, is too slender a reed to support that conclusion.

The comparison only of confirmation numbers from Pegasus's spreadsheets to the TRAMS database does not take into account the reconciliation efforts ADTRAV made in its weekly and monthly net remit reports to Duluth. ADTRAV's accounting reconciliation resulted in weekly and monthly reports to Duluth concerning the amount of hotel-commission revenue received and the appropriate allocation based on whose agents made the reservation. In addition to its TRAMS data, ADTRAV undertook a manual reconciliation of commission revenue on a weekly and monthly basis, often using not only confirmation numbers, but also names, dates, or other transaction identifiers to match hotel commission payments with records of reservations. If the confirmation numbers on the Pegasus reports were not the same as the confirmation numbers in ADTRAV's TRAMS database, or confirmation numbers were missing or corrupted, ADTRAV attempted to account for the commissions manually before producing the weekly or monthly net remit reports. These commissions show up in ADTRAV's weekly and monthly net remit reports as a "Research/None"

category, where reservations for which no confirmation number was reported were identified on the basis of the traveler's name, or the dates of travel, or the name of the hotel.

Mr. Zandman testified that commissions totaling $64,256.44 listed in the Pegasus reports could not be matched to any ADTRAV TRAMS data, but he did not attempt to make the same manual reconciliation by searching for reservations by name, date, or vendor. In short, the fact that the TRAMS database does not align with the Pegasus data does not establish that ADTRAV failed to locate and report each hotel-commission payment. The proper analysis would be a comparison of the Pegasus data to the manual net weekly and monthly remit reports, and Mr. Zandman admits he did not do this. Why some commissions reported by Pegasus cannot be found by confirmation number in TRAMS is unknown, but the inference that ADTRAV selectively modified or deleted data in the TRAMS database is unconvincing.

There are several other reasons why the court finds Duluth's assertion about ADTRAV underreporting hotel commissions unpersuasive. In addition to the unreliability of Duluth's analysis, the inference that ADTRAV would underreport hotel commissions is contrary ADTRAV's own financial interest. Duluth admits that it received contemporary commission-payment reports from Pegasus, thus enabling it to cross-check the net weekly and monthly reports from ADTRAV.

Indeed, the evidence seems to be that Duluth received these monthly commission reports from Pegasus and then forwarded them to ADTRAV to perform the accounting reconciliation. Any effort by ADTRAV to delete or alter data received from Pegasus as it prepared its weekly and monthly net remit reports was easily discoverable by Duluth. Even more important, from at least 2010 forward, the overwhelming bulk of hotel-commission revenue was deposited directly into Duluth's bank account, not the joint account.[16] It would make no sense for ADTRAV to *under*report hotel commissions when the actual commission money was in Duluth's possession. Doing so would only result in ADTRAV shorting itself its share of the revenue.[17] Any unreported commission income would continue to reside in Duluth's bank account.

The court finds Duluth's evidence on this purported underreporting of hotel-

---

[16]    ADTRAV admits that it received some hotel commissions that were paid, usually by paper check, directly from hotels at which reservations were booked, but this was a very small portion of the overall hotel-commission revenue. Most commissions for hotel reservations were paid by electronic transfer from a consolidator, like Pegasus or TACS. These electronic payments were paid into Duluth's bank account, to which ADTRAV had no access. Once ADTRAV performed its weekly and monthly reconciliation, Duluth would pay ADTRAV's share to it until those payments stopped in January 2013.

[17]    Consider a simple scenario. Assume that Pegasus electronically transfers $100 in hotel commissions to Duluth's bank account in a given month, but ADTRAV underreports that only $80 in hotel commissions was received. When the parties then divide the revenue 75% to Duluth and 25% to ADTRAV, ADTRAV would receive only $20, rather than the $25 it would have received from the full $100 of commissions. The $5 difference would remain in Duluth's bank account, not ADTRAV's. (Of course, as discussed below, revenue was not divided on the basis of strict mathematical percentages, but on the basis of whose agents performed the actual work, with a "goal" of dividing the work on the basis of the percentages.) As a result, ADTRAV would *lose* money by underreporting commissions.

commission revenue unpersuasive. ADTRAV produced weekly and monthly net remit reports that were checked and approved by representatives of Duluth until Duluth stopped paying ADTRAV's share in January 2013. ADTRAV substantially performed this aspect of the 2010 Agreement, and Duluth is not entitled to any relief on its counterclaim for this alleged but unproven underreporting.

The second way Duluth contends ADTRAV breached the contract was by failing to divide segment fees, air commissions, and overrides in the percentages required by the 2010 Agreement, from April 1 2012, to December 31, 2013. Duluth asserts that ADTRAV divided such revenue in percentages other than the 75% to 25% division required. In support of this contention, Duluth offers another analysis by Mr. Zandman, reflected in Defendant's Ex. 142, in which he asserts that segment fees, commissions, and overrides were required to be divided on the same monthly percentage as the VA transaction fees, calculated under Paragraph 5 of the Agreement. He testified that from April 2012 to December 2013, the VA transaction fees were divided almost precisely 75% for Duluth and 25% for ADTRAV, and therefore, the segment fees, commissions, and overrides also should have been divided in those percentages.

Insofar as Duluth concludes from this that the "striving" and goal-oriented nature of the contract is irrelevant, it misconstrues the obligations of the 2010

Agreement.  The Agreement expressly did not require a strict mathematical 75% to 25% division of revenue; rather, the Agreement only created a "goal" by which the parties were to divide the *work* required under the VA-travel contract, with Duluth performing 75% of the work and ADTRAV performing 25%.   The parties recognized that this division of "work," as opposed to a division of "revenue," would result in variations from month-to-month.

Three paragraphs of the 2010 Agreement are relevant to this contention by Duluth:

**3.**

**Distribution of Reservation Services**
Under this agreement, both companies will strive *to distribute the work (reservations) and total income* by company to be made for the VA in a proportion so that Duluth Travel maintains 75% (seventy five percent) of the revenue and ADTRAV maintains 25% (twenty five percent) of the revenue.  To simplify *the work distribution and obtain the mentioned percentage*, Duluth Travel will handle all the Beneficiary Travel, VIP travel and the proportion of employee travel necessary *to complete the agreed upon percentage of business distribution*. Other type of VA travel work distribution can be considered that will also suffice the revenue distribution percentage.

**4**.

Based upon the terms set forth in Paragraph 3 above, both agencies will retain the amount of the reservation service fee generated by that agency's employee(s).  For full service reservations, agents of both companies are authorized to work on any record to improve customer service and attention but are not allowed to make any changes to a record that may modify the originating full service agent's information.  Any disputes on the authentication of the originating agent will be determined through written agreement between the

supervising managers designated for both companies.

New Online reservations will be tagged to a corresponding agency, Duluth or ADTRAV, in accordance with the agreed revenue split. Online reservations that are bumped up to a full service fee will change ownership to the agent who claimed the original bump-up of the reservation. The parties agree to work together in good faith to ensure that the percentage requirements set forth in Paragraph 3 herein are met.

## 5.

## Distribution of Worldspan Segment Fees and Vendor Commissions and Overrides

Worldspan segment fees will be distributed to Duluth and ADTRAV based on a monthly transaction percentage. The monthly transaction percentage shall be equal to the total number of *airline* transactions handled by each partner divided by the *total number of transaction processed for the month*. If the actual percentage for any month varies from the agreed upon business distribution amount by more than 5%, both Partners agree to work together in good faith to develop a plan to modify the business practices in order to achieve the agreed upon business percentage distribution. *Vendor overrides and commissions, and other supplier payments will be distributed in this same manner.* In the case that these business percentages are mutually modified in writing, the supplier payments will be modified and paid in accordance to the new percentage agreement for business distribution. [Italics added for emphasis].

Based on the language of Paragraph 5 and the testimony of Mr. Zandman, Duluth contends that the parties were required to distribute the revenue from segment fees[18] and vendor commissions and overrides in the same percentages as

---

[18] Segment fees were something like commissions paid by airlines to travel agents booking an air reservation. Whenever an airline ticket was purchased through a travel agent, the airline paid the agent a "segment fee" for each segment of the booked flight. For example, if an agent booked a round trip flight from Birmingham to Washington, D.C., with a layover in Atlanta, the trip consisted of four "segments"—Birmingham to Atlanta, Atlanta to Washington, Washington back to Atlanta, and Atlanta to Birmingham. A segment fee would be paid for each segment.

transaction fees paid by the VA.[19]  It is true that Paragraph 5 required the parties, *each month*, to calculate a "transaction percentage" based on the number of *airline* transactions each party performed in relation to the total number of transactions, and, further, that segment fees and commissions and overrides earned *during that month* were to be divided between them on the basis of that calculated percentage. This does not mean, however, that the percentage division of the VA transaction fee and the calculated monthly transactions percentage were the same in any given month.  The VA transaction fee was a flat per-reservation charge payable by the VA,[20] whether the reservation being made was for air travel or hotel accommodations, or a rental car.  The calculated monthly transaction percentage in Paragraph 5, however, was expressly based on the ratio of *airline* transactions to total transactions.  This calculation would exclude non-airline transactions (hotel and rental car reservations) from the numerator of the fraction, making it potentially different from the VA transaction-fee percentage.

More critically, the language of Paragraph 5 plainly anticipates that the

---

This means the number and total dollar value of segment fees varied from flight to flight, depending on the number of segments involved.

[19]   Under the accommodated travel-services contract with the VA, the VA itself paid a fee for each transaction (airline reservation, hotel reservation, etc.) booked by a travel agent employed by Duluth or ADTRAV.  This fee was in addition to any segment fees or commissions paid by the airline or hotel with whom the reservation was made.

[20]   The parties agree that the VA transaction fee was by far the largest portion of revenue generated under the VA contract, constituting approximately 75% of the total revenue.

division of Worldspan segment fees inevitably would differ from the VA transaction-fee percentages. The "transaction percentage" for segment fees was to be calculated like this: "The monthly transaction percentage shall be equal to the *total number of airline transactions handled by each partner* divided by the total number of transaction processed for the month."[21]  (Italics added).  Because each partner likely handled a different gross number of airline transactions as a percentage of total transactions, the transaction percentage would vary from month to month and almost assuredly would be different than the VA transaction-fee percentage.  Taking a simple example, assume the partners handled a total of 100 transactions in a given month, of which 80 were for airline reservations and 20 were for hotel reservations.[22]  Of these 80 airline reservations, Duluth handled 60

---

[21]  The precise meaning of this sentence is unclear.  It seems to say that "each" partner has a different "transaction percentage" because it is calculated based on the number of airline transactions made by "each partner" in relation to the total number of transactions.  This reading results in an absurdity, however, and is rejected for that reason.  Using the same example in the text above, assume the partners handled a total of 100 transactions in a given month, of which 80 were for airline reservations and 20 were for hotel reservations.  Of these 80 airline reservations, Duluth handled 60 and ADTRAV handled the other 20.  What, then, is the "transaction percentage" for the month?  In this hypothetical, Duluth's "transaction percentage" is 60% (airline transactions *handled by Duluth* divided by the total transactions processed), while ADTRAV's "transaction percentage" is 20%.  Is the applicable division supposed to be  60% to 20%, and, if so, where did the other 20% go?  Is it 80% to 20%, or is it 60% to 40%?  In short, if the language of Paragraph 5 is applied strictly as written, the method of calculation set out is nonsensical because it does not result in a rational percentage for division of segment fees, commissions, and overrides between the parties.

[22]  The court is unaware of any evidence indicating the real relationship of airline reservations to hotel reservations.  The parties have not identified that information.  The court would assume, however, that, in terms of total transactions, it is likely that more hotel reservations were made than airline reservations for this reason—for almost every airline reservation, the traveler likely would need a corresponding hotel reservation, but not every hotel reservation involved air travel.

and ADTRAV handled the other 20 (which is a 75% to 25% division of the work). What, then, is the "transaction percentage" for the month? If Paragraph 5 is read to mean that the "transaction percentage" for segment fees is the ratio of airline transactions to total transactions, it would be 80% to 20%, not the 75% to 25% division for VA transaction-fee distribution. Indeed, the only time the "transaction percentage" would equal the VA transaction-fee percentage would be when airline transactions were themselves exactly 75% of the total of all transactions. In short, Mr. Zandman's premise that the method of calculation set out in Paragraph 5 is the equivalent of the VA transaction-fee percentage is an error.

The variable nature of the monthly calculation is clearly anticipated in the language of the paragraph, which requires the calculation of a "*monthly transaction*" percentage. This language clearly contemplates that the relative percentages attributable to the parties likely would vary from month to month. This reading is confirmed by the sentence stating, "If the actual percentage *for any month* varies from the agreed upon business distribution amount by more than 5%, both Partners agree to work together in good faith to develop a plan to modify the business practices in order to achieve the agreed upon business percentage distribution." Thus, the parties clearly anticipated that, as they distributed the work between them, there would be months in which the workload (and the

While the court has no way of knowing for certain, it is likely that the partners made more hotel reservations than airline reservations.

corresponding income) would stray from a rigid 75% to 25% division. Only if the calculated percentage strayed by more than five percentage points would the parties attempt to adjust the work distribution to bring it back in line with the 75% to 25% goal stated in Paragraph 3 as the "business distribution amount."

With this understanding that the calculation of the transaction percentage and the distribution of income, including segment fees and vendor commissions and overrides,[23] occurred monthly and likely varied from month to month, Mr. Zandman's analysis in Defendant's Ex. 142 did not do this. Instead, he calculated the distribution of segment fees, commissions, and overrides for the *entire* period of April 1, 2012, to December 31, 2013, without regard to how the transaction percentage varied from month to month. He testified that, for that period of time, the VA transaction fee was divided almost exactly 75% to Duluth and 25% to ADTRAV, and he concludes from that that the transaction percentage should also be almost exactly 75% to 25%. The court disagrees with that conclusion.

The contract never called for segment fees and commissions and overrides to be divided on the strict basis of 75% for Duluth and 25% for ADTRAV, or, indeed, in the same percentages as the VA transaction fee. What it did require was for the

---

[23] A further ambiguity lies in the way Paragraph 5 says that commissions and overrides are to be "distributed in this same manner." It is not clear whether this means, as Duluth argues, that the distribution of commissions and overrides in any given month would be based on the "transactions percentage" calculated *for* segment fees, or whether it means that commissions and overrides would themselves be subject to a separate calculation, i.e., the percentage of commission and override transactions to total transactions.

parties to calculate that percentage division monthly, and if it varied from 75% to 25%, they would strive to alter the work distribution in the future to bring it more in line with that standard.

Duluth's evidence that ADTRAV miscalculated the division of segment fees, commissions, and overrides consists only of Mr. Zandman's testimony and Ex. 142. For the reasons addressed, the court does not find this evidence persuasive because it fails to recognize that the monthly calculation of the percentages applicable to the division of segment fees and commissions and overrides was on a different basis than the VA transaction fees. ADTRAV has put into evidence its weekly and monthly net remit reports in which it calculated the division of this revenue, and Duluth has not shown that these reports are in any way substantially incorrect. Duluth has not produced acceptable evidence that ADTRAV failed to understand and apply the formula for this calculation stated in Paragraph 5 of the Agreement. For most of the time period the 2010 agreement was operative, Duluth had access not only to ARC reports and commission-consolidator reports, which it could have used to check ADTRAV's accounting, it also had access to ADTRAV's back-office accounting system, TRAMS. For it now to proclaim that it has found errors in the accounting, but without pointing to any in particular, is meritless.

The court concludes, therefore, that not only has ADTRAV shown that it has

substantially performed the accounting obligations of the Agreement, Duluth has failed to show any substantial error on which to base either a defense to ADTRAV's contract claim or in support of its counterclaim. Its counterclaim is meritless.

## 2. Duluth's Non-Performance

ADTRAV has alleged several ways in which it contends Duluth materially failed to perform its obligations under the Agreement: (1) Duluth failed to pay $34,500.00 as part of a Worldspan signing bonus; (2) in January 2013, Duluth stopped paying ADTRAV its share of segment fee revenue and hotel and car-rental commissions; (3) in January 2013, Duluth stopped paying ADTRAV the technology fees it owed for using ADTRAV's scripts and other computer software; (4) in January 2013, Duluth stopped paying ADTRAV's accounting fees; (5) Duluth stopped paying its share of debit memos; (6) on June 14, 2013, Duluth unilaterally took over all back-office accounting and shutdown ADTRAV's access to Duluth's ARC number until June 17, 2013; (7) and in January 2014, Duluth unilaterally terminated the 2010 Agreement without notice to ADTRAV, depriving ADTRAV of the right to participate in future VA travel business. Each of these will be discussed in turn.

In many instances, Duluth agrees that it has not made the required payments. The court agrees that these refusals by Duluth constitute non-trivial breaches to the

2010 Agreement. A breach of contract is a failure to perform as required by the contract when such a failure "touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.'" *Bentley Systems, Inc. v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (quoting *Sokol v. Bruno's, Inc.*, 527 So.2d 1245, 1248 (Ala.1988)). Certainly that is true here. Duluth's refusal to pay ADTRAV its share of various forms of revenue under the VA contract, even if Duluth disputed some of the amounts due, defeated the object of the parties in making the contract, which was to share revenue generated by providing travel-related services to the Veterans Administration. Although it is true that Duluth continued to pay ADTRAV its share of the VA transaction fees, which made up about 75% of the revenue under the contract, it is also true that Duluth stopped paying ADTRAV's share of other revenue streams and stopped paying for use of ADTRAV's technology and accounting services. These were substantial and material breaches of the contract, beginning no later than January 2013.

Duluth argues, however, that it was not Duluth that unilaterally terminated the 2010 Agreement, but ADTRAV. On January 10, 2014, ADTRAV notified Duluth by letter that it would cease performing under the 2010 Agreement on January 17, 2014, due to Duluth's refusal to make the payments to ADTRAV required by the contract. In the letter, ADTRAV stated that it "will cease providing services" to Duluth on January 17, 2014, and that "Duluth should make

appropriate arrangements prior to that date." Further, ADTRAV advised that "ADTRAV is not interested in pursuing with Duluth the contract for VA embedded travel services. Since the embedded travel services are not included in the contract, each party is free to pursue those services separately or in conjunction with another party." Finally, ADTRAV stated that it was choosing to commence litigation against Duluth for recovery of the sums due it.

From this, Duluth argues that it was ADTRAV that terminated the 2010 Agreement, not Duluth. Yet, as already discussed above, by January of 2014, Duluth was unmistakably in breach of the contract. The question at that point was not whether ADTRAV breached it, but what remedies were available to ADTRAV. Duluth's non-performance had already breached the contract, and ADTRAV had to decide what remedies to pursue for relief from the breach. This is a question to be addressed in relation to the "Damages" element of ADTRAV's claim for breach of contract. Because Duluth had materially and continually breached the contract for almost a full year, ADTRAV was shown Duluth's nonperformance as an element of its claim for breach of contract. ADTRAV's letter was not a breach of the contract, but it may have an impact on the damages recoverable by it.

### 3. ADTRAV's Damages

At this point, the court has determined that a contract existed between the parties, that ADTRAV substantially performed its obligations under it, and that

Duluth materially breached the 2010 Agreement by failing to perform several obligations to pay to ADTRAV its share of revenue under the VA travel contract. On the fourth element of a breach of contract action—damages incurred by the non-breaching party—ADTRAV has established that it suffered the loss of contract revenue in several different ways to which it was entitled under the Agreement.

First, the court notes that the 2010 Agreement itself included no specific language for remedies or limitation of remedies in the event of a breach of the contract. Although Paragraph 23 of the Agreement states that "[b]oth companies will strive to settle all differences between the parties as determined first by good faith and industry standards and with any major differences to be discussed with an arbitrator of mutual agreement," there is no indication that either party sought an arbitration of these disputes. (*See* Plaintiff's Ex. 22, Doc. 134-10). This means that the parties are left to pursue any ordinary contract remedies provided by law. In a contract requiring continuing performance by both parties, a material breach of the contract by one party requires the injured party to decide whether to terminate the contract, excusing his own remaining performance, and sue for damages, or continue performing under the contract and sue for damages resulting from the other party's nonperformance. *See Edwards v. Allied Home Mortgage Capital Corp.*, 962 So. 2d 194, 207–08 (Ala. 2007); *see also Hanuman, LLC v. Summit*

*Hotel OP, LP*, No. 2:13-CV-02234-HNJ, 2017 WL 4508158, at *4 (N.D. Ala. Oct. 2, 2017).

The court must determine what effect ADTRAV's January 10, 2014, letter to Duluth had, both upon the continuing obligations of the Agreement and ADTRAV's claim for damages. As the finder of fact, the court has little difficulty concluding that ADTRAV terminated the 2010 Agreement in its letter of January 10, 2014. The letter stated explicitly that ADTRAV was ceasing future services to Duluth, it was barring Duluth's use of ADTRAV's scripts and other computer technology, it no longer was interested in participating with Duluth in any "embedded" VA travel contract, and it was going to sue for damages. There can be little question that, after Duluth's repeated failure for over a year to pay sums even Duluth admitted it owed, ADTRAV's letter was meant to be and was taken as a termination of the 2010 Agreement. From that point forward, neither party was obligated to perform future, prospective obligations under the Agreement; however, ADTRAV remained entitled to recover damages for material breaches occurring before that date.

### (a) *Worldspan Bonus*

In 2012, Worldspan paid Duluth a "signing bonus" or an "incentive bonus" in the amount of $230,000.00, of which ADTRAV was not made aware. When ADTRAV discovered it later, the parties engaged in negotiations over whether

ADTRAV was entitled to a portion. Ultimately, on June 19, 2012, Duluth and ADTRAV reached agreement that Duluth would pay ADTRAV its share of the signing bonus in three installments, of which $34,500 was due in April 2013. (Plaintiff's Ex. 53, Doc. 134-15). The April 2013 installment was never paid.

Duluth admits that it was obligated to share the Worldspan incentive bonus with ADTRAV, but claims that most of ADTRAV's 25%-share is offset because only 80% of the Worldspan bonus was attributable to VA-related travel and because ADTRAV terminated the 2010 Agreement in January of 2014, leaving two years (out of five) of the bonus unearned. Insofar as Duluth argues that ADTRAV is entitled only to a share of 80% of the bonus because that is what was attributable to VA-related travel, that issue was negotiated by the parties and an agreement was reached on June 19, 2012, calling for Duluth to pay ADTRAV a $34,500.00 installment. *See* Plaintiff's Ex. 53, Doc. 134-15. If Duluth believed that ADTRAV was entitled only to a portion of the bonus remaining after non-VA related travel services were removed, it should have been discussed and resolved in those negotiations.[24] The negotiations leading to the agreed-upon payments of the incentive bonus were consistent with Paragraph 23 of the 2010 Agreement, and Duluth cannot now retroactively repudiate its earlier efforts to resolve the dispute over the incentive bonus.

---

[24] The 2010 Agreement expressly required the parties to work in good faith to resolve their disputes, *see* Plaintiffs' Ex. 22, Doc. 134-10, at ¶ 23.

What was not anticipated in June 2012, when the parties negotiated and resolved the dispute over the Worldspan incentive bonus, is that the 2010 Agreement would be terminated by ADTRAV in January 2014 due to Duluth's refusal to make revenue-sharing payments to ADTRAV during 2013. This termination, however, did not deprive ADTRAV of its right to the incentive bonus for two reasons. First, Duluth breached the contract in 2013, so that ADTRAV's termination of the contract in 2014 did not strip it of its fully-accrued right to the incentive bonus. The law will not countenance Duluth's breach of its contract, forcing ADTRAV to terminate the contract a year later due to Duluth's breach, and then claim that ADTRAV did not "earn" the remainder of the incentive bonus. Second, under the terms of the resolution of the issued reached by the parties, Duluth was obligated to pay the $34,500.00 installment in April 2013, *see* Plaintiff's Ex. 53, Doc. 134-15, well before ADTRAV terminated the 2010 Agreement in January 2014. But for Duluth's defalcation in making the payment, ADTRAV should have received it long before the termination occurred.

ADTRAV is entitled to recover the $34,500.00 for a Worldspan-bonus payment.

### (b) *Worldspan Incentives*

ADTRAV also claims $122,126.29 in unpaid Worldspan incentives, and Duluth admits that it owes $103,026.00 of this amount, but claims the rest, some

$19,100.00, was never received from Worldspan and, thus, not due to ADTRAV.[25]

The court agrees with Duluth that if no incentive payment was received from Worldspan in March and April 2013, for whatever reason, ADTRAV is not entitled to recover for money never received. ADTRAV was entitled under the 2010 Agreement to a percentage of revenue received by the parties in connection with VA travel services. If no revenue came in, a percentage of zero is still zero.

Thus, ADTRAV is entitled only to the lower amount of unpaid Worldspan incentives, totaling $103,026.00.

### (c) *Expenses and Hotel/Car Commissions*

Plaintiff's Ex. 400, Doc. 134-323, is a breakdown of the operating expenses,[26] hotel commissions, and rental-car commissions the parties were required to divide from January 2013 (when Duluth stopped paying ADTRAV's share) through February 2014. Ultimately, this chart shows Duluth owes ADTRAV $90,073.57. Duluth admits that it did not make these payments, but claims that only that if the proper distribution percentages are applied, the real sum owed ADTRAV is only $79,836.00. The court disagrees.

---

[25] ADTRAV contends that in March and April 2013, Worldspan assessed a "shortfall penalty," a penalty imposed when a travel agent's actual reservations for a month fall below an agreed minimum number for the month. ADTRAV offered Plaintiff's Ex. 416 to show that the amounts of incentive *earned* in those months were $9,061.61 and $11,514.61, even if the incentives were not paid due to the shortfall penalty. These total $20,576.22, not $19,100.00, as claimed by Duluth. Nevertheless, because the shortfall penalty was assessed, the incentives were not paid.

[26] Here, operating expenses include the technology and accounting fees owed to ADTRAV through the time period from January 2013 to February 2014.

Duluth relies on Mr. Zandman's calculation of a straight 75% of income and expenses to Duluth and 25% to ADTRAV for the entire time period, even though the 2010 Agreement clearly requires a monthly calculation based on the "transaction percentage," consisting of the ratio of airline transactions to total transactions. As discussed by the court above, this monthly calculation would not necessarily be a 75% to 25% split because the ratio of airline transactions to total transaction would fluctuate from month to month. The parties anticipated this monthly fluctuation because the contract called for them to adjust their *work* distribution if the monthly percentage varied by more than five percentage points from the agreed upon goal of a 75% to 25% division. Therefore, because the month percentage distribution of hotel and car commissions and expenses changed from month to month, Mr. Zandman's conclusion is based on an erroneous premise that the division would always be 75% to 25%.

On the other hand, ADTRAV prepared and produced to Duluth weekly and monthly net remit reports showing these monthly percentage calculations. Duluth has not been able to show that ADTRAV's calculations are wrong, based on a monthly analysis of the reports.[27]

---

[27] Duluth has argued that it did not have access to third-party documentation for use in checking these calculations each month. The evidence shows, however, that in 2013 and 2014, Duluth was receiving ARC reports from Worldspan and monthly reports from Pegasus at the very least. In fact, the Pegasus reports were sent to Duluth, who had to forward them to ADTRAV for ADTRAV to reconcile them with its TRAMS data. It also had direct access to ADTRAV's back-office TRAMS data. Duluth had the means to make reasonable checks of the data being

ADTRAV is entitled to recover $90,073.57 for its unpaid share of expenses and commissions.

(d) *Technology Fees*

After ADTRAV terminated the 2010 Agreement in January 2014 and instructed Duluth to cease using its proprietary scripts and computer software, Duluth continued to use ADTRAV's intellectual property for several month. Under the 2010 Agreement, ADTRAV was entitled to be paid $0.50 for each ticketed reservation as compensation for "scripts" and other computer software used by ADTRAV and Duluth as part of the VA-related travel contract. A Worldspan report showed that even though ADTRAV terminated Duluth's right to use the software on January 17, 2014, Duluth continued to use it (or a "replicated" version of it[28]) through at least May 2014. Plaintiff's Ex. 414 shows 47,393 Worldspan reservations made during that timeframe. At $0.50 per reservation, ADTRAV would be entitled to a fee of $23,696.00 for the use of its technology.

ADTRAV's attempt to establish the use of its proprietary software after May 31, 2014, is less convincing. Prior to May 31, ADTRAV had access to Duluth's

---

supplied by ADTRAV.

[28] A Duluth witness testified that Duluth hired a programmer to write new software for use on the VA contract after ADTRAV terminated the 2010 Agreement in January 2014. According to the witness, the programmer continued to use the same name, "WOW," as ADTRAV's proprietary software, and that explains why the Worldspan report shows that name on the reservations reports. The court finds this not credible. Even so, the witness stated the programmer "replicate[d]" the ADTRAV software, essentially copying it.

Worldspan ARC reports, which showed ADTRAV's proprietary software, "WOW," as the software used to make the reservations. Duluth cut off ADTRAV's access to its reports on June 1, 2014. Roger Hale testified that he was "confident" that Duluth continued to use the "WOW" software and other scripts thereafter, until October 1, 2014, when Duluth became a subcontractor of Concur for the VA "embedded" contract. Other than Hale's confidence and the circumstantial evidence that Duluth continued using the software through May 2014, there is no evidence that, in fact, Duluth continued to do so from June 1 to October 1, 2014. Indeed, John Lawless testified for Duluth that a programmer was hired to write new software, but it is unclear when this occurred. Ultimately it becomes speculation whether Duluth continued to use ADTRAV's proprietary software after May 31, or for how long. Even if the court could comfortably find that Duluth continued to do so for some period of time (based on the fact that it appears to have used ADTRAV's software up to May 31), there is no way to know whether that continued for one month or five months. The court is not willing to speculate past May 31.

ADTRAV is entitled to payment of technology fees of $23,696.50.

(e) *Non-VA Worldspan Segment Income*

The parties agree that, during their handling of travel services for the Veterans Administration, ADTRAV also had some non-VA customers for whom

reservations were made using Duluth's Worldspan account. This is essentially business unrelated to the VA travel contract that was paid to Duluth because the reservations were made on Duluth's Worldspan. Duluth admits that there is some non-VA revenue that belongs to ADTRAV, but it asserts that it is only $3,959.18, not the $6,265.10 claimed by ADTRAV. ADTRAV has provided Plaintiff's Ex. 406 to show how it calculated this claim. And while Duluth's witness described his own calculations, no exhibit was offered for comparison to ADTRAV's. The court accepts ADTRAV's documented calculation.

ADTRAV is entitled to recover $6,265.10 in non-VA related Worldspan revenue.

### (f)  *ARC Net Remit for Week Ending 1/12/14*

The parties agree that Duluth owes ADTRAV $5,174.26 for ADTRAV's share of the VA travel business for the last week ADTRAV performed accounting services before terminating the 2010 Agreement.

### (g)  *Debit Memos*

ADTRAV contends that Duluth owes it $1,100.80 for debit memos issued by Southwest Airlines to ADTRAV and paid by ADTRAV, but which ADTRAV asserts were caused by Duluth. Duluth responds that it has paid its share of the debit memos, except for $50 it could not account for, which were split 50% to 50% between the parties.

ADTRAV was initially charged these debit memos by Southwest Airline on ADTRAV's ARC number.  In an email exchange on October 25, 2013, the parties agreed to split these debit memos from Southwest to take advantage of a "settlement offer" from the airline.  In doing so, Cookie Jenkins for Duluth wrote, "Michelle and I are going to review all the debit memos on Monday and determine which agency is responsible and charge accordingly."  *See* Defendant's Ex. 1, Doc. 135-1, p. 3.  Ron Thomas and Lynn Slaughter for ATRAV agreed to the proposal and paid the debit memos.  Now ADTRAV contends that Duluth was responsible for the debit memos and still has not paid them.

The evidence on this question is not sufficient to find that Duluth still owes payment.  While it appears to be true that ADTRAV paid the debit memos to Southwest with the understanding that Duluth would review them and determine "which agency [was] responsible," there is no evidence (or at least no evidence the court can understand) that pinpoints whether Duluth was responsible for payment.  Mr. Hale testified essentially that the accounting department at ADTRAV has told him the debit memos remain unpaid, but he could not elaborate as to why Duluth would be responsible for debit memos charged to ADTRAV's ARC number.  Duluth's witness, Lawless, explained that he had examined each of the debit memos and had determined that they were paid, except for one $50 memo for which no documentation existed.  From this evidence, the court simply cannot

determine whether Duluth remained responsible for the debit memos after they were apparently reviewed in late October 2013. Because ADTRAV has the burden of proof, and the evidence is too thin to allow the court to make a determination, ADTRAV is not entitled to recover for these debit memos.

(h) *Lost Revenue*

ADTRAV also claims it is entitled to lost revenue from Duluth's VA accommodated travel contract from October 1, 2013, to October 1, 2014, when the accommodated contract ended and Duluth became part of an "embedded" contract as a subcontractor with Concur. ADTRAV argues that, under the 2010 Agreement, Duluth was obligated to include ADTRAV in any accommodated VA-travel contract and that Duluth violated the 2010 Agreement by not including ADTRAV in the 2013-2014 VA contract and the revenue produced under it. ADTRAV claims $435,914.20 as its 25% share of the revenue Duluth received under the 2013-2014 VA contract. Duluth counters that ADTRAV failed to properly and timely disclose to it ADTRAV's calculation of lost revenues as an item of damages in this action and, further, that ADTRAV terminated the 2010 Agreement, ending Duluth's obligations under it.

Although it may be true that ADTRAV only recently provided Duluth with the *calculation* of its claim for lost revenue, ADTRAV has made the claim since the very beginning of the case. At paragraph 27 of the complaint, ADTRAV

alleged that, but for Duluth's breach of the 2010 Agreement, "[u]nder the contracts, ADTRAV would have earned additional revenue and income from the VA travel services." The demand for relief in Count II of the complaint specifically seeks "lost revenues." (Doc. 1). In its initial disclosures, filed and served on April 4, 2014, (Doc. 22), ADTRAV explicitly itemized elements of its damages, including

> … ADTRAV also claims damages on additional and future revenue and profit under the VA Rebid Contract for the anticipatory breach of that contract by Duluth. ADTRAV does not currently have access to the amount of those revenue and profits but expects to receive documents from Duluth during discovery which would assist in calculating that amount. ADTRAV may supplement this damage claim if additional information is obtained during discovery that suggests ADTRAV is entitled to additional damages.

Doc. 22, p. 2. Further, in an amended initial disclosure, ADTRAV added that it "may supplement this damage claim if additional information is obtained during discovery that suggests ADTRAV is entitled to additional damages." (Doc. 24). Moreover, during discovery, ADTRAV requested information from Duluth related to "each and every contract that Duluth Travel has ever been awarded by the VA," and later in a motion for additional discovery, explicitly asked for information related "total revenue earned on VA account from October 1, 2013 to present day" (Doc. 37, p. 3), clearly indicating to Duluth that its revenue from the 2013-2014 VA contract was in issue. In interrogatories served on Duluth in July 2013,

ADTRAV requested information related to "all revenue received by Duluth from transactions under the ARC numbers" used to service the VA account. ADTRAV also asked for information related to the contracts between Duluth and Travel Incorporated and Concur "from 2012 to the present." (Docs. 37-1 and 37-2). It was plain to Duluth that ADTRAV wanted information related to Duluth's VA-account income following the termination of the agreement with ADTRAV. Finally, the court ordered additional discovery from Duluth, including "[r]evenues generated by the VA business and earned by the parties under Duluth Travel's contract with the VA after October 1, 2013, through December 31, 2014…."[29] (Doc. 53, p. 2).

Again, while it may be true that ADTRAV did not identify the *amount* of lost revenue it sought from Duluth until its pretrial disclosures a month before trial, it is not true that Duluth was unaware that such lost revenues were part of the claim for damages being made by ADTRAV. As ADTRAV points out, Duluth itself was the only source of information ADTRAV had concerning the amount revenue Duluth received from the VA contract in 2013 and 2014, supplied by Duluth in an interrogatory answer. Duluth had ample opportunity to discover from ADTRAV

---

[29] At the hearing leading to this Order, ADTRAV sought information related to Duluth's VA revenue from October 1, 2013, to the present, arguing that it needed that information to determine what it lost as a result of the breach of the 2010 duty of Duluth to include ADTRAV in its VA accommodated contract business. From this, Duluth was informed that ADTRAV was claiming damages for revenue lost when Duluth failed to include ADTRAV in its VA accommodated contract during 2013 to 2014.

the amount of lost revenue it claimed and the manner of its calculation. Duluth has not suffered any unfair prejudice under the facts of this case.

A more crucial issue is whether the evidence supports ADTRAV's claim for lost revenue. In substance, ADTRAV contends that, after Duluth breached the 2010 Agreement by failing to make payments due to ADTRAV, Duluth entered into a new VA accommodated travel contract effective October 1, 2013, working with Travel Incorporated rather than ADTRAV, which continued until October 1, 2014. ADTRAV asserts that doing so violated the following provision of the 2010 Agreement: "ADTRAV and Duluth Travel agree to jointly bid any future VA travel contract under the same terms and conditions of this Agreement as long as there are no substantial changes to stockholder ownership of any of the two companies and abide by the other sections of this agreement." *See* Plaintiff's Ex. 22, Doc. 134-10). Under Paragraph 24, with the heading "Termination," the Agreement states, "The intent of this agreement is to permit both companies to share in the VA account during the duration of the [2011] rebid of the accommodated TMC services *and any subsequent extensions that may be awarded to Duluth*." *Id.,* (italics added).

Although the court agrees with ADTRAV that it was Duluth who first breached the 2010 Agreement by refusing to make payments to ADTRAV due under the Agreement, the court also finds that it was ADTRAV who elected in

January 2014 to terminate the Agreement. As discussed above, when there is a contract requiring continued future performance by both parties, the party injured by the non-performance of the other party may elect either to terminate the contract, thereby excusing his own obligation to continue performing, and sue for damages, or he may continue the contract and its economic benefits while suing for damages accruing from the non-performance. In the former circumstance, the injured party is no longer required to fulfill his obligations for future performance. In the latter circumstance, however, an injured party electing to continue the contract (and receiving the economic benefits from it) cannot excuse himself from his own obligation of future performance. The injured party may not insist on the benefits of the other party's future performance while excusing himself from future performance.

In this case, ADTRAV made clear in its January 10, 2014, letter that it was ceasing further services to Duluth and that it was not interested in partnering on a future "embedded" contract with the VA. ADTRAV effectively elected to terminate the 2010 Agreement as of January 17, 2014. It could not thereafter insist that Duluth was required to partner with it on VA travel business. For this reason, ADTRAV is not entitled to recover any portion of the revenue earned by Duluth under the October 1, 2013, VA accommodated contract after January 17, 2014, when it terminated the 2010 Agreement.

ADTRAV argues that, in fact, it was Duluth who terminated by the 2010 Agreement by refusing to use two agents made available by ADTRAV to cover after-hours travel needs by the VA. A fair reading of the January 10 letter, however, leaves little doubt that ADTRAV plainly notified Duluth that, because of Duluth's refusal to make payments due to ADTRAV, it would no longer perform its duties under the 2010 Agreement.[30] This cannot be read other than as an election to terminate the Agreement due to Duluth's defaults. ADTRAV was not required to terminate the Agreement; it could have continued to insist on future performance while seeking a remedy for the past breaches. Instead, it elected to cease all performance under the Agreement, effectively terminating it.

Even though Duluth entered into a new VA accommodated travel contract on October 1, 2013, the evidence shows that it still permitted ADTRAV to make reservations and provide other travel services for the VA until ADTRAV's notice letter of January 10, 2014. As indicated by the plaintiff's "Partner Splits" exhibits (Plaintiff's Exs. 254-257), the parties continued jointly to make travel reservations for the VA and to split the revenue from it through January or February 2014. It was ADTRAV, not Duluth, who terminated that arrangement.

ADTRAV is not entitled to recover lost future revenue after it terminated the agreement under which that contract right existed.

---

[30] At the very most, Duluth's refusal to continue to use ADTRAV's after-hours agents amounted to a mutual agreement to terminate the 2010 Agreement, not a new and distinct breach of it.

### (i) *Attorneys' Fees and Expenses of Litigation*

ADTRAV seeks almost $600,000.00 in attorneys' fees and litigation costs as part of the judgment in this case. Specifically, it seeks an award of $467,035.50 for attorneys at Hand Arendall, $34,362.01 for attorneys at Wallace Jordan, and $97,125.61 in costs paid to a proposed expert witness, Ralph Summerford. Duluth opposes the demand for fees and expenses, asserting that ADTRAV breached the 2010 Agreement and that the fees and expenses claimed are excessive.

The 2010 Agreement includes the following provision:

> Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to litigation to enforce this Agreement, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to recover its or their reasonable attorneys' fees and costs in such litigation from the party or parties against whom enforcement was sought.

Plaintiff's Ex. 22, Doc. 10, p. 8. This provision clearly shifts the reasonable attorney's fees and "costs" of the prevailing party to the losing party. ADTRAV contends it is a prevailing party and that its claims for attorneys' fees and litigation costs are reasonable.

Because the claim for breach of contract is before the court in diversity jurisdiction, the rule in *Erie Railway* requires the court to apply state law to the determination of fees and costs under a *contractual* fee-shifting provision.

*See, e.g.*, *Yellow Pages Photos, Inc. v. Ziplocal*, LP, 846 F.3d 1159, 1166 (11th Cir. 2017) (applying Florida law to the award of attorneys' fees and costs under a contract); *Westburg Media Capital, LP v. West Alabama Radio*, No. CIV.A. 2:10-00094-KD, 2010 WL 3724125, at *6 (S.D. Ala. Sept. 14, 2010) (applying Washington state law to award of attorneys' fees under a contract). Under the terms of the contract, such fees and costs are part of the breach-of-contract damages incurred by the prevailing party, and thus are part of the judgment to be awarded. *Ierna v. Arthur Murray Int'l., Inc.*, 833 F.2d 1472, 1476 (11th Cir.1987) ("When the parties contractually provide for attorneys' fees, the award is an integral part of the merits of the case [ ]"); *Whitney Bank v. Pullum-Cecilio, LLC.*, No. CIV.A. 15-0002-CG-M, 2015 WL 3719143, at *10 (S.D. Ala. June 15, 2015).

The assessment of attorneys' fees under Alabama law has been summarized as follows by the Alabama Court of Civil Appeals:

> Our supreme court has held:
>
> > "The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and its determination on such an issue will not be disturbed on appeal unless in awarding the fee the trial court exceeded that discretion.
> >
> > "This Court has set forth 12 criteria a court might consider when determining the reasonableness of an attorney fee:
> >
> > "'(1) [T]he nature and value of the subject matter of the

employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.'

"*Van Schaack v. AmSouth Bank, N.A.*, 530 So. 2d 740, 749 (Ala. 1988). These criteria are for purposes of evaluating whether an attorney fee is reasonable; they are not an exhaustive list of specific criteria that must all be met."

\* \* \*

*Pharmacia Corp. v. McGowan*, 915 So. 2d 549, 552–53 (Ala. 2004).

"Although all of the criteria set forth above must be taken into consideration by the trier of the facts in determining a proper counsel fee—and it has been said that all of these factors should be utilized and applied as the facts so indicate—it is generally recognized that the first yardstick that is used by the trial judges is the time consumed."

*Peebles v. Miley*, 439 So. 2d 137, 141 (Ala. 1983).

*Diamond Concrete & Slabs, LLC v. Andalusia-Opp Airport Auth.*, 181 So. 3d 1071, 1075 (Ala. Civ. App. 2015) (internal citations omitted). *See also Wells Fargo Bank, N.A. v. Williamson*, No. CIV.A. 09-00557-KD-C, 2011 WL 382799,

at *4 (S.D. Ala. Feb. 3, 2011). The "time consumed" requires the court to calculate the "lodestar" of the fee, which is the number of hours reasonably used multiplied by a reasonable hourly rate for similar lawyers in the market in which the representation occurred. ADTRAV's counsel have submitted affidavits and detailed time records to establish both the number of hours used and the reasonableness of the hourly rates charged.[31]

In reviewing the claim for attorneys' fees the court must assure that the fee award is consistent with the contractual basis for the award. In this case, the contract provision contained in the 2010 Agreement specifically limits an award of fees to "reasonable attorneys' fees and costs *in* such litigation." While the court recognizes that the concept of "litigation" is not necessarily limited to the strict formal processes of an action in court,[32] the court believes that is what the parties

---

[31]  For purposes of the attorneys' fee provision in the 2010 Agreement, ADTRAV is the prevailing party. Not only has it succeeded on most of its own claims (save its claim for loss of future revenues), it has beat back Duluth's counterclaim for several millions of dollars. Certainly, one factor used in assessing the reasonableness of a fee award is the level of success the prevailing party achieves. Here, ADTRAV has been substantially successful on almost every claim it asserted and against those alleged by Duluth. The court does not believe that ADTRAV's lack of success on the future-revenue claim requires a reduction of the fee sought because that claim was unavoidably intertwined with ADTRAV's successful claims for breach of contract. Preparation and prosecution of the loss-of-future-revenue claim required little additional time and expense above the other breach of contract claims and cannot be reasonably separated from time expended on other breach-of-contract issues.

[32]  Certainly it can be argued that "litigation" includes time before the filing of the complaint when counsel investigates a claim. But in the context of this case, where the parties expressly anticipated minor disputes that would require them in good faith to work out their differences, they never intended for an attorneys' fee to attach every time a dispute arose between them requiring them to negotiate in good faith. The award of an attorneys' fee was meant by the

intended with this language. The only time for which a fee might be awardable under the contract is time used after the commencement of a formal action in court.

With that limitation in mind, it is clear that some of the fees charged by Wallace, Jordan are not recoverable because they accrued prior to the commencement of formal legal proceedings. Litigation was commenced by the filing of ADTRAV's complaint on January 10, 2014. Attorneys' fees incurred by ADTRAV prior to that date are not awardable under the language of the provision in the 2010 Agreement. In his affidavit for ADTRAV, attorney Oscar Price included several invoices for services rendered before January 10, 2014, which will be disallowed. Also, as to invoice # 135346, much of the time charged there is not part of the litigation, but the ongoing discussions and demands between ADTRAV and Duluth, including drafting and revising the January 10 letter. This time will not be allowed as it was not "in" the litigation. Only invoice # 135848, in the amount of $2,831.25 includes time directly related to the litigation then underway. Only this time is allowable with respect to the fees charged by Wallace, Jordan.

ADTRAV may recover $2,831.25 of the Wallace Jordan fees, which were reasonable for the services performed in preparing and filing the complaint commencing this litigation.

---

parties to occur only in the context of a formal action in court. Indeed, this appears to be ADTRAV's understanding. In its January 10, 2014, letter ceasing services to Duluth, ADTRAV informed Duluth that, at that time, it was about "to immediately commence litigation." ADTRAV understood the term "litigation" to mean formal proceedings in a court of law.

By far, the largest claim for attorneys' fees by ADTRAV is for fees and expenses incurred for Hand Arendall attorneys, who took over representation of ADTRAV soon after the complaint was filed. Filed as Document 138 and buttressed by the affidavit of attorney Roger L. Bates, the Hand Arendall lawyers claim a total of $467,035.50 in fees among several lawyers. The Bates affidavit points out that the three principal lawyers working on this case were Mr. Bates himself, Tracy R. Davis, and Rodney R. Cate. Mr. Bates charged 150.75 hours at a rate of $350.00 per hour, while Ms. Davis billed 955.15 hours at an hourly rate of $225.00 initially, but which increased to $260.00 as the case progressed. Mr. Cate billed 513.90 hours at $240.00 per hour initially, but which increased to $270.00 during the case. The court notes that the almost 150 pages of time records are thorough and detailed and that the hourly rates are reasonable, given that Mr. Bates has 35 years of experience as a litigator, Mr. Cates has more than 25 years' experience, and Ms. Davis has more than 17 years' experience. The rates are reasonable for the Birmingham, Jefferson County, Alabama, legal-services market.

The court also finds the total amount of hours charged by Hand Arendall (1,619.70) is reasonable in the aggregate, given the contentious and vigorous way the case has been litigated. There have been multiple discovery disputes, including motions for sanctions and contempt, during the course of three years of litigation leading up to the trial in March 2017. The volume of discovery has been great,

reflecting the large amount of documents, records, and electronic data exchanged in the business relationship between the parties over an eight-year period. The accounting records at the heart of the dispute between the parties were long, complex, and daunting, requiring a great deal to time to study and understand (as the court has learned from its own experience with them). The claims each party asserted against the other sought millions of dollars in damages, even though neither party will recover anything like that amount of money, and these claims required both parties to commit to a tenacious litigation strategy. Extensive hearings were conducted on the basis of complex evidence offered by accounting experts. There was a three-day bench trial, at which both parties were represented by at least two attorneys and there have been dozens of filings by both parties. Although the fees claimed are large, they are not excessive within the history of this case.[33]

Duluth has questioned several time entries as excessive, redundant, or insufficiently identified (*see* Duluth's Post-Trial Brief, Doc. 146, pp. 19-21).[34]

---

[33] The overall reasonableness of these fees incurred by ADTRAV is bolstered by the fact that Duluth admits that it has paid $716,386.02 in attorneys' fees itself in defense of ADTRAV's claims and in prosecution of its counterclaim. *See* Defendant's Post-Trial Brief, Doc. 146, p. 24).

[34] Duluth also challenges certain litigation expenses reflected on various Hand Arendall invoices, particularly complaining about charges paid to Legal Source One for "OCR conversion," computer time, flash drives, and expedited service. In light of the voluminous amount of financial and accounting records required to be offered at trial and converted to an Adobe pdf format for filing in the court's electronic case file (as required by an Eleventh Circuit

First, Duluth argues that having two lawyers attend several depositions and witness interviews (including in Atlanta) was excessive and redundant. While the court is hesitant to quibble over whether the presence of two lawyers was necessary, even reducing this time by eliminating the time for one of the lawyers results in a time reduction of 45.5 hours multiplied by Ms. Davis's rate of $225.00 per hour. This results in a reduction of $10,012.50.

Next, Duluth asserts that multiple discovery disputes during 2015 were ADTRAV's fault and it should not be rewarded with payment of 94.8 hours billed for them. The court's own recollection is that the parties had legitimate issues about the scope of discovery and the existence of certain records and documents. As is obvious from this litigation, the parties are competitors, and they had difficult issues with trying to balance the obligation of responding to discovery with a concern about revealing confidential or sensitive information to a competitor. They also clashed over whether some documents or records even existed, which led *Duluth* to twice seek an order for a third-party computer forensic examiner to review ADTRAV's computer systems. Duluth moved to hold ADTRAV in contempt, and that issue had to be litigated. The court did not view ADTRAV as obstructing discovery or causing the discovery process to become unnecessarily extended or complex. The court sees no reason why ADTRAV should not be

rule), these costs are not unreasonable.

awarded fees for the time expended in these discovery battles.

Third, Duluth contends that ADTRAV has included time for attorneys not properly identified in Mr. Bates's affidavit, specifically attorneys Brian C. Richardson (4.0 hours X $190.00), Jessica H. Thomas (50.60 hours X $185.00), William M. Dunn (11.0 hours X 130), and Andrew J. Sinor, Jr. (6.7 hours X $320.00).[35] Of course from the hourly rates charged, it is clear that Richardson, Thomas, and Dunn were associates used to perform some matters less expensively than could be done by either of the three partners (Bates, Davis, and Cate). If anything, the use of these associates reduced the attorneys' fees. On the other hand, it is not clear why a partner, Mr. Sinor, was used to argue a motion to compel that could have been handled by Ms. Davis at a lesser rate. The court will reduce the hourly rate for Mr. Sinor's 6.7 hours of time to Ms. Davis's rate of $225.00 per hour, which results in a reduction of $636.50.

Completing the arithmetic, the court will reduce the claim attributable to the Hand Arendall lawyers by the amount of $10,649.00, comprised of $636.50 in reduction for the rate charge by Mr. Sinor and $10,012.50 for the elimination of one of the lawyers attending depositions and witness interviews. Thus, subtracting

---

[35] Duluth also questions 3.10 hours for a paralegal, billed at the rate of $140.00 per hour, because it was higher than the rate charged for a lawyer, Mr. Dunn ($130.00 per hour). The court finds nothing questionable about billing an experienced and valuable staff member at a rate comparable or even slightly higher to that of a young, inexperienced (but valuable) associate. In any event, reducing the rate charged for the paralegal to something less than Mr. Dunn's rate would result in a *de minimis* reduction of less than $50.00. Doing so is unnecessary.

this amount from the amount claimed for the Hand Arendall lawyers ($467,035.50)

results in a final awardable fee attributable to the Hand Arendall lawyers of

$456,386.50.[36]

Lastly, Duluth challenges ADTRAV's claim of $97,125.61 in expert fees

paid to Ralph Summerford, a forensic accountant, engaged by ADTRAV to

respond to Duluth's witness, Mr. Zandman. *See* Doc. 136, ¶ 2. These expert fees

paid to Mr. Summerford are litigation costs[37] for ADTRAV. While it is true that

the explanation for each time entry on Mr. Summerford's invoices is scant, his role

in the case is well known, as he was called on to review, analyze, and respond to

two reports produced by the defendant's forensic accountant. Given the

complexity of the data that had to be reviewed and analyzed and the conclusions

reached by Mr. Zandman, it is not unreasonable that Mr. Summerford required a

lot of time to analyze, understand, and critique Mr. Zandman's reports. Checking

the reliability of a proffered expert's methodology is central to questions about the

---

[36] $467,035.50 minus $10,649.00 equals $456,386.50.

[37] The 2010 Agreement allows the prevailing party, who is ADTRAV in this case, to recover not only attorneys' fees but the "costs" of the litigation. Because this is a contractual provision, the court does not understand the meaning of the term "costs" used here to be limited by the definition in 28 U.S.C. § 1920. Here, it is the intention of the parties that gives meaning to the term, not Congress's intention, as would be the case when the cost-shifting is authorized by a statute. The court believes the parties intended, when drafting this provision, to allow the prevailing party to recover its *actual* litigation expenses, not just certain "cost" items, such as filing fees, witness fees, and court-reporter fees. There is no reason to presume that the parties were familiar with and intended to apply the more technical definition of the term found in § 1920. Instead, as two sophisticated businessmen, it is more likely that they wanted to be able to recover what it *actually* cost them to litigate a controversy.

admissibility of the expert's opinion. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). ADTRAV was required to hire a forensic accountant to test Mr. Zandman's methodology and data. ADTRAV is entitled to recover that cost.

In summation, ADTRAV is entitled to recover, as part of its judgment in this case, the reasonable attorneys' fees and litigation costs it incurred "in such litigation." As explained above, that amount totals the following:

| | |
|---|---:|
| Attorneys' Fees for Hand Arendall Lawyers | $456,386.50 |
| Attorneys' Fees for Wallace Jordan Lawyers | $2,831.25 |
| Litigation Cost of Expert Witness (Summerford) | <u>$97,125.61</u> |
| TOTAL | $556,343.36 |

The judgment for ADTRAV will include this total.

### (j)  *Pre-judgment Interest*

The final element of contract damages claimed by ADTRAV is prejudgment interest on the sums it was due to be paid by Duluth. To recover for prejudgment interest under Alabama law, the amount due from the defendant to the plaintiff must be reasonably certain or capable of being made certain by mathematical calculation. *See Miller & Co. v. McCown*, 531 So. 2d 888, 889 (Ala. 1988); *Braswell v. Conagra, Inc.*, 936 F.2d 1169, 1177 (11th Cir. 1991).[38]  Alabama

---

[38]  For purposes of any choice of law questions, the Alabama rule is essentially the same as the Georgia rule in this regard. An amount of money that is certain or capable of being made certain

Code § 8-8-8 (1975) states, "All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed." For such liquidated claims, the rate of prejudgment interest is a simple six percent per annum. *See* Alabama Code § 8-8-1 (1975).

In this case, the court has found that ADTRAV was entitled to payment of certain sums of money under the 2010 Agreement, as follows:

| Nature of Payment | Amount | Date Due | Prejudgment Interest |
|---|---|---|---|
| Worldspan Incentive Bonus | $34,500.00 | 4/30/13 | $9,660.00 |
| Worldspan Incentives | $103,026.00 | various[39] | $27,476.92 |
| Commission and Expenses | $90,073.57 | various[40] | $24,737.92 |

by mere calculation is "liquidated" damages. "The term 'liquidated damages' is defined as 'the amount of damages... ascertained by the judgment in the action, or... a specific sum of money... expressly stipulated by the parties... as the amount of damages to be recovered.... [Those] damages which are reasonably ascertainable at time of breach, measured by fixed or established external standard, or by standard apparent from documents upon which plaintiffs based their claim.' Black's Law Dictionary 391 (6th ed. 1990)." *U.S. Fid. & Guar. Co. v. German Auto, Inc.*, 591 So. 2d 841, 843 (Ala. 1991).

[39] As shown by Plaintiff's Ex. 416, Doc. 134-353, the Worldspan incentives accrued for each month from January 2103 to January 2014 (excluding March and April 2013). To calculate the prejudgment interest at 6% per annum, the court multiplied the amount due in each month by 0.005 (i.e., one-half percent) times the number of months since the payment was due. The court then added together the interest calculated for *each* payment due to get the total prejudgment interest. January 2013, the month Duluth first stopped making required payments, was 60 months before the date of judgment in this case, entered in January 2018. Each month after January 2013 was one less month. Thus, pre-judgment interest on a payment due in February 2013 was multiplied by 59 months, and for a payment due in March 2013, by 58 months, and so forth.

| | | | |
|---|---|---|---|
| Technology Fees | $23,696.50 | 6/1/14[41] | $5,094.64 |
| Non-Worldspan Segments | $6,265.10 | various[42] | $1,435.91 |
| ARC Remit for 1/12/14 | $5,174.26 | 1/12/14 | $1,241.76 |

Total Prejudgment Interest      $69,647.15

### 4. <u>Summary of Total Contract Damages</u>

Adding up the various findings of contract damages incurred by ADTRAV

can be summarized as follows:

| Nature of Damages | Amount |
|---|---|
| Worldspan Incentive Bonus | $34,500.00 |
| Worldspan Incentives | $103,026.00 |
| Commissions and Expenses | $90,073.57 |
| Technology Fees | $23,696.50 |
| Non-Worldspan Segments | $6,265.10 |
| ARC Remit for 1/12/14 | $5,174.26 |
| Attorneys' Fees and Costs | $556,343.36 |
| Prejudgment Interest | $69,647.15 |
| | |
| TOTAL JUDGMENT | $888,725.94 |

### C. *Unjust Enrichment*

ADTRAV also alleges a claim for unjust enrichment that focuses only with

---

[40]   Payments for commissions and expenses were due monthly from January 2013 to January 2014. The court has calculated the prejudgment interest for these payments in the same way as for Worldspan incentives.

[41]   Although technology fees accrued and were unpaid from January 2014 through May 2014, ADTRAV has not provided a monthly breakdown, just a gross sum for the entire period. For this reason, the court has calculated prejudgment interest from June 1, 2014.

[42]   Segment fees earned by ADTRAV on platforms other than Worldspan accrued between February 2014 and July 2014. The court has calculated the prejudgment interest in the same manner as Worldspan incentives, with February 2014 being 47 months before the date of judgment, and each month thereafter being one less.

respect to the loss of future revenue after January 2014. *See* Plaintiff's Post-Trial Brief, Doc. 145, p. 22. Because the court has already determined that it was ADTRAV who terminated the 2010 Agreement by letter dated January 10, 2014, ADTRAV was no longer entitled to share in VA-travel income earned by Duluth after that date. Consequently, Duluth's retention of revenue and profits earned after that date is not an unjust enrichment. This claim is meritless and will be dismissed with prejudice.

III. Conclusion

By separate judgment, the court will enter final judgment in favor of ADTRAV and against Duluth Travel, Inc., in the amount of EIGHT-HUNDRED EIGHTY-EIGHT THOUSAND SEVEN-HUNDRED TWENTY-FIVE AND 94/100 ($888,725.94) DOLLARS.

DONE this 17th day of January, 2018.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE